# EXHIBIT B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

RED TREE INVESTMENTS, LLC,

                              Plaintiff,

                    -against-

PETROLEOS DE VENEZUELA, S.A. and PDVSA
PETROLEO, S.A.,

                              Defendants.

---

**SUMMONS**

**Plaintiff Designates New York
County as the Place of Venue**

Index No. _____

TO THE ABOVE-NAMED DEFENDANTS:

> Petróleos de Venezuela, S.A.
> c/o Corporation Service Company
> 1180 Avenue of the Americas, Suite 210
> New York, NY 10036
>
> PDVSA Petróleo, S.A.
> c/o Corporation Service Company
> 1180 Avenue of the Americas, Suite 210
> New York, NY 10036

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys

answering papers on this Motion for Summary Judgment in Lieu of Complaint under CPLR 3213

within the time provided in the notice of motion annexed hereto. In case of your failure to

appear or answer, judgment will be taken against you on default for the relief demanded in the

Motion for Summary Judgment in Lieu of Complaint.

Plaintiff designates New York County as the place of venue. Venue is appropriate in

New York County pursuant to CPLR § 501.

Dated: New York, New York
February 15, 2019

<div style="margin-left:40%">

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
By: Stephen A. Broome
Susheel Kirpalani
Victor Noskov
Anna Deknatel
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

Daniel Salinas-Serrano (*pro hac vice*
forthcoming)
1300 I Street, N.W.
Suite 900
Washington, D.C. 20005
Tel: 202-538-8132

-and-

**GANFER SHORE LEEDS & ZAUDERER
LLP**
By: Mark C. Zauderer, Esq.
360 Lexington Avenue
New York, New York 10017
212-922-9250

*Attorneys for Red Tree Investments, LLC*

</div>

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| RED TREE INVESTMENTS, LLC, <br><br> Plaintiff, <br><br> -against- <br><br> PETROLEOS DE VENEZUELA, S.A. and PDVSA PETROLEO, S.A., <br><br> Defendants. | **NOTICE OF MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT** <br><br> **Oral Argument Is Requested** <br><br> Index No. _____ |

**PLEASE TAKE NOTICE** that, upon the summons dated February 15, 2019, and the annexed affidavits of Daniel Wallitt, sworn to on January 25, 2019, and the affidavit of Stephen Broome, with their exhibits annexed thereto, the Plaintiff, Red Tree Investments, LLC, will move this Court located at the New York County Courthouse at 60 Centre Street, New York, New York, Motion Submission Part, Room 130, on March 21, 2019, at 9:00 AM, or as soon thereafter as counsel can be heard for summary judgment in lieu of complaint, pursuant to C.P.L.R. § 3213, in favor of the plaintiff and against the defendants for the sum of $118,359,515.23, together with interest, upon the grounds that this action is based upon an instrument for the payment of money only and that there is no defense thereto, and for such other further relief as the Court may deem just and proper; and

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR 3213, answering papers, if any, shall be served upon undersigned counsel at least ten (10) days before the return date of this motion. Reply or responding affidavits shall be served at least one day before such time.

1

Dated: February 15, 2019
Respectfully submitted,


___/s/ Stephen A. Broome_____
By: Stephen A. Broome
Quinn Emanuel Urquhart & Sullivan, LLP
*Attorneys for Plaintiff*
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000


___/s/ Mark C. Zauderer_____
By: Mark C. Zauderer, Esq.
Ganfer Shore Leeds & Zauderer LLP
*Attorneys for Plaintiff*
360 Lexington Avenue
New York, New York 10017
(212) 922-9250


To:      Petróleos de Venezuela, S.A.

          Defendant

          c/o Corporation Service Company
          1180 Avenue of the Americas, Suite 210
          New York, NY 10036


To:      PDVSA Petróleo, S.A.

          Defendant

          c/o Corporation Service Company
          1180 Avenue of the Americas, Suite 210
          New York, NY 10036

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

RED TREE INVESTMENTS, LLC,

                           Plaintiff,

                  -against-

PETRÓLEOS DE VENEZUELA, S.A, and PDVSA
PETRÓLEO, S.A.,

                          Defendants.

Index No. _____

---

## AFFIRMATION OF STEPHEN A. BROOME IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT

I, Stephen A. Broome, an attorney duly admitted to practice before the Courts of the State of New York, hereby affirm, pursuant to CPLR Rule 2106, under penalty of perjury, as follows:

1.      I am a partner with the law firm of Quinn Emanuel Urquhart & Sullivan, LLP, attorneys for Plaintiff Red Tree Investments, LLC ("Red Tree") in the above-captioned action. I respectfully submit this affirmation in support of Red Tree's Motion for Summary Judgment in Lieu of Complaint.

2.      Attached hereto as **Exhibit A** is a true and correct copy of a note agreement dated March 27, 2015 (the "2015 Note Agreement") between and among General Electric Capital Corporation ("GE Capital"), Petróleos de Venezuela S.A. ("PDVSA"), PDVSA Petróleo S.A. ("Petróleo"), and Union Capital Group.

3.      Attached hereto as **Exhibit B** is a true and correct copy of a note issued on March 27, 2015 by PDVSA under the 2015 Note Agreement, providing that PDVSA agreed to pay GE Capital or its assigns the original principal balance of $131,855,116.31.

1

4.      Attached hereto as **Exhibit C** is a true and correct copy of a note issued on March 27, 2015 by PDVSA under the 2015 Note Agreement, providing that PDVSA agreed to pay SACE S.p.A. or its assigns the original principal balance of $124,700,488.54.

5.      Attached hereto as **Exhibit D** is a true and correct copy of a note agreement dated May 13, 2016 (the "2016 Note Agreement") between and among GE Capital EFS, PDVSA, and Petróleo.

6.      Attached hereto as **Exhibit E** is a true and correct copy of a note issued on May 13, 2016 by PDVSA under the 2016 Note Agreement, providing that PDVSA agreed to pay GE Capital EFS or its assigns the original principal balance of $193,959,763.03.

7.      Attached hereto as **Exhibit F** is a true and correct copy of the Affidavit of Daniel Wallitt, dated and sworn to on January 25, 2019, with respect to the 2015 Note Agreement, and the exhibits thereto.

8.      Attached hereto as **Exhibit G** is a true and correct copy of the Affidavit of Daniel Wallitt, dated and sworn to on January 25, 2019, with respect to the 2016 Note Agreement, and the exhibits thereto.

DATED:   New York, New York          */s/ Stephen A. Broome*
         February 15, 2019
                                     _____
                                     Stephen A. Broome

# EXHIBIT A

EXECUTION VERSION

Dated as of March 27, 2015

# Note Agreement

among

**Petróleos de Venezuela S.A.,**
as Issuer,

**PDVSA Petróleo S.A.,**
as Guarantor,

**General Electric Capital Corporation,**
as Initial Noteholder,

and

**General Electric Capital Corporation,**
as Administrative Agent

**Union Capital Group,**
as Lead Arranger

**$256,555,604.85 6.5% Senior Guaranteed Note**



## Table of Contents

Page

Article I Definitions ................................................................................................... 1
Section 1.01    Defined Terms ................................................................................ 1
Section 1.02    Terms Generally ............................................................................ 11

Article II The Notes .................................................................................................. 12
Section 2.01    Issuance of Initial Note ................................................................ 12
Section 2.02    Repayment of Notes ...................................................................... 12
Section 2.03    Interest on Notes ........................................................................... 12
Section 2.04    Default Interest ............................................................................. 12
Section 2.05    Repayment of Notes ...................................................................... 12
Section 2.06    Pro-Rata Treatment ....................................................................... 13
Section 2.07    Sharing of Setoffs ......................................................................... 13
Section 2.08    Payments ....................................................................................... 13
Section 2.09    Taxes ............................................................................................. 14
Section 2.10    Registration of Notes .................................................................... 14
Section 2.11    Transfer and Exchange of Notes ................................................... 15
Section 2.12    Replacement of Notes .................................................................... 15

Article III Representations and Warranties ................................................................ 16
Section 3.01    Issuer's Representations and Warranties ....................................... 16
Section 3.02    Initial Noteholder's Representations and Warranties .................... 21

Article IV Conditions of Initial Note Issuance .......................................................... 23
Section 4.01    Conditions to the Initial Note Issuance ......................................... 23

Article V Covenants .................................................................................................. 25
Section 5.01    Maintenance of Corporate Existence ............................................ 25
Section 5.02    Insurance ....................................................................................... 25
Section 5.03    Maintenance of Governmental Approvals ..................................... 25
Section 5.04    Financial Statements, Reports, etc. ............................................... 25
Section 5.05    Maintaining Records ..................................................................... 26
Section 5.06    Compliance with Laws .................................................................. 26
Section 5.07    Liens ............................................................................................. 26
Section 5.08    Mergers, Consolidations, Sales of Assets and Acquisitions .......... 27
Section 5.09    ERISA ........................................................................................... 28

Article VI Guarantee ................................................................................................. 28
Section 6.01    Guarantee ...................................................................................... 28
Section 6.02    Guarantee of Payment ................................................................... 29
Section 6.03    No Discharge or Diminishment of Note Guarantee ...................... 29
Section 6.04    Defenses Waived ........................................................................... 29
Section 6.05    Rights of Subrogation .................................................................... 30
Section 6.06    Reinstatement ................................................................................ 30
Section 6.07    Release .......................................................................................... 30

Article VII Events of Default ..................................................................................... 30

Article VIII Administrative Agent ............................................................................. 32

Article IX Miscellaneous ........................................................................................... 34
Section 9.01    Notices; Electronic Communications ............................................ 34

(i)

Page

Section 9.02   Survival of Agreement ........................................................................................... 35
Section 9.03   Binding Effect ...................................................................................................... 35
Section 9.04   Successors and Assigns......................................................................................... 35
Section 9.05   Expenses; Payments.............................................................................................. 37
Section 9.06   Right of Setoff ...................................................................................................... 37
Section 9.07   Applicable Law ..................................................................................................... 37
Section 9.08   Waivers; Amendment ........................................................................................... 38
Section 9.09   Interest Rate Limitation ........................................................................................ 38
Section 9.10   Entire Agreement................................................................................................... 38
Section 9.11   WAIVER OF JURY TRIAL .................................................................................. 38
Section 9.12   Severability............................................................................................................ 39
Section 9.13   Counterparts .......................................................................................................... 39
Section 9.14   Headings................................................................................................................. 39
Section 9.15   Jurisdiction; Consent to Service of Process.......................................................... 39
Section 9.16   Confidentiality ...................................................................................................... 40
Section 9.17   Noteholder Action ................................................................................................. 41
Section 9.18   USA PATRIOT Act Notice................................................................................... 41
Section 9.19   Payment Suspension or Cessation ........................................................................ 41

## EXHIBITS

Exhibit A    --    Form of Note
Exhibit B    --    Form of Assignment and Acceptance

## SCHEDULES

Schedule 2.08       --    Accounts of Administrative Agent and Initial Noteholder
Schedule 3.01(h) --    Subsidiaries
Schedule 3.01(i)  --    Litigation
Schedule 3.01(p) --    Environmental Matters

## ANNEXES

Annex I      --    Description of Affiliates of the Issuer and of Novated Receivables



## NOTE AGREEMENT

**NOTE AGREEMENT**, dated as of March 27, 2015 (the "**Effective Date**"), among **PETRÓLEOS DE VENEZUELA S.A.**, a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela (the "**Issuer**"), **PDVSA PETRÓLEO S.A.**, a corporation (*sociedad anónima*) organized and existing under the laws of the Bolivarian Republic of Venezuela (the "**Guarantor**"), **GENERAL ELECTRIC CAPITAL CORPORATION**, a Delaware corporation, as Initial Noteholder (in such capacity, the "**Initial Notcholder**"), the other Noteholders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Section 1.01) party hereto from time to time, and **GENERAL ELECTRIC CAPITAL CORPORATION**, a Delaware corporation, as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") for the Noteholders.

### WITNESSETH:

WHEREAS, the Issuer, certain Affiliates of the Issuer, and the Initial Noteholder are parties to a Debt Assumption and Novation Agreement, dated as of the date hereof (the "**Novation Agreement**");

WHEREAS, pursuant to the Novation Agreement (i) the Initial Noteholder released certain Affiliates of the Issuer described on Annex I hereto from their obligations to pay the accounts receivable due to the Initial Noteholder as described on Annex I hereto, (ii) in consideration of such release, the Issuer assumed and agreed to pay in full the obligations of such Affiliates in respect of the novated accounts receivable described on Annex I hereto (collectively, the "**Novated Receivables**"), and (iii) the Initial Notcholder agreed to release the Issuer from the Novated Receivables in consideration of the concurrent issuance of the Initial Note by the Issuer pursuant to this Agreement to the Initial Noteholder in a principal amount equal to the aggregate unpaid balance of the Novated Receivables held by the Initial Noteholder as of the Effective Date;

WHEREAS, the Issuer, the Guarantor, the Initial Noteholder and the Administrative Agent are entering into this Agreement pursuant to which the Issuer will issue and pay the Note and the Guarantor will guarantee the payment of the Note by the Issuer, all in accordance with, and subject to, the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

**Section 1.01    Defined Terms.** As used in this Agreement, the following terms shall have the meanings specified below:

"**Administrative Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided, however*, that the term "Affiliate" shall also include any Person that directly or indirectly owns 5% or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified. No Agent, Noteholder or Affiliate thereof shall be deemed to be an "Affiliate" of any Finance Party for purposes of this Agreement.

"**Agents**" shall mean the Administrative Agent and the Lead Arranger.

"**Agreement**" shall mean this Note Agreement.

"**Anti-Bribery and Anti-Corruption Laws**" means the U.S. Foreign Corrupt Practices Act, 1977, 15 U.S.C. §§ 78m, 78dd-1 through 78dd-3 and 78ff, *et seq.*, as amended from time to time, and other reasonably applicable laws and regulations addressing prohibitions against the receipt or acceptance of improper payments and bribes involving officers, directors, employees, agents and affiliates of Governmental Authorities.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Noteholder and an assignee substantially in the form of Exhibit B.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Business Day**" shall mean each day that is both (a) a Caracas Business Day and (b) a New York Business Day; *provided* that, in the event that there are more than three consecutive days that are Unscheduled Holidays, the day immediately following the third Unscheduled Holiday that would have been a Business Day but for such Unscheduled Holiday, and each consecutive Unscheduled Holiday thereafter (if any), shall, notwithstanding such Unscheduled Holidays, constitute a Business Day hereunder.

"**Caracas Business Day**" shall mean any day other than a Saturday, Sunday or day on which banks are authorized or required by law to close in Caracas, Venezuela.

"**Change of Control**" shall mean any of the following: (a) the failure at any time of Venezuela to (i) legally and beneficially own and control, directly or indirectly, at least 100% of the issued and outstanding Equity Interests of the Issuer, or (ii) have the ability to elect (and to have actually elected) and control all of the board of directors (or equivalent) of the Issuer, or (b) the failure at any time of the Issuer to (i) legally and beneficially own and control, directly or indirectly, at least 100% of the issued and outstanding Equity Interests of the Guarantor, or (ii) have the ability to elect (and to have actually elected) and control all of the board of directors (or equivalent) of the Guarantor.

"**Charges**" shall have the meaning assigned to such term in Section 9.09.

"**Citgo Group**" shall mean CITGO Petroleum Corporation and its subsidiaries.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Communications**" shall have the meaning assigned to such term in Section 9.01.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Default**" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"**Designated Person**" shall mean a Person:

(a)     listed in the annex to, or otherwise targeted by the provisions of, the Executive Order;

2



(b) named as a "Specially Designated National and Blocked Person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list;

(c) to the best of any Finance Party's knowledge, with which any Finance Party is prohibited from dealing or otherwise engaging in any transaction by any Economic Sanctions Laws; or

(d) owned (meaning 50 percent or greater ownership interest) or otherwise (directly or indirectly) controlled by a person identified in (a)-(c) above.

"**Dollars**" or "**$**" shall mean the lawful money of the United States.

"**Economic Sanctions Laws**" shall mean the Executive Order, the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.), the Trading with the Enemy Act (50 U.S.C. App. §§ 1 et seq.), any other law or regulation promulgated thereunder from time to time and administered by OFAC, the United States State Department, the United States Department of Commerce or the United States Department of the Treasury, and any similar law enacted in the United States after the date of this Agreement, in each case as the same may be amended from time to time.

"**Effective Date**" shall have the meaning assigned to such term in the introductory statement of this Agreement.

"**Eligible Institution**" shall mean any financial institution or any branch thereof (a) eligible for the then current lowest statutory rate of Venezuelan income Tax withholding from time to time generally applicable to non-Venezuelan financial institutions, or (b) in the event a statutory rate described in clause (a) does not generally apply, organized under the laws of a country subject to a double-taxation treaty with Venezuela.

"**Environmental Laws**" shall mean all former, current and future Venezuelan national, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"**Environmental Liability**" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equity Interests**" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

3

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with the Issuer, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**Events of Default**" shall have the meaning assigned to such term in <u>Article VII</u>.

"**Excluded Taxes**" shall mean, (a) with respect to the Administrative Agent, any Noteholder or any other recipient of any payment to be made by or on account of any obligation of the Issuer hereunder, (i) income or franchise Taxes imposed on (or measured by) its net income by the United States, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Noteholder, in which its applicable lending office is located, and (ii) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction described in clause (i) above, and (b) with respect to any Noteholder that is not an Eligible Institution, any portion of withholding Tax, if any, that exceeds 4.95% (or the then current lowest rate of Venezuelan income Tax withholding from time to time generally applicable to an Eligible Institution) of the amount subject to the withholding Tax.

"**Executive Order**" shall mean the United States Executive Order No. 13224 on Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism.

"**Fee Letter**" shall mean the Petróleos de Venezuela, S.A. Financing Engagement Letter dated May 9, 2014 between the Issuer and the Lead Arranger.

"**Finance Documents**" shall mean this Agreement, the Notes and any other document executed in connection with the foregoing (excluding the Fee Letter).

"**Finance Parties**" shall mean the Issuer and the Guarantor.

"**Governmental Authority**" shall mean any federal, national, state or local court or governmental agency, authority, instrumentality or regulatory body of any jurisdiction or territory.

"**Guarantee**" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided, however,* that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in <u>Section 6.01</u>.

"**Guarantor**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Hazardous Materials**" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated

4

biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Hedging Agreement**" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement, credit default swap agreement or other interest or currency exchange rate or commodity price or credit risk hedging arrangement.

"**IFRS**" shall mean the International Financial Reporting Standards promulgated from time to time by the International Accounting Standards Board or any successor institution ("**IASB**") (which includes standards and interpretations approved by the IASB and International Accounting Standards issued under its previous constitutions), together with its pronouncements thereon from time to time, applied on a basis consistent with the financial statements delivered pursuant to Section 4.01(d).

"**Indebtedness**" shall mean any obligation (whether present or future, actual or contingent and including, without limitation, any Guarantee) for the payment or repayment of money which has been borrowed or raised, excluding, for the avoidance of doubt, the issuance of Equity Interests constituting common stock or ordinary shares.

"**Indemnified Taxes**" shall mean Taxes other than Excluded Taxes.

"**Ineligible Transferee**" shall mean any Person that is (a) a Venezuelan Person, (b) a Venezuelan financial institution, (c) a Venezuelan branch of a non-Venezuelan financial institution, (d) a state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof (a "**Sovereign**"), (e) established by treaty or other arrangement between two or more Sovereigns and includes, without limiting the foregoing, the International Monetary Fund, European Central Bank, International Bank for Reconstruction and Development, European Bank for Reconstruction and Development and International Finance Corporation, or (f) not a Qualified Institutional Buyer or a buyer purchasing pursuant to a registration statement registered under the Securities Act.

"**Information**" shall have the meaning assigned to such term in Section 9.16.

"**Initial Note**" shall mean the "6.5% Senior Guaranteed Note" to be issued by the Issuer to the Initial Noteholder pursuant to this Agreement, substantially in the form of Exhibit A hereto with the legend thereon.

"**Initial Noteholder**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Initial Repayment Date**" shall mean March 31, 2015; *provided*, that if the Initial Repayment Date would occur on a day that is not a New York Business Day, the Initial Repayment Date shall be on the immediately succeeding New York Business Day.

"**Issuer**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Lead Arranger**" shall mean Union Capital Group.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

5

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a materially adverse effect on the business, assets, liabilities, operations or condition (financial or otherwise) of the Issuer, the Guarantor and their respective subsidiaries, taken as a whole, which has resulted, or could reasonably be expected to result, without the occurrence of any other event or effect, in an event described in clause (b) or (c) of this definition, (b) a material impairment of the ability of any Finance Party to perform any of its obligations under any Finance Document or (c) a material impairment of the rights and remedies of or benefits available to the Administrative Agent or the Noteholders under any Finance Document.

"**Maturity Date**" shall mean March 27, 2018; *provided*, that if the Maturity Date would occur on a day that is not a New York Business Day, the Maturity Date shall be on the immediately succeeding New York Business Day.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 9.09.

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**New York Business Day**" shall mean each day other than a Saturday, Sunday or a day on which banks in New York, New York, United States are authorized or required by law to close.

"**Notes**" shall mean the Initial Note and any promissory note or notes issued in exchange or replacement thereof in accordance with Section 2.11 and Section 2.12, respectively.

"**Noteholders**" shall mean (a) the Initial Noteholder (to the extent it has not ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any Person that has become a party hereto pursuant to an Assignment and Acceptance.

"**Novated Receivables**" shall have the meaning assigned to such term in the recitals hereto.

"**Novation Agreement**" shall have the meaning assigned to such term in the recitals hereto.

"**Obligated Party**" shall have the meaning assigned to such term in Section 6.02.

"**Obligations**" shall mean all obligations of every nature of each Finance Party from time to time owed to the Agents and/or the Noteholders or any of them, under any Finance Document, whether for principal, interest, fees, expenses, indemnification or otherwise.

"**OFAC**" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury (or any successor thereto).

"**Other Taxes**" shall mean any and all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under any Finance Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Finance Document, other than Excluded Taxes.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation.

"**Permitted Liens**" shall mean the following types of Liens:

(a)      Liens for Taxes, assessments or governmental charges or claims either (i) not delinquent (taking into account all available extensions) or (ii) contested in good faith by appropriate proceedings and as to which the Issuer or any of its subsidiaries shall have set aside on its books such reserves to the extent required pursuant to IFRS;

6

(b)      statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law or pursuant to customary reservations or retentions of title incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, to the extent required by IFRS shall have been made in respect thereof;

(c)      Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure public or statutory obligations, the performance of tenders, statutory obligations, surety and/or appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), including any Lien securing letters of credit issued in the ordinary course of business in connection therewith;

(d)      any judgment Lien not giving rise to an Event of Default;

(e)      easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Issuer or any of its subsidiaries;

(f)      any interest or title of a lessor under any capitalized lease obligation; *provided* that such Liens do not extend to any property or assets which are not leased property subject to such capitalized lease obligation;

(g)      Liens granted upon or with respect to any assets hereafter acquired by the Issuer or any of its subsidiaries to secure the acquisition costs of such assets or to secure Indebtedness incurred solely for the purpose of financing the acquisition of such assets, including any Lien existing at the time of the acquisition of such assets as long as the maximum amount so secured shall not exceed the aggregate acquisition costs of all such assets or the aggregate Indebtedness incurred solely for the acquisition of such assets, as the case may be;

(h)      Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(i)      Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(j)      Liens arising in the ordinary course of business in connection with Indebtedness maturing not more than one year after the date on which such Indebtedness was originally incurred and which are related to the financing of export, import or other trade transactions;

(k)      Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer or any of its subsidiaries, including rights of offset and set-off;

(l)      Liens securing Hedging Agreements otherwise permitted under this Agreement;

(m)      Liens existing on any asset or on any stock of any of Issuer's subsidiaries prior to the acquisition thereof by the Issuer or any of its subsidiaries as long as such Lien is not created in anticipation of such acquisition;

7



     (n)    Liens existing as of the Effective Date;

     (o)    Liens securing any senior indebtedness of the Issuer or any of its subsidiaries;

     (p)    Liens in favor of the Issuer or any of its subsidiaries;

     (q)    Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Issuer or any of its subsidiaries or becomes a subsidiary thereof; *provided* that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any other assets owned by the Issuer or such subsidiary;

     (r)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods or other Liens on inventory and goods to facilitate the purchase, shipment, or storage of such inventory or goods;

     (s)    Liens on assets that are the subject of a direct or indirect arrangement relating to property now owned or hereafter acquired whereby the Issuer or any of its subsidiaries transfers such property to another Person and the Issuer or such subsidiary leases it from such Person;

     (t)    Liens arising by operation of law;

     (u)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution;

     (v)    Liens on the receivables or inventory of the Issuer or any of its subsidiaries securing obligations under or in connection with any lines of credit or working capital facilities;

     (w)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not interfere in any material respect with the business of the Issuer and its subsidiaries;

     (x)    Liens in favor of the Venezuelan government or any agency or instrumentality thereof to secure payments under any agreement entered into between such entity and the Issuer or any of its subsidiaries;

     (y)    Liens to secure obligations of the Issuer or any of its subsidiaries under agreements that provide for indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets or subsidiary; *provided* that the maximum aggregate liability in respect of all such Liens will at no time exceed the gross proceeds actually received by the Issuer and its subsidiaries in connection with such disposition;

     (z)    Lien over any Qualifying Asset relating to a project financed by, and securing Indebtedness incurred in connection with, the Project Financing of such project by the Issuer, any of its subsidiaries or any consortium or other venture in which the Issuer has any ownership or similar interest; and

     (aa)    Liens in respect of Indebtedness the principal amount of which in the aggregate, together with all Liens not otherwise qualifying as the Issuer's Permitted Liens pursuant to this definition, does not exceed 15% of the Issuer's consolidated total assets (as determined in accordance with IFRS) at any date as at which the Issuer's balance sheet is prepared and published pursuant to any indenture, agreement or other instrument to which it is a party.



"**Person**" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 307 of ERISA, and in respect of which the Issuer or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Process Agent**" shall mean Corporation Service Company, having its offices on the date hereof at 1180 Avenue of the Americas, Suite 210, New York, NY 10036.

"**Project Financing**" of any project shall mean the incurrence of Indebtedness relating to the exploration, development, expansion, renovation, upgrade or other modification or construction of such project pursuant to which the providers of such Indebtedness or any trustee or other intermediary on their behalf or beneficiaries designated by any such provider, trustee or other intermediary are granted security over one or more Qualifying Assets relating to such project for repayment of principal, premium and interest or any other amount in respect of such Indebtedness.

"**Qualified Institutional Buyer**" shall have the meaning set forth in Rule 144A of the Securities Act.

"**Qualifying Asset**" in relation to any Project Financing shall mean:

(a)     any concession, authorization or other legal right granted by any Governmental Authority to the Issuer or any of its subsidiaries, or any consortium or other venture in which the Issuer or any of its subsidiaries has any ownership or other similar interest;

(b)     any drilling or other rig, any drilling or production platform, pipeline, marine vessel, vehicle or other equipment or any refinery, oil or gas field, processing plant, real property (whether leased or owned), right of way or plant or other fixtures or equipment;

(c)     any revenues or claims that arise from the operation, failure to meet specifications, failure to complete, exploitation, sale, loss or damage to, such concession, authorization or other legal right or such drilling or other rig, drilling or production platform, pipeline, marine vessel, vehicle or other equipment or refinery, oil or gas field, processing plant, real property, right of way, plant or other fixtures or equipment or any contract or agreement relating to any of the foregoing or the project financing of any of the foregoing (including insurance policies, credit support arrangements and other similar contracts) or any rights under any performance bond, letter of credit or similar instrument issued in connection therewith;

(d)     any oil, gas, petrochemical or other hydrocarbon-based products produced or processed by such project, including any receivables or contract rights arising therefrom or relating thereto and any such product (and such receivables or contract rights) produced or processed by other projects, fields or assets to which the lenders providing the project financing required, as a condition therefore, recourse as security in addition to that produced or processed by such project; and

(e)     shares, rights or other ownership interest in, and any subordinated debt rights owing to the Issuer by, a special purpose company or vehicle formed solely for the development of a project, and whose principal assets and business are constituted by such project and whose liabilities solely relate to such project.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

9

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"**Repayment Date**" shall mean (a) the Initial Repayment Date and (y) for each successive Repayment Date, each day in March, June, September and December described on Exhibit A to the form of Note attached hereto occurring after the Initial Repayment Date and on or prior to the Maturity Date (including the Maturity Date); *provided* that, in each case, whenever any Repayment Date would occur on a day that is not a New York Business Day, such Repayment Date shall be on the immediately succeeding New York Business Day.

"**Reportable Event**" shall mean any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder, with respect to a Plan as to which the PBGC has not by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of that event. However, with respect to any Plan, a failure to meet the minimum funding standard of Section 412 of the Code or Section 302 of ERISA shall be a reportable event for the purposes of this definition regardless of the issuance of any waiver.

"**Required Noteholders**" shall mean, at any time, Noteholders having Notes having an aggregate outstanding principal balance more than 66.66% of the aggregate outstanding principal balance of all Notes outstanding at such time.

"**Reserved Payments**" shall have the meaning assigned to such term in Section 9.19.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Significant Subsidiary**" shall mean any Subsidiary that would be a "Significant Subsidiary" of the Issuer within the meaning of Rule 1-02 under Regulation S-X promulgated by the United States Securities and Exchange Commission.

"**Similar Law**" shall have the meaning assigned to such term in Section 3.02(f).

"**Subsidiary**" shall mean any subsidiary of the Issuer.

"**subsidiary**" shall mean, with respect to any Person (herein referred to as the "**parent**"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"**Threshold Amount**" shall mean, in respect of any Event of Default, the lesser of (a) $100,000,000 or (b) any lower threshold amount set out in any Indebtedness of the Issuer, the Guarantor or any of the Significant Subsidiaries in respect of an analogous event.

10



"**Transactions**" shall mean, collectively, (a) the execution, delivery and performance by the Issuer, certain Affiliates of the Issuer, and the Initial Noteholder of the Novation Agreement, (b) the execution, delivery and performance by the Finance Parties of the Finance Documents to which they are a party and the making and borrowing of the Notes hereunder, and (c) the payment of related fees and expenses.

"**Transaction Documents**" shall mean the Novation Agreement and the Finance Documents.

"**Unfunded Vested Liability**" shall mean, relative to any Plan, including any Multiemployer Plan, at any time, the excess (if any) of (a) the present value of all vested nonforfeitable benefits under such Plan or such Multiemployer Plan, as the case may be, over (b) the fair market value of all Plan assets or Multiemployer Plan assets, as the case may be, allocable to such benefits, all determined as of the then most recent valuation date for such Plan or such Multiemployer Plan, as the case may be, but only to the extent that such excess represents a potential liability of the Issuer to the PBGC, such Plan or such Multiemployer Plan under Title IV of ERISA.

"**United States**" shall mean the United States of America.

"**Unscheduled Holiday**" shall mean a day that is not a Caracas Business Day and with respect to which the market was not made aware of such fact (by means of a public announcement or other publicly available information) until a time later than 9:00 a.m. local time in Caracas five Caracas Business Days prior to such Unscheduled Holiday.

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001, as amended).

"**Venezuela**" shall mean the Bolivarian Republic of Venezuela.

"**Venezuelan Governmental Authority**" shall mean any Governmental Authority of Venezuela.

"**Welfare Plan**" means a "welfare plan" as such term is defined in section 3(1) of ERISA.

**Section 1.02    Terms Generally.**  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. All references herein to Articles, Sections, Exhibits, Schedules and Annexes shall be deemed references to Articles and Sections of, and Exhibits, Schedules and Annexes to, this Agreement unless the context shall otherwise require and all references herein to this Agreement shall be deemed to include the Exhibits, Schedules and Annexes hereto. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any agreements (including the Finance Documents), other contractual instruments and publications shall mean such agreement, instrument or publication as amended, restated, supplemented or otherwise modified from time to time, (b) any reference made in any Finance Document to any Person shall mean such Person and its permitted successors and assigns, and (c) all terms of an accounting or financial nature shall be construed in accordance with IFRS, as in effect on the date hereof and consistent with financial statements delivered pursuant to Section 3.01(e).



11

## ARTICLE II

### THE NOTES

#### Section 2.01   Issuance of Initial Note.

(a)     The execution and delivery of this Agreement and the other Finance Documents shall occur at the offices of Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022, at 9:00 a.m., New York time (or at such other place or time or in such other manner as may be mutually agreed upon by the parties hereto), at a closing on the Effective Date.

On the Effective Date and upon the satisfaction or waiver of the conditions precedent specified in Section 4.01, the outstanding Novated Receivables held by the Initial Noteholder shall be released pursuant to the Novation Agreement and converted into the Initial Note issued by the Issuer pursuant to this Agreement to the Initial Noteholder in a principal amount equal to the aggregate outstanding amount of such Novated Receivables held by the Initial Noteholder as of the Effective Date as set forth on Annex I hereto. At the closing, the Issuer will deliver to the Initial Noteholder the Initial Note in the principal amount of the Novated Receivables of the Initial Noteholder that are released by the Initial Noteholder pursuant to the Novation Agreement substantially in the form of Exhibit A hereto with the legend thereon, dated the Effective Date and registered in the name of the Initial Noteholder.

**Section 2.02   Repayment of Notes.** (a) The Issuer hereby unconditionally promises to pay to each Noteholder the principal amount of the Note of such Noteholder as provided in Section 2.05.

(b)     Each Noteholder shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Issuer to such Noteholder resulting from each Note issued hereunder, including the amounts of principal and interest payable and paid to such Noteholder from time to time under this Agreement in respect of each such Note.

**Section 2.03   Interest on Notes.** (a) Subject to the provisions of Section 2.04, the Notes shall bear interest on the unpaid principal balance thereof from and after the Effective Date but excluding the date of repayment thereof, based on and computed on the basis of actual number of days elapsed on a year of 365/366 days, at a rate per annum equal to six and one-half percent (6.5%).

(b)     Interest on the Notes shall be payable on the Repayment Dates (including the Maturity Date), or at maturity by acceleration, and, after such maturity, on demand.

**Section 2.04   Default Interest.** If (a) the Issuer shall default in the payment of any principal of or interest on any Note or any other amount due hereunder or under any other Finance Document, by acceleration or otherwise (including automatic acceleration), or (b) if any Event of Default under Article VII (other than paragraph (a), (b) or (f) of Article VII) has occurred and is continuing and the Required Noteholders accelerate the Notes or direct the Administrative Agent to accelerate the Notes, then, in the case of clause (a) above, until such defaulted amount shall have been paid in full or, in the case of clause (b) above, from the date the applicable action has been taken by the Required Noteholders and for so long as such Event of Default is continuing or until the date the Required Noteholders agree otherwise, to the extent permitted by law, all amounts outstanding under this Agreement and the other Finance Documents shall bear interest (after as well as before judgment), payable on demand, based on and computed on the basis of actual number of days elapsed on a year of 365/366 days, at a rate per annum equal to eight and one-half percent (8.5%).

**Section 2.05   Repayment of Notes.** (a) The Issuer shall pay to the Administrative Agent, for the account of the Noteholders, on each Repayment Date, a principal amount of the Notes equal to the original principal amounts of the Note for the corresponding Repayment Dates set forth on Exhibit A to

the form of Note attached hereto; *provided* that, if any Note or any portion thereof is transferred or exchanged to one or more Noteholders pursuant to Section 2.11 or replaced or exchanged pursuant to Section 2.12, Exhibit A of such Note or Notes issued pursuant to Section 2.11 or Section 2.12, as the case may be, shall be modified to reflect the installments of principal due to be paid with respect to all Repayment Dates occurring after the date of the Note or Notes that is or are issued in exchange pursuant to Section 2.11 or replacement pursuant to Section 2.12.

(b)     To the extent not previously paid, all Notes shall be due and payable on the Maturity Date together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(c)     The Issuer shall have the right to prepay any one or more of the Notes in whole or in part at any time after not less than five (5) Business Days' notice by Issuer to the Administrative Agent. All such prepayments shall be applied in the inverse order of the maturity of the installments of principal due under the applicable Note or Notes to be prepaid.

(d)     All repayments or prepayments permitted pursuant to this Section 2.05 shall be without premium or penalty.

Section 2.06     **Pro-Rata Treatment**. Unless the Issuer has elected to prepay a specific Note or Notes pursuant to Section 2.05, each payment or prepayment of principal of any Note and each payment of interest on the Notes shall be allocated *pro rata* among the Notes in accordance with their respective principal amounts outstanding and unpaid thereon.

Section 2.07     **Sharing of Setoffs**. Each Noteholder agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Issuer or any other Finance Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Noteholder under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of the Notes as a result of which the unpaid principal portion of its Notes shall be proportionately less than the unpaid principal portion of the Notes of any other Noteholder, it shall be deemed simultaneously to have purchased from such other Noteholder at face value, and shall promptly pay to such other Noteholder the purchase price for, a participation in the Notes of such other Noteholder, so that the aggregate unpaid principal amount of the Notes and participation in the Notes held by each Noteholder shall be in the same proportion to the aggregate unpaid principal amount of all Notes then outstanding as the principal amount of its Notes prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Notes outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided, however*, that (a) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.07 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (b) the provisions of this Section 2.07 shall not be construed to apply to any payment made by the Issuer pursuant to and in accordance with the express terms of this Agreement or any payment made by the Issuer pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Noteholder as consideration for the assignment of or sale of a participation in any of its Notes to any assignee or participant, other than to the Guarantor or any of its Affiliates (as to which the provisions of this Section 2.07 shall apply). The Issuer and the Guarantor expressly consent to the foregoing arrangements.

Section 2.08     **Payments**. (a) The Issuer shall make each payment (including principal of or interest on any Note, fees or other amounts) hereunder and under any other Finance Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, solely

13



and exclusively in Dollars as currency of payment, and without setoff, defense or counterclaim (other than as specifically provided for in any such Finance Document solely with respect to amounts due under such Finance Document, including as provided in Section 2.09(d)). Each such payment shall be made to the Administrative Agent (at its offices at 800 Long Ridge Road, Stamford, CT 06927 or to its account set forth on Schedule 2.08) who shall promptly distribute to each Noteholder any payments received by the Administrative Agent on behalf of such Noteholder, in each case to the account of such Noteholder set forth on Schedule 2.08 or as designated by the applicable Noteholder in its Assignment and Acceptance, or at such other address as shall be designated by such Noteholder from time to time to the Issuer and the Administrative Agent.

(b) Except as otherwise expressly provided herein, whenever any payment (including interest on any Note, fees or other amounts) hereunder or under any other Finance Document shall become due, or otherwise would occur, on a day that is not a New York Business Day, such payment may be made on the immediately succeeding New York Business Day, and such extension of time shall in such case be included in the computation of interest or fees, if applicable.

**Section 2.09** Taxes. (a) Any and all payments by or on account of any obligation of the Issuer or any other Finance Party hereunder or under any other Finance Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that, if the Issuer or any other Finance Party shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent and each Noteholder (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Issuer or such Finance Party shall make such deductions and (iii) the Issuer or such Finance Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Issuer shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) The Issuer shall indemnify the Administrative Agent and each Noteholder within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Noteholder, as the case may be, on or with respect to any payment by or on account of any obligation of the Issuer or any other Finance Party hereunder or under any other Finance Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

(d) As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Issuer or any other Finance Party to a Governmental Authority, the Issuer shall deliver to the applicable Noteholder and, if applicable, the Administrative Agent, the original or a certified copy of either a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Noteholder and/or the Administrative Agent. If a Noteholder is not an Eligible Institution, notwithstanding any other provision of the Finance Documents, each Finance Party shall be entitled to deduct and setoff from the payments due to such Noteholder under the Finance Documents all amounts that are paid by either of such Finance Parties to a Governmental Authority for Excluded Taxes of the type that are described in clause (b) of the definition of Excluded Taxes set forth in Section 1.01.

**Section 2.10** Registration of Notes. The Issuer shall keep at its principal executive office a register for the registration and transfer of the Initial Note or, if applicable after a transfer and exchange of

14



the Initial Note for more than one Note pursuant to Section 2.09, the Notes. The name and address of each Noteholder, each transfer thereof and the name and address of each transferee of the Notes shall be registered in such register. The Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Issuer shall not be affected by any notice or knowledge to the contrary except for an assignee of the Note in respect of which the Issuer has received an executed Assignment and Acceptance as provided in Section 9.04.

### Section 2.11    Transfer and Exchange of Notes.

(a)    Upon surrender of any Note or part thereof at the principal executive office of the Issuer for transfer or exchange (and in the case of a surrender for transfer, duly endorsed and accompanied by an Assignment and Acceptance duly executed by the registered holder of such Note or his attorney duly authorized in writing and the transferee and accompanied by the address for notices of each transferee of such Note or part thereof), the Issuer shall execute and deliver, at the Issuer's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note; provided, that Notes issued in exchange for a surrendered Note must be issued in a minimum denomination of $100,000 each and in integral multiples of $1,000 in excess thereof. The Initial Note, and any subsequent Note issued as a result of a transfer or exchange in accordance with the terms of this Section 2.11, may be transferred or exchanged in part. The new Note shall be payable to the transferee and shall be substantially in the form of Exhibit A with the legend thereon, which shall not be modified under any circumstances. Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest stall have been paid thereon. The Issuer may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes.

(b)    The Noteholder shall pay the cost of delivering to or from such Noteholder's home office or custodian bank from or to the Issuer, insured to the reasonable satisfaction of such holder, the surrendered Note and any Note issued in substitution for the surrendered Note.

### Section 2.12    Replacement of Notes.

(a)    Upon receipt by the Issuer of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note, and

(i)    in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it, or

(ii)    in the case of mutilation, upon surrender and cancellation thereof,

the Issuer at its own expense shall execute and deliver, in lieu thereof, a new Note, which shall be substantially in the form of Exhibit A with the legend thereon and dated and dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

(b)    The Noteholder shall pay the cost of delivering to or from such Noteholder's home office or custodian bank from or to the Issuer, insured to the reasonable satisfaction of such holder, a mutilated Note and any Note issued in replacement for the mutilated Note.



15

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

**Section 3.01   Issuer's Representations and Warranties.**   The Issuer and the Guarantor represent and warrant to the Administrative Agent and the Initial Noteholder on the Effective Date that:

(a)   Organization; Powers. The Issuer, the Guarantor and each of the Subsidiaries (except with respect to the Subsidiaries (other than the Guarantor), only to the extent that failure to do so could result in a Material Adverse Effect) (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a Material Adverse Effect, and (d) has the power and authority to execute, deliver and perform its obligations under each of the Transaction Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Issuer, to issue the Initial Note hereunder.

(b)   Authorization. The Transactions (a) have been duly authorized by all requisite corporate and, if required, stockholder action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, or of the certificate or articles of organization or other constitutive documents or by-laws of the Issuer, the Guarantor or any Subsidiary, (B) any order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which the Issuer, the Guarantor or any Subsidiary is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Issuer, the Guarantor or any Subsidiary.

(c)   Enforceability. This Agreement has been duly executed and delivered by the Issuer and the Guarantor, and constitutes, and each other Transaction Document when executed and delivered by each other party thereto will constitute, a legal, valid and binding obligation of the Issuer, the Guarantor and any Subsidiary which is a party thereto, enforceable against the Issuer, the Guarantor and any such Subsidiary in accordance with its terms (except, in any case, as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

(d)   Governmental Approvals. No action, consent or approval (including any exchange control approval) of, registration or filing with or any other action by any Governmental Authority having jurisdiction over any Finance Party is or will be required in connection with the Transactions, except for such as have been made or obtained and are in full force and effect.

(e)   Financial Statements. The Issuer has heretofore furnished to the Initial Noteholder (i) its annual consolidated financial statements (including the notes thereof) as of and for the fiscal year ended December 31, 2013, prepared in accordance with IFRS and presented in the English language, together with a report thereon by the Issuer's certified independent accountants, and (ii) its semi-annual unaudited consolidated financial statements as of and for the six-month period ending June 30, 2014, prepared in accordance with IFRS and presented in the English language. Such financial statements and all other financial statements delivered in accordance with Section 5.04 hereof present fairly the financial condition of the Issuer and its consolidated Subsidiaries as of such dates and for such

16



periods, and, to the extent required by IFRS, disclose all material liabilities, direct or contingent, of the Issuer and its consolidated Subsidiaries as of the date thereof.

(f)     No Material Adverse Change.   No Material Adverse Effect has occurred since June 30, 2014.

(g)     Title to Properties; Possession Under Leases.

(i)     Each of the Issuer and the Guarantor has good and marketable title to, or valid leasehold interests in, all its material properties and assets, and each of the Subsidiaries has good and marketable title to, or valid leasehold interests in, all its material properties and assets, except to the extent such failure of a Subsidiary (other than the Guarantor) to have good and marketable title or a valid leasehold interest could not reasonably be expected to result in a Material Adverse Effect.   All such material properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 5.07 and Permitted Liens.

(ii)     Each of the Issuer and the Guarantor has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect, and each of the Subsidiaries has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect, except to the extent such failure of a Subsidiary (other than the Guarantor) to comply could not reasonably be expected to result in a Material Adverse Effect. Each of the Issuer and the Guarantor enjoys peaceful and undisturbed possession under all such material leases, and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases, except to the extent such possession by a Subsidiary (other than the Guarantor) could not reasonably be expected to result in a Material Adverse Effect.

(h)     Subsidiaries.   Schedule 3.01(h) sets forth as of the Effective Date a list of all Subsidiaries and the percentage ownership interest of the Issuer or the Guarantor therein.   The shares of capital stock or other ownership interests so indicated on Schedule 3.01(h) are fully paid and non-assessable and are owned by the Issuer or the Guarantor, directly or indirectly, free and clear of all Liens.

(i)     Litigation; Compliance with Laws.

(i)     Except as set forth on Schedule 3.01(i), there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of the Issuer or the Guarantor, threatened against or affecting the Issuer, the Guarantor or any Subsidiary or any business, property or rights of any such Person (i) that involve any Transaction Document or the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(ii)     None of the Issuer, the Guarantor or any of the Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted or the entry into or performance of its obligations under any Transaction Document violate, any law, rule or regulation (including any tax law, disclosure or reporting requirement, securities laws and regulations, zoning, building, Environmental Law, ordinance, code or approval or any building permits), or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

17

(j)     Agreements.

(i)     None of the Issuer, the Guarantor or any of the Subsidiaries is a party to any agreement or instrument or subject to any corporate restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(ii)     None of the Issuer, the Guarantor or any of the Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect.

(k)     Federal Reserve Regulations.

(i)     None of the Issuer, the Guarantor or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(ii)     None of the Issuer, the Guarantor or any of the Subsidiaries is a "public utility" within the meaning of, or subject to regulation under, the United States Federal Power Act of 1920 (16 U.S.C. §§791 et seq.).

(l)     Investment Company Act. None of the Issuer, the Guarantor or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

(m)     Tax Returns. Each of the Issuer, the Guarantor and the Subsidiaries has filed or caused to be filed all foreign and Venezuelan federal, national, state and local tax returns or materials required to have been filed by it, except any for which failure to file could not reasonably be expected to result in a Material Adverse Effect, and has paid or caused to be paid all Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Issuer, the Guarantor or such Subsidiary, as applicable, shall have set aside on its books adequate reserves.

(n)     No Material Misstatements. No information, report, financial statement, exhibit or schedule furnished by or on behalf of the Issuer or the Guarantor to the Administrative Agent or any Noteholder in connection with the negotiation of any Transaction Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Issuer represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with the historical audited financial statements of the Issuer and the Guarantor, as applicable) and due care in the preparation of such information, report, financial statement, exhibit or schedule.

(o)     Employee Benefit Plans.

(i)     None of the Issuer, the Guarantor or any ERISA Affiliate (other than any member of the Citgo Group) has during the past five years maintained, contributed to or had an obligation to contribute to any Plan, Multiemployer Plan or has any present intention to do so.

(ii)     In respect of the Citgo Group:

18



(A)      each Plan complies in all material respects with all requirements of law except to the extent that noncompliance could not reasonably be expected to have a Material Adverse Effect;

(B)      no Reportable Event has occurred, or is reasonably likely to occur, with respect to any Plan which could result in any member of the Citgo Group incurring a liability or obligation in excess of $50,000,000;

(C)      no steps have been taken to terminate any Plan which could result in any member of the Citgo Group making a contribution, or incurring a liability or obligation, to such Plan in excess of $50,000,000, and no steps have been taken to appoint a receiver or trustee to administer any such Plan;

(D)      there is no Unfunded Vested Liability with respect to any Plan that would reasonably be expected to have, in the event of termination of such Plan, a Material Adverse Effect;

(E)      no Plan is determined to be, or is expected to be, in at-risk status (within the meaning of Title IV of ERISA);

(F)      no contribution failure has occurred with respect to any Plan sufficient to give rise to a Lien under ERISA or the Code;

(G)      no condition exists or event or transaction has occurred with respect to any Plan which would reasonably be expected to have a Material Adverse Effect;

(H)      no member of the Citgo Group has any contingent liability with respect to any post-retirement benefit under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA, that would reasonably be expected to have a Material Adverse Effect; and

(I)      no member of the Citgo Group has during the past five years maintained, contributed to or had an obligation to contribute to any Multiemployer Plan or has any present intention to do so.

(p)      Environmental Matters.  Except as set forth in Schedule 3.01(p) and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Issuer, the Guarantor or any of the Subsidiaries (i) has failed to comply with any Environmental Law applicable to it or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law applicable to it, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(q)      Insurance.  The Issuer and the Subsidiaries maintain insurance to such extent and against such risks required pursuant to Section 5.02 of this Agreement.

(r)      Labor Matters.  As of the Effective Date, there are no strikes, lockouts or slowdowns against the Issuer, the Guarantor or any Subsidiary pending or, to the knowledge of the Issuer or the Guarantor, threatened which could reasonably be expected to result in a Material Adverse Effect. The hours worked by and payments made to employees of the Issuer, the Guarantor and the Subsidiaries have not been in violation of applicable Venezuelan national, state or local law dealing with such matters. All payments due from the Issuer, the Guarantor or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or, to the extent required by IFRS,

19



accrued as a liability on the books of the Issuer, the Guarantor or such Subsidiary. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Issuer, the Guarantor or any Subsidiary is bound.

        (s)    Solvency. On the Effective Date and immediately following the issuance of the Initial Note and after giving effect to the cancellation of the Novated Receivables, (a) the assets of each Finance Party, at a fair valuation, are in excess of the total amount of its debts (including contingent liabilities); (b) the present fair saleable value of each Finance Party's assets is greater than its probable liability on its existing debts as such debts become absolute and matured; (c) each Finance Party is then able and expects to be able to pay its debts (including contingent liabilities and other commitments) as they mature; (d) each Finance Party has capital sufficient to carry on its business as conducted and as proposed to be conducted; and (e) each Finance Party is in compliance with each applicable solvency standard under the laws of the jurisdiction where it is organized, domiciled, resident or otherwise located. For purposes of this Section, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

        (t)    US Anti-Terrorism Laws. Each of the Issuer, the Guarantor and the Subsidiaries, and, to the best of the Issuer's and the Guarantor's knowledge, any persons acting on any of their behalf with respect to activities performed under the Transaction Documents, (a) is not a Designated Person, and (b) has not used any part of the assets or services acquired in connection with the creation of the Novated Receivables on behalf of any Designated Person or will otherwise use, directly by it or indirectly through any Subsidiary, such assets or services in connection with any investment in, or any transactions or dealings with, any Designated Person. The Issuer, and each of the Affiliates of the Issuer that are the original obligors in respect of such Novated Receivables, has not used any of the assets or services acquired in connection with the creation of the Novated Receivables for purposes other than for the use of such assets or services in the ordinary course of business of the Affiliates that are the original obligors in respect of such Novated Receivables, or, directly or indirectly, used any of such assets or services for, or will repay any Note or Notes with the proceeds of, (i) business activities relating to Cuba, Sudan, Iran, Myanmar (Burma), Syria or North Korea, or (ii) business activities that are or which become subject to sanctions, restrictions or embargoes imposed by the United Nations, the European Union, the State Secretariat for Economic Affairs of Switzerland or the Swiss Directorate of International Law, OFAC, HM Treasury of the United Kingdom, the Hong Kong Monetary Authority and/or the Monetary Authority of Singapore. This includes, in particular (but without limitation) business activities involving Persons or entities subject to any such sanctions or named on any sanctions lists issued by any of the aforementioned bodies and entities owned or controlled by such listed Persons or entities.

        (u)    Anti-Bribery and Anti-Corruption Laws. Each of the Issuer, the Guarantor and the Subsidiaries, and, to the best of the Issuer's and the Guarantor's knowledge, each of the persons acting on any of their behalf with respect to activities performed under the Transaction Documents have not taken any action in connection with the acquisition of the assets or services acquired in connection with the creation of the Novated Receivables, or in connection with the negotiation, execution and delivery of the Transaction Documents, that is in violation of the Anti-Bribery and Anti-Corruption Laws.

        (v)    Senior Indebtedness. The Obligations constitute senior indebtedness that is entitled to the benefits of the subordination provisions, if any, relating to all other Indebtedness of the Issuer and its Subsidiaries and the Guarantor and its subsidiaries.

        (w)    Availability and Transfer of Foreign Currency. Each of the Issuer and the Guarantor is subject to the Law on the Central Bank of Venezuela (*Ley del Banco Central de Venezuela*), published in Extraordinary Official Gazette No. 6,155 dated November 19, 2014, and Exchange

Agreement No. 9 (*Convenio Cambiario No. 9*), published in Official Gazette No. 39,239 dated August 11, 2009, between the Central Bank of Venezuela and the Ministry of the People's Power for Economy and Finance (currently the Ministry of the People's Power for Economy, Finance and Public Banking), which grants the Issuer and the Guarantor the right to (a) maintain the proceeds received by the Issuer and the Guarantor derived from the export of hydrocarbons, in a foreign currency outside of Venezuela, and (b) apply such proceeds in a foreign currency outside of Venezuela to the repayment of the Notes and comply with its obligations pursuant to the terms of this Agreement. There are no other foreign exchange controls issued or, to the knowledge of the Issuer or the Guarantor, threatened to be issued by Venezuela or any Venezuelan Governmental Authority that would hinder the ability of the Issuer or the Guarantor to comply with its obligations under the Transaction Documents.

(x) <u>Commercial Activities; Absence of Immunity.</u> Each of the Issuer and the Guarantor is subject to civil and commercial law in Venezuela with respect to its obligations hereunder. The execution, delivery and performance by the Issuer and the Guarantor of its obligations hereunder constitute private and commercial acts rather than public or governmental acts under the laws of Venezuela. Neither the Issuer, nor the Guarantor, nor any of their properties, assets or revenues is entitled to any right of immunity in any jurisdiction from suit, court jurisdiction, judgment, attachment (whether before or after judgment), set-off or execution of a judgment or from any other legal process or remedy relating to the obligations of the Issuer except for the mandatory notice required pursuant to Article 99 of the Law of the Office of the Attorney General of Venezuela (*Ley Orgánica de la Procuraduría General de la República*).

**Section 3.02** <u>Initial Noteholder's Representations and Warranties</u>. The Initial Noteholder represents and warrants to the Issuer on the Effective Date that:

(a) <u>Organization; Powers.</u> The Initial Noteholder, only to the extent that failure to do so could result in a material impairment of the ability of the Initial Noteholder to perform any of its obligations under any Transaction Document (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a material impairment of the ability of the Initial Noteholder to perform any of its obligations under any Transaction Document, and (d) has the power and authority to execute, deliver and perform its obligations under each of the Transaction Documents and each other agreement or instrument contemplated thereby to which it is or will be a party.

(b) <u>Authorization.</u> The Transactions (a) have been duly authorized by all requisite corporate and, if required, stockholder action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, or of the certificate or articles of organization or other constitutive documents or by-laws of the Initial Noteholder, (B) any order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which the Initial Noteholder is a party or by which it or any of its property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Initial Noteholder.

(d) <u>Enforceability.</u> This Agreement has been duly executed and delivered by the Initial Noteholder and constitutes, and each other Transaction Document when executed and delivered by the Initial Noteholder to which it is a party will constitute, a legal, valid and binding obligation of the Initial Noteholder enforceable against the Initial Noteholder in accordance with its terms (except, in any

case, as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

(e)    Governmental Approvals.  No action, consent or approval (including any exchange control approval) of, registration or filing with or any other action by any Governmental Authority having jurisdiction over the Initial Noteholder is or will be required in connection with the Transactions, except for such as have been made or obtained and are in full force and effect.

(f)    No Registration.  The Initial Noteholder understands that (i) the Initial Note has not been and will not be, and any Note issued pursuant to Section 2.11 or Section 2.12 herein will not be, registered under the Securities Act or any other applicable securities law, (ii) the Initial Note is being acquired by the Initial Noteholder for investment, and (iii) the Initial Note may be offered, sold or otherwise transferred only to qualified institutional buyers pursuant to Rule 144A of the Securities Act or to a buyer purchasing pursuant to a registration statement under the Securities Act. The Initial Noteholder understands that the Initial Note, and any Note issued pursuant to Section 2.11 or Section 2.12 herein, will contain a legend as set forth on the form of Note attached hereto as Exhibit A.

(g)    Qualified Institutional Buyer.  With respect to the Initial Note, the Initial Noteholder is a "qualified institutional buyer" as defined in Rule 144A.

(h)    Access to Prior Necessary Information.  Prior to the delivery of the Initial Note, to the extent that the Initial Noteholder regarded as necessary to evaluate the merits and risks of its investment therein, the Initial Noteholder was afforded the opportunity to ask questions of, and received sufficient answers from, representatives of the Issuer concerning: (i) the terms and conditions of the Initial Note and (ii) the operations, financial condition and future prospects of the Issuer and the Guarantor. The Initial Noteholder has, independently and based upon such documents and information as the Initial Noteholder has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Issuer and the Guarantor and made its own decision to acquire the Initial Note, and will, independently and based on such documents and information as the Initial Noteholder shall deem appropriate at the time, continue to make its own analysis, appraisals and decisions in taking or not taking action under the Transaction Documents, and to make such investigation as the Initial Noteholder deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Issuer.

(i)    Eligible Institution.  The Initial Noteholder is an Eligible Institution.

(j)    Distribution of Materials.  The Initial Noteholder has not distributed any materials relating to the Initial Note to anyone other than any counsel or other advisor to it, and no one other than such Persons has used its copies of such documents.

(k)    No Distribution.  The Initial Noteholder, its Affiliates (as such term is defined in Rule 501(b) under the Securities Act) or any Person acting on their behalf:

(i)    has not engaged, does not intend to engage, and will not engage, in connection with the issuance of any Note hereunder, in any form of public distribution that would require registration of any Note with the Securities Exchange Commission under Section 5 of the Securities Act.

(ii)    has not entered and will not enter into any contractual arrangement with any distributor (as the term is defined for purposes of Rule 902(d) of Regulation S) with respect to the distribution or delivery of any Note.

(l)    ERISA.  Either: (i) the Initial Noteholder is not: (A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to the provisions of part 4 of subtitle B of Title I of

22

ERISA, (B) a "plan" to which Section 4975 of the Code applies, (C) a governmental, church or non-U.S. plan that is subject to any federal, state, local, non-U.S. or other laws or regulations that are substantially similar to the fiduciary responsibility or prohibited transaction provisions of ERISA or Section 4975 of the Code ("Similar Law") or (D) an entity whose underlying assets are deemed to include "plan assets" of any of the foregoing, or (ii) its acquisition or holding of such Initial Note does not and will not give rise to a non-exempt prohibited transaction under ERISA or Section 4975 of the Code or, with respect to investors described in clause (C) hereof, a non-exempt violation of any applicable Similar Law.

(m)      Independent Evaluation of Merits and Risks.      The Initial Noteholder has independently evaluated the merits and risks of its participation in the transactions contemplated hereby and, in so evaluating, has not relied upon the Lead Arranger or (other than the Issuer or the Guarantor) any other Person in connection with its decision to participate in such transactions.

(n)      Purchase for Investment. With respect to the Initial Note issued in reliance on Section 4(a)(2) of the Securities Act, the Initial Noteholder severally represents that the Initial Noteholder is acquiring the Initial Note for its own account, *provided* that the disposition of the Initial Noteholder's property shall at all times be within the Initial Noteholder's control. The Initial Noteholder understands that the Initial Note has not been registered under the Securities Act and may be sold, in whole or in part, only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Issuer is not required to register the Initial Note.

## ARTICLE IV

## CONDITIONS OF INITIAL NOTE ISSUANCE

The obligations of the Issuer to issue the Initial Note hereunder are subject to the satisfaction of the following conditions (it being acknowledged and agreed that, notwithstanding the failure to satisfy any of the conditions in this Article IV, if the Initial Noteholder chooses to waive such conditions, the Issuer shall be obligated to issue the Initial Note in accordance with Section 2.01):

Section 4.01     Conditions to the Initial Note Issuance. On the Effective Date:

(a)      The Administrative Agent and the Initial Noteholder shall have received a written opinion of (i) Hogan Lovells US LLP (under New York and United States federal law) and (ii) Hogan Lovells S.C. (under Venezuelan law), each counsel for the Issuer and the Guarantor, and, in each case, (A) dated the Effective Date, (B) addressed to the Administrative Agent and the Initial Noteholder, and (C) covering such matters relating to the Transaction Documents and the Transactions as the Initial Noteholder shall reasonably request and in form and substance reasonably satisfactory to the Initial Noteholder, and the Issuer and the Guarantor hereby request such counsel to deliver such opinions.

(b)      The Administrative Agent and the Initial Noteholder shall have received (i) a copy of the last amendment to the Articles of Incorporation and By-laws of the Issuer, the Guarantor and the other Affiliates of the Issuer that are a party to the Novation Agreement; (ii) a copy of a certificate of the secretary of each of the Issuer, the Guarantor and the other Affiliates of the Issuer that are a party to the Novation Agreement certifying as to the resolution of the board of directors of each of the Issuer, the Guarantor and the other Affiliates of the Issuer that are a party to the Novation Agreement (A) approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party and resolving that it execute the Transaction Documents to which it is a party, (B) authorizing a specified person or persons to execute the Transaction Documents to which it is a party on its behalf, and (C) authorizing a specified person or persons, on its behalf, to sign all documents and notices to be signed by it

23

under or in connection with the Transaction Documents to which it is a party, (iii) evidence of the payment capacity of the Issuer and the Guarantor, in form of the publication of a certification of debt of the Issuer and the Guarantor, as required by Article 101 of the Organic Law on the Financial Administration of the Public Sector, published in Extraordinary Official Gazette No. 6.154 dated November 19, 2014; (iv) a copy of the most recent minutes of the shareholders of each of the Issuer, the Guarantor, and the other Affiliates of the Issuer that are a party to the Novation Agreement appointing the members of its board of directors; (v) a copy of signature and incumbency certificates of each of the Issuer, the Guarantor, and the other Affiliates of the Issuer that are a party to the Novation Agreement, of the person or persons authorized to execute the Transaction Documents to which it is a party; and (vi) a certificate of an authorized signatory of each of the Issuer, the Guarantor, and the other Affiliates of the Issuer that area a party to the Novation Agreement, certifying that each copy of a document delivered pursuant to this <u>Section 4.01(b)</u> is true, correct, complete and in full force and effect as of the date of this Agreement.

(c)     Each of the Transaction Documents shall have been duly executed by the Finance Parties party thereto on the Effective Date.

(d)     The Administrative Agent and the Initial Noteholder shall have received the financial statements and report referred to in <u>Section 3.01(e)</u>, none of which shall demonstrate a change in the financial condition of the Issuer from (and shall not otherwise be materially inconsistent with) the financial statements previously provided to the Initial Noteholder, which has had or could reasonably be expected to result in a Material Adverse Effect.

(e)     All requisite Governmental Authorities and third parties shall have approved or consented to the Transactions and the other transactions contemplated hereby to the extent required, all applicable appeal periods shall have expired and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby.

(f)     The Administrative Agent and the Initial Noteholder shall have received evidence that the Issuer (for itself and the Guarantor) has obtained the prior favorable opinion of the Central Bank to hold funds in foreign currency outside of Venezuela, pursuant to Exchange Agreement No. 9 and a certificate from the Issuer to the effect that such authorization remains in full force and effect as of the Effective Date.

(g)     In the reasonable judgment of the Administrative Agent and the Initial Noteholder, there shall have been no change or development since June 30, 2014 involving a prospective material adverse change in (i) the United States, Venezuelan or international financial, banking, political or economic conditions, (ii) the political, social, economic or financial condition of Venezuela, (iii) the currency exchange rates or controls imposed by any Governmental Authority in Venezuela applicable to Dollars which affects the Issuer's or the Guarantor's ability to perform their respective obligations under the Transaction Documents, (iv) any legislation, rules, regulations or other conditions affecting financial transactions of the same nature as the one reflected by the Transaction Documents or (v) the Initial Note syndication or capital markets with respect to Venezuelan and/or Latin American issuers, and neither the Administrative Agent nor the Initial Noteholder shall have received any notice from the Issuer that there has been any such material adverse change or development. By having signed this Agreement, the Administrative Agent and the Initial Noteholder agree that this condition has been satisfied.



       (h)     The Administrative Agent and the Initial Noteholder shall have received, to the extent requested, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

## ARTICLE V

## COVENANTS

The Issuer covenants and agrees with the Initial Noteholder and any subsequent Noteholder that from the Effective Date and until the principal of and interest on the Notes, all fees and all other expenses or amounts payable under any Finance Document shall have been paid in full, unless the Required Noteholders shall otherwise consent in writing:

**Section 5.01**   **Maintenance of Corporate Existence.**  Except as permitted pursuant to Section 5.08, the Issuer will, and will cause each of the Subsidiaries to, maintain in effect its and their corporate existence and all rights, privileges, titles to property, licenses, franchises and the like necessary in connection with the normal conduct of its and their business, activities or operations; *provided, however*, that the Issuer shall not be required to, and shall not be required to cause the Subsidiaries (other than the Guarantor) to maintain any such rights, privileges, titles to property, licenses or franchises if the Issuer determines in good faith that the maintenance thereof is no longer necessary in the conduct of the business of the Issuer and the Subsidiaries as a whole, and the failure to so maintain any such rights, privileges, titles to property, licenses or franchise is not disadvantageous in any material respect to the Noteholders.

**Section 5.02**   **Insurance.**  The Issuer will, and will cause each of the Subsidiaries to, maintain insurance with reputable insurance companies and in such amounts and covering such risks as are believed by the Issuer to be usually carried by companies engaged in similar businesses and owning and/or operating properties similar to those owned and/or operated by the Issuer or such Subsidiary, as the case may be, in the same general areas in which the Issuer or such Subsidiary owns and/or operates its properties.

**Section 5.03**   **Maintenance of Governmental Approvals.**  The Issuer will, and will cause each of the Subsidiaries to, maintain in full force and effect all approvals, consents, licenses and authorizations of any Governmental Authority which may be necessary or the Issuer may deem appropriate under any applicable law or regulation for the conduct of its business or for the performance of its obligations under the Finance Documents, as the case may be, except to the extent failure to do so would not be reasonably expected to have a Material Adverse Effect.

**Section 5.04**   **Financial Statements, Reports, etc.**   The Issuer will furnish to the Administrative Agent and the Noteholders:

    (a)    within 180 days following the end of each fiscal year of the Issuer after the Effective Date, (i) the annual consolidated financial statements (including the notes thereto) of the Issuer, prepared in accordance with IFRS and presented in the English language, (ii) a report thereon by the Issuer's certified independent accountants, and (iii) a "management discussion and analysis" or other report of management providing an overview in reasonable detail of the results of operations and financial condition of the Issuer and the Subsidiaries;

    (b)    within 180 days following the end of the second fiscal quarter in each fiscal year of the Issuer beginning with the second fiscal quarter ending after the Effective Date, (i) the semi-annual consolidated financial statements of the Issuer, prepared in accordance with IFRS and presented in the English language, and (ii) a "management discussion and analysis" or other

report of management providing an overview in reasonable detail of the results of operations and financial condition of the Issuer and the Subsidiaries;

(c)     promptly upon obtaining knowledge thereof, written notice of the occurrence and continuance of any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(d)     promptly after the request by any Noteholder, all documentation and other information that such Noteholder reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(e)     promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Issuer, the Guarantor or any Subsidiary, or compliance with the terms of any Finance Document, as the Administrative Agent or any Noteholder may reasonably request; and

(f)     promptly after the request by any Noteholder, all documentation and other information that such Noteholder reasonably requests in order to assure itself that Issuer and Guarantor are in compliance with all applicable laws.

**Section 5.05     Maintaining Records.** The Issuer will, and will cause each of the Subsidiaries to, maintain books, accounts and other records in accordance with IFRS in all material respects, and the Issuer will cause the Significant Subsidiaries organized under laws of any other jurisdiction to maintain their books and records in accordance with the generally accepted accounting principles of the applicable jurisdiction in all material respects.

**Section 5.06     Compliance with Laws.** The Issuer will use its reasonable best efforts, and will cause each of the Subsidiaries to use its respective reasonable best efforts, to comply at all times with all laws applicable to the Issuer, the Subsidiaries, their respective business or the Transactions (including, without limitation, all US Anti-Terrorism Laws, as set forth in Section 3.01(u) of this Note Agreement, Anti-Bribery and Anti-Corruption Laws, tax laws, disclosure and reporting requirements and securities laws and regulations), except where (a) the Issuer determine in good faith that the failure by the Issuer or such Subsidiary to so comply would not have a Material Adverse Effect or (b) the necessity of compliance therewith is being contested by the Issuer, the Guarantor or any of the Subsidiaries in good faith by appropriate proceedings.

**Section 5.07     Liens.** The Issuer will not, and will not cause or permit any of its subsidiaries to incur, permit or suffer to exist any Lien, other than Permitted Liens (which Permitted Liens shall not be considered Liens for purposes of the application of any of the provisions hereinafter set forth in this Section 5.07), of any kind against or upon any property or assets of the Issuer or any of its subsidiaries whether owned on the Effective Date or acquired after the Effective Date, to secure any Indebtedness, unless it has made or will make effective provision whereby (a) the Administrative Agent and the Noteholders will be secured by such Lien equally and ratably with (or prior to, in the event such Indebtedness is subordinated in right of payment to the Obligations) all other Indebtedness of the Issuer or any of its subsidiaries secured by such Lien and (b) if such Lien secures obligations subordinated to the Obligations in right of payment, such Lien shall be subordinated to a Lien securing the Obligations in the same property as that securing such Lien to the same extent as such subordinated obligations are subordinated to the Obligations. Any Lien created for the benefit of the Administrative Agent and the Noteholders pursuant to the preceding sentence shall provide by its terms that such Lien will be automatically and unconditionally released and discharged upon release and discharge of the initial Lien.

26



**Section 5.08** **Mergers, Consolidations, Sales of Assets and Acquisitions.** The Issuer will not, in one or a series of transactions, consolidate or amalgamate with or merge into any corporation or convey, lease or transfer substantially all of its properties, assets or revenues to any Person or entity (other than a direct or indirect subsidiary) or permit any Person (other than a direct or indirect subsidiary) to merge with or into it unless:

(a) either the Issuer is the continuing entity or the Person (the "**successor company**") formed by the consolidation or into which the Issuer is merged or that acquired or leased the property or assets of the Issuer will assume (jointly and severally with the Issuer unless the Issuer will have ceased to exist as a result of that merger, consolidation or amalgamation), by a supplemental agreement, all of the Issuer's obligations under this Agreement and the other Finance Documents;

(b) the successor company (jointly and severally with the Issuer unless the Issuer will have ceased to exist as part of the merger, consolidation or amalgamation) agrees to indemnify the Administrative Agent and each Noteholder (including the Initial Noteholder) against any Tax, assessment or governmental charge thereafter imposed on the Administrative Agent and the Noteholders solely as a consequence of the consolidation, merger, conveyance, transfer or lease with respect to the payment of principal or interest of the Obligations;

(c) immediately after giving effect to the transaction, no Default or Event of Default has occurred and is continuing; and

(d) the Issuer has delivered to the Administrative Agent and the Noteholders a certificate of the secretary or assistant secretary of the Issuer and a favorable written opinion of counsel, each stating that the transaction complies with the terms of this Section 5.08 and that all conditions precedent provided for in this Section 5.08 and relating to the transaction have been complied with.

Notwithstanding anything herein to the contrary, so long as no Default or Event of Default under this Agreement or any other Finance Document will have occurred and be continuing at the time of the proposed transaction or would result from the transaction:

(i) the Issuer may merge, amalgamate or consolidate with or into, or convey, transfer, lease or otherwise dispose of all or substantially all of its properties, assets or revenues to a direct or indirect subsidiary in cases when the Issuer is the surviving entity in the transaction and the transaction would not have a Material Adverse Effect, it being understood that if the Issuer is not the surviving entity, the Issuer will be required to comply with the requirements set forth in paragraphs (a) through (d) above; or

(ii) any direct or indirect subsidiary may merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of assets to, any Person (other than the Issuer or any of its subsidiaries or affiliates) in cases when the transaction would not have a Material Adverse Effect; or

(iii) any direct or indirect subsidiary may merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of assets to, any other direct or indirect subsidiary; or

(iv) any direct or indirect subsidiary may liquidate or dissolve if the Issuer determines in good faith that the liquidation or dissolution is in the best interests of the Issuer, and would not result in a Material Adverse Effect and if the liquidation or dissolution is part of a corporate reorganization of the Issuer; or

(v)   the Issuer may omit to comply with any term, provision or condition set forth in certain covenants or any term, provision or condition of this Agreement, if before the time for the compliance the Required Noteholders waive the compliance, but no waiver can operate except to the extent expressly waived, and, until a waiver becomes effective, the Issuer's obligations and the duties of the Administrative Agent as set forth in this Agreement in respect of any such term, provision or condition will remain in full force and effect.

**Section 5.09    ERISA.** In respect of the Citgo Group, for so long as the Citgo Group is treated as a single employer with the Issuer under Section 414 of the Code, or is within the same "controlled group" (as defined in ERISA) as the Issuer, the Citgo Group shall:

(a)   ensure any material liability imposed on it pursuant to Title IV of ERISA is paid and discharged when due;

(b)   ensure that no Plan is terminated under Section 4041 of ERISA, except as would not reasonably be expected to result in a Material Adverse Effect;

(c)   not adopt an amendment to a Plan requiring the provision of security under ERISA or the Code without the prior consent of the Required Noteholders, except as would not reasonably be expected to result in a Material Adverse Effect; and

(d)   ensure that no member of the Citgo Group engages in a complete or partial withdrawal, within the meaning of Sections 4203 and 4205 of ERISA, from any Multiemployer Plan without the prior consent of the Required Noteholders, except as would not reasonably be expected to result in a Material Adverse Effect.

## ARTICLE VI

### GUARANTEE.

**Section 6.01    Guarantee.** The Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely, irrevocably and unconditionally guarantees to the Administrative Agent and the Noteholders the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including all court costs and attorneys' fees (including allocated costs of in-house counsel and paralegals) (which obligation in respect of counsel shall be limited to one counsel for the Administrative Agent and one counsel for the Noteholders, as well as, in each case, other special and local counsel) and expenses paid or incurred by the Administrative Agent and the Noteholders in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Issuer or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "Guaranteed Obligations"). The Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  All terms of this Guarantee apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the Noteholders. The Guarantor shall not assign or transfer any part of its rights or obligations under this Guarantee without the prior written consent of the Administrative Agent and the Noteholders, and any attempted assignment without such consent shall be null and void. Each Noteholder shall be entitled to assign its rights under this Guarantee to any Person or Persons to whom it assigns all or a portion of its interests, rights and obligations under this Agreement and the other Finance Documents in compliance with the terms and conditions thereof, with notice to, but without the prior written consent of, the Issuer, the Guarantor and the Administrative Agent.

28



**Section 6.02    Guarantee of Payment.** This Guarantee is a guarantee of payment and not of collection. The Guarantor waives any right to require the Administrative Agent or the Noteholders to sue the Issuer, the Guarantor, any other guarantor or any other person obligated for all or any part of the Guaranteed Obligations (each, an **"Obligated Party"**).

**Section 6.03    No Discharge or Diminishment of Note Guarantee.**

(a)     Unconditional.  Except as otherwise provided herein, the obligations of the Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Issuer or any other guarantor of or other person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which the Guarantor may have at any time against any Obligated Party, the Administrative Agent, the Noteholders or any other person, whether in connection herewith or in any unrelated transactions.

(b)     No Setoff, Etc.  The obligations of the Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or otherwise (other than as provided in Section 2.09(d) of this Agreement), or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)     No Diminishment.  Further, the obligations of the Guarantor hereunder are not discharged or impaired or otherwise affected by (i) the failure of the Administrative Agent or the Noteholders to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of the Issuer for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations; or (iv) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of the Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

**Section 6.04    Defenses Waived.**  To the fullest extent permitted by applicable law, the Guarantor hereby waives any defense based on or arising out of any defense of the Issuer or the Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Issuer or the Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, the Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party or any other person. The Administrative Agent may, at its election, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Guarantee except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent

permitted by applicable law, the Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantor against any Obligated Party or any security.

Section 6.05   Rights of Subrogation. The Guarantor will not assert any right, claim or cause of action, including a claim of subrogation, contribution or indemnification that it has against any Obligated Party until the Issuer and the Guarantor have fully performed all their obligations to the Administrative Agent and the Noteholders.

Section 6.06   Reinstatement. If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Guarantor's obligations under this Guarantee with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent and the Noteholders are in possession of this Guarantee. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Administrative Agent.

Section 6.07   Release. The Guarantor will be released from its obligations under this Article VI and the other Finance Documents to which it is a party upon the indefeasible payment in full of the Obligations. The Administrative Agent shall promptly execute any release documents giving effect to the immediately preceding sentence upon the request of the Issuer, without the consent or further agreement of Administrative Agent or the Noteholders.

## ARTICLE VII

## EVENTS OF DEFAULT

In case of the happening of any of the following events ("**Events of Default**"):

(a)   the failure to pay the principal of, or interest on any of the Notes, when such principal becomes due and payable, including at any of the Repayment Dates, by acceleration or otherwise, and such failure continues for a period of five (5) days after written notice thereof has been given to the Issuer;

(b)   the failure by any Finance Party to pay any fee or any other amount under any Finance Document (other than the principal of, or interest on any of the Notes) when the same becomes due and payable and the default continues for a period of fifteen (15) days after written notice thereof has been given to the Issuer;

(c)   a default in the observance or performance of any other covenant or agreement contained in the Finance Documents which default continues for a period of thirty (30) days after the Issuer receives written notice specifying the default (and demanding that such default be remedied) from the Required Noteholders;

(d)   the failure to pay at final stated maturity (giving effect to any applicable grace periods and any extensions thereof) the principal amount of any Indebtedness of the Issuer, the Guarantor or any of the Significant Subsidiaries, or any Indebtedness of the Issuer, the Guarantor or any of the Significant Subsidiaries has become due and payable before it would otherwise have been due and payable as a result of, or on the basis of, the occurrence of a default, event of default or other similar condition or event (however described) (which acceleration is not rescinded, annulled or otherwise cured

30

within thirty (30) days from the date of acceleration), other than a failure to make any required payment if the aggregate principal amount of such Indebtedness, together with the principal or other amount of any other such Indebtedness in default for failure to pay principal at final stated maturity or which has been accelerated (in each case with respect to which the thirty (30) day period described above has elapsed), aggregates the Threshold Amount or more at any time;

(e)     one or more judgments in an aggregate amount in excess of the Threshold Amount shall have been rendered against the Issuer, the Guarantor or any of the Significant Subsidiaries and such judgments remain undischarged, unpaid, unstayed, unbonded or not suspended by agreement for a period of sixty (60) days after such judgment or judgments become final and nonappealable;

(f)     the Issuer, the Guarantor or any of the Significant Subsidiaries (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts, or fails generally to pay its debts as they become due, or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes against it or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a final and non-appealable judgment of insolvency or bankruptcy (*declaración de quiebra*) or the entry of a final and non-appealable order for relief or the making of an order for its winding up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within sixty calendar days of the institution or presentation thereof; (v) passes a resolution for its winding up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, *conciliador*, trustee, *síndico*, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within sixty (60) consecutive calendar days thereafter; or (viii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive) (subject to the same time periods for such event to be dismissed, discharged, stayed or restrained);

(g)     an authorized officer of the Issuer or the Guarantor or a Governmental Authority (i) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of any of the Transaction Documents or any part thereof or (ii) unilaterally declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, with respect to any such Indebtedness in an aggregate amount of not less than the Threshold Amount, or takes any other action that has or would reasonably be expected to have an effect on the Repayment Dates hereunder, or the currency in which the Issuer shall pay the Obligations;

(h)     there shall have occurred any event which causes a Material Adverse Effect;

(i)     any Finance Party becomes entitled to claim immunity from suit, judgment, execution, attachment or other legal process in any proceedings taken in its jurisdiction of organization or otherwise in any other jurisdiction in relation to any Transaction Document;

(j)     there shall have occurred a Change of Control;

31



(k)       the failure at any time of the Obligations to constitute senior indebtedness that is entitled to the benefits of any subordination provisions relating to Indebtedness of the Issuer or its subsidiaries; or

(l)       at any time prior to the last day of the month falling 10 months after the month in which the Effective Date occurs, the Issuer or the Guarantor reschedules or fails to pay when due, in whole or in part, any amount required to be paid by it under the terms of any written contract with respect to any investment (which for the avoidance of doubt shall not include contracts with respect to borrowed money obligations of the Issuer or the Guarantor) as such terms are in effect on the Effective Date,

then, and in every such event (other than an event with respect to the Issuer or the Guarantor described in paragraph (f) above), and at any time thereafter during the continuance of such event, the Required Noteholders may, or the Administrative Agent at the request of the Required Noteholders shall, by notice to the Issuer, declare the Notes then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Notes so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Issuer accrued hereunder and under any other Finance Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained herein or in any other Finance Document to the contrary notwithstanding; and in any event with respect to the Issuer or the Guarantor described in paragraph (f) above, the principal of the Notes then outstanding, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Issuer accrued hereunder and under any other Finance Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained herein or in any other Finance Document to the contrary notwithstanding.

## ARTICLE VIII

### ADMINISTRATIVE AGENT

Each Noteholder hereby irrevocably appoints the Administrative Agent its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of the Finance Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to negotiate, enforce or settle any claim, action or proceeding affecting the Noteholders in their capacity as such, at the direction of the Required Noteholders, which negotiation, enforcement or settlement will be binding upon each Noteholder.

The institution serving as the Administrative Agent hereunder shall have all rights and powers in its capacity as a Noteholder as any other Noteholder and the Administrative Agent may exercise the same as though it were not the Administrative Agent, and the Administrative Agent and its Affiliates may generally engage in any kind of business with the Issuer, the Guarantor or any Subsidiary or other Affiliate thereof as if it was not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Finance Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and/or is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is instructed in writing to exercise by the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary under the circumstances provided in Section 9.08), and (c) except as expressly set forth in the Finance

32

Documents, the Administrative Agent shall not have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Issuer, the Guarantor or any of the Subsidiaries that is communicated to or obtained by the Person serving as the Administrative Agent and/or the Lead Arranger or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Administrative Agent by the Issuer, the Guarantor or a Noteholder, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Finance Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Finance Document, (iv) the validity, enforceability, effectiveness or genuineness of any Finance Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Finance Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Issuer), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities as the Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided below, the Administrative Agent may resign at any time upon thirty (30) days written notice by notifying the Noteholders and the Issuer; *provided* that, the Required Noteholders may, by written notice to the Administrative Agent, the Noteholders and the Issuer, require the Administrative Agent to resign in accordance with this paragraph, which notice shall (without any further action) be deemed to be a notice of resignation delivered by the Administrative Agent to the Noteholders and the Issuer. Upon any such resignation, the Required Noteholders shall have the right to appoint a successor. If no successor shall have been so appointed by the Required Noteholders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, the Administrative Agent's resignation shall become effective and the Required Noteholders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Finance Document until such time, if any, as the Required Noteholders appoint a successor Administrative Agent. Notwithstanding the foregoing, if the Required Noteholders agree prior to the expiration of the thirty (30) day period that they will not appoint a successor Administrative Agent, the Administrative Agent's resignation shall become effective immediately thereon, and the Required Noteholders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Finance Document until such time, if any, as the Required Noteholders appoint a successor Administrative Agent. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested

with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Issuer to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Issuer and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as the Administrative Agent.

Each Noteholder acknowledges that it has, independently and without reliance upon any Agent or any other Noteholder and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Noteholder also acknowledges that it will, independently and without reliance upon any Agent or any other Noteholder and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Finance Document, any related agreement or any document furnished hereunder or thereunder.

Notwithstanding anything herein or in any other Finance Document to the contrary, the Lead Arranger is named as such for recognition purposes only, and in its capacity as such shall have no duties, responsibilities or liabilities with respect to this Agreement or any other Transaction Document; it being understood and agreed that the Lead Arranger shall be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent provided herein and in the other Finance Documents. Without limitation of the foregoing, the Lead Arranger, in its capacity as such, shall not, by reason of this Agreement or any other Finance Document, have any fiduciary relationship in respect of any Noteholder, Finance Party or any other Person.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.01    Notices; Electronic Communications.**    Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, or sent by fax or electronic mail, as follows:

(a)    if to the Issuer or the Guarantor, to it at La Campiña, Av. Libertador, Calle El Empalme, Edificio Petróleos de Venezuela, Torre Este, Piso 8, Caracas, Venezuela, Attention of Mr. Victor Aular (Director) and Mr. Abraham Ortega (Executive Director of Finance) (Fax No. +58 212 7081441, Email: aularvs@pdvsa.com/ ortegaae@pdvsa.com);

(b)    if to the Administrative Agent, to General Electric Capital Corporation, 800 Long Ridge Road, Stamford, CT 06927, Fax No. +1-203-357-4890, Email: Gerald.Friel@ge.com;

(c)    if to the Initial Noteholder, to it at its address (or fax number or electronic mail address) set forth on Schedule 2.08; and

(d)    if to a Noteholder (other than the Initial Noteholder), to it at its address set forth in the Assignment and Acceptance pursuant to which such Noteholder shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or electronic mail, in each case delivered, or sent (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

34

The Issuer hereby agrees, unless the electronic mail address referred to below has not been provided by the Administrative Agent or a Noteholder to the Issuer, that it will, or will cause its subsidiaries to, provide to the Administrative Agent and the Noteholders all information, documents and other materials that it is obligated to furnish to the Administrative Agent and the Noteholders pursuant to the Finance Documents, including all financial statements, financial and other reports, certificates and other information materials (all such communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent and the Noteholders to an electronic mail address as directed by the Administrative Agent and each Noteholder.

Section 9.02   Survival of Agreement.   All covenants, agreements, representations and warranties made by the Issuer and the Guarantor herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Finance Document shall be considered to have been relied upon by the Noteholders and shall survive the issuance by the Issuer of the Notes, regardless of any investigation made by the Noteholders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on the Notes, any fee or any other amount payable under this Agreement or any other Finance Document is outstanding and unpaid. The provisions of this Section 9.02 and, Sections 2.09, 9.05, and 9.16 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Notes, the invalidity or unenforceability of any term or provision of this Agreement or any other Finance Document, or any investigation made by or on behalf of the Administrative Agent or any Noteholder. Notwithstanding anything herein to the contrary, the provisions of Sections 2.09 and 9.05 shall expire upon the expiration of all applicable statutes of limitations, and the provisions of 9.16 shall expire on the two year anniversary of the payment in full of all the Notes.

Section 9.03   Binding Effect.   This Agreement shall become effective on the Effective Date.

Section 9.04   Successors and Assigns.   (a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Issuer, the Administrative Agent or the Noteholders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)   Each Noteholder may assign to any Person or Persons (other than an Ineligible Transferee) all or a portion of its interests, rights and obligations under this Agreement and the other Finance Documents, with notice to, but without the prior written consent of, the Issuer and the Administrative Agent. Notwithstanding the foregoing sentences, upon the occurrence and continuance of an Event of Default, each Noteholder may effect such assignment to any Person or Persons, with notice to, but without the prior written consent of, the Issuer and the Administrative Agent; *provided,* that the parties to each assignment shall execute and deliver to each of the Issuer and the Administrative Agent a copy of the Assignment and Acceptance. From and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Noteholder under this Agreement, (B) the assigning Noteholder thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.09 and 9.05 and be subject to the provisions of Section 9.16), and (C) the assignee of a Note shall be entitled to exchange the assigned Note for a new Note as provided under Section 2.11.

35



By executing and delivering an Assignment and Acceptance, the assigning Noteholder thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Noteholder warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the outstanding balances of its Note, in each case without giving effect to assignment thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Noteholder makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Finance Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Issuer, the Guarantor or any Subsidiary or the performance or observance by the Issuer, the Guarantor or any Subsidiary of any of its obligations under this Agreement, any other Transaction Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants whether it is or is not an Eligible Institution and that it is a Person legally authorized to enter into such Assignment and Acceptance and that is not an Ineligible Transferee; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.01(e) or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, such assigning Noteholder or any other Noteholder and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as the Noteholder.

(c)    Each Noteholder may without the consent of the Issuer or the Administrative Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement and the Note held by it; provided, however, that (i) such Noteholder's obligations under this Agreement shall remain unchanged, (ii) such Noteholder shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Issuer, the Administrative Agent and the Noteholders shall continue to deal solely and directly with such Noteholder in connection with such Noteholder's rights and obligations under this Agreement and the Note held by it, and such Noteholder shall retain the sole right to enforce the obligations of the Issuer relating to this Agreement and the Note held by it and to approve any amendment, modification or waiver of any provision of this Agreement. To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 9.06 as though it were a Noteholder, *provided* such participating bank or other Person agrees to be subject to Section 9.06 as though it were a Noteholder and the Issuer has been notified of the identity of such participating bank or other Person prior to such participating bank or other Person exercising any setoff rights against the Issuer.

Any Noteholder or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Issuer in respect of this Transaction furnished to such Noteholder by or on behalf of the Issuer; *provided* that, prior to any such disclosure of information designated by the Issuer as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement enforceable by the Issuer and the Guarantor whereby such assignee or participant shall agree to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Noteholders pursuant to Section 9.16.

(d)     Any Noteholder may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and the other Obligations owed to such Noteholder to secure obligations owed by such Noteholder; *provided* that no such pledge or assignment shall release a Noteholder from any of its obligations hereunder or substitute any such assignee for such Noteholder as a party hereto.

(e)     The Issuer shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Noteholder, and any attempted assignment without such consent shall be null and void.

**Section 9.05     Expenses; Payments.** (a) Each Party shall be responsible for all out-of-pocket expenses incurred by it in connection with the preparation and administration of this Agreement except that the Issuer agrees to pay the fees, charges and disbursements of Norton Rose Fulbright, counsel for the Administrative Agent up to an amount not to exceed One Hundred Thousand Dollars ($100,000) in the aggregate (whether or not the transactions hereby or thereby contemplated shall be consummated). The Issuer agrees to pay all out-of-pocket expenses incurred by the Administrative Agent or any Noteholder in connection with the enforcement or protection of its rights in connection with this Agreement and the other Finance Documents or in connection with the Notes issued hereunder, and, in connection with any such enforcement or protection, the fees, charges and disbursements of any counsel for the Administrative Agent or any Noteholder.

All payments by the Issuer of principal, interest and other Obligations shall be made solely and exclusively in Dollars, as currency of payment, in same day funds, without setoff, counterclaim, deduction or other defense (other than as provided in Section 2.09(d) of this Agreement), free of any restriction or condition, and delivered to each Noteholder, the Lead Arranger or the Administrative Agent, as applicable, not later than 12:00 (noon), New York City time, on the date due at the account of each such Noteholder, the Lead Arranger or the Administrative Agent in accordance with Section 2.06 hereof. If it becomes necessary to convert into Dollars any amount in any other currency, then that conversion shall be made at the rate of exchange quoted in the interbroker market by the Administrative Agent for the spot purchase of such original currency at the close of business on the day immediately preceding the day such payment was made. The Issuer agrees that its obligation to make payments in Dollars shall be enforceable as a separate cause of action if the amount received by the Noteholder, the Lead Arranger or the Administrative Agent, as applicable, shall fall short of the full amount of Dollars payable hereunder, and shall not be affected by judgment being obtained for other sums due hereunder.

Subject to Section 9.02, the provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of the Notes, the invalidity or unenforceability of any term or provision of this Agreement or any other Finance Document, or any investigation made by or on behalf of the Administrative Agent or any Noteholder. All amounts due under this Section 9.05 shall be payable on written demand therefor.

**Section 9.06     Right of Setoff.** The Issuer acknowledges that if an Event of Default shall have occurred and be continuing, each Noteholder is entitled to whatever statutory or common law provisions relating to banker's liens, rights of set off or similar rights and remedies as to deposit accounts or other funds maintained with depository institutions are available to such Noteholder.

**Section 9.07     Applicable Law.** THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS (EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN ANY SUCH OTHER FINANCE DOCUMENT), AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED

AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WHICH THE ISSUER, THE GUARANTOR, THE NOTEHOLDERS AND THE ADMINISTRATIVE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

Section 9.08    Waivers; Amendment. (a) No failure or delay of the Administrative Agent or any Noteholder in exercising any power or right hereunder or under any other Finance Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Noteholders hereunder and under the other Finance Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Finance Document or consent to any departure by the Issuer or any other Finance Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Issuer or the Guarantor in any case shall entitle the Issuer or the Guarantor to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Issuer and the Required Noteholders; *provided*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Finance Document without the prior written consent of the Administrative Agent.

Section 9.09    Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Notes, together with all fees, charges and other amounts which are treated as interest on such Notes under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Noteholder holding such Note in accordance with applicable law, the rate of interest payable in respect of such Note, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Note but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Noteholder in respect of other periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Maximum Rate to the date of repayment, shall have been received by such Noteholder.

Section 9.10    Entire Agreement. This Agreement and the other Finance Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Finance Documents. Nothing in this Agreement or in the other Finance Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Noteholders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Finance Documents.

Section 9.11    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE



OTHER FINANCE DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

Section 9.12    Severability.  In the event any one or more of the provisions contained in this Agreement or in any other Finance Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13    Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 9.14    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.15    Jurisdiction; Consent to Service of Process.  (a) The Issuer and the Guarantor each hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of competent jurisdiction sitting in the County of New York, State of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Finance Documents, or for recognition or enforcement of any judgment, and agrees that it will not take any action or proceeding relating to this Agreement or the other Finance Documents in the courts of any other jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto further agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Noteholder may otherwise have to bring any action or proceeding relating to this Agreement or the other Finance Documents against the Issuer, the Guarantor or their respective properties in the courts of any jurisdiction.

(b)    The Issuer and the Guarantor each hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Finance Documents in any New York State or federal court sitting in the County of New York, State of New York. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, with the express intent that such provision shall apply.



(c) To the extent that the Issuer or the Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process, the Issuer and the Guarantor each hereby waives such immunity and hereby agrees not to assert, by way of motion, as a defense or otherwise, in any suit, action or proceeding the defense of sovereign immunity or any claim that it is not personally subject to the jurisdiction of the above-named courts by reason of sovereign immunity or otherwise, or that it is immune from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property or from attachment either prior to judgment or in aid of execution by reason of sovereign immunity, except for the mandatory notice required for Venezuelan state owned entities in accordance with Article 99 of the law of the Attorney General's Office *(Ley Orgánica de la Procuraduría General de la República)*.

(d) The Issuer and the Guarantor each irrevocably appoints the Process Agent as its agent to receive and forward any writs, process and summonses in any suit, action or proceeding brought in connection with this Agreement or any other Finance Document against the Issuer in any court of the State of New York or any United States federal court sitting in the County of New York, State of New York and has agreed that such appointment shall be so long as the Obligations remain outstanding in accordance with the terms hereof or until the appointment by the Issuer of a successor agent in the County of New York, State of New York as its agent for such purpose and the acceptance of such appointment by such successor. If for any reason such agent shall cease to be available to act as such (including by reason of the failure of such agent to maintain an office in the County of New York, State of New York), the Issuer agrees promptly to designate a new agent in the County of New York, State of New York, on the terms and for the purposes of this Section. Nothing herein shall in any way be deemed to limit the ability of the Administrative Agent or the Noteholders (including the Initial Noteholder) to serve any such legal process in any other manner permitted by applicable law or to obtain jurisdiction over the Issuer or the Guarantor or bring actions, suits or proceedings against it in such other jurisdictions, and in such manner, as may be permitted by applicable law.

**Section 9.16    Confidentiality.** Each of the Administrative Agent and the Noteholders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being agreed that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the Administrative Agent or Noteholder disclosing Information to such Affiliates shall be responsible for a disclosure of Information by such Affiliates in contravention of this Section 9.16), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, *provided* that if legally permissible, such Noteholder or the Administrative Agent, as applicable, shall use commercially reasonable efforts to provide prompt notice to the Issuer prior to such disclosure and if not possible, promptly thereafter, (d) in connection with the exercise of any remedies hereunder or under the other Finance Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Finance Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Issuer, the Guarantor or any Subsidiary or any of their respective obligations, (f) with the consent of the Issuer or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. For the purposes of this Section, **"Information"** shall mean all information received from the Issuer or the Guarantor and related to the Issuer or the Guarantor or their business, other than any such information that was available to the Administrative Agent or any Noteholder on a nonconfidential basis prior to its disclosure by the Issuer or



the Guarantor. Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

Section 9.17    Noteholder Action. Each Noteholder agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Finance Party or any other obligor under any of the Finance Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any property of any such Finance Party, unless expressly provided for herein or in any other Finance Document, without the prior written consent of the Administrative Agent. The provisions of this Section 9.17 are for the sole benefit of the Administrative Agent and shall not afford any right to, or constitute a defense available to, any Finance Party.

Section 9.18    USA PATRIOT Act Notice. Each Noteholder and the Administrative Agent (for itself and not on behalf of any Noteholder) hereby notifies the Issuer and the Guarantor that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Issuer and the Guarantor, which information includes the name and address of the Issuer and the Guarantor and other information that will allow such Noteholder or the Administrative Agent, as applicable, to identify the Issuer and the Guarantor in accordance with the USA PATRIOT Act.

Section 9.19    Payment Suspension or Cessation. Any Noteholder shall have the right, but not obligation, and for its account only, to issue written instructions to the Issuer to suspend or cease payment of amounts due under Notes or this Agreement if the payment obligations of the Issuer to such Noteholder under the Notes or this Agreement violates applicable law. Upon receipt of any such instructions, the Issuer shall comply therewith in respect of the Note of the Noteholder issuing such instruction and reserve any such payments that are so suspended or ceased (collectively, the **"Reserved Payments"**). Notwithstanding any provision of this Agreement or any Note to the contrary, failure to make such Reserved Payments in accordance with the written instruction of the Noteholder shall not be deemed a Default or an Event of Default or a breach or violation in any respect of such Note or this Agreement nor entitle the Noteholder or the Administrative Agent to exercise any remedies with respect to such Note or this Agreement. Notwithstanding the foregoing, such suspension or cessation of the Reserved Payments shall not be construed as relieving, cancelling or otherwise forgiving the Reserved Payments so suspended or ceased or otherwise relieve the Issuer of its other obligations under this Agreement and to other Noteholders; *provided*, that, notwithstanding any provision of the Note or this Agreement to the contrary, for so long as such suspension or cessation continues, the rate at which interest under such Note and this Agreement shall accrue with respect to the amount of the Reserved Payments shall be adjusted to be equal to the lesser of (i) 6.5% or (ii) a variable rate per annum equal to the "Money market, annual yield" as may from time to time be published in the Wall Street Journal (currently published under "Bonds, Rates and Yields") or if such information is no longer published, another comparable rate as shall be mutually agreed upon by the Issuer and the applicable Noteholder, acting reasonably. Such issuing Noteholder shall have the right at its sole discretion to revoke such instructions and require the Issuer to pay all amounts then due and owing, in which case, the Reserved Payments and interest thereon at the applicable rate set forth in the immediately preceding sentence shall be due to such Noteholder not later than ten (10) Business Days following the Issuer's receipt of a written notice of revocation of such instructions from such Noteholder.

[*remainder of page intentionally left blank*]



**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed by their respective authorized officers or directors as of the Effective Date.

**PETRÓLEOS DE VENEZUELA S.A.,**
as Issuer

By:_____
Name: Orlando Chacín
Title: Director

**PDVSA PETRÓLEO S.A.,**
as Guarantor

By:_____
Name: Orlando Chacín
Title: Director

**GENERAL ELECTRIC CAPITAL CORPORATION,**
as Initial Noteholder

By: _____

Name: Gerald Joseph Friel

Title: Authorized Signatory

*Signature page to Note Agreement*



**GENERAL ELECTRIC CAPITAL CORPORATION,**
as Administrative Agent

By: _____
Name: Gerald Joseph Friel
Title: Authorized Signatory

*Signature page to Note Agreement*



## FORM OF NOTE

### PETRÓLEOS DE VENEZUELA S.A.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, AGREES TO OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE ONLY TO QUALIFIED INSTITUTIONAL BUYERS PURSUANT TO RULE 144A OF THE SECURITIES ACT OR TO BUYERS PURCHASING PURSUANT TO A REGISTRATION STATEMENT REGISTERED UNDER THE SECURITIES ACT. IN ADDITION, ANY SUCH TRANSFERS MUST OTHERWISE BE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR OTHER APPLICABLE JURISDICTION.

### 6.5% SENIOR GUARANTEED NOTE

Date: May 27, 2015

No. R-1

FOR VALUE RECEIVED, the undersigned, **PETRÓLEOS DE VENEZUELA, S.A.** (herein called the "**Issuer**"), a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela, hereby promises to pay to GENERAL ELECTRIC CAPITAL CORPORATION, or registered assigns, the principal sum of TWO HUNDRED FIFTY-SIX MILLION FIVE HUNDRED FIFTY-FIVE THOUSAND SIX HUNDRED FOUR AND 85/100TH DOLLARS ($256,555,604.85), with interest (a) on the unpaid principal balance thereof based on and computed on the basis of the actual number of days elapsed on a year of 365/366 days, at a rate per annum equal to six and one-half percent (6.5%), payable quarterly, on March 31, 2015 (the "**Initial Repayment Date**") and on each day in March, June, September and December described on Exhibit A hereto occurring after the Initial Repayment Date on or prior to March 27, 2018 (the "**Maturity Date**" and, each such date on which payment of interest is due, including the Maturity Date, a "**Repayment Date**") or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, and (b) on any overdue payment of principal, any overdue payment of interest, payable quarterly as aforesaid (or, at the option of the registered holder hereof, on demand), at a rate per annum of eight and one-half percent (8.5%) per annum, calculated as set forth above. The principal amount of this Note shall be due and payable on each Repayment Date or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, in installments, with each installment being equal to the amounts set forth on Exhibit A hereto, with any unpaid principal and interest on this Note not previously paid being due and payable in full on the Maturity Date.

A-1

Payments of principal and interest on this Note are to be made in United States dollars to the Administrative Agent (at its offices at 800 Long Ridge Road, Stamford, CT 06927).

This Note is one of the Notes (herein called the "**Note**") issued pursuant to the Note Agreement, dated as of March 27, 2015 (as from time to time amended, the "**Note Agreement**"), among the Issuer, the Guarantor, the Administrative Agent and the Initial Noteholder named therein, and the Noteholders party thereto from time to time, and is entitled to the benefits and is otherwise subject to the provisions thereof. Capitalized terms used herein and not defined shall have the same meanings when used herein as in the Note Agreement.

This Note is a registered Note and, as provided in the Note Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note (or, subject to the provisions of Section 2.11 of the Note Agreement, new Notes with an aggregate principal amount equal to the principal amount of this Note) will be issued to, and registered in the name of, the transferor, the transferee or the transferees, as the case may be. Prior to due presentment for registration of transfer, the Issuer may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Issuer will not be affected by any notice to the contrary.

This Note is subject to optional prepayment, in whole or from time to time in part.

If an Event of Default, as defined in the Note Agreement, occurs and is continuing, the principal of this Note, together with all accrued and unpaid interest hereon, may be declared or otherwise become due and payable in the manner, and with the effect provided in the Note Agreement.

THIS NOTE, AND THE RIGHTS AND OBLIGATIONS OF THE ISSUER AND THE NOTEHOLDER HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WHICH THE ISSUER, THE NOTEHOLDER AND THE ADMINISTRATIVE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

**PETRÓLEOS DE VENEZUELA, S.A.**

By _____

    Name:

    Title:



A-2

Exhibit A
To
6.5% SENIOR GUARANTEED NOTE

| Repayment Date | Principal Amount Due | Interest Due |
|---|---|---|
| March 31, 2015 | $21,379,633.74 | - |
| June 29, 2015 | $21,379,633.74 | $3,991,458.84 |
| September 28, 2015 | $21,379,633.74 | $3,512,792.60 |
| December 28, 2015 | $21,379,633.74 | $3,161,513.34 |
| March 28, 2016 | $21,379,633.74 | $2,810,234.08 |
| June 27, 2016 | $21,379,633.74 | $2,458,954.82 |
| September 27, 2016 | $21,379,633.74 | $2,130,836.83 |
| December 27, 2016 | $21,379,633.74 | $1,756,396.30 |
| March 27, 2017 | $21,379,633.74 | $1,389,676.19 |
| June 27, 2017 | $21,379,633.74 | $1,065,418.41 |
| September 27, 2017 | $21,379,633.74 | $ 710,278.94 |
| December 27, 2017 | - | $ 351,279.26 |
| March 27, 2018 | $21,379,633.74 | $ 347,419.05 |

A-1



Exhibit A
To
6.5% SENIOR GUARANTEED NOTE

| Repayment Date | Principal Amount Due | Interest Due |
|---|---|---|
| March 31, 2015 | $21,379,633.74 | - |
| June 29, 2015 | $21,379,633.74 | $3,991,458.84 |
| September 28, 2015 | $21,379,633.74 | $3,512,792.60 |
| December 28, 2015 | $21,379,633.74 | $3,161,513.34 |
| March 28, 2016 | $21,379,633.74 | $2,810,234.08 |
| June 27, 2016 | $21,379,633.74 | $2,458,954.82 |
| September 27, 2016 | $21,379,633.74 | $2,130,836.83 |
| December 27, 2016 | $21,379,633.74 | $1,756,396.30 |
| March 27, 2017 | $21,379,633.74 | $1,389,676.19 |
| June 27, 2017 | $21,379,633.74 | $1,065,418.41 |
| September 27, 2017 | $21,379,633.74 | $ 710,278.94 |
| December 27, 2017 | - | $ 351,279.26 |
| March 27, 2018 | $21,379,633.74 | $ 347,419.05 |

A-1



EXHIBIT B

## FORM OF ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between [**Insert name of Assignor**] (the "Assignor") and [**Insert name of Assignee**] (the "Assignee"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Note Agreement identified below (the "Note Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Finance Documents, as of the Effective Date set forth below, the interest in and to all of the Assignor's rights and obligations under the Note Agreement (or, if a Note has been transferred to an Assignee in part, a portion thereof equivalent to the portion of such Note transferred to the Assignee), the other Transaction Documents and any other agreements, documents or instruments delivered pursuant thereto or for the benefit of the Noteholders relating thereto that represents the amount identified below of all of the Assignor's outstanding rights and obligations under the Note identified below (collectively, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| (a) | Assignor: | _____ |
| (b) | Assignee: | _____ |
| (c) | Issuer: | Petróleos de Venezuela, S.A. |
| (d) | Administrative Agent: | General Electric Capital Corporation, as administrative agent under the Note Agreement |
| (e) | Note Agreement: | The Note Agreement, dated as of March 27, 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and General Electric Capital Corporation, as Administrative Agent. |
| (f) | Assigned Interest: | Unpaid principal balance of $_____ on the Note dated [_____], 20[__] in the original principal amount of $_____ |
| (g) | Account for Payments: | [_____] |

Effective Date: _____, 20___

[*remainder of page intentionally left blank*]



C-2-1

The terms set forth in this Assignment are hereby agreed to:

**ASSIGNOR**
[**NAME OF ASSIGNOR**]

By: _____
Name:
Title:

**ASSIGNEE**
[**NAME OF ASSIGNEE**]

By: _____
Name:
Title:



ANNEX I

NOTE AGREEMENT, DATED AS OF MARCH 27, 2015, BY AND AMONG PETRÓLEOS DE
VENEZUELA, S.A., AS ISSUER, PDVSA PETRÓLEO, S.A., AS GUARANTOR, THE
NOTEHOLDERS THAT ARE A PARTY THERETO FROM TIME TO TIME AND GENERAL
ELECTRIC CAPITAL CORPORATION, AS ADMINISTRATIVE AGENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ACCEPTANCE

1.    **Representations and Warranties**

1.1   **Assignor**

The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the
Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other
adverse claim and (iii) it has full power and authority, and has taken all action necessary, to
execute and deliver this Assignment and to consummate the transactions contemplated hereby;
and (b) assumes no responsibility with respect to (i) any statements, warranties or representations
made in or in connection with the Note Agreement or any other agreement, instrument or
document delivered pursuant thereto or for the benefit of the Noteholders relating thereto, other
than this Assignment (collectively, the "Finance Documents"), (ii) the execution, legality, validity,
enforceability, genuineness, sufficiency or value of the Finance Documents, or any collateral
thereunder, (iii) the financial condition of the Issuer, the Guarantor, any of the Subsidiaries or any
of their respective Affiliates in respect of any Finance Document, or (iv) the performance or
observance by the Issuer, the Guarantor, any of the Subsidiaries or any of their respective
Affiliates of any of their respective obligations under any Finance Document.

1.2   **Assignee**

The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all
action necessary, to execute and deliver this Assignment and to consummate the transactions
contemplated hereby and to become a Noteholder under the Note Agreement, (ii) it is [an Eligible
Institution / not an Eligible Institution][1] and is not an Ineligible Transferee, (iii) from and after the
Effective Date, it shall be bound by the provisions of the Note Agreement and, to the extent of the
Assigned Interest, shall have the obligations of a Noteholder thereunder, and (iv) it has received a
copy of the Note Agreement, together with copies of the most recent financial statements
delivered pursuant to Section 5.04 thereof and such other documents and information as it has
deemed appropriate to make its own credit analysis and decision to enter into this Assignment and
to purchase the Assigned Interest on the basis of which it has made such analysis and decision;
and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the
Assignor or any other Noteholder, and based on such documents and information as it shall deem
appropriate at the time, continue to make its own credit decisions in taking or not taking action
under the Finance Documents, and (ii) it will perform in accordance with their terms all of the
obligations which by the terms of the Finance Documents are required to be performed by it as a
Noteholder.

2.    **Payments**

From and after the Effective Date, the Administrative Agent shall make all payments in respect of
the Assigned Interest (including payments of principal, interest and other amounts) to the

---

[1] Select one as applicable.



Assignor for amounts which have accrued up to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    **General Provisions**

This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy and electronic mail shall be equally effective to the delivery of a manually executed counterpart of this Assignment. THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

[*remainder of page intentionally left blank*]



## ACCOUNTS OF ADMINISTRATIVE AGENT AND INITIAL NOTEHOLDER

Account of Administrative Agent:

Legal Entity Name:         General Electric Capital Corporation
Account Title:             GECC EFS/T&I Depository Account
Bank:                      Deutsche Bank Trust Company Americas
Bank Branch Code:          DEUTUS-021001033
ABA Routing:               021001033
SWIFT:                     BKTRUS33
Currency:                  USD
Country:                   US
National Account Number:   50278772

Issuer is to provide, at the time of each cash transfer, all the related information for its proper identification, including, but not limited to bank account source of the funds, swift code and amount.

Account of Initial Noteholder:

Legal Entity Name:         General Electric Capital Corporation
Account Title:             GECC EFS/T&I Depository Account
Bank:                      Deutsche Bank Trust Company Americas
Bank Branch Code:          DEUTUS-021001033
ABA Routing:               021001033
SWIFT:                     BKTRUS33
Currency:                  USD
Country:                   US
National Account Number:   50278772

Administrative Agent is to provide, at the time of each cash transfer, all the related information for its proper identification, including, but not limited to bank account source of the funds, swift code and amount.



Schedule 3.01(h)

## SUBSIDIARIES

### Corporate Structure

The following chart summarizes our corporate structure:



Schedule 3.01(i)

## LITIGATION

### *Mobil Cerro Negro Ltd.*

On January 27, 2008, a subsidiary of ExxonMobil, Mobil Cerro Negro Ltd. ("Mobil Cerro Negro") filed an arbitration request before the International Court of Arbitration of the International Chamber of Commerce against PDVSA and PDVSA Cerro Negro, S.A. ("PDVSA Cerro Negro"), claiming an entitlement to indemnity from PDVSA Cerro Negro under the association agreement relating to the Cerro Negro Project (the "Cerro Negro Association Agreement") and from the Issuer under the terms of a guaranty granted by the Issuer of PDVSA Cerro Negro's obligations under the Cerro Negro Association Agreement. In December 2007, Mobil Cerro Negro had obtained from the United States District Court for the Southern District of New York an attachment order on funds of PDVSA Cerro Negro, deposited in accounts held in the Bank of New York Mellon. Pursuant to that order, US$300 million of PDVSA Cerro Negro funds remained attached pending completion of the arbitration procedure. Additionally, on January 24, 2008, Mobil Cerro Negro had obtained ex parte a worldwide freezing order from the High Court of Justice in London, restricting the Issuer from disposing of certain assets and ordering it to maintain, on a global basis, assets having an aggregate value of US$12 billion. However, the High Court of Justice vacated the order on March 18, 2008, upon the Issuer's application. Ex parte attachment orders were also obtained by Mobil Cerro Negro in The Netherlands, attaching the shares of a subsidiary, and The Netherlands Antilles and Aruba, which have not interfered with the Issuer's ordinary course of business.

Although the provisional measures proceedings in the national courts were based on an alleged indemnity claim of US$12 billion, Mobil Cerro Negro reduced its claim in the arbitration to approximately US$6.5 billion to US$7 billion, plus interest and costs. The claim in the arbitration was for indemnification under Article XV of the Cerro Negro Association Agreement, which provided that PDVSA Cerro Negro would indemnify Mobil Cerro Negro, subject to certain limitations, for governmental actions defined as "Discriminatory Measures" having a "Material Adverse Impact" on Mobil Cerro Negro as defined in the Association Agreement. Mobil Cerro Negro claimed that various royalty, tax and production cutback measures starting in 2004 as well as the migration process of 2007 which required all associations operating outside of the legal framework established by the Organic Hydrocarbons Law to migrate to the mixed company structure under that law, constituted "Discriminatory Measures" as defined in the Cerro Negro Association Agreement, triggering the indemnity obligation of PDVSA Cerro Negro and the Issuer's guaranty. The hearing on all issues in the arbitration concluded on September 24, 2010 and post-hearing briefing and the submission of costs claims was completed on January 24, 2011.

The arbitral tribunal issued its final award on December 23, 2011, and the award was delivered to the parties on December 30, 2011. The tribunal determined that PDVSA Cerro Negro and the Issuer were liable to Mobil Cerro Negro in the amount of US$907,581,000 with respect to "Discriminatory Measures" under the Cerro Negro Association Agreement, with an offset based upon counterclaims asserted by the Issuer and PDVSA Cerro Negro in the amount

of US$160,643,042. The arbitral tribunal found that PDVSA Cerro Negro had not breached the Cerro Negro Association Agreement and that the Issuer had not breached the guaranty and awarded no pre-award interest. The tribunal also did not award Mobil Cerro Negro any part of its cost claim. The tribunal awarded post-award interest on the amount of US$736,937,958 at the New York Prime Rate and granted PDVSA Cerro Negro and the Issuer 60 days to pay the award. Prior to February 23, 2012, the monetary aspect of the award was satisfied in full by the release to Mobil Cerro Negro of the funds that were attached in New York, the cancelation of Cerro Negro project bonds that the Issuer acquired in 2007, and the payment in cash by the Issuer to Mobil Cerro Negro of the balance.

The New York attachment proceeding was terminated by a stipulation and order dated June 6, 2012 (the "Stipulation and Order") pursuant to which the Issuer was joined to the action and the Issuer and PDVSA CN agreed to (i) pay into the Venezuelan Treasury or otherwise satisfy, on behalf of Mobil Cerro Negro, any tax liability that may be imposed by the Venezuelan Government on Mobil Cerro Negro's compensation awarded by the Tribunal and/or Mobil Cerro Negro's income from the Cerro Negro Project; and (ii) hold Mobil Cerro Negro harmless from any such tax liabilities, including, but not limited to, any related penalties, interest, or fees. A judgment to the same effect was entered on July 7, 2012. In connection with the resolution of the New York attachment, the attachment orders in The Netherlands, The Netherlands Antilles and Aruba were vacated.

### *PDV Sweeny and ConocoPhillips Company*

On February 25, 2010, PDV Sweeny, Inc. ("PDV Sweeny") and PDV Texas, Inc. ("PDV Texas") filed a request for arbitration with the International Chamber of Commerce (the "ICC") against ConocoPhillips Company ("ConocoPhillips") and Sweeny Coker Investor Sub, Inc. ("Sweeny Sub"), in connection with the exercise of a call option by ConocoPhillips and Sweeny Sub to purchase the interests of PDV Sweeny and PDV Texas in the joint venture for no consideration (the "Call Option Arbitration"). PDV Sweeny and PDV Texas seek an award declaring, among other things, that the exercise of the call option was invalid and ineffective and that they are entitled to their interests in the joint venture. Thereafter, on August 16, 2010 (amended on September 29, 2010), ConocoPhillips filed a request for arbitration with the ICC against the Issuer and its wholly-owned subsidiary, the Guarantor, alleging that the Guarantor, breached an obligation under a crude oil supply agreement to participate in a joint calculation of an adjustment to the price of crude oil for the second half of 2008, and all of 2009, and that as a result ConocoPhillips suffered damages in excess of US$242 million, and further alleging that the Issuer, as guarantor, had an obligation to indemnify ConocoPhillips for such damages (the "Lookback Adjustment Arbitration"). On December 17, 2010, an arbitral tribunal granted the request of the Issuer and its affiliates to consolidate the Call Option Arbitration and the Lookback Adjustment Arbitration. On February 4, 2011, ConocoPhillips resubmitted its claim related to the Lookback Adjustment Arbitration as a counterclaim and submitted two additional counterclaims, alleging that the Guarantor, under a crude oil supply agreement and the Issuer as guarantor were liable for damages caused by their failure to supply crude oil during the months of January, March, April, June, July and August 2009, in excess of US$16 million, as well as damages caused by demurrage, in excess of US$3.3 million. On May 3, 2011, the tribunal and the parties signed the terms of reference, and on May 26, 2011, the tribunal issued a procedural

order, establishing a schedule for the arbitration. In accordance with that procedural order, the Issuer and its affiliates submitted their Statement of Claim on August 3, 2011, and the Statement of Defense and Counterclaim was filed on December 20, 2011. A hearing was conducted in December 2012. An arbitral award was issued on April 14, 2014 ordering the Issuer to pay approximately $5 million in damages. The tribunal has yet to issue a decision regarding the reimbursement of legal costs incurred during the proceedings.

### *OPIC Arbitration*

On November 19, 2010, Opic Karimun Corporation ("OPIC") filed a request for arbitration before the International Court of Arbitration of the International Chamber of Commerce in New York, against Corporación Venezolana del Petróleo, S.A. ("CVP") and the Issuer under the exploration at risk and profit sharing association agreements relating to the Gulf of Paria East and Gulf of Paria West (the "Gulf of Paria Agreements") and the Issuer's guaranties of CVP's obligations thereunder. OPIC alleges that the Issuer and CVP are liable under a variety of theories, including breach of the Gulf of Paria Agreements and the guaranties, and seeks damages in the amount of approximately US$200 million as a result of the migration process of 2007 in accordance with Decree-Law 5.200. On January 14, 2011, the Issuer and CVP filed their Answer to the Request for Arbitration. Thereafter, following the constitution of the arbitral tribunal and the establishment of the terms of reference, the parties have submitted their initial briefs and have engaged in document production.

A pre-hearing briefing on the matter was completed on December 14, 2012 and a hearing on the merits was held on January 21, 2013 through January 28, 2013. The parties submitted their post-hearing briefs on March 15, 2013. Thereafter, the Secretariat of the ICC informed the parties that the ICC International Court of Arbitration has extended the time limit for rendering the award until November 29, 2013. An award was issued on November 11, 2013, pursuant to which the Issuer was ordered to pay $81 million. the Issuer has not made any payments on this award.

### *SIMCO Arbitration*

On March 26, 2010, Simco Consortium, formed by Wood Engineering Limited, filed an arbitration request against the Guarantor before the International Court of Arbitration of the International Chamber of Commerce in New York, based on an alleged breach by the Guarantor of a contract for the provision of water treatment and injection services in Lake Maracaibo. Plaintiffs are seeking damages for $62,243,663 and Bs.163,348,885.

The arbitral tribunal was formed on December 2, 2010. The parties filed their supporting briefs in the first half of 2011. Additional briefs were filed late 2011 and early 2012. The hearing took place in April 2012. The parties filed post-hearing briefs in July 2012. On December 31, 2012 the International Court of Arbitration of the International Chamber of Commerce in New York issued an order extending the decision term until February 2013, and on July 30, 2013 the Court of Arbitration decided to further extend the decision term until October 31, 2013. The arbitration was suspended to allow for settlement negotiations, and a final settlement agreement



was entered into by the parties on January 15, 2014. All amounts due pursuant to the settlement agreement have been paid. .

### *The Guarantor*

On July 30, 2007, the Venezuelan 9th Superior Tax Court issued a decision in connection with a recourse filed by the Guarantor regarding certain rulings of the Venezuelan tax authority challenging the deductibility of a contribution made in compliance with Section 6 of the Organic Hydrocarbons Law. Said decision held that only crude oil exports were subject to deduction, and that, in contrast, other hydrocarbons products or sub-products were not allowed to be deducted. Although our management and our legal advisors understand there are legal grounds to uphold said ruling, we will file an appeal with the Venezuelan Supreme Court. As of December 31, 2012 and December 31, 2011, we registered allowances of $673 million for contingencies in respect of said procedure and the potential impact it may have in other deductions made in reliance of Section 6 of the Organic Hydrocarbons Law.

As of December 31, 2012 and December 31, 2011, we registered allowances of $68 million for contingencies in respect of certain tax obligations of the Guarantor pertaining to 1994, 1995 and 1996 having a $415 million aggregate principal amount. In such connection, we have made cash and in kind payments by delivering Reimbursement Tax Certificates to the SENIAT for an aggregate principal amount of $682 million and $13 million, respectively.

### *Helmerich & Payne International Drilling Co. and Helmerich & Payne de Venezuela C.A.*

On November 29, 2011, Helmerich & Payne International Drilling Co. and Helmerich & Payne de Venezuela C.A., filed a lawsuit against the Bolivarian Republic of Venezuela, the Issuer and the Guarantor before the United States District Court for the District of Columbia, seeking recovery of damages in an as yet unspecified amount for violation of international law and breach of contract related to payment disputes over drilling services provided. A decision on jurisdiction was rendered by the court on September 20, 2013, whereby the court ruled that as a Venezuelan corporation, Helmerich & Payne de Venezuela C.A. must be deemed a citizen of Venezuela for purposes of international law. With respect to a motion to dismiss the breach of contract claim, the court ruled that the alleged breaches have a direct effect in the United States. The above rulings were appealed by Helmerich & Payne de Venezuela C.A., Venezuela and the Issuer. A consolidated common appeal is currently pending before the U.S. Court of Appeals for the District of Columbia.

### *Other Claims; Allowances for Contingencies*

As of December 31, 2013, we were subject to other legal claims and procedures in the ordinary course of business having an aggregate amount of $1,318 million.

As of December 31, 2013 and December 31, 2012, we registered allowances for contingences having an aggregate amount of $983 million and $1,244 million, respectively.



Schedule 3.01(p)

## ENVIRONMENTAL MATTERS

**Environment and Occupational Health.** We and our subsidiaries are subject to a complex environmental and occupational health regulation framework. Under this framework, we and our subsidiaries may be required to make significant expenditures to modify our facilities and to prevent or remedy the effects of waste disposal, pollutant spills, and accidents on the environment and the population's health.

We are taking important steps to prevent risks to the environment, the population's health, and the integrity of our installations. During 2012 and 2013, we continued the implementation of our company-wide Integral Risk Management System (SIR-PDVSA®). The system is based on international practices and standards, such as ISO 14001 for Environmental Management, ISO 18000 and British Standard BUSINESS 8800 for health, and the Occupational Safety and Health Administration (OSHA)'s and American Petroleum Institute (API) for process safety.

We have invested \$42 million to complete the implementation of SIR-PDVSA®. In addition, we are undertaking an investment plan to comply with Venezuelan environmental laws under which \$88 million was invested during 2011, \$115 million was invested during 2012 and \$32 million during the six months ended June 30, 2013. In addition, CITGO plans to invest approximately \$291 million for projects managing environmental risks between 2013 and 2017.

As part of our environmental responsibility initiative, we have also instituted a plan to recover oil pits that were left behind from oil exploration and production activities until 2004. Oil pits are excavations made on the soil surface to store oil sludge and drilling cuts. The plan includes the recovery, recycling and transformation of the disposed waste, including abandoned installations, in order to convert them into financial and environmental assets. The plan was first implemented in 2001 and has an expected duration of twelve years. Since 2005, a total of 3,223 oil pits have been closed and restored. In 2012, 565 oil pits were closed and restored. As of December 31, 2012, the total amount of restored oil pits are 5,081. In 2012, 2011 and 2010, we registered remediation and restoration expenses having an aggregate amount of \$176 million, \$217 million and \$164 million, respectively.

Our subsidiary CITGO has received several notices of violation from the Environmental Protection Agency of the United States and other government authorities, which include notices of violation under the Federal Clean Air Act that may lead to CITGO being deemed liable, jointly with other companies, for remediation of contamination in respect of certain properties pursuant to the Comprehensive Environmental Response, Compensation and Liability Act. Such notices of violation are currently being analyzed by CITGO and, in certain cases, remediation actions are being performed. CITGO is committed to negotiate and settle with the governmental authorities in respect of such matters.

As of December 31, 2012, CITGO's non-current liabilities included an environmental accrual of \$135 million compared with \$127 million as of December 31, 2011. CITGO estimates a possible additional loss of \$72 million as of December 31, 2012 in connection with environmental matters.

On February 4, 2012, two surface pipelines in the Venezuelan state of Monagas ruptured, resulting in a spill of light crude oil. The resulting oil spill spread over a distance of approximately 0.5 km to the Guarapiche River. A water treatment plant that treats water from

the Guarapiche River and provides such water to residents of certain areas of the state of Monagas was temporarily shut down while the Issuer contained and conducted a clean-up of the oil spill. During such shut down, the Issuer distributed potable water to residents of the affected areas. In consultation with experts, the Issuer deployed containment barriers and equipment for purposes of containing and removing the oil. After containing the spill, the Issuer worked to remediate the affected water and soil. The clean-up of the spill and the restoration of the water supply to affected residents was completed within forty days of the incident.

Since May 2012, the following changes to the Issuer's environmental safety initiatives have occurred: (i) the Issuer has increased the number of environmental indicators certified by KPMG; (ii) the Issuer has engaged in the development of the subsoil injection of waste, which has allowed the Issuer to safely dispose of approximately 650,000 barrels of mud and industrial water; (iii) the Issuer has designed and implemented new plans to address oil spills; (iv) the Issuer has commenced 174 environmental projects in different facilities throughout Venezuela; and (v) the Issuer has incorporated additional environmental policies to seven projects to be developed by the Issuer.



Annex I

## Description of Affiliates of the Issuer and of Novated Receivables

AMOUNT IN USD      $131,855,116
AMOUNT IN EUR      $114,646,032

| GE Entity | PDVSA Entity | Invoice number | Currency | Amount | Date | Ref. |
|---|---|---|---|---|---|---|
| Bently Nevada, Inc. | Bariven S.A. | 1010079966 | USD | $1,811 | 7-Jun-13 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010104093 | USD | 57,622 | 19-Nov-13 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010104349 | USD | $55,151 | 21-Nov-13 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010104350 | USD | $34,964 | 21-Nov-13 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010107156 | USD | $11,295 | 10-Dec-13 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010119223 | USD | $19,261 | 6-Mar-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010124190 | USD | $459,302 | 3-Apr-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010124191 | USD | $176,315 | 3-Apr-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010148659 | USD | $9,884 | 17-Sep-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010148660 | USD | $1,587 | 17-Sep-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010148910 | USD | $26,460 | 18-Sep-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010149502 | USD | $196,556 | 23-Sep-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010149619 | USD | $109,354 | 23-Sep-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010149919 | USD | $41,730 | 24-Sep-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010159592 | USD | $6,370 | 25-Nov-14 | |
| Bently Nevada, Inc. | Bariven S.A. | 1010161930 | USD | $13,129 | 11-Dec-14 | 1) |
| Bently Nevada, Inc. | Bariven S.A. | 1010161930 | USD | $158 | 11-Dec-14 | 2) |
| Bently Nevada, Inc. | Bariven S.A. | 1010163878 | USD | $987,179 | 22-Dec-14 | 3) |
| Bently Nevada, Inc. | Bariven S.A. | 1010163879 | USD | $803,312 | 22-Dec-14 | 4) |
| Bently Nevada, Inc. | Bariven S.A. | 1010164845 | USD | $19,528 | 27-Dec-14 | 5) |
| Bently Nevada, Inc. | Bariven S.A. | 1010167638 | USD | $87,323 | 22-Jan-15 | 6) |
| Bently Nevada, Inc. | Bariven S.A. | 1010167638 | USD | $1,397 | 22-Jan-15 | 7) |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18784 | USD | $84,139 | 31-Jan-11 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18638 | USD | $801 | 31-May-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18871 | USD | $4,400 | 31-May-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18725 | USD | $29,065 | 30-Jun-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18445 | USD | $8,840 | 31-Jul-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18640 | USD | $17,112 | 31-Jul-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18878 | USD | $23,569 | 31-Aug-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19190 | USD | $17,288 | 31-Aug-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18637 | USD | $4,400 | 31-Oct-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18721 | USD | $4,440 | 31-Oct-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18433 | USD | $1,202 | 31-Dec-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18438 | USD | $4,801 | 31-Dec-12 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18630 | USD | $30,844 | 31-Jan-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18633 | USD | $39,226 | 31-Jan-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18418 | USD | $135,104 | 27-Mar-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18440 | USD | $997 | 27-Mar-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18442 | USD | $786 | 27-Mar-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18840 | USD | $162,921 | 27-Mar-13 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18869 | USD | $21,177 | 27-Mar-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18877 | USD | $23,127 | 27-Mar-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18879 | USD | $32,176 | 27-Mar-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18955 | USD | $22,031 | 27-Mar-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18422 | USD | $103,553 | 30-Apr-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18842 | USD | $33,944 | 30-Apr-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18867 | USD | $33,941 | 30-Apr-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19186 | USD | $28,878 | 30-Apr-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18435 | USD | $786 | 31-May-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18798 | USD | $91,421 | 18-Jun-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18420 | USD | $18,919 | 25-Jun-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18959 | USD | $282,148 | 25-Jun-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18626 | USD | $151,104 | 26-Jul-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18195 | USD | $7,260 | 30-Jul-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18715 | USD | $95,673 | 29-Aug-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19118 | USD | $25,532 | 29-Aug-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18284 | USD | $67,378 | 30-Aug-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18291 | USD | $8,387 | 30-Aug-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18424 | USD | $134,231 | 30-Aug-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18799 | USD | $83,031 | 30-Aug-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18907 | USD | $243,830 | 30-Aug-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18363 | USD | $128,840 | 23-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18616 | USD | $2,799 | 23-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18802 | USD | $81 | 23-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18803 | USD | $67,659 | 23-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18805 | USD | $64,984 | 23-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18807 | USD | $506 | 23-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18591 | USD | $235,624 | 24-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18593 | USD | $88,082 | 24-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18851 | USD | $107,473 | 24-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18909 | USD | $186,456 | 24-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18965 | USD | $28,080 | 25-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19133 | USD | $54,327 | 25-Sep-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18513 | USD | $7,260 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18531 | USD | $5,347 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18533 | USD | $42,690 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18549 | USD | $56,586 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18551 | USD | $7,260 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18735 | USD | $60,722 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18737 | USD | $31,657 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18811 | USD | $190,535 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18812 | USD | $18,044 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18818 | USD | $69,274 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18849 | USD | $176,566 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18906 | USD | $175,561 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18962 | USD | $176,795 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19121 | USD | $29,797 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19127 | USD | $40,666 | 31-Oct-13 | |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18644 | USD | $358,345 | 30-Nov-13 | 8) |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18646 | USD | $175,669 | 30-Nov-13 | 8) |

| | | | | | |
|---|---|---|---|---|---|
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18652 | USD | $65,260 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18654 | USD | $39,951 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18662 | USD | $7,260 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18664 | USD | $78,970 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18679 | USD | $292,827 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18813 | USD | $91,572 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18814 | USD | $218,377 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18831 | USD | $226,823 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18833 | USD | $82,465 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18836 | USD | $10,729 | 30-Nov-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 6167 | USD | ($3,089) | 19-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18744 | USD | $7,260 | 19-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18755 | USD | $74,753 | 19-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18757 | USD | $168 | 19-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18763 | USD | $7,260 | 19-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18819 | USD | $256,752 | 19-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18821 | USD | $298,369 | 19-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18862 | USD | $148,022 | 19-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18767 | USD | $97,480 | 20-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18957 | USD | $189,783 | 20-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19130 | USD | $39,538 | 20-Dec-13 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18889 | USD | $7,260 | 29-Jan-14 | 9| |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18983 | USD | $228,525 | 29-Jan-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19109 | USD | $232,929 | 29-Jan-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18901 | USD | $7,260 | 30-Jan-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18953 | USD | $16,667 | 30-Jan-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19063 | USD | $304,457 | 30-Jan-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18911 | USD | $183,703 | 21-Feb-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18914 | USD | $6,259 | 21-Feb-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19112 | USD | $207,165 | 21-Feb-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19114 | USD | $163,047 | 21-Feb-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18921 | USD | $7,260 | 24-Feb-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18923 | USD | $116,281 | 24-Feb-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18925 | USD | $49,454 | 24-Feb-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18927 | USD | $65,157 | 24-Feb-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18929 | USD | $7,260 | 24-Feb-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18994 | USD | $182 | 24-Mar-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18997 | USD | $1,451 | 24-Mar-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 18999 | USD | $694 | 24-Mar-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19004 | USD | $7,260 | 24-Mar-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19007 | USD | $666 | 24-Mar-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19012 | USD | $7,260 | 25-Mar-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19015 | USD | $378 | 25-Mar-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19363 | USD | $75,869 | 25-Apr-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19365 | USD | $94,769 | 28-Apr-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19367 | USD | $152,115 | 28-Apr-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19373 | USD | $54,150 | 28-Apr-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19182 | USD | $7,260 | 29-Apr-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19171 | USD | $7,260 | 30-Apr-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19289 | USD | $2,667 | 30-Apr-14 |

| | | | | | |
|---|---|---|---|---|---|
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19377 | USD | $44,332 | 30-Apr-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19379 | USD | $44,824 | 30-Apr-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19211 | USD | $62,675 | 23-May-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19213 | USD | $70,886 | 23-May-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19215 | USD | $182 | 23-May-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19236 | USD | $7,260 | 26-May-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19238 | USD | $7,260 | 26-May-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19369 | USD | $166,137 | 26-May-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19371 | USD | $150,112 | 26-May-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19375 | USD | $79,431 | 26-May-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 6575 | USD | ($726) | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19315 | USD | $1,767 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19317 | USD | $1,304 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19325 | USD | $62,109 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19331 | USD | $8,430 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19333 | USD | $7,260 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19338 | USD | $7,260 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19504 | USD | $61,808 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19570 | USD | $83,561 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19578 | USD | $111,711 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19580 | USD | $110,029 | 24-Jun-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19455 | USD | $103,700 | 28-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19458 | USD | $679 | 28-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19582 | USD | $1,601 | 28-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19584 | USD | $182 | 28-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19586 | USD | $8,383 | 28-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 6512 | USD | ($726) | 29-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19482 | USD | $5,329 | 29-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19484 | USD | $7,260 | 29-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19507 | USD | $114,428 | 29-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19655 | USD | $7,260 | 29-Jul-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19550 | USD | $1,668 | 28-Aug-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19588 | USD | $642 | 28-Aug-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19595 | USD | $87,619 | 28-Aug-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19597 | USD | $74,582 | 28-Aug-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19706 | USD | $7,260 | 28-Aug-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 6549 | USD | ($726) | 29-Aug-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19566 | USD | $7,260 | 29-Aug-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19590 | USD | $207 | 29-Aug-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19593 | USD | $80,061 | 29-Aug-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 6565 | USD | ($41,167) | 8-Sep-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 6711 | USD | ($1,089) | 22-Sep-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19609 | USD | $4,785 | 22-Sep-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19618 | USD | $7,260 | 22-Sep-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19634 | USD | $7,260 | 22-Sep-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19648 | USD | $67,785 | 22-Sep-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19650 | USD | $81,471 | 22-Sep-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19657 | USD | $131,939 | 22-Sep-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19704 | USD | $1,388 | 22-Sep-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 6746 | USD | ($6,456) | 28-Oct-14 |

Annex 1-4

| | | | | | |
|---|---|---|---|---|---|
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19662 | USD | $7,260 | 28-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19664 | USD | $5,790 | 28-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19667 | USD | $57,921 | 28-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19669 | USD | $91 | 28-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19675 | USD | $3,772 | 28-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19679 | USD | $7,260 | 28-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19710 | USD | $311,222 | 28-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19712 | USD | $63,384 | 28-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19771 | USD | $188,460 | 28-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 6726 | USD | ($3,917) | 31-Oct-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19719 | USD | $68,561 | 24-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19721 | USD | $78,930 | 24-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19746 | USD | $7,260 | 26-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19748 | USD | $3,427 | 26-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19752 | USD | $49 | 26-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19754 | USD | $2,723 | 26-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19756 | USD | $2,347 | 26-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19758 | USD | $713 | 26-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19773 | USD | $181,114 | 26-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19778 | USD | $150,787 | 26-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19781 | USD | $14,398 | 26-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19764 | USD | $7,260 | 27-Nov-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 6763 | USD | ($1,452) | 13-Dec-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19784 | USD | $7,260 | 13-Dec-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19791 | USD | $2,408 | 13-Dec-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19793 | USD | $182 | 13-Dec-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19795 | USD | $428 | 13-Dec-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19799 | USD | $7,260 | 13-Dec-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19809 | USD | $292,103 | 15-Dec-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19811 | USD | $3,772 | 15-Dec-14 |
| Corporacion ESP de Venezuela C.A. | PDVSA Petroleo S.A. | 19830 | USD | $126 | 16-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1220112 | USD | $20,853 | 19-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220342 | USD | $39,006 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220348 | USD | $12,236 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220351 | USD | $160 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220353 | USD | $2,202 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220367 | USD | $3,003 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220373 | USD | $56,306 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220374 | USD | $27,950 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220375 | USD | $1,846 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220407 | USD | $86 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220408 | USD | $172 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220481 | USD | $4,837 | 20-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220756 | USD | $97,796 | 21-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220757 | USD | $14,748 | 21-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220758 | USD | $27,713 | 21-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220975 | USD | $43,567 | 22-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220976 | USD | $28,405 | 22-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220977 | USD | $87,761 | 22-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1220979 | USD | $209,081 | 22-Mar-13 |

| Dresser Inc. | Bariven S.A. | 1221281 | USD | $42,275 | 25-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1221282 | USD | $275,096 | 25-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1221283 | USD | $537 | 25-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1221284 | USD | $78,023 | 25-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1221285 | USD | $1,672 | 25-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1221287 | USD | $163,579 | 25-Mar-13 |
| Dresser Inc. | Bariven S.A. | 1227174 | USD | $42,672 | 29-Apr-13 |
| Dresser Inc. | Bariven S.A. | 1227177 | USD | $19,870 | 29-Apr-13 |
| Dresser Inc. | Bariven S.A. | 61359 | USD | $7,910 | 1-May-13 |
| Dresser Inc. | Bariven S.A. | 1228769 | USD | $15,268 | 7-May-13 |
| Dresser Inc. | Bariven S.A. | 1228770 | USD | $23,519 | 7-May-13 |
| Dresser Inc. | Bariven S.A. | 1228771 | USD | $23,076 | 7-May-13 |
| Dresser Inc. | Bariven S.A. | 1228772 | USD | $22,125 | 7-May-13 |
| Dresser Inc. | Bariven S.A. | 1228773 | USD | $11,843 | 7-May-13 |
| Dresser Inc. | Bariven S.A. | 1233847 | USD | $46,125 | 3-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1234449 | USD | $73,631 | 6-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1235346 | USD | $10,406 | 12-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1235352 | USD | $9,730 | 12-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1235956 | USD | $7,922 | 17-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1236184 | USD | $61,333 | 18-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1236185 | USD | $8,958 | 18-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1236191 | USD | $51,039 | 18-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1236193 | USD | $17,219 | 18-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1236194 | USD | $56,172 | 18-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1237524 | USD | $56 | 26-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1237955 | USD | $477 | 27-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1237961 | USD | $12,370 | 27-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1238447 | USD | $28,247 | 28-Jun-13 |
| Dresser Inc. | Bariven S.A. | 1240020 | USD | $178 | 12-Jul-13 |
| Dresser Inc. | Bariven S.A. | 1249472 | USD | $31,011 | 16-Sep-13 |
| Dresser Inc. | Bariven S.A. | 1251414 | USD | $106 | 26-Sep-13 |
| Dresser Inc. | Bariven S.A. | 1251418 | USD | $10,195 | 26-Sep-13 |
| Dresser Inc. | Bariven S.A. | 1251604 | USD | $53,659 | 26-Sep-13 |
| Dresser Inc. | Bariven S.A. | 1251605 | USD | $6,470 | 26-Sep-13 |
| Dresser Inc. | Bariven S.A. | 1251610 | USD | $57,918 | 26-Sep-13 |
| Dresser Inc. | Bariven S.A. | 1251611 | USD | $4,334 | 26-Sep-13 |
| Dresser Inc. | Bariven S.A. | 1251612 | USD | $19,548 | 26-Sep-13 |
| Dresser Inc. | Bariven S.A. | 1252393 | USD | $887 | 2-Oct-13 |
| Dresser Inc. | Bariven S.A. | 1254977 | USD | $56 | 18-Oct-13 |
| Dresser Inc. | Bariven S.A. | 1256531 | USD | $131,126 | 28-Oct-13 |
| Dresser Inc. | Bariven S.A. | 1256530 | USD | $100 | 29-Oct-13 |
| Dresser Inc. | Bariven S.A. | 1263130 | USD | $7,009 | 13-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1263131 | USD | $851 | 13-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1263275 | USD | $12,423 | 16-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1263407 | USD | $887 | 16-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1263582 | USD | $298 | 17-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1263583 | USD | $5,411 | 17-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1263733 | USD | $2,439 | 17-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1263745 | USD | $11,468 | 17-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1263746 | USD | $2,360 | 17-Dec-13 |



| Dresser Inc. | Bariven S.A. | 1263798 | USD | $6,079 | 18-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1264103 | USD | $61,405 | 19-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1264104 | USD | $393 | 19-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1264123 | USD | $211,980 | 19-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1264129 | USD | $7,337 | 19-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1264130 | USD | $888 | 19-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1264332 | USD | $5,834 | 20-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1265249 | USD | $9,433 | 30-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1265250 | USD | $28,683 | 30-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1265251 | USD | $9,982 | 30-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1265252 | USD | $18,774 | 30-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1265253 | USD | $16,675 | 30-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1265254 | USD | $55,460 | 30-Dec-13 |
| Dresser Inc. | Bariven S.A. | 1263408 | USD | $50 | 15-Jan-14 |
| Dresser Inc. | Bariven S.A. | 1271371 | USD | $39,073 | 13-Feb-14 |
| Dresser Inc. | Bariven S.A. | 1272322 | USD | $148,044 | 19-Feb-14 |
| Dresser Inc. | Bariven S.A. | 1307432 | USD | $28,567 | 18-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1307433 | USD | $25,743 | 18-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1307450 | USD | $1,278 | 18-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1307452 | USD | $40,325 | 18-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1307454 | USD | $27,002 | 18-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1307476 | USD | $1,210 | 18-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1307498 | USD | $76,526 | 18-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1307499 | USD | $6,444 | 18-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1307507 | USD | $10,618 | 18-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1307777 | USD | $123,983 | 19-Sep-14 |
| Dresser Inc. | Bariven S.A. | 1311189 | USD | $13,814 | 9-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1311220 | USD | $11,475 | 9-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1311604 | USD | $9,743 | 13-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1311607 | USD | $125,707 | 13-Oct-14 |
| Dresser Inc. | Bariven S.A. | 4520005845 | USD | $12,729 | 13-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1312267 | USD | $1,354 | 15-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1312520 | USD | $17,969 | 16-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1312525 | USD | $30,362 | 16-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1312526 | USD | $65,552 | 16-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1312527 | USD | $28,914 | 16-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1313633 | USD | $15,795 | 23-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1313637 | USD | $20,048 | 23-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1313638 | USD | $592,566 | 23-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1313639 | USD | $3,504 | 23-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1314451 | USD | $13,435 | 28-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1314699 | USD | $22,277 | 29-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1314962 | USD | $5,902 | 30-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1314963 | USD | $151 | 30-Oct-14 |
| Dresser Inc. | Bariven S.A. | 1315768 | USD | $9,114 | 3-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1315769 | USD | $37,497 | 3-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1315771 | USD | $161,592 | 3-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1315772 | USD | $31,101 | 3-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1315779 | USD | $5,545 | 3-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1316236 | USD | $62,239 | 6-Nov-14 |

10)

| | | | | | |
|---|---|---|---|---|---|
| Dresser Inc. | Bariven S.A. | 1316606 | USD | $31,622 | 6-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1317201 | USD | $35,649 | 11-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1317208 | USD | $191,502 | 11-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1317311 | USD | $47,997 | 12-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1319442 | USD | $8,114 | 24-Nov-14 |
| Dresser Inc. | Bariven S.A. | 1319948 | USD | $7,729 | 1-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1319952 | USD | $9,439 | 1-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1320453 | USD | $22,767 | 4-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1320928 | USD | $6,185 | 8-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1320960 | USD | $7,175 | 8-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1320961 | USD | $8,578 | 8-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1321708 | USD | $37,744 | 10-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1321712 | USD | $51,086 | 10-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1321713 | USD | $9,729 | 10-Dec-14 |
| Dresser Inc. | Bariven S.A. | 4520006708 | USD | $15,665 | 11-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1322406 | USD | $21,875 | 15-Dec-14 |
| Dresser Inc. | Bariven S.A. | 1326422 | USD | $2,671 | 14-Jan-15 |
| GE Energy Control Solutions Inc. | Bariven S.A. | 1010045981 | USD | $748,454 | 18-Oct-12 |
| GE Energy Control Solutions Inc. | Bariven S.A. | 1010101436 | USD | $60,802 | 31-Oct-13 |
| GE Energy Control Solutions Inc. | Bariven S.A. | 1010108639 | USD | $1,865 | 18-Dec-13 |
| GE Energy Control Solutions Inc. | Bariven S.A. | 1010154946 | USD | $259,090 | 24-Oct-14 |
| GE O&G Inc. | Bariven S.A. | 500108658 | USD | $54,137 | 19-Dec-12 |
| GE O&G Inc. | Bariven S.A. | 500108939 | USD | $401,275 | 29-Dec-12 |
| GE O&G Inc. | Bariven S.A. | 500109857 | USD | $600 | 29-Jan-13 |
| GE O&G Inc. | Bariven S.A. | 500110418 | USD | $286,410 | 15-Feb-13 |
| GE O&G Inc. | Bariven S.A. | 500111240 | USD | $631,185 | 28-Mar-13 |
| GE O&G Inc. | Bariven S.A. | 700016528 | USD | $588,029 | 30-Jun-13 |
| GE O&G Inc. | Bariven S.A. | 500113698 | USD | $21,312 | 23-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16508 | USD | $165,571 | 3-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16518 | USD | $7,138 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16521 | USD | $5,931 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16524 | USD | $3,752 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16526 | USD | $39,990 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16528 | USD | $47,730 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16530 | USD | $39,990 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16532 | USD | $39,990 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16534 | USD | $43,860 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16536 | USD | $39,990 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16538 | USD | $39,990 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16540 | USD | $47,836 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16542 | USD | $39,999 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16544 | USD | $40,077 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16546 | USD | $40,043 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16548 | USD | $43,861 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16550 | USD | $40,083 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16552 | USD | $39,990 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16554 | USD | $40,009 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16556 | USD | $40,007 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16558 | USD | $39,990 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16560 | USD | $39,990 | 17-Jun-13 |



| | | | | | |
|---|---|---|---|---|---|
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16563 | USD | $39,990 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16565 | USD | $40,021 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16567 | USD | $40,016 | 17-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16569 | USD | $39,990 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16571 | USD | $18,060 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16573 | USD | $39,990 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16575 | USD | $18,060 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16577 | USD | $39,990 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16580 | USD | $40,020 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16583 | USD | $40,028 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16586 | USD | $18,060 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16589 | USD | $43,899 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16592 | USD | $40,029 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16595 | USD | $40,061 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16598 | USD | $39,991 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16601 | USD | $18,060 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16604 | USD | $40,017 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16607 | USD | $40,013 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16610 | USD | $40,018 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16613 | USD | $25,837 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16616 | USD | $40,019 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16619 | USD | $18,060 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16622 | USD | $40,035 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16625 | USD | $40,048 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16628 | USD | $3,916 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16631 | USD | $40,042 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16634 | USD | $3,875 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16637 | USD | $3,871 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16640 | USD | $3,870 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16643 | USD | $3,870 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16646 | USD | $3,870 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16649 | USD | $7,758 | 18-Jun-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16654 | USD | $3,870 | 8-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16657 | USD | $3,870 | 8-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16660 | USD | $7,740 | 8-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16663 | USD | $7,740 | 9-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16666 | USD | $1,353 | 9-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16669 | USD | $984 | 9-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16672 | USD | $268 | 9-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16675 | USD | $6,057 | 10-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16678 | USD | $2,953 | 10-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16681 | USD | $1,107 | 10-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16684 | USD | $7,380 | 10-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16687 | USD | $7,380 | 10-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16694 | USD | $7,276 | 10-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16697 | USD | $3,764 | 10-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16701 | USD | $156,763 | 17-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16703 | USD | $153,153 | 17-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16704 | USD | $146,855 | 17-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16705 | USD | $132,085 | 17-Jul-13 |

| | | | | | |
|---|---|---|---|---|---|
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16720 | USD | $3,870 | 19-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16723 | USD | $6,898 | 19-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16729 | USD | $3,694 | 19-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16732 | USD | $6,708 | 19-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16735 | USD | $3,741 | 19-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16738 | USD | $6,519 | 19-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16741 | USD | $6,329 | 19-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16742 | USD | $7,276 | 19-Jul-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16744 | USD | $147,660 | 5-Aug-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16770 | USD | $6,519 | 5-Aug-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16774 | USD | $139,071 | 13-Aug-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16777 | USD | $6,140 | 19-Aug-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16780 | USD | $9,359 | 19-Aug-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16795 | USD | $6,519 | 19-Aug-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16798 | USD | $5,951 | 19-Aug-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16809 | USD | $7,276 | 4-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16812 | USD | $6,898 | 4-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16815 | USD | $4,222 | 4-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16818 | USD | $6,898 | 4-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16821 | USD | $6,898 | 4-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16832 | USD | $24,070 | 18-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16833 | USD | $9,000 | 18-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16835 | USD | $23,370 | 18-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16836 | USD | $1,646 | 18-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16839 | USD | $24,070 | 24-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16840 | USD | $4,200 | 24-Sep-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16843 | USD | $40,027 | 4-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16846 | USD | $5,951 | 4-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16849 | USD | $5,951 | 4-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16852 | USD | $6,898 | 4-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16855 | USD | $5,951 | 9-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16857 | USD | $63,682 | 9-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16859 | USD | $28,070 | 9-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16861 | USD | $183,895 | 14-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16863 | USD | $128,377 | 14-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16865 | USD | $27,270 | 14-Oct-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16869 | USD | $162,756 | 5-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16871 | USD | $10,700 | 11-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16873 | USD | $38,390 | 11-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16875 | USD | $27,270 | 11-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16877 | USD | $24,070 | 11-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16880 | USD | $18,060 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16883 | USD | $36,120 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16886 | USD | $36,120 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16889 | USD | $36,120 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16892 | USD | $36,120 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16895 | USD | $36,120 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16898 | USD | $36,120 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16901 | USD | $36,120 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16904 | USD | $36,120 | 15-Nov-13 |

| | | | | | |
|---|---|---|---|---|---|
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16907 | USD | $36,120 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16910 | USD | $39,997 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16913 | USD | $40,007 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16916 | USD | $39,991 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16919 | USD | $39,991 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16922 | USD | $39,990 | 15-Nov-13  11) |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16925 | USD | $18,060 | 15-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16928 | USD | $72,508 | 20-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16931 | USD | $6,898 | 20-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16933 | USD | $25,520 | 22-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16935 | USD | $78,670 | 22-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16937 | USD | $61,599 | 22-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16945 | USD | $165,104 | 25-Nov-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16949 | USD | $28,270 | 2-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16951 | USD | $30,470 | 2-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16954 | USD | $5,761 | 2-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16957 | USD | $6,140 | 2-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16960 | USD | $3,659 | 2-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16963 | USD | $5,383 | 2-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16965 | USD | $33,043 | 4-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16967 | USD | $26,070 | 4-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16969 | USD | $56,904 | 4-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16971 | USD | $280,070 | 4-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16973 | USD | $27,270 | 4-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16975 | USD | $59,740 | 4-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16977 | USD | $56,171 | 4-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16980 | USD | $36,120 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16983 | USD | $36,120 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16985 | USD | $43,070 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16988 | USD | $2,064 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16991 | USD | $43,861 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16994 | USD | $3,659 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 16997 | USD | $6,708 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17000 | USD | $7,087 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17003 | USD | $7,087 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17006 | USD | $7,087 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17009 | USD | $5,203 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17011 | USD | $5,951 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17013 | USD | $33,260 | 13-Dec-13 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17014 | USD | $27,270 | 8-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17016 | USD | $28,709 | 8-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17018 | USD | $25,520 | 8-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17020 | USD | $52,916 | 8-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17022 | USD | $43,270 | 8-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17024 | USD | $28,270 | 8-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17026 | USD | $30,720 | 8-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17030 | USD | $7,786 | 10-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17033 | USD | $5,761 | 10-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17035 | USD | $60,450 | 10-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17038 | USD | $54,070 | 22-Jan-14 |

| | | | | | |
|---|---|---|---|---|---|
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17041 | USD | $38,662 | 22-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17046 | USD | $6,519 | 24-Jan-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17050 | USD | $60,450 | 5-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17053 | USD | $7,087 | 5-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17055 | USD | $57,317 | 7-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17057 | USD | $60,541 | 7-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17059 | USD | $60,450 | 7-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17064 | USD | $66,300 | 7-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17066 | USD | $27,270 | 12-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17068 | USD | $60,450 | 12-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17070 | USD | $60,450 | 12-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17072 | USD | $60,572 | 12-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17074 | USD | $60,470 | 12-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17076 | USD | $154,445 | 12-Feb-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17079 | USD | $3,840 | 12-Mar-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17082 | USD | $5,951 | 12-Mar-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17084 | USD | $60,503 | 12-Mar-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17086 | USD | $60,618 | 12-Mar-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17089 | USD | $6,708 | 17-Mar-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17092 | USD | $9,287 | 17-Mar-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17095 | USD | $60,499 | 21-Mar-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17097 | USD | $60,450 | 21-Mar-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17099 | USD | $165,246 | 2-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17102 | USD | $23,370 | 9-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17103 | USD | $3,900 | 9-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17105 | USD | $41,750 | 9-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17107 | USD | $10,700 | 9-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17109 | USD | $33,260 | 9-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17111 | USD | $60,450 | 11-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17113 | USD | $60,450 | 11-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17115 | USD | $60,450 | 11-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17117 | USD | $60,450 | 11-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17119 | USD | $60,450 | 11-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17121 | USD | $60,450 | 11-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17123 | USD | $33,260 | 16-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17125 | USD | $169,278 | 22-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17128 | USD | $6,661 | 23-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17131 | USD | $6,848 | 23-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17133 | USD | $66,300 | 23-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17135 | USD | $60,450 | 23-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17137 | USD | $60,506 | 23-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17140 | USD | $7,466 | 23-Apr-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17141 | USD | $11,070 | 7-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17143 | USD | $55,731 | 7-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17145 | USD | $60,451 | 9-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17147 | USD | $66,396 | 9-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17149 | USD | $60,450 | 9-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17151 | USD | $60,450 | 9-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17158 | USD | $66,357 | 9-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17359 | USD | $60,450 | 9-May-14 |

| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17160 | USD | $54,600 | 9-May-14 |
|---|---|---|---|---|---|
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17162 | USD | $66,537 | 16-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17164 | USD | $60,450 | 16-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17166 | USD | $5,944 | 16-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17169 | USD | $6,329 | 16-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17172 | USD | $7,224 | 16-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17174 | USD | $60,450 | 16-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17177 | USD | $6,898 | 16-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17179 | USD | $60,450 | 16-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17181 | USD | $190,181 | 19-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17383 | USD | $126,585 | 19-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17385 | USD | $174,920 | 19-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17187 | USD | $60,450 | 21-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17190 | USD | $3,752 | 21-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17192 | USD | $66,300 | 23-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17195 | USD | $8,791 | 23-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17397 | USD | $60,450 | 23-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17199 | USD | $125,708 | 26-May-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17201 | USD | $66,301 | 2-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17203 | USD | $60,450 | 2-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17205 | USD | $60,464 | 2-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17207 | USD | $60,494 | 2-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17210 | USD | $60,451 | 3-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17212 | USD | $60,450 | 6-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17215 | USD | $10,306 | 6-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17217 | USD | $60,450 | 6-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17223 | USD | $6,898 | 6-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17226 | USD | $7,087 | 6-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17228 | USD | $9,359 | 9-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17230 | USD | $72,151 | 13-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17232 | USD | $66,300 | 13-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17234 | USD | $66,409 | 13-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17237 | USD | $3,766 | 13-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17239 | USD | $60,543 | 19-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17241 | USD | $60,450 | 19-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17243 | USD | $60,495 | 19-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17245 | USD | $60,562 | 19-Jun-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17248 | USD | $4,436 | 2-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17251 | USD | $5,193 | 2-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17254 | USD | $7,276 | 2-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17257 | USD | $6,519 | 2-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17260 | USD | $3,846 | 2-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17262 | USD | $178,008 | 2-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17279 | USD | $60,464 | 9-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17281 | USD | $66,496 | 9-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17283 | USD | $60,450 | 9-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17285 | USD | $66,405 | 9-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17287 | USD | $60,450 | 9-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17289 | USD | $60,778 | 9-Jul-14 |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17292 | USD | $7,276 | 15-Jul-14 |

Annex I-13

| | | | | | | |
|---|---|---|---|---|---|---|
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17294 | USD | $60,450 | 15-Jul-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17296 | USD | $180,376 | 15-Jul-14 | 12) |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17298 | USD | $66,972 | 4-Aug-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17304 | USD | $149,517 | 7-Aug-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17306 | USD | $60,450 | 15-Aug-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17308 | USD | $60,560 | 15-Aug-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17310 | USD | $120 | 15-Aug-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17313 | USD | $3,905 | 20-Aug-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17357 | USD | $147,439 | 3-Sep-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17367 | USD | $13,147 | 23-Sep-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17372 | USD | $3,465 | 15-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17374 | USD | $22,190 | 15-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17382 | USD | $221,660 | 20-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17384 | USD | $41,555 | 22-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17388 | USD | $35,035 | 22-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17390 | USD | $2,730 | 28-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17392 | USD | $385 | 28-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17394 | USD | $35,945 | 28-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17397 | USD | $162,316 | 28-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17399 | USD | $19,425 | 28-Oct-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17402 | USD | $5,338 | 5-Nov-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17405 | USD | $241,800 | 5-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17407 | USD | $120,900 | 5-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17409 | USD | $181,351 | 5-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17411 | USD | $120,900 | 5-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17413 | USD | $869,995 | 5-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17415 | USD | $181,449 | 12-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17417 | USD | $120,900 | 12-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17421 | USD | $60,450 | 18-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17423 | USD | $60,450 | 18-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17425 | USD | $60,450 | 18-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17427 | USD | $120,901 | 18-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17429 | USD | $269,100 | 18-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17431 | USD | $44,912 | 22-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17433 | USD | $68,400 | 22-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17435 | USD | $78,000 | 22-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17437 | USD | $63,600 | 22-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17439 | USD | $72,600 | 22-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17441 | USD | $130,200 | 22-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17443 | USD | $72,320 | 22-Dec-14 | |
| GE O&G Logging Services C.A. | PDVSA Petroleo S.A. | 17445 | USD | $142,963 | 22-Dec-14 | |
| GE O&G UK Ltd. | Bariven S.A. | C676 02. | USD | $26,361,137 | 3-Aug-12 | |
| GE O&G UK Ltd. | Bariven S.A. | C594 01 | USD | $35,530,367 | 11-Feb-13 | |
| GE O&G UK Ltd. | Bariven S.A. | C594 02 | USD | $23,686,912 | 26-Feb-13 | |
| GE O&G UK Ltd. | Bariven S.A. | C594 REEL 01 | USD | $3,013,393 | 26-Jun-13 | |
| GE O&G UK Ltd. | Bariven S.A. | C594 05 | USD | $740,000 | 13-Jan-14 | |
| GE O&G UK Ltd. | Bariven S.A. | C594 06 | USD | $900,000 | 27-Jun-14 | |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0910057175 | USD | $18,097 | 31-Jul-12 | |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0910057539 | USD | $40,017 | 31-Jul-12 | |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0910057540 | USD | $26,611 | 31-Jul-12 | |

Annex I-14



| | | | | | |
|---|---|---|---|---|---|
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0910057541 | USD | $314 | 31-Jul-12 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0910057542 | USD | $535 | 31-Jul-12 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0910086827 | USD | $7,138 | 15-Nov-12 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0910086829 | USD | $6,120 | 15-Nov-12 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0935081142 | USD | $15,058 | 28-Oct-13 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915101712 | USD | $41,299 | 27-Nov-13 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915102600 | USD | $77,208 | 30-Nov-13 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915102601 | USD | $942,282 | 30-Nov-13 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915119808 | USD | $274,089 | 31-Dec-13 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915155261 | USD | $40,860 | 28-Feb-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915173085 | USD | $4,886 | 28-Mar-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915173089 | USD | $722 | 28-Mar-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915174853 | USD | $40,168 | 31-Mar-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915274855 | USD | $101,444 | 31-Mar-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915174937 | USD | $78,599 | 31-Mar-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915174992 | USD | $20,461 | 31-Mar-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915177646 | USD | $63,557 | 3-Apr-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915209951 | USD | $137,321 | 28-May-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915220514 | USD | $206,131 | 13-Jun-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915232662 | USD | $71,123 | 30-Jun-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915260280 | USD | $109,082 | 31-Jul-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915262761 | USD | $93,808 | 31-Jul-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915283192 | USD | $26,408 | 26-Aug-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915286684 | USD | $8,991 | 28-Aug-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915101711 | USD | $85,238 | 29-Aug-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915289267 | USD | $29,089 | 29-Aug-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0910089082 | USD | $516,382 | 10-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915313808 | USD | $536 | 24-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915313828 | USD | $684 | 24-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915314771 | USD | $2,779 | 25-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915316504 | USD | $116,706 | 26-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915317001 | USD | $97,254 | 26-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915317011 | USD | $71,803 | 26-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915318055 | USD | $1,243,746 | 27-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915318636 | USD | $33,837 | 28-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915318637 | USD | $51,854 | 28-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915318640 | USD | $1,584 | 28-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915318649 | USD | $48,174 | 28-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 0915322299 | USD | $46,919 | 30-Sep-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915333332 | USD | $264 | 9-Oct-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915346436 | USD | $7,595 | 23-Oct-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915350230 | USD | $51 | 27-Oct-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915350233 | USD | $95 | 27-Oct-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915356706 | USD | $120,305 | 30-Oct-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915382687 | USD | $15,348 | 26-Nov-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915382739 | USD | $9,371 | 26-Nov-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915383435 | USD | $456 | 26-Nov-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915383573 | USD | $29,202 | 26-Nov-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915409422 | USD | $27,900 | 23-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915409426 | USD | $20,242 | 23-Dec-14 |

Annex I-15



| | | | | | |
|---|---|---|---|---|---|
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915411551 | USD | $293 | 29-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915411552 | USD | $21,793 | 29-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915411556 | USD | $14,654 | 29-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915412698 | USD | $44 | 29-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915412717 | USD | $847 | 29-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915413844 | USD | $76,236 | 30-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915413847 | USD | $5,047 | 30-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 935413887 | USD | $12,884 | 30-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915415186 | USD | $7,386 | 30-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915416211 | USD | $12,940 | 31-Dec-14 |
| GE Oil & Gas Compression Systems L.L.C. | Bariven S.A. | 915416213 | USD | $8,713 | 31-Dec-14 |
| GE Oil Gas ESP Inc. | Bariven S.A. | 445528 | USD | $288,971 | 12/29/2014 |
| GE Oil Gas ESP Inc. | Bariven S.A. | 445451 | USD | $70,808 | 12/9/2014 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4445 | EUR | $10,161 | 20-Mar-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4450 | EUR | $46,963 | 20-Mar-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4448-2012 | EUR | $318 | 20-Mar-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4817 | EUR | $39,432 | 23-Mar-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5064 | EUR | $46,010 | 26-Mar-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5220 | EUR | $105,491 | 27-Mar-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5436 | EUR | $96,714 | 29-Mar-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5456 | EUR | $90,222 | 29-Mar-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5500 | EUR | $306 | 29-Mar-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 7828 | EUR | $28,417 | 22-May-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9073 | EUR | $2,053 | 7-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10441 | EUR | $54,687 | 20-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10452 | EUR | $46,857 | 20-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10455 | EUR | $11,775 | 20-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10893 | EUR | $15,997 | 22-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10894 | EUR | $76,963 | 22-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10909 | EUR | $65,812 | 22-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10910 | EUR | $9,402 | 22-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11188 | EUR | $47,531 | 26-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11199 | EUR | $369,035 | 26-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11317 | EUR | $62,705 | 27-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11416 | EUR | $868,984 | 28-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11544 | EUR | $90,626 | 29-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11575 | EUR | $756,411 | 29-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11583 | EUR | $1,089,200 | 29-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11606 | EUR | $323,787 | 29-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11636 | EUR | $4,624,694 | 29-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11637 | EUR | $4,624,694 | 29-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 82112 | EUR | $55,980 | 30-Jun-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12002 | EUR | $218,940 | 11-Jul-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12509 | EUR | $74,048 | 23-Jul-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14126 | EUR | $40 | 27-Aug-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14984-2012 | EUR | $3,522 | 7-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15537 | EUR | $566 | 13-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16021 | EUR | $32,799 | 19-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16445 | EUR | $4,588 | 22-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16478 | EUR | $145,303 | 22-Sep-12 |

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 16731 | EUR | $219,438 | 25-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16746 | EUR | $30,076 | 25-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16770 | EUR | $65,703 | 25-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16781 | EUR | $30,767 | 25-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16801 | EUR | $10,608 | 25-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16884 | EUR | $206,762 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16902 | EUR | $233,229 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16904 | EUR | $11,363 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16915 | EUR | $46,363 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16916 | EUR | $60,007 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16952 | EUR | $113,590 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16953 | EUR | $66,944 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16955 | EUR | $74,060 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16960 | EUR | $56,795 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16961 | EUR | $56,795 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16962 | EUR | $56,792 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17034 | EUR | $14,259 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17035 | EUR | $8,571 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17043 | EUR | $1,271 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17045 | EUR | $241,066 | 26-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17072 | EUR | $150,973 | 27-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17082 | EUR | $156,629 | 27-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17099 | EUR | $14,913 | 27-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17104 | EUR | $1,722,150 | 27-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17116 | EUR | $182,694 | 27-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17188 | EUR | $734,189 | 27-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17226 | EUR | $271,110 | 27-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17252 | EUR | $287,179 | 28-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17262 | EUR | $608,969 | 28-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17264 | EUR | $559,177 | 28-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17272 | EUR | $540,227 | 28-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17305 | EUR | $96,666 | 28-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17346 | EUR | $426,426 | 28-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17370 | EUR | $26,573 | 28-Sep-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18152 | EUR | $202,247 | 16-Oct-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18229 | EUR | $1,857 | 18-Oct-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18303 | EUR | $47,037 | 22-Oct-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18664 | EUR | $30,700 | 29-Oct-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18677 | EUR | $3,279 | 29-Oct-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 19037 | EUR | $144,480 | 6-Nov-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 19093 | EUR | $278,637 | 7-Nov-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 19094 | EUR | $243,231 | 7-Nov-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 19331 | EUR | $54,269 | 9-Nov-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 19596 | EUR | $160,051 | 14-Nov-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20766 | EUR | $124,508 | 29-Nov-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20767 | EUR | $117,229 | 29-Nov-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20984 | EUR | $11,445 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21040 | EUR | $71,628 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21044 | EUR | $144,673 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21062 | EUR | $26,435 | 3-Dec-12 |

Annex I-17

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 21064 | EUR | $40,105 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21082 | EUR | $26,011 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21086 | EUR | $5,946 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21088 | EUR | $1,343 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21089 | EUR | $1,282,857 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21090 | EUR | $118,542 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21091 | EUR | $1,450,234 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21094 | EUR | $37,713 | 3-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21159 | EUR | $252,852 | 4-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21167 | EUR | $5,406 | 4-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21173 | EUR | $14,383 | 4-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21177 | EUR | $66,215 | 4-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21178 | EUR | $60,030 | 4-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21194 | EUR | $8,146 | 4-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21252 | EUR | $49,005 | 5-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21360 | EUR | $6,685 | 6-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21456 | EUR | $41,496 | 6-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21520 | EUR | $52,998 | 7-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21613 | EUR | $46,256 | 10-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21706 | EUR | $37,859 | 10-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21709 | EUR | $10,675 | 10-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21765 | EUR | $850,146 | 11-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21784 | EUR | $160,066 | 11-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21800 | EUR | $26,080 | 11-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21801 | EUR | $55,909 | 11-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21915 | EUR | $39,783 | 12-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22059 | EUR | $23,140 | 13-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22182 | EUR | $24,030 | 14-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22188 | EUR | $217,033 | 14-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22189 | EUR | $116,600 | 14-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22396 | EUR | $23,670 | 17-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22654 | EUR | $37,762 | 18-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22664 | EUR | $36,350 | 18-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22682 | EUR | $1,200,610 | 18-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22716 | EUR | $99,827 | 18-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22942 | EUR | $95,101 | 20-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22943 | EUR | $600,119 | 20-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22944 | EUR | $232,343 | 20-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22952 | EUR | $313,859 | 20-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23084 | EUR | $1,200,610 | 21-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23095 | EUR | $152,254 | 21-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23105 | EUR | $16,018 | 21-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23110 | EUR | $167,067 | 21-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23113 | EUR | $623,816 | 21-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23114 | EUR | $844,810 | 21-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23140 | EUR | $249,891 | 21-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23141 | EUR | $223,433 | 21-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23142 | EUR | $64,891 | 21-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23221 | EUR | $434,042 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23222 | EUR | $406,459 | 22-Dec-12 |

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 23223 | EUR | $39,734 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23224 | EUR | $125,355 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23244 | EUR | $106,594 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23245 | EUR | $85,027 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23249 | EUR | $47,443 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23251 | EUR | $30,197 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23257 | EUR | $14,579 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23273 | EUR | $3,527 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23278 | EUR | $161,126 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23279 | EUR | $33,501 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23285 | EUR | $863,300 | 23-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23286 | EUR | $858,850 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23290 | EUR | $30,084 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23286-2012 | EUR | $32,182 | 22-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23333 | EUR | $37,955 | 24-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23338 | EUR | $61,945 | 24-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23369 | EUR | $33,795 | 24-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23434 | EUR | $273,337 | 27-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23462 | EUR | $772,281 | 27-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23465 | EUR | $484,204 | 27-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23469 | EUR | $19,645 | 27-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23473 | EUR | $570,000 | 27-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23582 | EUR | $164,554 | 28-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23635 | EUR | $764,888 | 28-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23706 | EUR | $3,098,980 | 29-Dec-12 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 868 | EUR | $394,943 | 25-Jan-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 1334 | EUR | $592,477 | 5-Feb-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 2027 | EUR | $140,598 | 18-Feb-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 2038 | EUR | $1,301,492 | 18-Feb-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 2560 | EUR | $93,099 | 27-Feb-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3530 | EUR | $41,830 | 12-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4045 | EUR | $16,355 | 16-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4046 | EUR | $8,472 | 16-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4048 | EUR | $5,040 | 16-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 80536 | EUR | $246,076 | 18-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4166 | EUR | $446,583 | 19-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4201 | EUR | $50,207 | 19-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4245 | EUR | $1,342,853 | 19-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4246 | EUR | $1,342,853 | 19-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4285 | EUR | $80,569 | 19-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4387 | EUR | $8,917 | 20-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4388 | EUR | $323,194 | 20-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4392 | EUR | $454 | 20-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4397 | EUR | $185,143 | 20-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4405 | EUR | $649,459 | 20-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4406 | EUR | $1,271,849 | 20-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4436 | EUR | $2,639 | 20-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4440 | EUR | $164,118 | 20-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4441 | EUR | $16,999 | 20-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4448-2013 | EUR | $1,073,872 | 20-Mar-13 |

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 4487 | EUR | $3,656 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4488 | EUR | $3,520 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4490 | EUR | $283,770 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4535 | EUR | $50,887 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4536 | EUR | $987,701 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4537 | EUR | $84,180 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4538 | EUR | $99,700 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4539 | EUR | $24,091 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4541 | EUR | $227,178 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4551 | EUR | $115,989 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4556 | EUR | $16,933 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4559 | EUR | $39,942 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4568 | EUR | $22,162 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4575 | EUR | $192,813 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4598 | EUR | $48,212 | 21-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4623 | EUR | $11,542 | 22-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4624 | EUR | $415,009 | 22-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4628 | EUR | $302,191 | 22-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4734 | EUR | $57,441 | 22-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4783 | EUR | $236,448 | 23-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4805 | EUR | $214,280 | 23-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4855 | EUR | $30,864 | 25-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4856 | EUR | $14,401 | 25-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4884 | EUR | $66,161 | 25-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4946 | EUR | $81,160 | 25-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5013 | EUR | $272,420 | 26-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5040 | EUR | $69,165 | 26-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5056 | EUR | $259,545 | 26-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5147 | EUR | $52,360 | 27-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5148 | EUR | $205,768 | 27-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5149 | EUR | $75,378 | 27-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5196 | EUR | $73,356 | 27-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5211 | EUR | $96,554 | 27-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5227 | EUR | $120,000 | 27-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5291 | EUR | $38,536 | 28-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5293 | EUR | $15,286 | 28-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5393 | EUR | $488,382 | 28-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5394 | EUR | $38,738 | 28-Mar-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 6000 | EUR | $258,555 | 15-Apr-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 6308 | EUR | $36,119 | 19-Apr-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 6946 | EUR | $200,933 | 7-May-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 7404 | EUR | $160,347 | 14-May-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 7651 | EUR | $9,283 | 17-May-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 8952 | EUR | $546 | 7-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9627 | EUR | $39,000 | 15-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9743 | EUR | $178,296 | 17-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9746 | EUR | $7,258 | 17-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9747 | EUR | $1,474 | 17-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9904 | EUR | $24,039 | 18-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9905 | EUR | $50,450 | 18-Jun-13 |

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 9906 | EUR | $4,879 | 18-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9907 | EUR | $5,936 | 18-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10013 | EUR | $12,492 | 19-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10025 | EUR | $54,629 | 19-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10026 | EUR | $931 | 19-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10027 | EUR | $28,380 | 19-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10035 | EUR | $118 | 19-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10048 | EUR | $31,844 | 19-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10059 | EUR | $28,949 | 19-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10062 | EUR | $3,278 | 19-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10145 | EUR | $185,466 | 20-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10146 | EUR | $1,972 | 20-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10194 | EUR | $1,935 | 20-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10239 | EUR | $2,800,000 | 20-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10348 | EUR | $151,121 | 21-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10362 | EUR | $83,324 | 21-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10367 | EUR | $493,209 | 21-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10369 | EUR | $93,288 | 21-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10370 | EUR | $128,934 | 21-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10492 | EUR | $56,057 | 22-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10511 | EUR | $516,467 | 22-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10522 | EUR | $13,615 | 22-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10541 | EUR | $237,932 | 22-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10572 | EUR | $28,082 | 24-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10736 | EUR | $32,421 | 25-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10738 | EUR | $301,185 | 25-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10980 | EUR | $579,235 | 26-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11095 | EUR | $805,717 | 27-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11096 | EUR | $350,143 | 27-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11098 | EUR | $159,885 | 27-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11107 | EUR | $291,227 | 27-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11288 | EUR | $333,683 | 28-Jun-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11944 | EUR | $100,000 | 19-Jul-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12286 | EUR | $248,075 | 29-Jul-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12689 | EUR | $212,224 | 7-Aug-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 13079 | EUR | $57,685 | 13-Aug-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14194 | EUR | $62,976 | 6-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14694 | EUR | $100,848 | 13-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14826 | EUR | $4,109 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14847 | EUR | $3,606 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14849 | EUR | $66,835 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14850 | EUR | $6,278 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14852 | EUR | $24,099 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14859 | EUR | $37,266 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14865 | EUR | $60,647 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14866 | EUR | $14,671 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14901 | EUR | $5,399 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14941 | EUR | $12,805 | 16-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 14984-2013 | EUR | $286,253 | 17-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15108 | EUR | $255,608 | 18-Sep-13 |

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 15152 | EUR | $874 | 18-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15153 | EUR | $7,103 | 18-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15154 | EUR | $117,516 | 18-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15157 | EUR | $23,178 | 18-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15160 | EUR | $208,508 | 18-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15168 | EUR | $9,334 | 18-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15169 | EUR | $6,231 | 18-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15171 | EUR | $197,117 | 18-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15380 | EUR | $62,843 | 20-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 82737 | EUR | $349,901 | 20-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 82738 | EUR | $22,933 | 20-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15630 | EUR | $26,069 | 23-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15632 | EUR | $512,585 | 23-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15633 | EUR | $910,133 | 23-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15634 | EUR | $61,272 | 23-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15635 | EUR | $42,433 | 23-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15641 | EUR | $61,937 | 23-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15647 | EUR | $322,636 | 23-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15820 | EUR | $29,085 | 24-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15837 | EUR | $876,665 | 24-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15838 | EUR | $521 | 24-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15839 | EUR | $840,138 | 24-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 15926 | EUR | $1,463 | 25-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16025 | EUR | $40,463 | 25-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16033 | EUR | $442,631 | 25-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16034-2013 | EUR | $398,293 | 25-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16097 | EUR | $366,823 | 26-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16101 | EUR | $295,832 | 26-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16168 | EUR | $288,421 | 26-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16260 | EUR | $521,793 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16301 | EUR | $45,251 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16302 | EUR | $34,360 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16304 | EUR | $9,190 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16305 | EUR | $89,142 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16307 | EUR | $406,095 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16308 | EUR | $1,060,084 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16309 | EUR | $618,577 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16376 | EUR | $18,618 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16377 | EUR | $60,303 | 27-Sep-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20475 | EUR | $4,849 | 10-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20483 | EUR | $61,330 | 10-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20491 | EUR | $35,733 | 10-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20514 | EUR | $38,550 | 11-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20520 | EUR | $10,066 | 11-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20521 | EUR | $116,170 | 11-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20540 | EUR | $22,070 | 11-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20546 | EUR | $602 | 11-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20586 | EUR | $95,326 | 11-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20587 | EUR | $113,068 | 11-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20590 | EUR | $12,111 | 11-Dec-13 |

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 20502 | EUR | $32,418 | 11-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21273 | EUR | $81,460 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21285 | EUR | $104,517 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21292 | EUR | $165,140 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21294 | EUR | $187,614 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21297 | EUR | $52,919 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21321 | EUR | $234,617 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21322 | EUR | $320,400 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21324 | EUR | $18,512 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21325 | EUR | $2,115 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21373 | EUR | $53 | 16-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21639 | EUR | $162,785 | 18-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21956 | EUR | $71,999 | 19-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22002 | EUR | $48,447 | 20-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22305 | EUR | $24,261 | 21-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22306 | EUR | $778,354 | 21-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22308 | EUR | $82,153 | 21-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22414 | EUR | $637,658 | 23-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22415 | EUR | $645,212 | 23-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22561 | EUR | $4,883 | 24-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22580 | EUR | $98,197 | 24-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22608 | EUR | $233,620 | 24-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22627 | EUR | $86,149 | 24-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23106 | EUR | $2,700,000 | 28-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23170 | EUR | $89,066 | 30-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23236 | EUR | $173,778 | 30-Dec-13 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 651 | EUR | $9,855 | 22-Jan-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 2862 | EUR | $959 | 28-Feb-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3666 | EUR | $134,340 | 10-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3707 | EUR | $199,091 | 10-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3719 | EUR | $103,591 | 10-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3721 | EUR | $29,645 | 10-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3725 | EUR | $6,007 | 10-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3732 | EUR | $53,837 | 10-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3778 | EUR | $5,767 | 11-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3823 | EUR | $291,395 | 12-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3824 | EUR | $28,018 | 12-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3825 | EUR | $17,594 | 12-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3876 | EUR | $110 | 12-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3901 | EUR | $5,193 | 12-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 3937 | EUR | $71 | 12-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4052 | EUR | $24,783 | 13-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4787 | EUR | $63,412 | 18-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4835 | EUR | $122,880 | 18-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4836 | EUR | $688,466 | 18-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4837 | EUR | $491,764 | 18-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4843 | EUR | $7,774 | 18-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 4954 | EUR | $345 | 19-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5391 | EUR | $2,313 | 22-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 5543 | EUR | $34,839 | 24-Mar-14 |

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 6099 | EUR | $324,416 | 26-Mar-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 6999 | EUR | $40,362 | 16-Apr-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 8740 | EUR | $72,740 | 19-May-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 8911 | EUR | $40,000 | 21-May-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9592 | EUR | $13,593 | 30-May-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9596 | EUR | $3,654 | 30-May-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9597 | EUR | $18,733 | 30-May-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9612 | EUR | $39,368 | 30-May-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9673 | EUR | $154,749 | 3-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9717 | EUR | $16,581 | 3-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9828 | EUR | $60,969 | 4-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 9847 | EUR | $358,812 | 4-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10052 | EUR | $724,563 | 6-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10054 | EUR | $21,337 | 6-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10193 | EUR | $295,000 | 9-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10211 | EUR | $51,811 | 9-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10214 | EUR | $21,353 | 9-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 10627-2014 | EUR | $92,326 | 12-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11756 | EUR | $17,306 | 20-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 11835 | EUR | $648,882 | 21-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12207 | EUR | $16,936 | 24-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12221 | EUR | $27,790 | 24-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12290 | EUR | $350,249 | 24-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12305 | EUR | $58,235 | 24-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12629 | EUR | $126,352 | 26-Jun-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 12783 | EUR | $712,734 | 27-Jun-14 | 13) |
| Nuovo Pignone S.P.A. | Bariven S.A. | 13114 | EUR | $1,200,000 | 7-Jul-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16001 | EUR | $17,346 | 29-Aug-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16003 | EUR | $20,155 | 29-Aug-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16013 | EUR | $11,365 | 29-Aug-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16035 | EUR | $1,362,602 | 29-Aug-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16036 | EUR | $1,109,214 | 29-Aug-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16034-2014 | EUR | $130,907 | 29-Aug-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16077 | EUR | $4,371 | 1-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16078 | EUR | $9,724 | 1-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16400 | EUR | $158,338 | 5-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16401 | EUR | $191,228 | 5-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16402 | EUR | $190,798 | 5-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16403 | EUR | $125,073 | 5-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16404 | EUR | $161,998 | 5-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16405 | EUR | $89,892 | 5-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16560 | EUR | $38,406 | 8-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16590 | EUR | $83,240 | 8-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 16724 | EUR | $473,252 | 10-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17752 | EUR | $24,841 | 18-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17782 | EUR | $70,754 | 18-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17863 | EUR | $47,743 | 19-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17864 | EUR | $43,954 | 19-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17866 | EUR | $97,229 | 19-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 17867 | EUR | $60,820 | 19-Sep-14 |

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 17870 | EUR | $85,902 | 19-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18216 | EUR | $52,640 | 22-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18218 | EUR | $3,237 | 22-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18219 | EUR | $2,881 | 22-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18440 | EUR | $355,324 | 24-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18506 | EUR | $147,294 | 24-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18525 | EUR | $188,078 | 24-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18604 | EUR | $74,394 | 25-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18646 | EUR | $45,793 | 25-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18758 | EUR | $92,999 | 25-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18796 | EUR | $24,060 | 26-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18833 | EUR | $107,970 | 26-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18834 | EUR | $22,165 | 26-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18835 | EUR | $177,705 | 26-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18836 | EUR | $235,227 | 26-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 18994 | EUR | $57,751 | 27-Sep-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 19561 | EUR | $152,365 | 8-Oct-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 19576 | EUR | $8,977 | 8-Oct-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 19695 | EUR | $57,059 | 10-Oct-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 20966 | EUR | $20,950 | 11-Nov-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21421 | EUR | $4,052 | 19-Nov-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21422 | EUR | $245,371 | 19-Nov-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 21444 | EUR | $150,429 | 19-Nov-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22061 | EUR | $300,000 | 27-Nov-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22748 | EUR | $480 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22750 | EUR | $13,508 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22766 | EUR | $38,892 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22772 | EUR | $201,264 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22773 | EUR | $47,413 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22775 | EUR | $7,583 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22791 | EUR | $463 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22792 | EUR | $202,731 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22800 | EUR | $201,607 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22809 | EUR | $2,604 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22818 | EUR | $122,821 | 4-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 22941 | EUR | $20,064 | 5-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23042 | EUR | $105,286 | 6-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23043 | EUR | $53,055 | 6-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23044 | EUR | $329,436 | 6-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23045 | EUR | $14,780 | 6-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23086 | EUR | $769 | 9-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23196 | EUR | $2,134 | 10-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23289 | EUR | $20,864 | 10-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23305 | EUR | $5,882 | 10-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23307 | EUR | $100,261 | 10-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23310 | EUR | $138,573 | 10-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23788-2014 | EUR | $25,555 | 10-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23535 | EUR | $117,529 | 11-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23539 | EUR | $267 | 11-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23541 | EUR | $294,096 | 11-Dec-14 |

| | | | | | |
|---|---|---|---|---|---|
| Nuovo Pignone S.P.A. | Bariven S.A. | 23594 | EUR | $7,916 | 12-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23595 | EUR | $23,911 | 12-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23822 | EUR | $98,245 | 15-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23867 | EUR | $3,104 | 15-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 23891 | EUR | $5,707 | 15-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24134 | EUR | $1,285 | 17-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24818 | EUR | $90,208 | 22-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24894 | EUR | $86,399 | 22-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24895 | EUR | $110,625 | 22-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24896 | EUR | $98,054 | 22-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24897 | EUR | $94,924 | 22-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24898 | EUR | $120,476 | 22-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24899 | EUR | $66,080 | 22-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24959 | EUR | $156,689 | 23-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24981 | EUR | $1,028,887 | 23-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24982 | EUR | $1,467,510 | 23-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24983 | EUR | $1,226,638 | 23-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 24984 | EUR | $756,001 | 23-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 25240 | EUR | $603,436 | 27-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 25417 | EUR | $33,266 | 29-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 25493 | EUR | $984,455 | 29-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 25616 | EUR | $450,855 | 29-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 25617 | EUR | $1,702,210 | 29-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 25689 | EUR | $1,283,978 | 30-Dec-14 |
| Nuovo Pignone S.P.A. | Bariven S.A. | 25745 | EUR | $381,864 | 30-Dec-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23320-2 | USD | $14,331 | 12-Nov-13 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23322-2 | USD | $14,331 | 12-Nov-13 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23440-2 | USD | $2,791 | 17-Mar-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23474-2 | USD | $62,400 | 22-May-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23475-2 | USD | $39,520 | 22-May-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23527-2 | USD | $13,894 | 26-Aug-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23528-2 | USD | $60,040 | 26-Aug-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23529-2 | USD | $30,020 | 26-Aug-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23530-2 | USD | $40,027 | 26-Aug-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23531-2 | USD | $20,013 | 26-Aug-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23532-2 | USD | $41,900 | 27-Aug-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23535-2 | USD | $12,875 | 9-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23536-2 | USD | $11,407 | 9-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23537-2 | USD | $4,812 | 9-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23544-2 | USD | $76,044 | 15-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23553-2 | USD | $53,251 | 22-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23554-2 | USD | $27,779 | 22-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23555-2 | USD | $45,030 | 22-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23556-2 | USD | $30,020 | 22-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23557-2 | USD | $75,666 | 22-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23558-2 | USD | $37,833 | 22-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23559-2 | USD | $12,611 | 22-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23562-2 | USD | $3,802 | 23-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23563-2 | USD | $1,604 | 23-Sep-14 |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23564-2 | USD | $20 | 23-Sep-14 |

14)

| | | | | | | |
|---|---|---|---|---|---|---|
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23568-2 | USD | $91,116 | 10-Oct-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23569-2 | USD | $22,779 | 10-Oct-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23570-2 | USD | $3,664 | 10-Oct-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23571-2 | USD | $4,690 | 10-Oct-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23582-2 | USD | $25,017 | 19-Nov-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Gas S.A. | M23583-2 | USD | $23,619 | 19-Nov-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23584-2 | USD | $2,192 | 24-Nov-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23585-2 | USD | $18,913 | 24-Nov-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23587-2 | USD | $16,672 | 24-Nov-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23596-2 | USD | $2,071 | 10-Dec-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23597-2 | USD | $100 | 10-Dec-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23599-2 | USD | $188,549 | 10-Dec-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23600-2 | USD | $13,894 | 12-Dec-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23603-2 | USD | $3,764 | 18-Dec-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23604-2 | USD | $2,791 | 18-Dec-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23605-2 | USD | $5,581 | 18-Dec-14 | |
| Vetco Gray de Venezuela C.A. | PDVSA Petroleo S.A. | M23606-2 | USD | $14,331 | 18-Dec-14 | |
| Vetco Gray Inc. | Bariven S.A. | 10066469 | USD | $2,075,700 | 8-Sep-14 | 15) |
| Vetco Gray Inc. | Bariven S.A. | 10066470 | USD | $369,800 | 8-Sep-14 | 16) |
| Vetco Gray Inc. | Bariven S.A. | 10066471 | USD | $2,014,330 | 8-Sep-14 | 17) |
| Vetco Gray Inc. | Bariven S.A. | 10066334 | USD | $1,395,840 | 8-Sep-14 | 18) |
| Vetco Gray Inc. | Bariven S.A. | 10069151 | USD | $426,564 | 20-Dec-14 | |
| Vetco Gray Inc. | Bariven S.A. | 10069152 | USD | $379,168 | 20-Dec-14 | |
| | **TOTAL USD** | | **765** | **$131,855,116** | | |
| | **TOTAL EUR** | | **512** | **$114,646,032** | | |

1) PDVSA recorded the invoice with a different number: 5100117805
2) PDVSA recorded the invoice with a different number: 5100117805
3) PDVSA recorded the invoice with a different number: 5400001924
4) PDVSA recorded the invoice with a different number: 5400002329
5) PDVSA recorded the invoice with a different number: 5100119507
6) PDVSA recorded the invoice with a different number: 5100118649
7) PDVSA recorded the invoice with a different number: 5100118649
8) At PDVSA's record invoices 18644 and 18646 are merged
9) PDVSA recorded a different amount: $8,131.32
10) PDVSA recorded the invoice with a different number: 1322407
11) PDVSA recorded a different amount: $39,990.91
12) PDVSA recorded the invoice with a different number: 2530
13) PDVSA recorded the invoice with a different number: 12149
14) PDVSA recorded the invoice with a different number: M233527-2
15) PDVSA recorded the invoice with a different number: 10066332
16) PDVSA recorded the invoice with a different number: 10066333
17) PDVSA recorded the invoice with a different number: 10066335
18) PDVSA recorded the invoice in 2 lines



# EXHIBIT B

## PETRÓLEOS DE VENEZUELA S.A.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, AGREES TO OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE ONLY TO QUALIFIED INSTITUTIONAL BUYERS PURSUANT TO RULE 144A OF THE SECURITIES ACT OR TO BUYERS PURCHASING PURSUANT TO A REGISTRATION STATEMENT REGISTERED UNDER THE SECURITIES ACT. IN ADDITION, ANY SUCH TRANSFERS MUST OTHERWISE BE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR OTHER APPLICABLE JURISDICTION.

### 6.5% SENIOR GUARANTEED NOTE

Date: March 27, 2015

No. R-2

FOR VALUE RECEIVED, the undersigned, **PETRÓLEOS DE VENEZUELA, S.A.** (herein called the "**Issuer**"), a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela, hereby promises to pay to **GENERAL ELECTRIC CAPITAL CORPORATION**, or registered assigns, the principal sum of ONE HUNDRED THIRTY-ONE MILLION EIGHT HUNDRED FIFTY-FIVE THOUSAND ONE HUNDRED SIXTEEN AND 31/100TH DOLLARS ($131,855,116.31), with interest (a) on the unpaid principal balance thereof based on and computed on the basis of the actual number of days elapsed on a year of 365/366 days, at a rate per annum equal to six and one-half percent (6.5%), payable quarterly, on March 31, 2015 (the "**Initial Repayment Date**") and on each day in March, June, September and December described on Exhibit A hereto occurring after the Initial Repayment Date on or prior to March 27, 2018 (the "**Maturity Date**" and, each such date on which payment of interest is due, including the Maturity Date, a "**Repayment Date**") or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, and (b) on any overdue payment of principal, any overdue payment of interest, payable quarterly as aforesaid (or, at the option of the registered holder hereof, on demand), at a rate per annum of eight and one-half percent (8.5%) per annum, calculated as set forth above. The principal amount of this Note shall be due and payable on each Repayment Date or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, in installments, with each installment being equal to the amounts set forth on Exhibit A hereto, with any unpaid principal and interest on this Note not previously paid being due and payable in full on the Maturity Date.

Payments of principal and interest on this Note are to be made in United States dollars to the Administrative Agent (at its offices at 800 Long Ridge Road, Stamford, CT 06927).

This Note is one of the Notes (herein called the "**Note**") issued pursuant to the Note Agreement, dated as of March 27, 2015 (as from time to time amended, the "**Note Agreement**"), among the Issuer, the Guarantor, the Administrative Agent and the Initial Noteholder named therein, and the Noteholders party thereto from time to time, and is entitled to the benefits and is otherwise subject to the provisions thereof. Capitalized terms used herein and not defined shall have the same meanings when used herein as in the Note Agreement.

This Note is a registered Note and, as provided in the Note Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note (or, subject to the provisions of Section 2.11 of the Note Agreement, new Notes with an aggregate principal amount equal to the principal amount of this Note) will be issued to, and registered in the name of, the transferor, the transferee or the transferees, as the case may be. Prior to due presentment for registration of transfer, the Issuer may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Issuer will not be affected by any notice to the contrary.

This Note is subject to optional prepayment, in whole or from time to time in part.

If an Event of Default, as defined in the Note Agreement, occurs and is continuing, the principal of this Note, together with all accrued and unpaid interest hereon, may be declared or otherwise become due and payable in the manner, and with the effect provided in the Note Agreement.

THIS NOTE, AND THE RIGHTS AND OBLIGATIONS OF THE ISSUER AND THE NOTEHOLDER HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WHICH THE ISSUER, THE NOTEHOLDER AND THE ADMINISTRATIVE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

PETRÓLEOS DE VENEZUELA, S.A.

By _____

Name: Orlando Chacín
Title: Director



-2-

Exhibit A
To
6.5% SENIOR GUARANTEED NOTE

| Repayment Date | Principal Amount Due | Interest Due |
|---|---|---|
| March 31, 2015 | 10,987,926.36 | -- |
| June 29, 2015 | 10,987,926.36 | 2,051,384.81 |
| September 28, 2015 | 10,987,926.36 | 1,805,377.34 |
| December 28, 2015 | 10,987,926.36 | 1,624,839.61 |
| March 28, 2016 | 10,987,926.36 | 1,444,301.88 |
| June 27, 2016 | 10,987,926.36 | 1,263,764.14 |
| September 27, 2016 | 10,987,926.36 | 1,095,129.99 |
| December 27, 2016 | 10,987,926.36 | 902,688.67 |
| March 27, 2017 | 10,987,926.36 | 714,215.21 |
| June 27, 2017 | 10,987,926.36 | 547,565.00 |
| September 27, 2017 | 10,987,926.36 | 365,043.33 |
| December 27, 2017 | -- | 180,537.73 |
| March 27, 2018 | 10,987,926.36 | 178,553.80 |



# EXHIBIT C

## PETRÓLEOS DE VENEZUELA S.A.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, AGREES TO OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE ONLY TO QUALIFIED INSTITUTIONAL BUYERS PURSUANT TO RULE 144A OF THE SECURITIES ACT OR TO BUYERS PURCHASING PURSUANT TO A REGISTRATION STATEMENT REGISTERED UNDER THE SECURITIES ACT. IN ADDITION, ANY SUCH TRANSFERS MUST OTHERWISE BE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR OTHER APPLICABLE JURISDICTION.

### 6.5% SENIOR GUARANTEED NOTE

Date: March 27, 2015

No. R-3

FOR VALUE RECEIVED, the undersigned, **PETRÓLEOS DE VENEZUELA, S.A.** (herein called the "**Issuer**"), a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela, hereby promises to pay to **SACE S.p.A.**, or registered assigns, the principal sum of ONE HUNDRED TWENTY FOUR MILLION SEVEN HUNDRED THOUSAND FOUR HUNDRED EIGHTY-EIGHT AND 54/100TH DOLLARS ($124,700,488.54), with interest (a) on the unpaid principal balance thereof based on and computed on the basis of the actual number of days elapsed on a year of 365/366 days, at a rate per annum equal to six and one-half percent (6.5%), payable quarterly, on March 31, 2015 (the "**Initial Repayment Date**") and on each day in March, June, September and December described on Exhibit A hereto occurring after the Initial Repayment Date on or prior to March 27, 2018 (the "**Maturity Date**" and, each such date on which payment of interest is due, including the Maturity Date, a "**Repayment Date**") or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, and (b) on any overdue payment of principal, any overdue payment of interest, payable quarterly as aforesaid (or, at the option of the registered holder hereof, on demand), at a rate per annum of eight and one-half percent (8.5%) per annum, calculated as set forth above. The principal amount of this Note shall be due and payable on each Repayment Date or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, in installments, with each installment being equal to the amounts set forth on Exhibit A hereto, with any unpaid principal and interest on this Note not previously paid being due and payable in full on the Maturity Date.



Payments of principal and interest on this Note are to be made in United States dollars to the Administrative Agent (at its offices at 800 Long Ridge Road, Stamford, CT 06927).

This Note is one of the Notes (herein called the "**Note**") issued pursuant to the Note Agreement, dated as of March 27, 2015 (as from time to time amended, the "**Note Agreement**"), among the Issuer, the Guarantor, the Administrative Agent and the Initial Noteholder named therein, and the Noteholders party thereto from time to time, and is entitled to the benefits and is otherwise subject to the provisions thereof. Capitalized terms used herein and not defined shall have the same meanings when used herein as in the Note Agreement.

This Note is a registered Note and, as provided in the Note Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note (or, subject to the provisions of Section 2.11 of the Note Agreement, new Notes with an aggregate principal amount equal to the principal amount of this Note) will be issued to, and registered in the name of, the transferor, the transferee or the transferees, as the case may be. Prior to due presentment for registration of transfer, the Issuer may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Issuer will not be affected by any notice to the contrary.

This Note is subject to optional prepayment, in whole or from time to time in part.

If an Event of Default, as defined in the Note Agreement, occurs and is continuing, the principal of this Note, together with all accrued and unpaid interest hereon, may be declared or otherwise become due and payable in the manner, and with the effect provided in the Note Agreement.

THIS NOTE, AND THE RIGHTS AND OBLIGATIONS OF THE ISSUER AND THE NOTEHOLDER HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WHICH THE ISSUER, THE NOTEHOLDER AND THE ADMINISTRATIVE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

**PETRÓLEOS DE VENEZUELA, S.A.**

By _____

Name: Orlando Chacín
Title: Director

-2-



Exhibit A

To

6.5% SENIOR GUARANTEED NOTE

| Repayment Date | Principal Amount Due | Interest Due |
|---|---|---|
| March 31, 2015 | $10,391,707.38 | - |
| June 29, 2015 | $10,391,707.38 | $1,940,074.04 |
| September 28, 2015 | $10,391,707.38 | $1,707,415.25 |
| December 28, 2015 | $10,391,707.38 | $1,536,673.73 |
| March 28, 2016 | $10,391,707.38 | $1,365,932.20 |
| June 27, 2016 | $10,391,707.38 | $1,195,190.68 |
| September 27, 2016 | $10,391,707.38 | $1,035,706.84 |
| December 27, 2016 | $10,391,707.38 | $853,707.63 |
| March 27, 2017 | $10,391,707.38 | $675,460.98 |
| June 27, 2017 | $10,391,707.38 | $517,853.42 |
| September 27, 2017 | $10,391,707.38 | $345,235.61 |
| December 27, 2017 | - | $170,741.53 |
| March 27, 2018 | $10,391,707.38 | $168,865.24 |



Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 107 of 312

# EXHIBIT D

Execution Version

Dated as of May 13, 2016

# Note Agreement

among

## Petróleos de Venezuela, S.A.,
as Issuer,

## PDVSA Petróleo, S.A.,
as Guarantor,

## GE Capital EFS Financing, Inc.,
as Initial Noteholder,

and

## GE Capital EFS Financing, Inc.,
as Administrative Agent

**$ 193,959,763.03 6.5% Senior Guaranteed Note**



## Table of Contents

| | | Page |
|---|---|---|
| **ARTICLE I DEFINITIONS** | | 1 |
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Terms Generally | 11 |
| **ARTICLE II THE NOTES** | | 12 |
| Section 2.01 | Issuance of Initial Note | 12 |
| Section 2.02 | Repayment of Notes | 12 |
| Section 2.03 | Interest on Notes | 12 |
| Section 2.04 | Default Interest | 13 |
| Section 2.05 | Repayment of Notes | 13 |
| Section 2.06 | Pro-Rata Treatment | 13 |
| Section 2.07 | Sharing of Setoffs | 13 |
| Section 2.08 | Payments | 14 |
| Section 2.09 | Taxes | 14 |
| Section 2.10 | Registration of Notes | 15 |
| Section 2.11 | Transfer and Exchange of Notes | 15 |
| Section 2.12 | Replacement of Notes | 16 |
| **ARTICLE III REPRESENTATIONS AND WARRANTIES** | | 16 |
| Section 3.01 | Issuer's and Guarantor's Representations and Warranties | 16 |
| Section 3.02 | Initial Noteholder's Representations and Warranties | 22 |
| **ARTICLE IV CONDITIONS OF INITIAL NOTE ISSUANCE** | | 24 |
| Section 4.01 | Conditions to the Initial Note Issuance | 24 |
| **ARTICLE V COVENANTS** | | 26 |
| Section 5.01 | Maintenance of Corporate Existence | 26 |
| Section 5.02 | Insurance | 26 |
| Section 5.03 | Maintenance of Governmental Approvals | 26 |
| Section 5.04 | Financial Statements, Reports, etc. | 26 |
| Section 5.05 | Maintaining Records | 27 |
| Section 5.06 | Compliance with Laws | 27 |
| Section 5.07 | Liens | 27 |
| Section 5.08 | Mergers, Consolidations, Sales of Assets and Acquisitions | 27 |
| Section 5.09 | ERISA | 29 |
| **ARTICLE VI GUARANTEE** | | 29 |
| Section 6.01 | Guarantee | 29 |
| Section 6.02 | Guarantee of Payment | 30 |
| Section 6.03 | No Discharge or Diminishment of Note Guarantee | 30 |
| Section 6.04 | Defenses Waived | 30 |
| Section 6.05 | Rights of Subrogation | 31 |
| Section 6.06 | Reinstatement | 31 |
| Section 6.07 | Release | 31 |
| **ARTICLE VII EVENTS OF DEFAULT** | | 31 |
| **ARTICLE VIII ADMINISTRATIVE AGENT** | | 33 |



Page

ARTICLE IX MISCELLANEOUS............................................................................................35
Section 9.01    Notices; Electronic Communications ..................................................35
Section 9.02    Survival of Agreement.............................................................................36
Section 9.03    Binding Effect............................................................................................36
Section 9.04    Successors and Assigns ...........................................................................36
Section 9.05    Expenses; Payments ................................................................................38
Section 9.06    Right of Setoff ..........................................................................................39
Section 9.07    Applicable Law.........................................................................................39
Section 9.08    Waivers; Amendment..............................................................................39
Section 9.09    Interest Rate Limitation..........................................................................39
Section 9.10    Entire Agreement.....................................................................................40
Section 9.11    WAIVER OF JURY TRIAL ....................................................................40
Section 9.12    Severability...............................................................................................40
Section 9.13    Counterparts .............................................................................................40
Section 9.14    Headings.....................................................................................................40
Section 9.15    Jurisdiction; Consent to Service of Process.........................................40
Section 9.16    Confidentiality..........................................................................................41
Section 9.17    Noteholder Action ...................................................................................42
Section 9.18    USA PATRIOT Act Notice......................................................................42
Section 9.19    Payment Suspension or Cessation ........................................................42

EXHIBITS

Exhibit A        --        Form of Note
Exhibit B        --        Form of Assignment and Acceptance

SCHEDULES

Schedule 2.08        --        Accounts of Administrative Agent and Initial Noteholder
Schedule 3.01(h)    --        Subsidiaries
Schedule 3.01(i)    --        Litigation
Schedule 3.01(p)    --        Environmental Matters

ANNEXES

Annex I        --        Description of Affiliates of the Issuer and of Novated Receivables



## NOTE AGREEMENT

NOTE AGREEMENT, dated as of May 13, 2016 (the "**Effective Date**"), among **PETRÓLEOS DE VENEZUELA, S.A.**, a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela (the "**Issuer**"), **PDVSA PETRÓLEO, S.A.**, a corporation (*sociedad anónima*) organized and existing under the laws of the Bolivarian Republic of Venezuela (the "**Guarantor**"), **GE CAPITAL EFS FINANCING, INC.**, a Delaware corporation, as Initial Noteholder (in such capacity, the "**Initial Noteholder**"), the other Noteholders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Section 1.01) party hereto from time to time, and **GE CAPITAL EFS FINANCING, INC.**, a Delaware corporation, as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") for the Noteholders.

### WITNESSETH:

WHEREAS, the Issuer, certain Affiliates of the Issuer, and the Initial Noteholder are parties to a Debt Assumption and Novation Agreement, dated as of the date hereof (the "**Novation Agreement**");

WHEREAS, pursuant to the Novation Agreement (i) the Initial Noteholder released certain Affiliates of the Issuer described on Annex I hereto from their obligations to pay the accounts receivable due to the Initial Noteholder as described on Annex I hereto, (ii) in consideration of such release, the Issuer assumed and agreed to pay in full the obligations of such Affiliates in respect of the novated accounts receivable described on Annex I hereto (collectively, the "**Novated Receivables**"), and (iii) the Initial Noteholder agreed to release the Issuer from the Novated Receivables in consideration of the concurrent issuance of the Initial Note by the Issuer pursuant to this Agreement to the Initial Noteholder in a principal amount equal to the aggregate unpaid balance of the Novated Receivables held by the Initial Noteholder as of the Effective Date;

WHEREAS, the Issuer, the Guarantor, the Initial Noteholder and the Administrative Agent are entering into this Agreement pursuant to which the Issuer will issue and pay the Note and the Guarantor will guarantee the payment of the Note by the Issuer, all in accordance with, and subject to, the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

**Section 1.01   Defined Terms.** As used in this Agreement, the following terms shall have the meanings specified below:

"**Administrative Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided, however*, that the term "Affiliate" shall also include any Person that directly or indirectly owns 5% or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified. No Administrative Agent, Noteholder or Affiliate thereof shall be deemed to be an "Affiliate" of any Finance Party for purposes of this Agreement.



"**Agreement**" shall mean this Note Agreement.

"**Anti-Bribery and Anti-Corruption Laws**" means the U.S. Foreign Corrupt Practices Act, 1977, 15 U.S.C. §§ 78m, 78dd-1 through 78dd-3 and 78ff, *et seq.*, as amended from time to time, and other reasonably applicable laws and regulations addressing prohibitions against the receipt or acceptance of improper payments and bribes involving officers, directors, employees, agents and affiliates of Governmental Authorities.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Noteholder and an assignee substantially in the form of Exhibit B.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Business Day**" shall mean each day that is both (a) a Caracas Business Day and (b) a New York Business Day; *provided* that, in the event that there are more than three consecutive days that are Unscheduled Holidays, the day immediately following the third Unscheduled Holiday that would have been a Business Day but for such Unscheduled Holiday, and each consecutive Unscheduled Holiday thereafter (if any), shall, notwithstanding such Unscheduled Holidays, constitute a Business Day hereunder.

"**Caracas Business Day**" shall mean any day other than a Saturday, Sunday or day on which banks are authorized or required by law to close in Caracas, Venezuela.

"**Change of Control**" shall mean any of the following: (a) the failure at any time of Venezuela to (i) legally and beneficially own and control, directly or indirectly, at least 100% of the issued and outstanding Equity Interests of the Issuer, or (ii) have the ability to elect (and to have actually elected) and control all of the board of directors (or equivalent) of the Issuer, or (b) the failure at any time of the Issuer to (i) legally and beneficially own and control, directly or indirectly, at least 100% of the issued and outstanding Equity Interests of the Guarantor, or (ii) have the ability to elect (and to have actually elected) and control all of the board of directors (or equivalent) of the Guarantor.

"**Charges**" shall have the meaning assigned to such term in Section 9.09.

"**Citgo Group**" shall mean CITGO Petroleum Corporation and its subsidiaries.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Communications**" shall have the meaning assigned to such term in Section 9.01.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Default**" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"**Designated Person**" shall mean a Person:

(a) listed in the annex to, or otherwise targeted by the provisions of, the Executive Order;

2



(b)     named as a "Specially Designated National and Blocked Person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list;

(c)     to the best of any Finance Party's knowledge, with which any Finance Party is prohibited from dealing or otherwise engaging in any transaction by any Economic Sanctions Laws; or

(d)     owned (meaning 50 percent or greater ownership interest) or otherwise (directly or indirectly) controlled by a person identified in (a)-(c) above.

"Dollars" or "$" shall mean the lawful money of the United States.

"Economic Sanctions Laws" shall mean the Executive Order, the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 *et seq.*), the Trading with the Enemy Act (50 U.S.C. App. §§ 1 *et seq.*), any other law or regulation promulgated thereunder from time to time and administered by OFAC, the United States State Department, the United States Department of Commerce or the United States Department of the Treasury, and any similar law enacted in the United States after the date of this Agreement, in each case as the same may be amended from time to time.

"Effective Date" shall have the meaning assigned to such term in the introductory statement of this Agreement.

"Eligible Institution" shall mean any financial institution or any branch thereof (a) eligible for the then current lowest statutory rate of Venezuelan income Tax withholding from time to time generally applicable to non-Venezuelan financial institutions, or (b) in the event a statutory rate described in clause (a) does not generally apply, organized under the laws of a country subject to a double-taxation treaty with Venezuela.

"Environmental Laws" shall mean all former, current and future Venezuelan national, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

3



"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with the Issuer, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**Events of Default**" shall have the meaning assigned to such term in Article VII.

"**Excluded Taxes**" shall mean, (a) with respect to the Administrative Agent, any Noteholder or any other recipient of any payment to be made by or on account of any obligation of the Issuer hereunder, (i) income or franchise Taxes imposed on (or measured by) its net income by the United States, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Noteholder, in which its applicable lending office is located, and (ii) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction described in clause (i) above, and (b) with respect to any Noteholder that is not an Eligible Institution, any portion of withholding Tax, if any, that exceeds 4.95% (or the then current lowest rate of Venezuelan income Tax withholding from time to time generally applicable to an Eligible Institution) of the amount subject to the withholding Tax.

"**Executive Order**" shall mean the United States Executive Order No. 13224 on Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism.

"**Finance Documents**" shall mean this Agreement, the Notes and any other document executed in connection with the foregoing.

"**Finance Parties**" shall mean the Issuer and the Guarantor.

"**Governmental Authority**" shall mean any federal, national, state or local court or governmental agency, authority, instrumentality or regulatory body of any jurisdiction or territory.

"**Guarantee**" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided, however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 6.01.

"**Guarantor**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

4



"**Hazardous Materials**" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Hedging Agreement**" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement, credit default swap agreement or other interest or currency exchange rate or commodity price or credit risk hedging arrangement.

"**IFRS**" shall mean the International Financial Reporting Standards promulgated from time to time by the International Accounting Standards Board or any successor institution ("**IASB**") (which includes standards and interpretations approved by the IASB and International Accounting Standards issued under its previous constitutions), together with its pronouncements thereon from time to time, applied on a basis consistent with the financial statements delivered pursuant to Section 4.01(d).

"**Indebtedness**" shall mean any obligation (whether present or future, actual or contingent and including, without limitation, any Guarantee) for the payment or repayment of money which has been borrowed or raised, excluding, for the avoidance of doubt, the issuance of Equity Interests constituting common stock or ordinary shares.

"**Indemnified Taxes**" shall mean Taxes other than Excluded Taxes.

"**Ineligible Transferee**" shall mean any Person that is (a) a Venezuelan Person, (b) a Venezuelan financial institution, (c) a Venezuelan branch of a non-Venezuelan financial institution, (d) a state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof (a "**Sovereign**"), (e) established by treaty or other arrangement between two or more Sovereigns and includes, without limiting the foregoing, the International Monetary Fund, European Central Bank, International Bank for Reconstruction and Development, European Bank for Reconstruction and Development and International Finance Corporation, or (f) not a Qualified Institutional Buyer or a buyer purchasing pursuant to a registration statement registered under the Securities Act.

"**Information**" shall have the meaning assigned to such term in Section 9.16.

"**Initial Note**" shall mean the "6.5% Senior Guaranteed Note" to be issued by the Issuer to the Initial Noteholder pursuant to this Agreement, substantially in the form of Exhibit A hereto with the legend thereon.

"**Initial Noteholder**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Initial Repayment Date**" shall mean June 27, 2016; *provided*, that if the Initial Repayment Date would occur on a day that is not a New York Business Day, the Initial Repayment Date shall be on the immediately succeeding New York Business Day.

"**Issuer**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having



substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a materially adverse effect on the business, assets, liabilities, operations or condition (financial or otherwise) of the Issuer, the Guarantor and their respective subsidiaries, taken as a whole, which has resulted, or could reasonably be expected to result, without the occurrence of any other event or effect, in an event described in clause (b) or (c) of this definition, (b) a material impairment of the ability of any Finance Party to perform any of its obligations under any Finance Document or (c) a material impairment of the rights and remedies of or benefits available to the Administrative Agent or the Noteholders under any Finance Document.

"**Maturity Date**" shall mean May 13, 2019; *provided*, that if the Maturity Date would occur on a day that is not a New York Business Day, the Maturity Date shall be on the immediately succeeding New York Business Day.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 9.09.

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**New York Business Day**" shall mean each day other than a Saturday, Sunday or a day on which banks in New York, New York, United States are authorized or required by law to close.

"**Noteholders**" shall mean (a) the Initial Noteholder (to the extent it has not ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any Person that has become a party hereto pursuant to an Assignment and Acceptance.

"**Notes**" shall mean the Initial Note and any promissory note or notes issued in exchange or replacement thereof in accordance with Section 2.11 and Section 2.12, respectively.

"**Novated Receivables**" shall have the meaning assigned to such term in the recitals hereto.

"**Novation Agreement**" shall have the meaning assigned to such term in the recitals hereto.

"**Obligated Party**" shall have the meaning assigned to such term in Section 6.02.

"**Obligations**" shall mean all obligations of every nature of each Finance Party from time to time owed to the Administrative Agent and/or the Noteholders or any of them, under any Finance Document, whether for principal, interest, fees, expenses, indemnification or otherwise.

"**OFAC**" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury (or any successor thereto).

"**Other Taxes**" shall mean any and all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under any Finance Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Finance Document, other than Excluded Taxes.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation.

"**Permitted Liens**" shall mean the following types of Liens:



(a) Liens for Taxes, assessments or governmental charges or claims either (i) not delinquent (taking into account all available extensions) or (ii) contested in good faith by appropriate proceedings and as to which the Issuer or any of its subsidiaries shall have set aside on its books such reserves to the extent required pursuant to IFRS;

(b) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law or pursuant to customary reservations or retentions of title incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, to the extent required by IFRS shall have been made in respect thereof;

(c) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure public or statutory obligations, the performance of tenders, statutory obligations, surety and/or appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), including any Lien securing letters of credit issued in the ordinary course of business in connection therewith;

(d) any judgment Lien not giving rise to an Event of Default;

(e) easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Issuer or any of its subsidiaries;

(f) any interest or title of a lessor under any capitalized lease obligation; *provided* that such Liens do not extend to any property or assets which are not leased property subject to such capitalized lease obligation;

(g) Liens granted upon or with respect to any assets hereafter acquired by the Issuer or any of its subsidiaries to secure the acquisition costs of such assets or to secure Indebtedness incurred solely for the purpose of financing the acquisition of such assets, including any Lien existing at the time of the acquisition of such assets as long as the maximum amount so secured shall not exceed the aggregate acquisition costs of all such assets or the aggregate Indebtedness incurred solely for the acquisition of such assets, as the case may be;

(h) Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(i) Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(j) Liens arising in the ordinary course of business in connection with Indebtedness maturing not more than one year after the date on which such Indebtedness was originally incurred and which are related to the financing of export, import or other trade transactions;

(k) Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer or any of its subsidiaries, including rights of offset and set-off;

7

(l)     Liens securing Hedging Agreements otherwise permitted under this Agreement;

(m)    Liens existing on any asset or on any stock of any of Issuer's subsidiaries prior to the acquisition thereof by the Issuer or any of its subsidiaries as long as such Lien is not created in anticipation of such acquisition;

(n)     Liens existing as of the Effective Date;

(o)     Liens securing any senior indebtedness of the Issuer or any of its subsidiaries;

(p)     Liens in favor of the Issuer or any of its subsidiaries;

(q)     Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Issuer or any of its subsidiaries or becomes a subsidiary thereof; *provided* that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any other assets owned by the Issuer or such subsidiary;

(r)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods or other Liens on inventory and goods to facilitate the purchase, shipment, or storage of such inventory or goods;

(s)     Liens on assets that are the subject of a direct or indirect arrangement relating to property now owned or hereafter acquired whereby the Issuer or any of its subsidiaries transfers such property to another Person and the Issuer or such subsidiary leases it from such Person;

(t)     Liens arising by operation of law;

(u)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution;

(v)     Liens on the receivables or inventory of the Issuer or any of its subsidiaries securing obligations under or in connection with any lines of credit or working capital facilities;

(w)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not interfere in any material respect with the business of the Issuer and its subsidiaries;

(x)     Liens in favor of the Venezuelan government or any agency or instrumentality thereof to secure payments under any agreement entered into between such entity and the Issuer or any of its subsidiaries;

(y)     Liens to secure obligations of the Issuer or any of its subsidiaries under agreements that provide for indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets or subsidiary; *provided* that the maximum aggregate liability in respect of all such Liens will at no time exceed the gross proceeds actually received by the Issuer and its subsidiaries in connection with such disposition;

(z)     Lien over any Qualifying Asset relating to a project financed by, and securing Indebtedness incurred in connection with, the Project Financing of such project by the Issuer, any of its subsidiaries or any consortium or other venture in which the Issuer has any ownership or similar interest; and

8

(aa)    Liens in respect of Indebtedness the principal amount of which in the aggregate, together with all Liens not otherwise qualifying as the Issuer's Permitted Liens pursuant to this definition, does not exceed 15% of the Issuer's consolidated total assets (as determined in accordance with IFRS) at any date as at which the Issuer's balance sheet is prepared and published pursuant to any indenture, agreement or other instrument to which it is a party.

"**Person**" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 307 of ERISA, and in respect of which the Issuer or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Process Agent**" shall mean Corporation Service Company, having its offices on the date hereof at 1180 Avenue of the Americas, Suite 210, New York, NY 10036.

"**Project Financing**" of any project shall mean the incurrence of Indebtedness relating to the exploration, development, expansion, renovation, upgrade or other modification or construction of such project pursuant to which the providers of such Indebtedness or any trustee or other intermediary on their behalf or beneficiaries designated by any such provider, trustee or other intermediary are granted security over one or more Qualifying Assets relating to such project for repayment of principal, premium and interest or any other amount in respect of such Indebtedness.

"**Qualified Institutional Buyer**" shall have the meaning set forth in Rule 144A of the Securities Act.

"**Qualifying Asset**" in relation to any Project Financing shall mean:

(a)    any concession, authorization or other legal right granted by any Governmental Authority to the Issuer or any of its subsidiaries, or any consortium or other venture in which the Issuer or any of its subsidiaries has any ownership or other similar interest;

(b)    any drilling or other rig, any drilling or production platform, pipeline, marine vessel, vehicle or other equipment or any refinery, oil or gas field, processing plant, real property (whether leased or owned), right of way or plant or other fixtures or equipment;

(c)    any revenues or claims that arise from the operation, failure to meet specifications, failure to complete, exploitation, sale, loss or damage to, such concession, authorization or other legal right or such drilling or other rig, drilling or production platform, pipeline, marine vessel, vehicle or other equipment or refinery, oil or gas field, processing plant, real property, right of way, plant or other fixtures or equipment or any contract or agreement relating to any of the foregoing or the project financing of any of the foregoing (including insurance policies, credit support arrangements and other similar contracts) or any rights under any performance bond, letter of credit or similar instrument issued in connection therewith;

(d)    any oil, gas, petrochemical or other hydrocarbon-based products produced or processed by such project, including any receivables or contract rights arising therefrom or relating thereto and any such product (and such receivables or contract rights) produced or processed by other projects, fields or assets to which the lenders providing the project financing required, as a condition therefore, recourse as security in addition to that produced or processed by such project; and

9

(e)    shares, rights or other ownership interest in, and any subordinated debt rights owing to the Issuer by, a special purpose company or vehicle formed solely for the development of a project, and whose principal assets and business are constituted by such project and whose liabilities solely relate to such project.

"**Regulation S**" shall mean Regulation S promulgated by the United States Securities and Exchange Commission as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"**Repayment Date**" shall mean (a) the Initial Repayment Date and (b) for each successive Repayment Date, each day in March, June, September and December described on Exhibit A to the form of Note attached hereto occurring after the Initial Repayment Date and on or prior to the Maturity Date (including the Maturity Date); *provided* that, in each case, whenever any Repayment Date would occur on a day that is not a New York Business Day, such Repayment Date shall be on the immediately succeeding New York Business Day.

"**Reportable Event**" shall mean any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder, with respect to a Plan as to which the PBGC has not by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of that event. However, with respect to any Plan, a failure to meet the minimum funding standard of Section 412 of the Code or Section 302 of ERISA shall be a reportable event for the purposes of this definition regardless of the issuance of any waiver.

"**Required Noteholders**" shall mean, at any time, Noteholders having Notes having an aggregate outstanding principal balance more than 66.66% of the aggregate outstanding principal balance of all Notes outstanding at such time.

"**Reserved Payments**" shall have the meaning assigned to such term in Section 9.19.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Significant Subsidiary**" shall mean any Subsidiary that would be a "Significant Subsidiary" of the Issuer within the meaning of Rule 1-02 under Regulation S-X promulgated by the United States Securities and Exchange Commission.

"**Similar Law**" shall have the meaning assigned to such term in Section 3.02(l).

"**Subsidiary**" shall mean any subsidiary of the Issuer.

10



"**subsidiary**" shall mean, with respect to any Person (herein referred to as the "parent"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**successor company**" shall have the meaning assigned to such term in Section 5.08.

"**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"**Threshold Amount**" shall mean, in respect of any Event of Default, the lesser of (a) $100,000,000 or (b) any lower threshold amount set out in any Indebtedness of the Issuer, the Guarantor or any of the Significant Subsidiaries in respect of an analogous event.

"**Transactions**" shall mean, collectively, (a) the execution, delivery and performance by the Issuer, certain Affiliates of the Issuer, and the Initial Noteholder of the Novation Agreement, (b) the execution, delivery and performance by the Finance Parties of the Finance Documents to which they are a party and the making and borrowing of the Notes hereunder, and (c) the payment of related fees and expenses.

"**Transaction Documents**" shall mean the Novation Agreement and the Finance Documents.

"**Unfunded Vested Liability**" shall mean, relative to any Plan, including any Multiemployer Plan, at any time, the excess (if any) of (a) the present value of all vested nonforfeitable benefits under such Plan or such Multiemployer Plan, as the case may be, over (b) the fair market value of all Plan assets or Multiemployer Plan assets, as the case may be, allocable to such benefits, all determined as of the then most recent valuation date for such Plan or such Multiemployer Plan, as the case may be, but only to the extent that such excess represents a potential liability of the Issuer to the PBGC, such Plan or such Multiemployer Plan under Title IV of ERISA.

"**United States**" shall mean the United States of America.

"**Unscheduled Holiday**" shall mean a day that is not a Caracas Business Day and with respect to which the market was not made aware of such fact (by means of a public announcement or other publicly available information) until a time later than 9:00 a.m. local time in Caracas five Caracas Business Days prior to such Unscheduled Holiday.

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001, as amended)).

"**Venezuela**" shall mean the Bolivarian Republic of Venezuela.

"**Venezuelan Governmental Authority**" shall mean any Governmental Authority of Venezuela.

"**Welfare Plan**" means a "welfare plan" as such term is defined in section 3(1) of ERISA.

Section 1.02    Terms Generally. The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and

11

"including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. All references herein to Articles, Sections, Exhibits, Schedules and Annexes shall be deemed references to Articles and Sections of, and Exhibits, Schedules and Annexes to, this Agreement unless the context shall otherwise require and all references herein to this Agreement shall be deemed to include the Exhibits, Schedules and Annexes hereto. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any agreements (including the Finance Documents), other contractual Instruments and publications shall mean such agreement, instrument or publication as amended, restated, supplemented or otherwise modified from time to time, (b) any reference made in any Finance Document to any Person shall mean such Person and its permitted successors and assigns, and (c) all terms of an accounting or financial nature shall be construed in accordance with IFRS, as in effect on the date hereof and consistent with financial statements delivered pursuant to Section 3.01(c).

## ARTICLE II

## THE NOTES

### Section 2.01    Issuance of Initial Note.

(a)    The execution and delivery of this Agreement and the other Finance Documents shall occur at the offices of Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022, at 9:00 a.m., New York time (or at such other place or time or in such other manner as may be mutually agreed upon by the parties hereto), at a closing on the Effective Date.

On the Effective Date and upon the satisfaction or waiver of the conditions precedent specified in Section 4.01, the outstanding Novated Receivables held by the Initial Noteholder shall be released pursuant to the Novation Agreement and converted into the Initial Note issued by the Issuer pursuant to this Agreement to the Initial Noteholder in a principal amount equal to the aggregate outstanding amount of such Novated Receivables held by the Initial Noteholder as of the Effective Date as set forth on Annex I hereto. At the closing, the Issuer will deliver to the Initial Noteholder the Initial Note in the principal amount of the Novated Receivables of the Initial Noteholder that are released by the Initial Noteholder pursuant to the Novation Agreement substantially in the form of Exhibit A hereto with the legend thereon, dated the Effective Date and registered in the name of the Initial Noteholder.

**Section 2.02    Repayment of Notes.** (a) The Issuer hereby unconditionally promises to pay to each Noteholder the principal amount of the Note of such Noteholder as provided in Section 2.05.

(b)    Each Noteholder shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Issuer to such Noteholder resulting from each Note issued hereunder, including the amounts of principal and interest payable and paid to such Noteholder from time to time under this Agreement in respect of each such Note.

**Section 2.03    Interest on Notes.** (a) Subject to the provisions of Section 2.04, the Notes shall bear interest on the unpaid principal balance thereof from and after the Effective Date but excluding the date of repayment thereof, based on and computed on the basis of actual number of days elapsed on a year of 365/366 days, at a rate per annum equal to six and one-half percent (6.5%).

(b)    Interest on the Notes shall be payable on the Repayment Dates (including the Maturity Date), or at maturity by acceleration, and, after such maturity, on demand.

12

Section 2.04   **Default Interest**. If (a) the Issuer shall default in the payment of any principal of or interest on any Note or any other amount due hereunder or under any other Finance Document, by acceleration or otherwise (including automatic acceleration), or (b) if any Event of Default under Article VII (other than paragraph (a), (b) or (f) of Article VII) has occurred and is continuing and the Required Noteholders accelerate the Notes or direct the Administrative Agent to accelerate the Notes, then, in the case of clause (a) above, until such defaulted amount shall have been paid in full or, in the case of clause (b) above, from the date the applicable action has been taken by the Required Noteholders and for so long as such Event of Default is continuing or until the date the Required Noteholders agree otherwise, to the extent permitted by law, all amounts outstanding under this Agreement and the other Finance Documents shall bear interest (after as well as before judgment), payable on demand, based on and computed on the basis of actual number of days elapsed on a year of 365/366 days, at a rate per annum equal to eight and one-half percent (8.5%).

Section 2.05   **Repayment of Notes**. (a) The Issuer shall pay to the Administrative Agent, for the account of the Noteholders, on each Repayment Date, a principal amount of the Notes equal to the original principal amounts of the Note for the corresponding Repayment Dates set forth on Exhibit A to the form of Note attached hereto; *provided* that, if any Note or any portion thereof is transferred or exchanged to one or more Noteholders pursuant to Section 2.11 or replaced or exchanged pursuant to Section 2.12, Exhibit A of such Note or Notes issued pursuant to Section 2.11 or Section 2.12, as the case may be, shall be modified to reflect the installments of principal due to be paid with respect to all Repayment Dates occurring after the date of the Note or Notes that is or are issued in exchange pursuant to Section 2.11 or replacement pursuant to Section 2.12.

(b)   To the extent not previously paid, all Notes shall be due and payable on the Maturity Date together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(c)   The Issuer shall have the right to prepay any one or more of the Notes in whole or in part at any time after not less than five (5) Business Days' notice by the Issuer to the Administrative Agent. All such prepayments shall be applied in the inverse order of the maturity of the Installments of principal due under the applicable Note or Notes to be prepaid.

(d)   All repayments or prepayments permitted pursuant to this Section 2.05 shall be without premium or penalty.

Section 2.06   **Pro-Rata Treatment**. Unless the Issuer has elected to prepay a specific Note or Notes pursuant to Section 2.05, each payment or prepayment of principal of any Note and each payment of interest on the Notes shall be allocated *pro rata* among the Notes in accordance with their respective principal amounts outstanding and unpaid thereon.

Section 2.07   **Sharing of Setoffs**. Each Noteholder agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Issuer or any other Finance Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Noteholder under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of the Notes as a result of which the unpaid principal portion of its Notes shall be proportionately less than the unpaid principal portion of the Notes of any other Noteholder, it shall be deemed simultaneously to have purchased from such other Noteholder at face value, and shall promptly pay to such other Noteholder the purchase price for, a participation in the Notes of such other Noteholder, so that the aggregate unpaid principal amount of the Notes and participation in the Notes held by each Noteholder shall be in the same proportion to the aggregate unpaid principal amount of all Notes

13



then outstanding as the principal amount of its Notes prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Notes outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided, however*, that (a) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.07 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (b) the provisions of this Section 2.07 shall not be construed to apply to any payment made by the Issuer pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Noteholder as consideration for the assignment of or sale of a participation in any of its Notes to any assignee or participant, other than to the Guarantor or any of its Affiliates (as to which the provisions of this Section 2.07 shall apply). The Issuer and the Guarantor expressly consent to the foregoing arrangements.

Section 2.08 Payments. (a) The Issuer shall make each payment (including principal of or interest on any Note, fees or other amounts) hereunder and under any other Finance Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, solely and exclusively in Dollars as currency of payment, and without setoff, defense or counterclaim (other than as specifically provided for in any such Finance Document solely with respect to amounts due under such Finance Document, including as provided in Section 2.09(d)). Each such payment shall be made to the Administrative Agent (at its offices at 800 Long Ridge Road, Stamford, CT 06927 or to its account set forth on Schedule 2.08) who shall promptly distribute to each Noteholder any payments received by the Administrative Agent on behalf of such Noteholder, in each case to the account of such Noteholder set forth on Schedule 2.08 or as designated by the applicable Noteholder in its Assignment and Acceptance, or at such other address as shall be designated by such Noteholder from time to time to the Issuer and the Administrative Agent.

(b) Except as otherwise expressly provided herein, whenever any payment (including interest on any Note, fees or other amounts) hereunder or under any other Finance Document shall become due, or otherwise would occur, on a day that is not a New York Business Day, such payment may be made on the immediately succeeding New York Business Day, and such extension of time shall in such case be included in the computation of interest or fees, if applicable.

Section 2.09 Taxes. (a) Any and all payments by or on account of any obligation of the Issuer or any other Finance Party hereunder or under any other Finance Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that, if the Issuer or any other Finance Party shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent and each Noteholder (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Issuer or such Finance Party shall make such deductions and (iii) the Issuer or such Finance Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Issuer shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) The Issuer shall indemnify the Administrative Agent and each Noteholder within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Noteholder, as the case may be, on or with respect to any payment by or on account of any obligation of the Issuer or any other Finance Party hereunder or under any other

14



Finance Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

(d) As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Issuer or any other Finance Party to a Governmental Authority but no later than 90 days after payment, the Issuer shall deliver to the applicable Noteholder and, if applicable, the Administrative Agent, the original or a copy of either a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment (provided that such copy shall be delivered to the applicable Noteholder within 90 days of filing), or other evidence of such payment reasonably satisfactory to such Noteholder and/or the Administrative Agent. If a Noteholder is not an Eligible Institution, notwithstanding any other provision of the Finance Documents, each Finance Party shall be entitled to deduct and setoff from the payments due to such Noteholder under the Finance Documents all amounts that are paid by either of such Finance Parties to a Governmental Authority for Excluded Taxes of the type that are described in clause (b) of the definition of Excluded Taxes set forth in Section 1.01, provided that, in addition to any evidence of payment to a Governmental Authority of Indemnified Taxes or Other Taxes in the preceding sentence, the Issuer also shall deliver to the applicable Noteholder and, if applicable, the Administrative Agent, evidence of any payment to a Governmental Authority of Excluded Taxes, which shall meet the criteria set forth in the preceding sentence with respect to the payment to a Governmental Authority of Indemnified Taxes or Other Taxes.

Section 2.10    Registration of Notes. The Issuer shall keep at its principal executive office a register for the registration and transfer of the Initial Note or, if applicable after a transfer and exchange of the Initial Note for more than one Note pursuant to Section 2.11, the Notes. The name and address of each Noteholder, each transfer thereof and the name and address of each transferee of the Notes shall be registered in such register. The Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Issuer shall not be affected by any notice or knowledge to the contrary except for an assignee of the Note in respect of which the Issuer has received an executed Assignment and Acceptance as provided in Section 9.04.

Section 2.11    Transfer and Exchange of Notes.

(a) Upon surrender of any Note or part thereof at the principal executive office of the Issuer for transfer or exchange (and in the case of a surrender for transfer, duly endorsed and accompanied by an Assignment and Acceptance duly executed by the registered holder of such Note or his attorney duly authorized in writing and the transferee and accompanied by the address for notices of each transferee of such Note or part thereof), the Issuer shall execute and deliver, at the Issuer's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note; provided, that Notes issued in exchange for a surrendered Note must be issued in a minimum denomination of $100,000 each and in integral multiples of $1,000 in excess thereof. The Initial Note, and any subsequent Note issued as a result of a transfer or exchange in accordance with the terms of this Section 2.11, may be transferred or exchanged in part. The new Note shall be payable to the transferee and shall be substantially in the form of Exhibit A with the legend thereon, which shall not be modified under any circumstances. Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest stall have been paid thereon. The Issuer may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes.

15



(b)    The Noteholder shall pay the cost of delivering to or from such Noteholder's home office or custodian bank from or to the Issuer, insured to the reasonable satisfaction of such holder, the surrendered Note and any Note issued in substitution for the surrendered Note.

### Section 2.12    Replacement of Notes.

(a)    Upon receipt by the Issuer of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note, and

(i)    in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it, or

(ii)    in the case of mutilation, upon surrender and cancellation thereof,

the Issuer at its own expense shall execute and deliver, in lieu thereof, a new Note, which shall be substantially in the form of Exhibit A with the legend thereon and dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

(b)    The Noteholder shall pay the cost of delivering to or from such Noteholder's home office or custodian bank from or to the Issuer, insured to the reasonable satisfaction of such holder, a mutilated Note and any Note issued in replacement for the mutilated Note.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

**Section 3.01    Issuer's and Guarantor's Representations and Warranties.**  The Issuer and the Guarantor represent and warrant to the Administrative Agent and the Initial Noteholder on the Effective Date that:

(a)    Organization; Powers. The Issuer, the Guarantor and each of the Subsidiaries (except with respect to the Subsidiaries (other than the Guarantor), only to the extent that failure to do so could result in a Material Adverse Effect) (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a Material Adverse Effect, and (d) has the power and authority to execute, deliver and perform its obligations under each of the Transaction Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Issuer, to issue the Initial Note hereunder.

(b)    Authorization. The Transactions (a) have been duly authorized by all requisite corporate and, if required, stockholder action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, or of the certificate or articles of organization or other constitutive documents or by-laws of the Issuer, the Guarantor or any Subsidiary, (B) any order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which the Issuer, the Guarantor or any Subsidiary is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or

16



imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Issuer, the Guarantor or any Subsidiary.

(c)    Enforceability. This Agreement has been duly executed and delivered by the Issuer and the Guarantor, and constitutes, and each other Transaction Document when executed and delivered by each other party thereto will constitute, a legal, valid and binding obligation of the Issuer, the Guarantor and any Subsidiary which is a party thereto, enforceable against the Issuer, the Guarantor and any such Subsidiary in accordance with its terms (except, in any case, as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

(d)    Governmental Approvals. No action, consent, authorization or approval of, registration or filing with or any other action by any Governmental Authority having jurisdiction over any Finance Party is or will be required in connection with the Transactions, except for such as have been made or obtained and are in full force and effect.

(e)    Financial Statements. The Issuer has heretofore furnished to the Initial Noteholder (i) its annual consolidated financial statements (including the notes thereof) as of and for the fiscal year ended December 31, 2014, prepared in accordance with IFRS and presented in the English language, together with a report thereon by the Issuer's certified independent accountants, and (ii) its semi-annual unaudited consolidated financial statements as of and for the six-month period ending September 30, 2015, prepared in accordance with IFRS and presented in the English language. Such financial statements and all other financial statements delivered in accordance with Section 5.04 hereof present fairly the financial condition of the Issuer and its consolidated Subsidiaries as of such dates and for such periods, and, to the extent required by IFRS, disclose all material liabilities, direct or contingent, of the Issuer and its consolidated Subsidiaries as of the date thereof.

(f)    No Material Adverse Change. No Material Adverse Effect has occurred since September 30, 2015.

(g)    Title to Properties; Possession Under Leases.

(i)    Each of the Issuer and the Guarantor has good and marketable title to, or valid leasehold interests in, all its material properties and assets, and each of the Subsidiaries has good and marketable title to, or valid leasehold interests in, all its material properties and assets, except to the extent such failure of a Subsidiary (other than the Guarantor) to have good and marketable title or a valid leasehold interest could not reasonably be expected to result in a Material Adverse Effect. All such material properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 5.07 and Permitted Liens.

(ii)    Each of the Issuer and the Guarantor has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect, and each of the Subsidiaries has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect, except to the extent such failure of a Subsidiary (other than the Guarantor) to comply could not reasonably be expected to result in a Material Adverse Effect. Each of the Issuer and the Guarantor enjoys peaceful and undisturbed possession under all such material leases, and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases, except to the extent such possession by a Subsidiary (other than the Guarantor) could not reasonably be expected to result in a Material Adverse Effect.

17



(h)  Subsidiaries.  Schedule 3.01(h) sets forth as of the Effective Date a list of all Subsidiaries and the percentage ownership interest of the Issuer or the Guarantor therein.  The shares of capital stock or other ownership interests so indicated on Schedule 3.01(h) are fully paid and non-assessable and are owned by the Issuer or the Guarantor, directly or indirectly, free and clear of all Liens.

(i)  Litigation; Compliance with Laws.

(i)  Except as set forth on Schedule 3.01(i), there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of the Issuer or the Guarantor, threatened against or affecting the Issuer, the Guarantor or any Subsidiary or any business, property or rights of any such Person (i) that involve any Transaction Document or the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(ii)  None of the Issuer, the Guarantor or any of the Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted or the entry into or performance of its obligations under any Transaction Document violate, any law, rule or regulation (including any tax law, disclosure or reporting requirement, securities laws and regulations, zoning, building, Environmental Law, ordinance, code or approval or any building permits), or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

(j)  Agreements.

(i)  None of the Issuer, the Guarantor or any of the Subsidiaries is a party to any agreement or instrument or subject to any corporate restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(ii)  None of the Issuer, the Guarantor or any of the Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect.

(k)  Federal Reserve Regulations.

(i)  None of the Issuer, the Guarantor or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(ii)  None of the Issuer, the Guarantor or any of the Subsidiaries is a "public utility" within the meaning of, or subject to regulation under, the United States Federal Power Act of 1920 (16 U.S.C. §§791 et seq.).

(l)  Investment Company Act.  None of the Issuer, the Guarantor or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

18



(m) <u>Tax Returns</u>. Each of the Issuer, the Guarantor and the Subsidiaries has filed or caused to be filed all foreign and Venezuelan federal, national, state and local tax returns or materials required to have been filed by it, except any for which failure to file could not reasonably be expected to result in a Material Adverse Effect, and has paid or caused to be paid all Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Issuer, the Guarantor or such Subsidiary, as applicable, shall have set aside on its books adequate reserves.

(n) <u>No Material Misstatements</u>. No information, report, financial statement, exhibit or schedule furnished by or on behalf of the Issuer or the Guarantor to the Administrative Agent or any Noteholder in connection with the negotiation of any Transaction Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Issuer represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with the historical audited financial statements of the Issuer and the Guarantor, as applicable) and due care in the preparation of such information, report, financial statement, exhibit or schedule.

(o) <u>Employee Benefit Plans</u>.

(i) None of the Issuer, the Guarantor or any ERISA Affiliate (other than any member of the Citgo Group) has during the past five years maintained, contributed to or had an obligation to contribute to any Plan, Multiemployer Plan or has any present intention to do so.

(ii) In respect of the Citgo Group:

(A) each Plan complies in all material respects with all requirements of law except to the extent that noncompliance could not reasonably be expected to have a Material Adverse Effect;

(B) no Reportable Event has occurred, or is reasonably likely to occur, with respect to any Plan which could result in any member of the Citgo Group incurring a liability or obligation in excess of $50,000,000;

(C) no steps have been taken to terminate any Plan which could result in any member of the Citgo Group making a contribution, or incurring a liability or obligation, to such Plan in excess of $50,000,000, and no steps have been taken to appoint a receiver or trustee to administer any such Plan;

(D) there is no Unfunded Vested Liability with respect to any Plan that would reasonably be expected to have, in the event of termination of such Plan, a Material Adverse Effect;

(E) no Plan is determined to be, or is expected to be, in at-risk status (within the meaning of Title IV of ERISA);

(F) no contribution failure has occurred with respect to any Plan sufficient to give rise to a Lien under ERISA or the Code;

19



(G)     no condition exists or event or transaction has occurred with respect to any Plan which would reasonably be expected to have a Material Adverse Effect;

(H)     no member of the Citgo Group has any contingent liability with respect to any post-retirement benefit under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA, that would reasonably be expected to have a Material Adverse Effect; and

(I)     no member of the Citgo Group has during the past five years maintained, contributed to or had an obligation to contribute to any Multiemployer Plan or has any present intention to do so.

(p)     Environmental Matters.  Except as set forth in Schedule 3.01(p) and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Issuer, the Guarantor or any of the Subsidiaries (i) has failed to comply with any Environmental Law applicable to it or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law applicable to it, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(q)     Insurance.  The Issuer and the Subsidiaries maintain insurance to such extent and against such risks required pursuant to Section 5.02 of this Agreement.

(r)     Labor Matters.  As of the Effective Date, there are no strikes, lockouts or slowdowns against the Issuer, the Guarantor or any Subsidiary pending or, to the knowledge of the Issuer or the Guarantor, threatened which could reasonably be expected to result in a Material Adverse Effect. The hours worked by and payments made to employees of the Issuer, the Guarantor and the Subsidiaries have not been in violation of applicable Venezuelan national, state or local law dealing with such matters. All payments due from the Issuer, the Guarantor or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or, to the extent required by IFRS, accrued as a liability on the books of the Issuer, the Guarantor or such Subsidiary. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Issuer, the Guarantor or any Subsidiary is bound.

(s)     Solvency.  On the Effective Date and immediately following the issuance of the Initial Note and after giving effect to the cancellation of the Novated Receivables, (a) the assets of each Finance Party, at a fair valuation, are in excess of the total amount of its debts (including contingent liabilities); (b) the present fair saleable value of each Finance Party's assets is greater than its probable liability on its existing debts as such debts become absolute and matured; (c) each Finance Party is then able and expects to be able to pay its debts (including contingent liabilities and other commitments) as they mature; (d) each Finance Party has capital sufficient to carry on its business as conducted and as proposed to be conducted; and (e) each Finance Party is in compliance with each applicable solvency standard under the laws of the jurisdiction where it is organized, domiciled, resident or otherwise located. For purposes of this Section, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(t)     US Anti-Terrorism Laws.  Each of the Issuer, the Guarantor and the Subsidiaries, and, to the best of the Issuer's and the Guarantor's knowledge, any persons acting on any of their behalf

20



with respect to activities performed under the Transaction Documents, (a) is not a Designated Person, and (b) has not used any part of the assets or services acquired in connection with the creation of the Novated Receivables on behalf of any Designated Person or will otherwise use, directly by it or indirectly through any Subsidiary, such assets or services in connection with any investment in, or any transactions or dealings with, any Designated Person. The Issuer, and each of the Affiliates of the Issuer that are the original obligors in respect of such Novated Receivables, has not used any of the assets or services acquired in connection with the creation of the Novated Receivables for purposes other than for the use of such assets or services in the ordinary course of business of the Affiliates that are the original obligors in respect of such Novated Receivables, or, directly or indirectly, used any of such assets or services for, or will repay any Note or Notes with the proceeds of, (i) business activities relating to Cuba, Sudan, Iran, Myanmar (Burma), Syria or North Korea, or (ii) business activities that are or which become subject to sanctions, restrictions or embargoes imposed by the United Nations, the European Union, the State Secretariat for Economic Affairs of Switzerland or the Swiss Directorate of International Law, OFAC, HM Treasury of the United Kingdom, the Hong Kong Monetary Authority and/or the Monetary Authority of Singapore. This includes, in particular (but without limitation) business activities involving Persons or entities subject to any such sanctions or named on any sanctions lists issued by any of the aforementioned bodies and entities owned or controlled by such listed Persons or entities.

(u)     Anti-Bribery and Anti-Corruption Laws. Each of the Issuer, the Guarantor and the Subsidiaries, and, to the best of the Issuer's and the Guarantor's knowledge, each of the persons acting on any of their behalf with respect to activities performed under the Transaction Documents have not taken any action in connection with the acquisition of the assets or services acquired in connection with the creation of the Novated Receivables, or in connection with the negotiation, execution and delivery of the Transaction Documents, that is in violation of the Anti-Bribery and Anti-Corruption Laws.

(v)     Senior Indebtedness. The Obligations constitute senior indebtedness that is entitled to the benefits of the subordination provisions, if any, relating to all other Indebtedness of the Issuer and its Subsidiaries and the Guarantor and its subsidiaries.

(w)     Availability and Transfer of Foreign Currency. Each of the Issuer and the Guarantor is subject to the Law on the Central Bank of Venezuela (*Ley del Banco Central de Venezuela*), published in Extraordinary Official Gazette No. 6,211 dated December 30, 2015, and Exchange Agreement No. 9 (*Convenio Cambiario No. 9*), published in Official Gazette No. 39,239 dated August 11, 2009, between the Central Bank of Venezuela and the Ministry of the People's Power for Economy and Finance (currently the Ministry of the People's Power for Banking and Finance), which grants the Issuer and the Guarantor the right to (a) maintain the proceeds received by the Issuer and the Guarantor derived from the export of hydrocarbons, in a foreign currency outside of Venezuela, and (b) apply such proceeds in a foreign currency outside of Venezuela to the repayment of the Notes and comply with its obligations pursuant to the terms of this Agreement. There are no other foreign exchange controls issued or, to the knowledge of the Issuer or the Guarantor, threatened to be issued by Venezuela or any Venezuelan Governmental Authority that would hinder the ability of the Issuer or the Guarantor to comply with its obligations under the Transaction Documents.

(x)     Commercial Activities; Absence of Immunity. Each of the Issuer and the Guarantor is subject to civil and commercial law in Venezuela with respect to its obligations hereunder. The execution, delivery and performance by the Issuer and the Guarantor of its obligations hereunder constitute private and commercial acts rather than public or governmental acts under the laws of Venezuela. Neither the Issuer, nor the Guarantor, nor any of their properties, assets or revenues is entitled to any right of immunity in any jurisdiction from suit, court jurisdiction, judgment, attachment (whether before or after judgment), set-off or execution of a judgment or from any other legal process or

21



remedy relating to the obligations of the Issuer except for the mandatory notice required pursuant to Article 111 of the Law of the Office of the Attorney General of Venezuela (*Ley Orgánica de la Procuraduría General de la República*).

Section 3.02 <u>Initial Noteholder's Representations and Warranties</u>. The Initial Noteholder represents and warrants to the Issuer on the Effective Date that:

(a) <u>Organization; Powers</u>. The Initial Noteholder, only to the extent that failure to do so could result in a material impairment of the ability of the Initial Noteholder to perform any of its obligations under any Transaction Document (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business In, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a material impairment of the ability of the Initial Noteholder to perform any of its obligations under any Transaction Document, and (d) has the power and authority to execute, deliver and perform its obligations under each of the Transaction Documents and each other agreement or instrument contemplated thereby to which it is or will be a party.

(b) <u>Authorization</u>. The Transactions (a) have been duly authorized by all requisite corporate and, if required, stockholder action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, or of the certificate or articles of organization or other constitutive documents or by-laws of the Initial Noteholder, (B) any order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which the Initial Noteholder is a party or by which it or any of its property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Initial Noteholder.

(d) <u>Enforceability</u>. This Agreement has been duly executed and delivered by the Initial Noteholder and constitutes, and each other Transaction Document when executed and delivered by the Initial Noteholder to which it is a party will constitute, a legal, valid and binding obligation of the Initial Noteholder enforceable against the Initial Noteholder in accordance with its terms (except, in any case, as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

(e) <u>Governmental Approvals</u>. No action, consent, authorization or approval of, registration or filing with or any other action by any Governmental Authority having jurisdiction over the Initial Noteholder is or will be required in connection with the Transactions, except for such as have been made or obtained and are in full force and effect.

(f) <u>No Registration</u>. The Initial Noteholder understands that (i) the Initial Note has not been and will not be, and any Note issued pursuant to <u>Section 2.11</u> or <u>Section 2.12</u> herein will not be, registered under the Securities Act or any other applicable securities law, (ii) the Initial Note is being acquired by the Initial Noteholder for investment, and (iii) the Initial Note may be offered, sold or otherwise transferred only to qualified institutional buyers pursuant to Rule 144A of the Securities Act or to a buyer purchasing pursuant to a registration statement under the Securities Act. The Initial Noteholder understands that the Initial Note, and any Note issued pursuant to <u>Section 2.11</u> or <u>Section 2.12</u> herein, will contain a legend as set forth on the form of Note attached hereto as <u>Exhibit A</u>.

22



(g)     Qualified Institutional Buyer. With respect to the Initial Note, the initial Noteholder is a "qualified institutional buyer" as defined in Rule 144A.

(h)     Access to Prior Necessary Information. Prior to the delivery of the Initial Note, to the extent that the Initial Noteholder regarded as necessary to evaluate the merits and risks of its investment therein, the Initial Noteholder was afforded the opportunity to ask questions of, and received sufficient answers from, representatives of the Issuer concerning: (i) the terms and conditions of the Initial Note and (ii) the operations, financial condition and future prospects of the Issuer and the Guarantor. The Initial Noteholder has, independently and based upon such documents and information as the Initial Noteholder has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Issuer and the Guarantor and made its own decision to acquire the Initial Note, and will, independently and based on such documents and information as the Initial Noteholder shall deem appropriate at the time, continue to make its own analysis, appraisals and decisions in taking or not taking action under the Transaction Documents, and to make such investigation as the Initial Noteholder deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Issuer.

(i)     Eligible Institution. The Initial Noteholder is not an Eligible Institution.

(j)     Distribution of Materials. The Initial Noteholder has not distributed any materials relating to the Initial Note to anyone other than any counsel or other advisor to it, and no one other than such Persons has used its copies of such documents.

(k)     No Distribution. The Initial Noteholder, its Affiliates (as such term is defined in Rule 501(b) under the Securities Act) or any Person acting on their behalf:

(i)     has not engaged, does not intend to engage, and will not engage, in connection with the issuance of any Note hereunder, in any form of public distribution that would require registration of any Note with the Securities and Exchange Commission under Section 5 of the Securities Act.

(ii)     has not entered and will not enter into any contractual arrangement with any distributor (as the term is defined for purposes of Rule 902(d) of Regulation S) with respect to the distribution or delivery of any Note.

(l)     ERISA. Either: (i) the Initial Noteholder is not: (A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to the provisions of part 4 of subtitle B of Title I of ERISA, (B) a "plan" to which Section 4975 of the Code applies, (C) a governmental, church or non-U.S. plan that is subject to any federal, state, local, non-U.S. or other laws or regulations that are substantially similar to the fiduciary responsibility or prohibited transaction provisions of ERISA or Section 4975 of the Code ("Similar Law") or (D) an entity whose underlying assets are deemed to include "plan assets" of any of the foregoing, or (ii) its acquisition or holding of such Initial Note does not and will not give rise to a non-exempt prohibited transaction under ERISA or Section 4975 of the Code or, with respect to investors described in clause (C) hereof, a non-exempt violation of any applicable Similar Law.

(m)     Independent Evaluation of Merits and Risks. The Initial Noteholder has independently evaluated the merits and risks of its participation in the transactions contemplated hereby and, in so evaluating, has not relied upon any Person (other than the Issuer or the Guarantor) in connection with its decision to participate in such transactions.



(n)     Purchase for Investment. With respect to the Initial Note issued in reliance on Section 4(a)(2) of the Securities Act, the Initial Noteholder represents that the Initial Noteholder is acquiring the Initial Note for its own account, *provided* that the disposition of the Initial Noteholder's property shall at all times be within the Initial Noteholder's control. The Initial Noteholder understands that the Initial Note has not been registered under the Securities Act and may be sold, in whole or in part, only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Issuer is not required to register the Initial Note.

## ARTICLE IV

### CONDITIONS OF INITIAL NOTE ISSUANCE

The obligations of the Issuer to issue the Initial Note hereunder are subject to the satisfaction of the following conditions (it being acknowledged and agreed that, notwithstanding the failure to satisfy any of the conditions in this Article IV, if the Initial Noteholder chooses to waive such conditions, the Issuer shall be obligated to issue the Initial Note in accordance with Section 2.01):

**Section 4.01     Conditions to the Initial Note Issuance.** On the Effective Date:

(a)     The Administrative Agent and the Initial Noteholder shall have received a written opinion of (i) Hogan Lovells US LLP (under New York and United States federal law) and (ii) Hogan Lovells S.C. (under Venezuelan law), each counsel for the Issuer and the Guarantor, and, in each case, (A) dated the Effective Date, (B) addressed to the Administrative Agent and the Initial Noteholder, and (C) covering such matters relating to the Transaction Documents and the Transactions as the Initial Noteholder shall reasonably request and in form and substance reasonably satisfactory to the Initial Noteholder, and the Issuer and the Guarantor hereby request such counsel to deliver such opinions.

(b)     The Administrative Agent and the Initial Noteholder shall have received (i) a copy of the last amendment to the Articles of Incorporation and By-laws of the Issuer, the Guarantor and the other Affiliates of the Issuer that are a party to the Novation Agreement; (ii) a copy of a certificate of the secretary of each of the Issuer, the Guarantor and the other Affiliates of the Issuer that are a party to the Novation Agreement certifying as to the resolution of the board of directors of each of the Issuer, the Guarantor and the other Affiliates of the Issuer that are a party to the Novation Agreement (A) approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party and resolving that it execute the Transaction Documents to which it is a party, (B) authorizing a specified person or persons to execute the Transaction Documents to which it is a party on its behalf, and (C) authorizing a specified person or persons, on its behalf, to sign all documents and notices to be signed by it under or in connection with the Transaction Documents to which it is a party, (iii) evidence of the payment capacity of the Issuer and the Guarantor, in the form of the publication of a certification of debt of the Issuer and the Guarantor, as required by Article 101 of the Organic Law on the Financial Administration of the Public Sector, published in Extraordinary Official Gazette No. 6.210 dated December 30, 2015; (iv) a copy of the most recent minutes of the shareholders of each of the Issuer, the Guarantor, and the other Affiliates of the Issuer that are a party to the Novation Agreement appointing the members of its board of directors; (v) a copy of signature and incumbency certificates of each of the Issuer, the Guarantor, and the other Affiliates of the Issuer that are a party to the Novation Agreement, of the person or persons authorized to execute the Transaction Documents to which it is a party; and (vi) a certificate of an authorized signatory of

24



Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 135 of 312

each of the Issuer, the Guarantor, and the other Affiliates of the Issuer that are a party to the Novation Agreement, certifying that each copy of a document delivered pursuant to this Section 4.01(b) is true, correct, complete and in full force and effect as of the date of this Agreement.

(c)     Each of the Transaction Documents shall have been duly executed by the Finance Parties party thereto on the Effective Date.

(d)     The Administrative Agent and the Initial Noteholder shall have received the financial statements and report referred to in Section 3.01(e), none of which shall demonstrate a change in the financial condition of the Issuer from (and shall not otherwise be materially inconsistent with) the financial statements previously provided to the Initial Noteholder, which has had or could reasonably be expected to result in a Material Adverse Effect.

(e)     All requisite Governmental Authorities and third parties shall have approved, authorized or consented to the Transactions and the other transactions contemplated hereby to the extent required, all applicable appeal periods shall have expired and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby.

(f)     The Administrative Agent and the Initial Noteholder shall have received evidence that the Issuer (for itself and the Guarantor) has obtained the prior favorable opinion of the Central Bank to hold funds in foreign currency outside of Venezuela, pursuant to Exchange Agreement No. 9 and a certificate from the Issuer to the effect that such authorization remains in full force and effect as of the Effective Date.

(g)     In the reasonable judgment of the Administrative Agent and the Initial Noteholder, there shall have been no change or development since September 30, 2015 involving a prospective material adverse change in (i) the United States, Venezuelan or international financial, banking, political or economic conditions, (ii) the political, social, economic or financial condition of Venezuela, (iii) the currency exchange rates or controls imposed by any Governmental Authority in Venezuela applicable to Dollars which affects the Issuer's or the Guarantor's ability to perform their respective obligations under the Transaction Documents, (iv) any legislation, rules, regulations or other conditions affecting financial transactions of the same nature as the one reflected by the Transaction Documents or (v) the Initial Note syndication or capital markets with respect to Venezuelan and/or Latin American issuers, and neither the Administrative Agent nor the Initial Noteholder shall have received any notice from the Issuer that there has been any such material adverse change or development.  By having signed this Agreement, the Administrative Agent and the Initial Noteholder agree that this condition has been satisfied.

(h)     The Administrative Agent and the Initial Noteholder shall have received, to the extent requested, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.



## ARTICLE V

## COVENANTS

The Issuer covenants and agrees with the Initial Noteholder and any subsequent Noteholder that from the Effective Date and until the principal of and interest on the Notes, all fees and all other expenses or amounts payable under any Finance Document shall have been paid in full, unless the Required Noteholders shall otherwise consent in writing:

Section 5.01    **Maintenance of Corporate Existence.** Except as permitted pursuant to Section 5.08, the Issuer will, and will cause each of the Subsidiaries to, maintain in effect its and their corporate existence and all rights, privileges, titles to property, licenses, franchises and the like necessary in connection with the normal conduct of its and their business, activities or operations; *provided, however,* that the Issuer shall not be required to, and shall not be required to cause the Subsidiaries (other than the Guarantor) to maintain any such rights, privileges, titles to property, licenses or franchises if the Issuer determines in good faith that the maintenance thereof is no longer necessary in the conduct of the business of the Issuer and the Subsidiaries as a whole, and the failure to so maintain any such rights, privileges, titles to property, licenses or franchise is not disadvantageous in any material respect to the Noteholders.

Section 5.02    **Insurance.** The Issuer will, and will cause each of the Subsidiaries to, maintain insurance with reputable insurance companies and in such amounts and covering such risks as are believed by the Issuer to be usually carried by companies engaged in similar businesses and owning and/or operating properties similar to those owned and/or operated by the Issuer or such Subsidiary, as the case may be, in the same general areas in which the Issuer or such Subsidiary owns and/or operates its properties.

Section 5.03    **Maintenance of Governmental Approvals.** The Issuer will, and will cause each of the Subsidiaries to, maintain in full force and effect all approvals, consents, licenses and authorizations of any Governmental Authority which may be necessary or the Issuer may deem appropriate under any applicable law or regulation for the conduct of its business or for the performance of its obligations under the Finance Documents, as the case may be, except to the extent failure to do so would not be reasonably expected to have a Material Adverse Effect.

Section 5.04    **Financial Statements, Reports, etc.**    The Issuer will furnish to the Administrative Agent and the Noteholders:

(a)    within 180 days following the end of each fiscal year of the Issuer after the Effective Date, (i) the annual consolidated financial statements (including the notes thereto) of the Issuer, prepared in accordance with IFRS and presented in the English language, (ii) a report thereon by the Issuer's certified independent accountants, and (iii) a "management discussion and analysis" or other report of management providing an overview in reasonable detail of the results of operations and financial condition of the Issuer and the Subsidiaries;

(b)    within 180 days following the end of the second fiscal quarter in each fiscal year of the Issuer beginning with the second fiscal quarter ending after the Effective Date, (i) the semi-annual consolidated financial statements of the Issuer, prepared in accordance with IFRS and presented in the English language, and (ii) a "management discussion and analysis" or other report of management providing an overview in reasonable detail of the results of operations and financial condition of the Issuer and the Subsidiaries;

26



(c)     promptly upon obtaining knowledge thereof, written notice of the occurrence and continuance of any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(d)     promptly after the request by any Noteholder, all documentation and other information that such Noteholder reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(e)     promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Issuer, the Guarantor or any Subsidiary, or compliance with the terms of any Finance Document, as the Administrative Agent or any Noteholder may reasonably request; and

(f)     promptly after the request by any Noteholder, all documentation and other information that such Noteholder reasonably requests in order to assure itself that the Issuer and the Guarantor are in compliance with all applicable laws.

Section 5.05   Maintaining Records. The Issuer will, and will cause each of the Subsidiaries to, maintain books, accounts and other records in accordance with IFRS in all material respects, and the Issuer will cause the Significant Subsidiaries organized under laws of any other jurisdiction to maintain their books and records in accordance with the generally accepted accounting principles of the applicable jurisdiction in all material respects.

Section 5.06   Compliance with Laws. The Issuer will use its reasonable best efforts, and will cause each of the Subsidiaries to use its respective reasonable best efforts, to comply at all times with all laws applicable to the Issuer, the Subsidiaries, their respective business or the Transactions (including, without limitation, all US Anti-Terrorism Laws, as set forth in Section 3.01(t) of this Note Agreement, Anti-Bribery and Anti-Corruption Laws, tax laws, disclosure and reporting requirements and securities laws and regulations), except where (a) the Issuer determine in good faith that the failure by the Issuer or such Subsidiary to so comply would not have a Material Adverse Effect or (b) the necessity of compliance therewith is being contested by the Issuer, the Guarantor or any of the Subsidiaries in good faith by appropriate proceedings.

Section 5.07   Liens. The Issuer will not, and will not cause or permit any of its subsidiaries to incur, permit or suffer to exist any Lien, other than Permitted Liens (which Permitted Liens shall not be considered Liens for purposes of the application of any of the provisions hereinafter set forth in this Section 5.07), of any kind against or upon any property or assets of the Issuer or any of its subsidiaries whether owned on the Effective Date or acquired after the Effective Date, to secure any Indebtedness, unless it has made or will make effective provision whereby (a) the Administrative Agent and the Noteholders will be secured by such Lien equally and ratably with (or prior to, in the event such Indebtedness is subordinated in right of payment to the Obligations) all other Indebtedness of the Issuer or any of its subsidiaries secured by such Lien and (b) if such Lien secures obligations subordinated to the Obligations in right of payment, such Lien shall be subordinated to a Lien securing the Obligations in the same property as that securing such Lien to the same extent as such subordinated obligations are subordinated to the Obligations. Any Lien created for the benefit of the Administrative Agent and the Noteholders pursuant to the preceding sentence shall provide by its terms that such Lien will be automatically and unconditionally released and discharged upon release and discharge of the initial Lien.

Section 5.08   Mergers, Consolidations, Sales of Assets and Acquisitions. The Issuer will not, in one or a series of transactions, consolidate or amalgamate with or merge into any corporation or



convey, lease or transfer substantially all of its properties, assets or revenues to any Person or entity (other than a direct or indirect subsidiary) or permit any Person (other than a direct or indirect subsidiary) to merge with or into it unless:

(a)    either the Issuer is the continuing entity or the Person (the "successor company") formed by the consolidation or into which the Issuer is merged or that acquired or leased the property or assets of the Issuer will assume (jointly and severally with the Issuer unless the Issuer will have ceased to exist as a result of that merger, consolidation or amalgamation), by a supplemental agreement, all of the Issuer's obligations under this Agreement and the other Finance Documents;

(b)    the successor company (jointly and severally with the Issuer unless the Issuer will have ceased to exist as part of the merger, consolidation or amalgamation) agrees to indemnify the Administrative Agent and each Noteholder (including the Initial Noteholder) against any Tax, assessment or governmental charge thereafter imposed on the Administrative Agent and the Noteholders solely as a consequence of the consolidation, merger, conveyance, transfer or lease with respect to the payment of principal or interest of the Obligations;

(c)    immediately after giving effect to the transaction, no Default or Event of Default has occurred and is continuing; and

(d)    the Issuer has delivered to the Administrative Agent and the Noteholders a certificate of the secretary or assistant secretary of the Issuer and a favorable written opinion of counsel, each stating that the transaction complies with the terms of this Section 5.08 and that all conditions precedent provided for in this Section 5.08 and relating to the transaction have been complied with.

Notwithstanding anything herein to the contrary, so long as no Default or Event of Default under this Agreement or any other Finance Document will have occurred and be continuing at the time of the proposed transaction or would result from the transaction:

(i)    the Issuer may merge, amalgamate or consolidate with or into, or convey, transfer, lease or otherwise dispose of all or substantially all of its properties, assets or revenues to a direct or indirect subsidiary in cases when the Issuer is the surviving entity in the transaction and the transaction would not have a Material Adverse Effect, it being understood that if the Issuer is not the surviving entity, the Issuer will be required to comply with the requirements set forth in paragraphs (a) through (d) above; or

(ii)    any direct or indirect subsidiary may merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of assets to, any Person (other than the Issuer or any of its subsidiaries or affiliates) in cases when the transaction would not have a Material Adverse Effect; or

(iii)    any direct or indirect subsidiary may merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of assets to, any other direct or indirect subsidiary; or

(iv)    any direct or indirect subsidiary may liquidate or dissolve if the Issuer determines in good faith that the liquidation or dissolution is in the best interests of the Issuer, and would not result in a Material Adverse Effect and if the liquidation or dissolution is part of a corporate reorganization of the Issuer; or

28



(v)  the Issuer may omit to comply with any term, provision or condition set forth in certain covenants or any term, provision or condition of this Agreement, if before the time for the compliance the Required Noteholders waive the compliance, but no waiver can operate except to the extent expressly waived, and, until a waiver becomes effective, the Issuer's obligations and the duties of the Administrative Agent as set forth in this Agreement in respect of any such term, provision or condition will remain in full force and effect.

**Section 5.09    ERISA**.  In respect of the Citgo Group, for so long as the Citgo Group is treated as a single employer with the Issuer under Section 414 of the Code, or is within the same "controlled group" (as defined in ERISA) as the Issuer, the Citgo Group shall:

(a)  ensure any material liability imposed on it pursuant to Title IV of ERISA is paid and discharged when due;

(b)  ensure that no Plan is terminated under Section 4041 of ERISA, except as would not reasonably be expected to result in a Material Adverse Effect;

(c)  not adopt an amendment to a Plan requiring the provision of security under ERISA or the Code without the prior consent of the Required Noteholders, except as would not reasonably be expected to result in a Material Adverse Effect; and

(d)  ensure that no member of the Citgo Group engages in a complete or partial withdrawal, within the meaning of Sections 4203 and 4205 of ERISA, from any Multiemployer Plan without the prior consent of the Required Noteholders, except as would not reasonably be expected to result in a Material Adverse Effect.

## ARTICLE VI

## GUARANTEE.

**Section 6.01    Guarantee**.  The Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely, irrevocably and unconditionally guarantees to the Administrative Agent and the Noteholders the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) (which obligation in respect of counsel shall be limited to one counsel for the Administrative Agent and one counsel for the Noteholders, as well as, in each case, other special and local counsel) and expenses paid or incurred by the Administrative Agent and the Noteholders in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Issuer or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the **"Guaranteed Obligations"**). The Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  All terms of this Guarantee apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the Noteholders. The Guarantor shall not assign or transfer any part of its rights or obligations under this Guarantee without the prior written consent of the Administrative Agent and the Noteholders, and any attempted assignment without such consent shall be null and void. Each Noteholder shall be entitled to assign its rights under this Guarantee to any Person or Persons to whom it assigns all or a portion of its interests, rights and obligations under this Agreement and the other Finance

29



Documents in compliance with the terms and conditions thereof, with notice to, but without the prior written consent of, the Issuer, the Guarantor and the Administrative Agent.

Section 6.02 <u>Guarantee of Payment</u>. This Guarantee is a guarantee of payment and not of collection. The Guarantor waives any right to require the Administrative Agent or the Noteholders to sue the Issuer, the Guarantor, any other guarantor or any other person obligated for all or any part of the Guaranteed Obligations (each, an "**Obligated Party**").

Section 6.03 <u>No Discharge or Diminishment of Note Guarantee.</u>

(a) <u>Unconditional</u>. Except as otherwise provided herein, the obligations of the Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Issuer or any other guarantor of or other person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which the Guarantor may have at any time against any Obligated Party, the Administrative Agent, the Noteholders or any other person, whether in connection herewith or in any unrelated transactions.

(b) <u>No Setoff, Etc</u>. The obligations of the Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or otherwise (other than as provided in <u>Section 2.09(d)</u> of this Agreement), or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c) <u>No Diminishment</u>. Further, the obligations of the Guarantor hereunder are not discharged or impaired or otherwise affected by (i) the failure of the Administrative Agent or the Noteholders to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of the Issuer for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations; or (iv) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of the Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

Section 6.04 <u>Defenses Waived</u>. To the fullest extent permitted by applicable law, the Guarantor hereby waives any defense based on or arising out of any defense of the Issuer or the Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Issuer or the Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, the Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party or any other person. The Administrative Agent may, at its

30



election, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Guarantee except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent permitted by applicable law, the Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantor against any Obligated Party or any security.

Section 6.05    Rights of Subrogation. The Guarantor will not assert any right, claim or cause of action, including a claim of subrogation, contribution or indemnification that it has against any Obligated Party until the Issuer and the Guarantor have fully performed all their obligations to the Administrative Agent and the Noteholders.

Section 6.06    Reinstatement. If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Guarantor's obligations under this Guarantee with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent and the Noteholders are in possession of this Guarantee. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Administrative Agent.

Section 6.07    Release. The Guarantor will be released from its obligations under this Article VI and the other Finance Documents to which it is a party upon the indefeasible payment in full of the Obligations. The Administrative Agent shall promptly execute any release documents giving effect to the immediately preceding sentence upon the request of the Issuer, without the consent or further agreement of Administrative Agent or the Noteholders.

## ARTICLE VII

## EVENTS OF DEFAULT

In case of the happening of any of the following events ("**Events of Default**"):

(a)    the failure to pay the principal of, or interest on any of the Notes, when such principal becomes due and payable, including at any of the Repayment Dates, by acceleration or otherwise, and such failure continues for a period of five (5) days after written notice thereof has been given to the Issuer;

(b)    the failure by any Finance Party to pay any fee or any other amount under any Finance Document (other than the principal of, or interest on any of the Notes) when the same becomes due and payable and the default continues for a period of fifteen (15) days after written notice thereof has been given to the Issuer;

(c)    a default in the observance or performance of any other covenant or agreement contained in the Finance Documents which default continues for a period of thirty (30) days after the Issuer receives written notice specifying the default (and demanding that such default be remedied) from the Required Noteholders;

31



(d) the failure to pay at final stated maturity (giving effect to any applicable grace periods and any extensions thereof) the principal amount of any Indebtedness of the Issuer, the Guarantor or any of the Significant Subsidiaries, or any Indebtedness of the Issuer, the Guarantor or any of the Significant Subsidiaries has become due and payable before it would otherwise have been due and payable as a result of, or on the basis of, the occurrence of a default, event of default or other similar condition or event (however described) (which acceleration is not rescinded, annulled or otherwise cured within thirty (30) days from the date of acceleration), other than a failure to make any required payment if the aggregate principal amount of such Indebtedness, together with the principal or other amount of any other such Indebtedness in default for failure to pay principal at final stated maturity or which has been accelerated (in each case with respect to which the thirty (30) day period described above has elapsed), aggregates the Threshold Amount or more at any time;

(e) one or more judgments in an aggregate amount in excess of the Threshold Amount shall have been rendered against the Issuer, the Guarantor or any of the Significant Subsidiaries and such judgments remain undischarged, unpaid, unstayed, unbonded or not suspended by agreement for a period of sixty (60) days after such judgment or judgments become final and nonappealable;

(f) the Issuer, the Guarantor or any of the Significant Subsidiaries (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts, or fails generally to pay its debts as they become due, or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes against it or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a final and non-appealable judgment of insolvency or bankruptcy (*declaración de quiebra*) or the entry of a final and non-appealable order for relief or the making of an order for its winding up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within sixty calendar days of the institution or presentation thereof; (v) passes a resolution for its winding up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, *conciliador*, trustee, *síndico*, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within sixty (60) consecutive calendar days thereafter; or (viii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive) (subject to the same time periods for such event to be dismissed, discharged, stayed or restrained);

(g) an authorized officer of the Issuer or the Guarantor or a Governmental Authority (i) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of any of the Transaction Documents or any part thereof or (ii) unilaterally declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, with respect to any such Indebtedness in an aggregate amount of not less than the Threshold Amount, or takes any other action that has or would reasonably be expected to have an effect on the Repayment Dates hereunder, or the currency in which the Issuer shall pay the Obligations;

(h) there shall have occurred any event which causes a Material Adverse Effect;

32



(i)    any Finance Party becomes entitled to claim immunity from suit, judgment, execution, attachment or other legal process in any proceedings taken in its jurisdiction of organization or otherwise in any other jurisdiction in relation to any Transaction Document;

(j)    there shall have occurred a Change of Control;

(k)    the failure at any time of the Obligations to constitute senior indebtedness that is entitled to the benefits of any subordination provisions relating to Indebtedness of the Issuer or its subsidiaries; or

(l)    at any time prior to the last day of the month falling 10 months after the month in which the Effective Date occurs, the Issuer or the Guarantor reschedules or fails to pay when due, in whole or in part, any amount required to be paid by it under the terms of any written contract with respect to any investment (which for the avoidance of doubt shall not include contracts with respect to borrowed money obligations of the Issuer or the Guarantor) as such terms are in effect on the Effective Date,

then, and in every such event (other than an event with respect to the Issuer or the Guarantor described in paragraph (f) above), and at any time thereafter during the continuance of such event, the Required Noteholders may, or the Administrative Agent at the request of the Required Noteholders shall, by notice to the Issuer, declare the Notes then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Notes so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Issuer accrued hereunder and under any other Finance Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained herein or in any other Finance Document to the contrary notwithstanding; and in any event with respect to the Issuer or the Guarantor described in paragraph (f) above, the principal of the Notes then outstanding, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Issuer accrued hereunder and under any other Finance Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained herein or in any other Finance Document to the contrary notwithstanding.

## ARTICLE VIII

## ADMINISTRATIVE AGENT

Each Noteholder hereby irrevocably appoints the Administrative Agent its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of the Finance Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to negotiate, enforce or settle any claim, action or proceeding affecting the Noteholders in their capacity as such, at the direction of the Required Noteholders, which negotiation, enforcement or settlement will be binding upon each Noteholder.

The institution serving as the Administrative Agent hereunder shall have all rights and powers in its capacity as a Noteholder as any other Noteholder and the Administrative Agent may exercise the same as though it were not the Administrative Agent, and the Administrative Agent and its Affiliates may generally engage in any kind of business with the Issuer, the Guarantor or any Subsidiary or other Affiliate thereof as if it was not the Administrative Agent hereunder.



The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Finance Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and/or is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is instructed in writing to exercise by the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary under the circumstances provided in Section 9.08), and (c) except as expressly set forth in the Finance Documents, the Administrative Agent shall not have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Issuer, the Guarantor or any of the Subsidiaries that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Administrative Agent by the Issuer, the Guarantor or a Noteholder, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Finance Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Finance Document, (iv) the validity, enforceability, effectiveness or genuineness of any Finance Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Finance Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Issuer), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities as the Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided below, the Administrative Agent may resign at any time upon thirty (30) days written notice by notifying the Noteholders and the Issuer; *provided* that, the Required Noteholders may, by written notice to the Administrative Agent, the Noteholders and the Issuer, require the Administrative Agent to resign in accordance with this paragraph, which notice shall (without any further action) be deemed to be a notice of resignation delivered by the Administrative Agent to the Noteholders and the Issuer. Upon any such resignation, the Required Noteholders shall have the right to appoint a successor. If no successor shall have been so appointed by the Required Noteholders and shall have accepted such appointment within

34



thirty (30) days after the retiring Administrative Agent gives notice of its resignation, the Administrative Agent's resignation shall become effective and the Required Noteholders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Finance Document until such time, if any, as the Required Noteholders appoint a successor Administrative Agent. Notwithstanding the foregoing, if the Required Noteholders agree prior to the expiration of the thirty (30) day period that they will not appoint a successor Administrative Agent, the Administrative Agent's resignation shall become effective immediately thereon, and the Required Noteholders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Finance Document until such time, if any, as the Required Noteholders appoint a successor Administrative Agent. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Issuer to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Issuer and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as the Administrative Agent.

Each Noteholder acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Noteholder and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Noteholder also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Noteholder and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Finance Document, any related agreement or any document furnished hereunder or thereunder.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.01    Notices; Electronic Communications.**    Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, or sent by fax or electronic mail, as follows:

(a)    if to the Issuer or the Guarantor, to it at La Campiña, Av. Libertador, Calle El Empalme, Edificio Petróleos de Venezuela, Torre Este, Piso 8, Caracas, Venezuela, Attention of Ana María España (Director) and Renny Bolívar (Executive Director of Finance) (Fax No. +58 212 7081441, Email: espanaam@pdvsa.com y bolivarrs@pdvsa.com);

(b)    if to the Administrative Agent, to GE Capital EFS Financing, Inc., 800 Long Ridge Road, Stamford, CT 06927, Fax No. +1-203-357-4890, Email: Gerald.Friel@ge.com;

(c)    if to the Initial Noteholder, to it at its address (or fax number or electronic mail address) set forth on Schedule 2.08; and

(d)    if to a Noteholder (other than the Initial Noteholder), to it at its address set forth in the Assignment and Acceptance pursuant to which such Noteholder shall have become a party hereto.



All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or electronic mail, in each case delivered, or sent (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

The Issuer hereby agrees, unless the electronic mail address referred to below has not been provided by the Administrative Agent or a Noteholder to the Issuer, that it will, or will cause its subsidiaries to, provide to the Administrative Agent and the Noteholders all information, documents and other materials that it is obligated to furnish to the Administrative Agent and the Noteholders pursuant to the Finance Documents, including all financial statements, financial and other reports, certificates and other information materials (all such communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent and the Noteholders to an electronic mail address as directed by the Administrative Agent and each Noteholder.

Section 9.02    Survival of Agreement.    All covenants, agreements, representations and warranties made by the Issuer and the Guarantor herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Finance Document shall be considered to have been relied upon by the Noteholders and shall survive the issuance by the Issuer of the Notes, regardless of any investigation made by the Noteholders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on the Notes, any fee or any other amount payable under this Agreement or any other Finance Document is outstanding and unpaid. The provisions of this Section 9.02 and, Sections 2.09, 9.05, and 9.16 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Notes, the invalidity or unenforceability of any term or provision of this Agreement or any other Finance Document, or any investigation made by or on behalf of the Administrative Agent or any Noteholder. Notwithstanding anything herein to the contrary, the provisions of Sections 2.09 and 9.05 shall expire upon the expiration of all applicable statutes of limitations, and the provisions of 9.16 shall expire on the two year anniversary of the payment in full of all the Notes.

Section 9.03    Binding Effect.    This Agreement shall become effective on the Effective Date.

Section 9.04    Successors and Assigns.    (a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Issuer, the Administrative Agent or the Noteholders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)    Each Noteholder may assign to any Person or Persons (other than an Ineligible Transferee) all or a portion of its interests, rights and obligations under this Agreement and the other Finance Documents, with notice to, but without the prior written consent of, the Issuer and the Administrative Agent. Notwithstanding the foregoing sentences, upon the occurrence and continuance of an Event of Default, each Noteholder may effect such assignment to any Person or Persons, with notice to, but without the prior written consent of, the Issuer and the Administrative Agent; *provided*, that the parties to each assignment shall execute and deliver to each of the Issuer and the Administrative Agent a copy of the Assignment and Acceptance. From and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Noteholder under this

36



Agreement, (B) the assigning Noteholder thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.09 and 9.05 and be subject to the provisions of Section 9.16), and (C) the assignee of a Note shall be entitled to exchange the assigned Note for a new Note as provided under Section 2.11.

By executing and delivering an Assignment and Acceptance, the assigning Noteholder thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Noteholder warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the outstanding balances of its Note, in each case without giving effect to assignment thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Noteholder makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Finance Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Issuer, the Guarantor or any Subsidiary or the performance or observance by the Issuer, the Guarantor or any Subsidiary of any of its obligations under this Agreement, any other Transaction Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants whether it is or is not an Eligible Institution and that it is a Person legally authorized to enter into such Assignment and Acceptance and that is not an Ineligible Transferee; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.01(e) or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, such assigning Noteholder or any other Noteholder and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as the Noteholder.

(c)    Each Noteholder may without the consent of the Issuer or the Administrative Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement and the Note held by it; provided, however, that (i) such Noteholder's obligations under this Agreement shall remain unchanged, (ii) such Noteholder shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Issuer, the Administrative Agent and the Noteholders shall continue to deal solely and directly with such Noteholder in connection with such Noteholder's rights and obligations under this Agreement and the Note held by it, and such Noteholder shall retain the sole right to enforce the obligations of the Issuer relating to this Agreement and the Note held by it and to approve any amendment, modification or waiver of any provision of this Agreement. To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 9.06as though it were a Noteholder, *provided* such participating bank or other Person agrees to be subject to Section 9.06 as though it were a Noteholder and the Issuer



has been notified of the identity of such participating bank or other Person prior to such participating bank or other Person exercising any setoff rights against the Issuer.

Any Noteholder or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Issuer in respect of this Transaction furnished to such Noteholder by or on behalf of the Issuer; *provided* that, prior to any such disclosure of information designated by the Issuer as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement enforceable by the Issuer and the Guarantor whereby such assignee or participant shall agree to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Noteholders pursuant to Section 9.16.

(d)    Any Noteholder may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and the other Obligations owed to such Noteholder to secure obligations owed by such Noteholder; *provided* that no such pledge or assignment shall release a Noteholder from any of its obligations hereunder or substitute any such assignee for such Noteholder as a party hereto.

(e)    The Issuer shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Noteholder, and any attempted assignment without such consent shall be null and void.

Section 9.05    Expenses; Payments. (a) Each Party shall be responsible for all out-of-pocket expenses incurred by it in connection with the preparation and administration of this Agreement except that the Issuer agrees to pay the fees, charges and disbursements of Norton Rose Fulbright, counsel for the Administrative Agent, up to an amount not to exceed Seventy-five Thousand Dollars ($75,000) in the aggregate (whether or not the transactions hereby or thereby contemplated shall be consummated). The Issuer agrees to pay all out-of-pocket expenses incurred by the Administrative Agent or any Noteholder in connection with the enforcement or protection of its rights in connection with this Agreement and the other Finance Documents or in connection with the Notes issued hereunder; and, in connection with any such enforcement or protection, the fees, charges and disbursements of any counsel for the Administrative Agent or any Noteholder.

All payments by the Issuer of principal, interest and other Obligations shall be made solely and exclusively in Dollars, as currency of payment, in same day funds, without setoff, counterclaim, deduction or other defense (other than as provided in Section 2.09(d) of this Agreement), free of any restriction or condition, and delivered to each Noteholder or the Administrative Agent, as applicable, not later than 12:00 (noon), New York City time, on the date due at the account of each such Noteholder or the Administrative Agent in accordance with Section 2.06 hereof. If it becomes necessary to convert into Dollars any amount in any other currency, then that conversion shall be made at the rate of exchange quoted in the interbroker market by the Administrative Agent for the spot purchase of such original currency at the close of business on the day immediately preceding the day such payment was made. The Issuer agrees that its obligation to make payments in Dollars shall be enforceable as a separate cause of action if the amount received by the Noteholder or the Administrative Agent, as applicable, shall fall short of the full amount of Dollars payable hereunder, and shall not be affected by judgment being obtained for other sums due hereunder.

Subject to Section 9.02, the provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of the Notes, the invalidity or unenforceability of any term or provision of this Agreement or any other Finance Document, or any investigation made by or on



behalf of the Administrative Agent or any Noteholder. All amounts due under this Section 9.05 shall be payable on written demand therefor.

Section 9.06 **Right of Setoff.** The Issuer acknowledges that if an Event of Default shall have occurred and be continuing, each Noteholder is entitled to whatever statutory or common law provisions relating to banker's liens, rights of set off or similar rights and remedies as to deposit accounts or other funds maintained with depository institutions are available to such Noteholder.

Section 9.07 **Applicable Law.** THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS (EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN ANY SUCH OTHER FINANCE DOCUMENT), AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WHICH THE ISSUER, THE GUARANTOR, THE NOTEHOLDERS AND THE ADMINISTRATIVE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

Section 9.08 **Waivers; Amendment.** (a) No failure or delay of the Administrative Agent or any Noteholder in exercising any power or right hereunder or under any other Finance Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Noteholders hereunder and under the other Finance Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Finance Document or consent to any departure by the Issuer or any other Finance Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Issuer or the Guarantor in any case shall entitle the Issuer or the Guarantor to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Issuer and the Required Noteholders; *provided*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Finance Document without the prior written consent of the Administrative Agent.

Section 9.09 **Interest Rate Limitation.** Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Notes, together with all fees, charges and other amounts which are treated as interest on such Notes under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Noteholder holding such Note in accordance with applicable law, the rate of interest payable in respect of such Note, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Note but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Noteholder in respect of other periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Maximum Rate to the date of repayment, shall have been received by such Noteholder.

39



Section 9.10    Entire Agreement.    This Agreement and the other Finance Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Finance Documents. Nothing in this Agreement or in the other Finance Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Noteholders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Finance Documents.

Section 9.11    WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER FINANCE DOCUMENTS.    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

Section 9.12    Severability.    In the event any one or more of the provisions contained in this Agreement or in any other Finance Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13    Counterparts.    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 9.14    Headings.    Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.15    Jurisdiction; Consent to Service of Process.    (a) The Issuer and the Guarantor each hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of competent jurisdiction sitting in the County of New York, State of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Finance Documents, or for recognition or enforcement of any judgment, and agrees that it will not take any action or proceeding relating to this Agreement or the other Finance Documents in the courts of any other jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto further agrees that a final judgment in any such



action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Noteholder may otherwise have to bring any action or proceeding relating to this Agreement or the other Finance Documents against the Issuer, the Guarantor or their respective properties in the courts of any jurisdiction.

(b)     The Issuer and the Guarantor each hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Finance Documents in any New York State or federal court sitting in the County of New York, State of New York. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, with the express intent that such provision shall apply.

(c)     To the extent that the Issuer or the Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process, the Issuer and the Guarantor each hereby waives such immunity and hereby agrees not to assert, by way of motion, as a defense or otherwise, in any suit, action or proceeding the defense of sovereign immunity or any claim that it is not personally subject to the jurisdiction of the above-named courts by reason of sovereign immunity or otherwise, or that it is immune from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property or from attachment either prior to judgment or in aid of execution by reason of sovereign immunity, except for the mandatory notice required for Venezuelan state owned entities in accordance with Article 111 of the Law of the Attorney General's Office (*Ley Orgánica de la Procuraduría General de la República*).

(d)     The Issuer and the Guarantor each irrevocably appoints the Process Agent as its agent to receive and forward any writs, process and summonses in any suit, action or proceeding brought in connection with this Agreement or any other Finance Document against the Issuer in any court of the State of New York or any United States federal court sitting in the County of New York, State of New York and has agreed that such appointment shall be so long as the Obligations remain outstanding in accordance with the terms hereof or until the appointment by the Issuer of a successor agent in the County of New York, State of New York as its agent for such purpose and the acceptance of such appointment by such successor. If for any reason such agent shall cease to be available to act as such (including by reason of the failure of such agent to maintain an office in the County of New York, State of New York), the Issuer agrees promptly to designate a new agent in the County of New York, State of New York, on the terms and for the purposes of this Section. Nothing herein shall in any way be deemed to limit the ability of the Administrative Agent or the Noteholders (including the Initial Noteholder) to serve any such legal process in any other manner permitted by applicable law or to obtain jurisdiction over the Issuer or the Guarantor or bring actions, suits or proceedings against it in such other jurisdictions, and in such manner, as may be permitted by applicable law.

Section 9.16     Confidentiality. Each of the Administrative Agent and the Noteholders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being agreed that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the Administrative Agent or Noteholder disclosing Information to such Affiliates shall be responsible for a disclosure of Information by such Affiliates in contravention of this Section 9.16), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the

41



National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, *provided* that if legally permissible, such Noteholder or the Administrative Agent, as applicable, shall use commercially reasonable efforts to provide prompt notice to the Issuer prior to such disclosure and if not possible, promptly thereafter, (d) in connection with the exercise of any remedies hereunder or under the other Finance Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Finance Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Issuer, the Guarantor or any Subsidiary or any of their respective obligations, (f) with the consent of the Issuer or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. For the purposes of this Section, "**Information**" shall mean all information received from the Issuer or the Guarantor and related to the Issuer or the Guarantor or their business, other than any such information that was available to the Administrative Agent or any Noteholder on a nonconfidential basis prior to its disclosure by the Issuer or the Guarantor. Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

**Section 9.17    Noteholder Action.** Each Noteholder agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Finance Party or any other obligor under any of the Finance Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any property of any such Finance Party, unless expressly provided for herein or in any other Finance Document, without the prior written consent of the Administrative Agent. The provisions of this Section 9.17 are for the sole benefit of the Administrative Agent and shall not afford any right to, or constitute a defense available to, any Finance Party.

**Section 9.18    USA PATRIOT Act Notice.** Each Noteholder and the Administrative Agent (for itself and not on behalf of any Noteholder) hereby notifies the Issuer and the Guarantor that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Issuer and the Guarantor, which information includes the name and address of the Issuer and the Guarantor and other information that will allow such Noteholder or the Administrative Agent, as applicable, to identify the Issuer and the Guarantor in accordance with the USA PATRIOT Act.

**Section 9.19    Payment Suspension or Cessation.** Any Noteholder shall have the right, but not obligation, and for its account only, to issue written instructions to the Issuer to suspend or cease payment of amounts due under Notes or this Agreement if the payment obligations of the Issuer to such Noteholder under the Notes or this Agreement violates applicable law. Upon receipt of any such instructions, the Issuer shall comply therewith in respect of the Note of the Noteholder issuing such instruction and reserve any such payments that are so suspended or ceased (collectively, the "**Reserved Payments**"). Notwithstanding any provision of this Agreement or any Note to the contrary, failure to make such Reserved Payments in accordance with the written instruction of the Noteholder shall not be deemed a Default or an Event of Default or a breach or violation in any respect of such Note or this Agreement nor entitle the Noteholder or the Administrative Agent to exercise any remedies with respect to such Note or this Agreement. Notwithstanding the foregoing, such suspension or cessation of the Reserved Payments shall not be construed as relieving, cancelling or otherwise forgiving the Reserved Payments so suspended or ceased or otherwise relieve the Issuer of its other obligations under this

Agreement and to other Noteholders; *provided*, that, notwithstanding any provision of the Note or this Agreement to the contrary, for so long as such suspension or cessation continues, the rate at which interest under such Note and this Agreement shall accrue with respect to the amount of the Reserved Payments shall be adjusted to be equal to the lesser of (i) 6.5% or (ii) a variable rate per annum equal to the "Money market, annual yield" as may from time to time be published in the Wall Street Journal (currently published under "Bonds, Rates and Yields") or if such information is no longer published, another comparable rate as shall be mutually agreed upon by the Issuer and the applicable Noteholder, acting reasonably. Such issuing Noteholder shall have the right at its sole discretion to revoke such instructions and require the Issuer to pay all amounts then due and owing, in which case, the Reserved Payments and interest thereon at the applicable rate set forth in the immediately preceding sentence shall be due to such Noteholder not later than ten (10) Business Days following the Issuer's receipt of a written notice of revocation of such instructions from such Noteholder.

*[remainder of page intentionally left blank]*

43



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers or directors as of the Effective Date.


**PETRÓLEOS DE VENEZUELA, S.A.,**
as Issuer

By: _____

Name: Ana María España
Title: Vice President of Finance


**PDVSA PETRÓLEO, S.A.,**
as Guarantor

By: _____

Name: Ana María España
Title: Authorized signatory


*Signature page to Note Agreement*



**GE CAPITAL EFS FINANCING, INC.,**
as Administrative Agent

By: _____

Name: Cristopher N. Matteson
Title: Vice President

*Signature page to Note Agreement*

GE CAPITAL EFS FINANCING, INC.,
as Initial Noteholder

By: _____
Name: Cristopher N. Matteson
Title: Vice President

*Signature page to Note Agreement*

EXHIBIT A

### FORM OF NOTE

### PETRÓLEOS DE VENEZUELA, S.A.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, AGREES TO OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE ONLY TO QUALIFIED INSTITUTIONAL BUYERS PURSUANT TO RULE 144A OF THE SECURITIES ACT OR TO BUYERS PURCHASING PURSUANT TO A REGISTRATION STATEMENT REGISTERED UNDER THE SECURITIES ACT. IN ADDITION, ANY SUCH TRANSFERS MUST OTHERWISE BE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR OTHER APPLICABLE JURISDICTION.

### 6.5% SENIOR GUARANTEED NOTE

Date: May 13, 2016

No. R-1

FOR VALUE RECEIVED, the undersigned, **PETRÓLEOS DE VENEZUELA, S.A.** (herein called the "Issuer"), a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela, hereby promises to pay to **GE CAPITAL EFS FINANCING, INC.**, or registered assigns, the principal sum of ONE HUNDRED NINETY-THREE MILLION NINE HUNDRED FIFTY-NINE THOUSAND SEVEN HUNDRED SIXTY-THREE AND 3/100TH DOLLARS ($193,959,763.03), with interest (a) on the unpaid principal balance thereof based on and computed on the basis of the actual number of days elapsed on a year of 365/366 days, at a rate per annum equal to six and one-half percent (6.5%), payable quarterly, on June 27, 2016 (the "Initial Repayment Date"), and on each day in March, June, September and December described on Exhibit A hereto occurring after the Initial Repayment Date on or prior to May 13, 2019 (the "Maturity Date" and, each such date on which payment of interest is due, including the Maturity Date, a "Repayment Date"), or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, and (b) on any overdue payment of principal, any overdue payment of interest, payable quarterly as aforesaid (or, at the option of the registered holder hereof, on demand), at a rate per annum of eight and one-half percent (8.5%) per annum, calculated as set forth above. The principal amount of this Note shall be due and payable on each Repayment Date or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, in installments, with each installment being equal to the amounts set forth



on Exhibit A hereto, with any unpaid principal and interest on this Note not previously paid being due and payable in full on the Maturity Date.

Payments of principal and interest on this Note are to be made in United States dollars to the Administrative Agent (at its offices at 800 Long Ridge Road, Stamford, CT 06927).

This Note is one of the Notes (herein called the "**Note**") issued pursuant to the Note Agreement, dated as of May 13, 2016 (as from time to time amended, the "**Note Agreement**"), among the Issuer, the Guarantor, the Administrative Agent and the Initial Noteholder named therein, and the Noteholders party thereto from time to time, and is entitled to the benefits and is otherwise subject to the provisions thereof. Capitalized terms used herein and not defined shall have the same meanings when used herein as in the Note Agreement.

This Note is a registered Note and, as provided in the Note Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note (or, subject to the provisions of Section 2.11 of the Note Agreement, new Notes with an aggregate principal amount equal to the principal amount of this Note) will be issued to, and registered in the name of, the transferor, the transferee or the transferees, as the case may be. Prior to due presentment for registration of transfer, the Issuer may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Issuer will not be affected by any notice to the contrary.

This Note is subject to optional prepayment, in whole or from time to time in part.

If an Event of Default, as defined in the Note Agreement, occurs and is continuing, the principal of this Note, together with all accrued and unpaid interest hereon, may be declared or otherwise become due and payable in the manner, and with the effect provided in the Note Agreement.

THIS NOTE, AND THE RIGHTS AND OBLIGATIONS OF THE ISSUER AND THE NOTEHOLDER HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WHICH THE ISSUER, THE NOTEHOLDER AND THE ADMINISTRATIVE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

PETRÓLEOS DE VENEZUELA, S.A.

By_____

Name:
Title:

A-2



Exhibit A

To

6.5% SENIOR GUARANTEED NOTE

| Repayment Date | Principal Amount Due | Interest Due |
|---|---|---|
| June 27, 2016 | $16,163,313.59 | $ 1,554,335.09 |
| September 27, 2016 | $16,163,313.59 | $ 2,912,939.09 |
| December 27, 2016 | $16,163,313.59 | $ 2,619,342.46 |
| March 27, 2017 | $16,163,313.59 | $ 2,331,502.63 |
| June 27, 2017 | $16,163,313.59 | $ 2,118,501.16 |
| September 27, 2017 | $16,163,313.59 | $ 1,853,688.51 |
| December 27, 2017 | $16,163,313.59 | $ 1,571,605.48 |
| March 27, 2018 | $16,163,313.59 | $ 1,295,279.24 |
| June 27, 2018 | $16,163,313.59 | $ 1,059,250.58 |
| September 27, 2018 | $16,163,313.59 | $ 794,437.93 |
| December 27, 2018 | $16,163,313.59 | $ 523,868.49 |
| March 27, 2019 | - | $ 259,055.85 |
| May 13, 2019 | $16,163,313.59 | $ 135,284.72 |

A-1



<div align="right">EXHIBIT B</div>

### FORM OF ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between [**Insert name of Assignor**] (the "Assignor") and [**Insert name of Assignee**] (the "Assignee"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Note Agreement identified below (the "Note Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Finance Documents, as of the Effective Date set forth below, the interest in and to all of the Assignor's rights and obligations under the Note Agreement (or, if a Note has been transferred to an Assignee in part, a portion thereof equivalent to the portion of such Note transferred to the Assignee), the other Transaction Documents and any other agreements, documents or instruments delivered pursuant thereto or for the benefit of the Noteholders relating thereto that represents the amount identified below of all of the Assignor's outstanding rights and obligations under the Note identified below (collectively, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| (a) | Assignor: | _____ |
| (b) | Assignee: | _____ |
| (c) | Issuer: | Petróleos de Venezuela, S.A. |
| (d) | Administrative Agent: | GE Capital EFS Financing, Inc., as administrative agent under the Note Agreement |
| (e) | Note Agreement: | The Note Agreement, dated as of May 10, 2016 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and GE Capital EFS Financing, Inc., as Administrative Agent. |
| (f) | Assigned Interest: | Unpaid principal balance of $_____ on the Note dated [_____], 20[__] in the original principal amount of $[_____] |
| (g) | Account for Payments: | [_____] |

Effective Date: _____ ___, 20___

*[remainder of page intentionally left blank]*



The terms set forth in this Assignment are hereby agreed to:

**ASSIGNOR**
[**NAME OF ASSIGNOR**]

By: _____
Name:
Title:

**ASSIGNEE**
[**NAME OF ASSIGNEE**]

By: _____
Name:
Title:



ANNEX 1

NOTE AGREEMENT, DATED AS OF MAY 10, 2016, BY AND AMONG PETRÓLEOS DE
VENEZUELA, S.A., AS ISSUER, PDVSA PETRÓLEO, S.A., AS GUARANTOR, THE
NOTEHOLDERS THAT ARE A PARTY THERETO FROM TIME TO TIME AND GE CAPITAL EFS
FINANCING, INC., AS ADMINISTRATIVE AGENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ACCEPTANCE

1.    **Representations and Warranties**

1.1    **Assignor**

The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the
Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other
adverse claim and (iii) it has full power and authority, and has taken all action necessary, to
execute and deliver this Assignment and to consummate the transactions contemplated hereby;
and (b) assumes no responsibility with respect to (i) any statements, warranties or representations
made in or in connection with the Note Agreement or any other agreement, instrument or
document delivered pursuant thereto or for the benefit of the Noteholders relating thereto, other
than this Assignment (collectively, the "Finance Documents"), (ii) the execution, legality, validity,
enforceability, genuineness, sufficiency or value of the Finance Documents, or any collateral
thereunder, (iii) the financial condition of the Issuer, the Guarantor, any of the Subsidiaries or any
of their respective Affiliates in respect of any Finance Document, or (iv) the performance or
observance by the Issuer, the Guarantor, any of the Subsidiaries or any of their respective
Affiliates of any of their respective obligations under any Finance Document.

1.2    **Assignee**

The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all
action necessary, to execute and deliver this Assignment and to consummate the transactions
contemplated hereby and to become a Noteholder under the Note Agreement, (ii) it is [an Eligible
Institution / not an Eligible Institution][1] and is not an Ineligible Transferee, (iii) from and after the
Effective Date, it shall be bound by the provisions of the Note Agreement and, to the extent of the
Assigned Interest, shall have the obligations of a Noteholder thereunder, and (iv) it has received a
copy of the Note Agreement, together with copies of the most recent financial statements
delivered pursuant to Section 5.04 thereof and such other documents and information as it has
deemed appropriate to make its own credit analysis and decision to enter into this Assignment and
to purchase the Assigned Interest on the basis of which it has made such analysis and decision;
and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the
Assignor or any other Noteholder, and based on such documents and information as it shall deem
appropriate at the time, continue to make its own credit decisions in taking or not taking action
under the Finance Documents, and (ii) it will perform in accordance with their terms all of the
obligations which by the terms of the Finance Documents are required to be performed by it as a
Noteholder.

---

[1] Select one as applicable.



2.    **Payments**

From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest and other amounts) to the Assignor for amounts which have accrued up to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    **General Provisions**

This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy and electronic mail shall be equally effective to the delivery of a manually executed counterpart of this Assignment. THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

*[remainder of page intentionally left blank]*



Schedule 2.08

## ACCOUNTS OF ADMINISTRATIVE AGENT AND INITIAL NOTEHOLDER

Account of Administrative Agent:

| | |
|---|---|
| Legal Entity Name: | GE Capital EFS Financing, Inc. |
| Account Title: | GEC EFSF, Inc  Loan COE - EFS |
| Bank: | Deutsche Bank Trust Company Americas |
| Bank Branch Code: | DEUTUS-021001033 |
| ABA Routing: | 021001033 |
| SWIFT: | BKTRUS33 |
| Currency: | USD |
| Country: | US |
| National Account Number: | 50292590 |

Issuer is to provide, at the time of each cash transfer, all the related information for its proper identification, including, but not limited to bank account source of the funds, swift code and amount.

Account of Initial Noteholder:

| | |
|---|---|
| Legal Entity Name: | GE Capital EFS Financing, Inc. |
| Account Title: | GEC EFSF, Inc  Loan COE - EFS |
| Bank: | Deutsche Bank Trust Company Americas |
| Bank Branch Code: | DEUTUS-021001033 |
| ABA Routing: | 021001033 |
| SWIFT: | BKTRUS33 |
| Currency: | USD |
| Country: | US |
| National Account Number: | 50292590 |

Administrative Agent is to provide, at the time of each cash transfer, all the related information for its proper identification, including, but not limited to bank account source of the funds, swift code and amount.

S3.01(h)-1



## SUBSIDIARIES

### Corporate Structure

The following chart summarizes our corporate structure:





S3.01(h)-1

Schedule 3.01(i)

## LITIGATION

**Legal Proceedings**

*Mobil Cerro Negro Ltd.*

On January 27, 2008, a subsidiary of ExxonMobil, Mobil Cerro Negro Ltd. ("Mobil Cerro Negro") filed an arbitration request before the International Court of Arbitration of the International Chamber of Commerce against Petróleos de Venezuela, S.A. ("PDVSA") and PDVSA Cerro Negro, S.A. ("PDVSA Cerro Negro"), claiming an entitlement to indemnity from PDVSA Cerro Negro under the association agreement relating to the Cerro Negro Project (the "Cerro Negro Association Agreement") and from PDVSA under the terms of a guaranty granted by PDVSA of PDVSA Cerro Negro's obligations under the Cerro Negro Association Agreement. In December 2007, Mobil Cerro Negro had obtained from the United States District Court for the Southern District of New York an attachment order on funds of PDVSA Cerro Negro, deposited in accounts held in the Bank of New York Mellon. Pursuant to that order, US$300 million of PDVSA Cerro Negro funds remained attached pending completion of the arbitration procedure. Additionally, on January 24, 2008, Mobil Cerro Negro had obtained ex parte a worldwide freezing order from the High Court of Justice in London, restricting PDVSA from disposing of certain assets and ordering it to maintain, on a global basis, assets having an aggregate value of US$12 billion. However, the High Court of Justice vacated the order on March 18, 2008, upon PDVSA's application. Ex parte attachment orders were also obtained by Mobil Cerro Negro in The Netherlands, attaching the shares of a subsidiary, and The Netherlands Antilles and Aruba, which have not interfered with PDVSA's ordinary course of business.

Although the provisional measures proceedings in the national courts were based on an alleged indemnity claim of US$12 billion, Mobil Cerro Negro reduced its claim in the arbitration to approximately US$6.5 billion to US$7 billion, plus interest and costs. The claim in the arbitration was for indemnification under Article XV of the Cerro Negro Association Agreement, which provided that PDVSA Cerro Negro would compensate Mobil Cerro Negro, subject to certain limitations, for governmental actions defined as "Discriminatory Measures" having a "Material Adverse Impact" on Mobil Cerro Negro as defined in the Association Agreement. Mobil Cerro Negro claimed that various royalty, tax and production cutback measures starting in 2004 as well as the migration process of 2007 which required all associations operating outside of the legal framework established by the 2001 Organic Hydrocarbons Law to migrate to the mixed company structure under that law, constituted "Discriminatory Measures" as defined in the Cerro Negro Association Agreement, triggering the compensation obligation of PDVSA Cerro Negro and PDVSA's guaranty. The hearing on all issues in the arbitration concluded on September 24, 2010 and post-hearing briefing and the submission of costs claims was completed on January 24, 2011.

The arbitral tribunal issued its final award on December 23, 2011, and the award was delivered to the parties on December 30, 2011. The tribunal determined that PDVSA Cerro Negro and PDVSA were liable to Mobil Cerro Negro in the amount of US$907,581,000 with respect to "Discriminatory Measures" under the Cerro Negro Association Agreement, with an offset based upon counterclaims asserted by PDVSA and PDVSA Cerro Negro in the amount of US$160,643,042. The arbitral tribunal found that PDVSA Cerro Negro had not breached the Cerro Negro Association Agreement and that PDVSA had not breached the guaranty and awarded no pre-award interest. The tribunal also did not award Mobil Cerro Negro any part of its cost claim. The tribunal awarded post-award interest on the amount of



US$736,937,958 at the New York Prime Rate and granted PDVSA Cerro Negro and PDVSA 60 days to pay the award. Prior to February 23, 2012, the monetary aspect of the award was satisfied in full by the release to Mobil Cerro Negro of the funds that were attached in New York, the cancelation of Cerro Negro project bonds that PDVSA acquired in 2007, and the payment in cash by PDVSA to Mobil Cerro Negro of the balance.

The New York attachment proceeding was terminated by a stipulation and order dated June 6, 2012 (the "Stipulation and Order") pursuant to which PDVSA was joined to the action and PDVSA and PDVSA Cerro Negro agreed to (i) pay into the Venezuelan Treasury or otherwise satisfy, on behalf of Mobil Cerro Negro, any tax liability that may be imposed by the Venezuelan Government on Mobil Cerro Negro's compensation awarded by the tribunal and/or Mobil Cerro Negro's income from the Cerro Negro Project; and (ii) hold Mobil Cerro Negro harmless from any such tax liabilities, including, but not limited to, any related penalties, interest, or fees. A judgment to the same effect was entered on July 7, 2012. In connection with the resolution of the New York attachment, the attachment orders in The Netherlands, The Netherlands Antilles and Aruba were vacated.

*PDV Sweeny and ConocoPhillips Company*

On February 25, 2010, PDV Sweeny, Inc. ("PDV Sweeny") and PDV Texas, Inc. ("PDV Texas") filed a request for arbitration with the International Chamber of Commerce (the "ICC") against ConocoPhillips Company ("ConocoPhillips") and Sweeny Coker Investor Sub, Inc. ("Sweeny Sub"), in connection with the exercise of a call option by ConocoPhillips and Sweeny Sub to purchase the interests of PDV Sweeny and PDV Texas in the joint venture for no consideration (the "Call Option Arbitration"). PDV Sweeny and PDV Texas seek an award declaring, among other things, that the exercise of the call option was invalid and ineffective and that they are entitled to their interests in the joint venture. Thereafter, on August 16, 2010 (amended on September 29, 2010), ConocoPhillips filed a request for arbitration with the ICC against PDVSA and its wholly-owned subsidiary PDVSA Petróleo, S.A., alleging that PDVSA Petróleo, S.A., breached an obligation under a crude oil supply agreement to participate in a joint calculation of an adjustment to the price of crude oil for the second half of 2008, and all of 2009, and that as a result ConocoPhillips suffered damages in excess of US$242 million, and further alleging that PDVSA, as guarantor, had an obligation to indemnify ConocoPhillips for such damages (the "Lookback Adjustment Arbitration"). On December 17, 2010, an arbitral tribunal granted the request of PDVSA and its affiliates to consolidate the Call Option Arbitration and the Lookback Adjustment Arbitration. On February 4, 2011, ConocoPhillips resubmitted its claim related to the Lookback Adjustment Arbitration as a counterclaim and submitted two additional counterclaims, alleging that PDVSA Petróleo, S.A., under a crude oil supply agreement and PDVSA as guarantor were liable for damages caused by their failure to supply crude oil during the months of January, March, April, June, July and August 2009, in excess of US$16 million, as well as damages caused by demurrage, in excess of US$3.3 million. On May 3, 2011, the tribunal and the parties signed the terms of reference, and on May 26, 2011, the tribunal issued a procedural order, establishing a schedule for the arbitration. In accordance with that procedural order, PDVSA and its affiliates submitted their Statement of Claim on August 3, 2011, and the Statement of Defense and Counterclaim was filed on December 20, 2011. A hearing was conducted in December 2012. An arbitral award was issued on April 14, 2014 ordering PDVSA to pay approximately US$5 million in damages. On February 16, 2016, ConocoPhillips submitted a certificate to the tribunal confirming that it had received payment from PDV Texas and PDV Sweeny of US$4,027,594.55 and that accordingly both PDV Texas and PDV Sweeny had complied with their payment obligations in accordance with the arbitral award. The tribunal has yet to issue a decision regarding the reimbursement of legal costs incurred during the proceedings.

S-3.01(i)-2



### OPIC Arbitration

On November 19, 2010, Opic Karimun Corporation ("OPIC") filed a request for arbitration before the International Court of Arbitration of the International Chamber of Commerce in New York, against Corporación Venezolana del Petróleo, S.A. ("CVP") and PDVSA under the exploration at risk and profit sharing association agreements relating to the Gulf of Paria East and Gulf of Paria West (the "Gulf of Paria Agreements") and PDVSA's guaranties of CVP's obligations thereunder. OPIC alleges that PDVSA and CVP are liable under a variety of theories, including breach of the Gulf of Paria Agreements and the guaranties, and seeks damages in the amount of approximately US$200 million as a result of the migration process of 2007 in accordance with Decree-Law 5.200. On January 14, 2011, PDVSA and CVP filed their Answer to the Request for Arbitration. Thereafter, following the constitution of the arbitral tribunal and the establishment of the terms of reference, the parties have submitted their initial briefs and have engaged in document production.

A pre-hearing briefing on the matter was completed on December 14, 2012 and a hearing on the merits was held on January 21, 2013 through January 28, 2013. The parties submitted their post-hearing briefs on March 15, 2013. Thereafter, the Secretariat of the ICC informed the parties that the ICC International Court of Arbitration has extended the time limit for rendering the award until November 29, 2013. An award was issued on November 11, 2013, pursuant to which PDVSA was ordered to pay $81 million. PDVSA has not made any payments on this award.

### PDVSA Petróleo

On July 30, 2007, the Venezuelan 9th Superior Tax Court issued a decision in connection with a recourse filed by PDVSA Petróleo, S.A. regarding certain rulings of the Venezuelan tax authority challenging the deductibility of a contribution made in compliance with Section 6 of the Organic Hydrocarbons Law. Said decision held that only crude oil exports were subject to deduction, and that, in contrast, other hydrocarbons products or sub-products were not allowed to be deducted. Although our management and our legal advisors understand there are legal grounds to uphold said ruling, we will file an appeal with the Venezuelan Supreme Tribunal of Justice. As of December 31, 2012 and December 31, 2011, we registered allowances of $673 million for contingencies in respect of said procedure and the potential impact it may have in other deductions made in reliance of Section 6 of the Organic Hydrocarbons Law.

As of December 31, 2012 and December 31, 2011, we registered allowances of $68 million for contingencies in respect of certain tax obligations of PDVSA Petróleo, S.A. pertaining to 1994, 1995 and 1996 having a $415 million aggregate principal amount. In such connection, we have made cash and in kind payments by delivering Reimbursement Tax Certificates to the SENIAT for an aggregate principal amount of $682 million and $13 million, respectively.

### Helmerich & Payne International Drilling Co. and Helmerich & Payne de Venezuela C.A.

On November 29, 2011, Helmerich & Payne International Drilling Co. and Helmerich & Payne de Venezuela C.A., filed a lawsuit against the Bolivarian Republic of Venezuela, PDVSA and PDVSA Petróleo, S.A. before the United States District Court for the District of Columbia, seeking recovery of damages in an as yet unspecified amount for violation of international law and breach of contract related to payment disputes over drilling services provided. A decision confirming jurisdiction was rendered by the court on September 20, 2013, whereby the court ruled that as a Venezuelan corporation, Helmerich &



Payne de Venezuela C.A. must be deemed a citizen of Venezuela for purposes of international law. With respect to a motion to dismiss the breach of contract claim, the court ruled that the alleged breaches have a direct effect in the United States. The above rulings were appealed by Helmerich & Payne de Venezuela C.A., Venezuela and PDVSA. A consolidated common appeal is currently pending before the U.S. Court of Appeals for the District of Columbia, regarding jurisdiction.

On November 27, 2015, the plaintiffs petitioned the United States Supreme Court to review the part of the sentence issued by the First Circuit Court of Appeals on May 1, 2015 which resulted in the denial of their contractual claims. On December 23, 2015, the defendants filed their opposition to this petition. A decision is pending.

*Other Claims; Allowances for Contingencies*

As of December 31, 2015, we were subject to other legal claims and procedures in the ordinary course of business having an aggregate amount of $3,159 million.

As of December 31, 2013 and December 31, 2014, we registered allowances for contingences having an aggregate amount of $1,244 million and $4.274 million, respectively.



Schedule 3.01(p)

## ENVIRONMENTAL MATTERS

**Environment and Occupational Health.** We and our subsidiaries are subject to a complex environmental and occupational health regulation framework. Under this framework, we and our subsidiaries may be required to make significant expenditures to modify our facilities and to prevent or remedy the effects of waste disposal, pollutant spills, and accidents on the environment and the population's health.

We are taking important steps to prevent risks to the environment, the population's health, and the integrity of our installations. During 2012 and 2013, we continued the implementation of our company-wide Integral Risk Management System (SIR-PDVSA®). The system is based on international practices and standards, such as ISO 14001 for Environmental Management, ISO 18000 and British Standard BUSINESS 8800 for health, and the Occupational Safety and Health Administration (OSHA)'s and American Petroleum Institute (API) for process safety.

We have invested $42 million to complete the implementation of SIR-PDVSA®. In addition, we are undertaking an investment plan to comply with Venezuelan environmental laws under which $88 million was invested during 2011, $115 million was invested during 2012 and $32 million during the six months ended June 30, 2013. In addition, CITGO plans to invest approximately $291 million for projects managing environmental risks between 2013 and 2017.

As part of our environmental responsibility initiative, we have also instituted a plan to recover oil pits that were left behind from oil exploration and production activities until 2004. Oil pits are excavations made on the soil surface to store oil sludge and drilling cuts. The plan includes the recovery, recycling and transformation of the disposed waste, including abandoned installations, in order to convert them into financial and environmental assets. The plan was first implemented in 2001 and has an expected duration of twelve years. Since 2005, a total of 3,223 oil pits have been closed and restored. In 2012, 565 oil pits were closed and restored. As of December 31, 2012, the total amount of restored oil pits are 5,081. In 2012, 2011 and 2010, we registered remediation and restoration expenses having an aggregate amount of $176 million, $217 million and $164 million, respectively.

Our subsidiary CITGO has received several notices of violation from the Environmental Protection Agency of the United States and other government authorities, which include notices of violation under the Federal Clean Air Act that may lead to CITGO being deemed liable, jointly with other companies, for remediation of contamination in respect of certain properties pursuant to the Comprehensive Environmental Response, Compensation and Liability Act. Such notices of violation are currently being analyzed by CITGO and, in certain cases, remediation actions are being performed. CITGO is committed to negotiate and settle with the governmental authorities in respect of such matters.

As of December 31, 2012, CITGO's non-current liabilities included an environmental accrual of $135 million compared with $127 million as of December 31, 2011. CITGO estimates a possible additional loss of $72 million as of December 31, 2012 in connection with environmental matters.

On February 4, 2012, two surface pipelines in the Venezuelan state of Monagas ruptured, resulting in a spill of light crude oil. The resulting oil spill spread over a distance of approximately 0.5 km to the



Guarapiche River. A water treatment plant that treats water from the Guarapiche River and provides such water to residents of certain areas of the state of Monagas was temporarily shut down while Petróleos de Venezuela, S.A. ("PDVSA") contained and conducted a clean-up of the oil spill. During such shut down, PDVSA distributed potable water to residents of the affected areas. In consultation with experts, PDVSA deployed containment barriers and equipment for purposes of containing and removing the oil. After containing the spill, PDVSA worked to remediate the affected water and soil. The clean-up of the spill and the restoration of the water supply to affected residents was completed within forty days of the incident.

Since May 2012, the following changes to PDVSA's environmental safety initiatives have occurred: (i) PDVSA has increased the number of environmental indicators certified by KPMG; (ii) PDVSA has engaged in the development of the subsoil injection of waste, which has allowed PDVSA to safely dispose of approximately 650,000 barrels of mud and industrial water; (iii) PDVSA has designed and implemented new plans to address oil spills; (iv) PDVSA has commenced 174 environmental projects in different facilities throughout Venezuela; and (v) PDVSA has incorporated additional environmental policies to seven projects to be developed by PDVSA.

At the beginning of 2015 PDVSA initiated a process of certifying 12 environmental management progress indicators, which were included in the 2015 Memorandum of Balance of Environmental Management, with the support of the auditing firm KPMG. The 12 indicators in process of certification are: Authorization Procedures, Sanctioning Procedures, Environmental Conservation, Natural Resources Monitoring, Effluent Liquids Management, Production Waters, Atmospheric Emissions, Air Quality Monitoring, Waste Management, Hydrocarbon and other Contaminating Substances Spills, Social-Environmental Formation and Environmental Cure and Restoration.



**FILED: NEW YORK COUNTY CLERK 02/15/2019 04:37 PM**
NYSCEF DOC. NO.    Case 1:19-cv-02519-AJN    Document 3-1    Filed 03/21/19    Page 172 of 312   NYSCEF: 02/15/2019

INDEX NO. 651005/2019

Annex I

## Description of Affiliates of the Issuer and of Novated Receivables

| | | |
|---|---|---|
| AMOUNT IN USD | $118,009,293 | |
| AMOUNT IN EUR | € 57,129,635 | |

| GE Entity | PDVSA Entity | Invoice number | Currency | Amount | Date | PDVSA Invoice number |
|---|---|---|---|---|---|---|
| Alstom Grid GmbH | Bariven S.A. | 4516005961 | USD | $245,000 | 19-Dec-14 | 4516005961 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010151632 | USD | $40,079 | 2-Oct-14 | 1010151632 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010151632 | USD | $641 | 2-Oct-14 | 1010151632CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010187440 | USD | $5,107 | 1-Jun-15 | 1010187440 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218753 | USD | $3,074 | 27-Dec-15 | 1010218753 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010226633 | USD | $13,858 | 24-Feb-16 | 1010226633 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010228635 | USD | $5,351 | 24-Feb-16 | 1010226635 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010226631 | USD | $7,589 | 24-Feb-16 | 1010226631 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010205850 | USD | $21,092 | 30-Sep-15 | 1010205850 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010232732 | USD | $1,704,264 | 1-Apr-16 | 1010232732 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010232740 | USD | $398,866 | 1-Apr-16 | 1010232740 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010192151 | USD | $25,726 | 28-Jun-15 | 1010192151 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010205852 | USD | $103,155 | 30-Sep-15 | 1010205852 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010207282 | USD | $57,002 | 8-Oct-15 | 1010207282 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010207282 | USD | $912 | 8-Oct-15 | 1010207282CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010226632 | USD | $3,088 | 24-Feb-16 | 1010226632 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010228845 | USD | $30,983 | 10-Mar-16 | 1010228845 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010228845 | USD | $496 | 10-Mar-16 | 1010228845 CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010227860 | USD | $44,635 | 3-Mar-16 | 1010227860 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010162527 | USD | $40,782 | 14-Dec-14 | 1010162527 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010110136 | USD | $171,541 | 27-Dec-13 | 1010110136 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010162672 | USD | $220,509 | 16-Dec-14 | 1010162672 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010162672 | USD | $3,528 | 16-Dec-14 | 1010162672CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010176732 | USD | $21,510 | 25-Mar-15 | 1010176732 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010176729 | USD | $2,184 | 25-Mar-15 | 1010176729 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010176730 | USD | $8,154 | 25-Mar-15 | 1010176730 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010176730 | USD | $130 | 25-Mar-15 | 1010176730CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010187237 | USD | $153,954 | 29-May-15 | 1010187237 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010187237 | USD | $2,463 | 29-May-15 | 1010187237CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010189603 | USD | $3,055 | 16-Jun-15 | 1010189603 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010189603 | USD | $80 | 16-Jun-15 | 1010189603CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010190819 | USD | $41,448 | 23-Jun-15 | 1010190819 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010190819 | USD | $863 | 23-Jun-15 | 1010190819CD |

Annex I-1



| | | | | | | |
|---|---|---|---|---|---|---|
| BENTLY NEVADA, INC. | Bariven S.A. | 1010192088 | USD | $4,009 | 28-Jun-15 | 1010192088 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010192088 | USD | $80 | 28-Jun-15 | 1010192088CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010196937 | USD | $6,236 | 4-Aug-15 | 1010196937 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010204743 | USD | $65,336 | 25-Sep-15 | 1010204743 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010205700 | USD | $9,016 | 30-Sep-15 | 1010205700 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010070863 | USD | ($1,744) | 5-Apr-15 | 1010070863 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218373 | USD | $2,066,737 | 23-Dec-15 | 1010218373 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010205699 | USD | $232,594 | 30-Sep-15 | 1010205699 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010226634 | USD | $7,240 | 24-Feb-16 | 1010226634 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010226637 | USD | $88,496 | 24-Feb-16 | 1010226637 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010226636 | USD | $2,212 | 24-Feb-16 | 1010226636 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010229295 | USD | $135,268 | 14-Mar-16 | 1010229295 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218755 | USD | $19,878 | 27-Dec-15 | 1010218755 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218755 | USD | $318 | 27-Dec-15 | 1010218755CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218511 | USD | $3,758 | 23-Dec-15 | 1010218511 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218511 | USD | $80 | 23-Dec-15 | 1010218511CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010205849 | USD | $23,391 | 30-Sep-15 | 1010205849 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010205698 | USD | $9,605 | 30-Sep-15 | 1010205698 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218509 | USD | $35,260 | 23-Dec-15 | 1010218509 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218509 | USD | $564 | 23-Dec-15 | 1010218509CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218756 | USD | $74,676 | 27-Dec-15 | 1010218756 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218756 | USD | $1,195 | 17-Mar-16 | 1010218756 CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010205698 | USD | $154 | 30-Sep-15 | 1010205698 CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010190374 | USD | $29,317 | 19-Jun-15 | 1010190374 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010190374 | USD | $469 | 19-Jun-15 | 1010190374 CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010189062 | USD | $724,512 | 1-May-15 | 1010189062 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010189063 | USD | $502,393 | 10-Dec-15 | 1010189063 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218752 | USD | $1,372 | 27-Dec-15 | 1010218752 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218754 | USD | $694,497 | 27-Dec-15 | 1010218754 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218754 | USD | $11,112 | 27-Dec-15 | 1010218754CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218752 | USD | $80 | 27-Dec-15 | 1010218752 CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218507 | USD | $2,404 | 23-Dec-15 | 1010218507 |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218507 | USD | $80 | 23-Dec-15 | 1010218507 CD |
| BENTLY NEVADA, INC. | Bariven S.A. | 1010218510 | USD | $90,637 | 23-Dec-15 | 1010218510 |
| Dresser Inc | Bariven S.A. | 1336124 | USD | $28,650 | 17-Mar-15 | 1336124 |
| Dresser Inc | Bariven S.A. | 1345603 | USD | $73,477 | 8-May-15 | 1345603 |
| Dresser Inc | Bariven S.A. | 1336046 | USD | $228,898 | 17-Mar-15 | 1336046 |
| Dresser Inc | Bariven S.A. | 1336806 | USD | $160,991 | 20-Mar-15 | 1336806 |
| Dresser Inc | Bariven S.A. | 1345604 | USD | $45,000 | 8-May-15 | 1345604 |
| Dresser Inc | Bariven S.A. | 1341235 | USD | $25,578 | 14-Apr-15 | 1341235 |
| Dresser Inc | Bariven S.A. | 1336125 | USD | $28,756 | 17-Mar-15 | 1336125 |
| Dresser Inc | Bariven S.A. | 1341234 | USD | $13,643 | 14-Apr-15 | 1341234 |
| Dresser Inc | Bariven S.A. | 1350693 | USD | $2,267 | 5-Jun-15 | 1350693 |

Annex I-2



| | | | | | | |
|---|---|---|---|---|---|---|
| Dresser Inc | Bariven S.A. | 1350692 | USD | $11,549 | 5-Jun-15 | 1350692 |
| Dresser Inc | Bariven S.A. | 1357279 | USD | $46,595 | 17-Jul-15 | 1357279 |
| Dresser Inc | Bariven S.A. | 1348874 | USD | $9,422 | 27-May-15 | 1348874 |
| Dresser Inc | Bariven S.A. | 1348873 | USD | $72,622 | 27-May-15 | 1348873 |
| Dresser Inc | Bariven S.A. | 1348737 | USD | $20,834 | 26-May-15 | 1348737 |
| Dresser Inc | Bariven S.A. | 1351398 | USD | $60,835 | 9-Jun-15 | 1351398 |
| Dresser Inc | Bariven S.A. | 1368876 | USD | $2,909 | 30-Sep-15 | 1368876 |
| Dresser Inc | Bariven S.A. | 1381730 | USD | $4,818 | 30-Dec-15 | 1381730 |
| Dresser Inc | Bariven S.A. | 1358132 | USD | $142,792 | 23-Jul-15 | 1358132 |
| Dresser Inc | Bariven S.A. | 1381683 | USD | ($4,818) | 17-Dec-15 | 1381683 |
| Dresser Inc | Bariven S.A. | 1368888 | USD | $4,699 | 30-Sep-15 | 1368888 |
| Dresser Inc | Bariven S.A. | 1342386 | USD | $133,940 | 21-Apr-15 | 1342386 |
| Dresser Inc | Bariven S.A. | 1344641 | USD | $10,006 | 1-May-15 | 1344641 |
| Dresser Inc | Bariven S.A. | 1348443 | USD | $19,197 | 13-May-15 | 1348443 |
| Dresser Inc | Bariven S.A. | 1348872 | USD | $18,156 | 27-May-15 | 1348872 |
| Dresser Inc | Bariven S.A. | 1314171 | USD | $39,097 | 27-Oct-14 | 1314171 |
| Dresser Inc | Bariven S.A. | 1357277 | USD | $22,886 | 17-Jul-15 | 1357277 |
| Dresser Inc | Bariven S.A. | 1380013 | USD | $30,712 | 17-Dec-15 | 1380013 |
| Dresser Inc | Bariven S.A. | 1313634 | USD | $70,882 | 23-Oct-14 | 1313634 |
| Dresser Inc | Bariven S.A. | 1317200 | USD | $15,198 | 11-Nov-14 | 1317200 |
| Dresser Inc | Bariven S.A. | 1336126 | USD | $24,078 | 17-Mar-15 | 1336126 |
| Dresser Inc | Bariven S.A. | 1336528 | USD | $8,144 | 19-Mar-15 | 1336528 |
| Dresser Inc | Bariven S.A. | 1336529 | USD | $18,911 | 19-Mar-15 | 1336529 |
| Dresser Inc | Bariven S.A. | 1336453 | USD | $7,700 | 18-Mar-15 | 1336453 |
| Dresser Inc | Bariven S.A. | 1336807 | USD | $26,659 | 20-Mar-15 | 1336807 |
| Dresser Inc | Bariven S.A. | 1336819 | USD | $61,020 | 20-Mar-15 | 1336819 |
| Dresser Inc | Bariven S.A. | 1336821 | USD | $22,339 | 20-Mar-15 | 1336821 |
| Dresser Inc | Bariven S.A. | 1336820 | USD | $11,598 | 20-Mar-15 | 1336820 |
| Dresser Inc | Bariven S.A. | 1339476 | USD | $11,925 | 2-Apr-15 | 1339476 |
| Dresser Inc | Bariven S.A. | 1339715 | USD | $24,556 | 6-Apr-15 | 1339715 |
| Dresser Inc | Bariven S.A. | 1339904 | USD | $1,001 | 7-Apr-15 | 1339904 |
| Dresser Inc | Bariven S.A. | 1341236 | USD | $14,948 | 14-Apr-15 | 1341236 |
| Dresser Inc | Bariven S.A. | 1336823 | USD | $58,347 | 20-Mar-15 | 1336823 |
| Dresser Inc | Bariven S.A. | 1343638 | USD | $15,411 | 28-Apr-15 | 1343638 |
| Dresser Inc | Bariven S.A. | 1343639 | USD | $8,383 | 28-Apr-15 | 1343639 |
| Dresser Inc | Bariven S.A. | 1344402 | USD | $20,790 | 30-Apr-15 | 1344402 |
| Dresser Inc | Bariven S.A. | 1346047 | USD | $27,450 | 12-May-15 | 1346047 |
| Dresser Inc | Bariven S.A. | 1344404 | USD | $77,691 | 30-Apr-15 | 1344404 |
| Dresser Inc | Bariven S.A. | 1344642 | USD | $111,345 | 1-May-16 | 1344642 |
| Dresser Inc | Bariven S.A. | 1349437 | USD | $10,932 | 29-May-15 | 1349437 |
| Dresser Inc | Bariven S.A. | 1349877 | USD | $64,991 | 1-Jun-15 | 1349877 |
| Dresser Inc | Bariven S.A. | 1307306 | USD | $3,195 | 17-Sep-14 | 1307306 |
| Dresser Inc | Bariven S.A. | 1320454 | USD | $51,777 | 4-Dec-14 | 1320454 |

Annex 1-3



| | | | | | | |
|---|---|---|---|---|---|---|
| Dresser Inc | Bariven S.A. | 1349878 | USD | $14,676 | 1-Jun-15 | 1349878 |
| Dresser Inc | Bariven S.A. | 1352958 | USD | $60,147 | 18-Jun-15 | 1352958 |
| Dresser Inc | Bariven S.A. | 1354475 | USD | $2,377 | 29-Jun-15 | 1354475 |
| Dresser Inc | Bariven S.A. | 1355478 | USD | $21,765 | 8-Jul-15 | 1355478 |
| Dresser Inc | Bariven S.A. | 4520014205 | USD | $475 | 20-Jul-15 | 4520014205 |
| Dresser Inc | Bariven S.A. | 4520014122 | USD | $339 | 20-Jul-15 | 4520014122 |
| Dresser Inc | Bariven S.A. | 1357661 | USD | $30,433 | 21-Jul-15 | 1357661 |
| Dresser Inc | Bariven S.A. | 1357529 | USD | $22,100 | 20-Jul-15 | 1357529 |
| Dresser Inc | Bariven S.A. | 1357280 | USD | $6,676 | 17-Jul-15 | 1357280 |
| Dresser Inc | Bariven S.A. | 1359351 | USD | $20,811 | 30-Jul-15 | 1359351 |
| Dresser Inc | Bariven S.A. | 1359353 | USD | $17,096 | 30-Jul-15 | 1359353 |
| Dresser Inc | Bariven S.A. | 1359355 | USD | $44,556 | 30-Jul-15 | 1359355 |
| Dresser Inc | Bariven S.A. | 1359356 | USD | $3,755 | 30-Jul-15 | 1359356 |
| Dresser Inc | Bariven S.A. | 1360666 | USD | $3,175 | 12-Aug-15 | 1360666 |
| Dresser Inc | Bariven S.A. | 1360665 | USD | $39,269 | 12-Aug-15 | 1360665 |
| Dresser Inc | Bariven S.A. | 1357747 | USD | $22,135 | 21-Jul-15 | 1357747 |
| Dresser Inc | Bariven S.A. | 1361127 | USD | $17,183 | 14-Aug-15 | 1361127 |
| Dresser Inc | Bariven S.A. | 4520015298 | USD | $3,059 | 14-Aug-15 | 4520015298 |
| Dresser Inc | Bariven S.A. | 1368885 | USD | $48,303 | 30-Sep-15 | 1368885 |
| Dresser Inc | Bariven S.A. | 1368884 | USD | $33,907 | 30-Sep-15 | 1368884 |
| Dresser Inc | Bariven S.A. | 1368878 | USD | $34,741 | 30-Sep-15 | 1368878 |
| Dresser Inc | Bariven S.A. | 1368877 | USD | $21,943 | 30-Sep-15 | 1368877 |
| Dresser Inc | Bariven S.A. | 4520019940 | USD | $160,795 | 29-Oct-15 | 4520019940 |
| Dresser Inc | Bariven S.A. | 1380017 | USD | $32,842 | 17-Dec-15 | 1380017 |
| Dresser Inc | Bariven S.A. | 1380643 | USD | $1,569 | 21-Dec-15 | 1380643 |
| Dresser Inc | Bariven S.A. | 1380644 | USD | $1,610 | 21-Dec-15 | 1380644 |
| Dresser Inc | Bariven S.A. | 1381607 | USD | $42,609 | 29-Dec-15 | 1381607 |
| Dresser Inc | Bariven S.A. | 1368880 | USD | $45,211 | 30-Sep-15 | 1368880 |
| Dresser Inc | Bariven S.A. | 1314449 | USD | $49,749 | 28-Oct-14 | 1314449 |
| Dresser Inc | Bariven S.A. | 1220113 | USD | $263 | 19-Mar-13 | 1220113 |
| Dresser Inc | Bariven S.A. | 1336449 | USD | $7,944 | 18-Mar-15 | 1336449 |
| Dresser Inc | Bariven S.A. | 1343641 | USD | $6,201 | 26-Apr-15 | 1343641 |
| Dresser Inc | Bariven S.A. | 1368875 | USD | $20,720 | 30-Sep-15 | 1368875 |
| Dresser Inc | Bariven S.A. | 1380012 | USD | $5,779 | 17-Dec-15 | 1380012 |
| Dresser Inc | Bariven S.A. | 1220350 | USD | $85,879 | 20-Mar-13 | 1220350 |
| Dresser Inc | Bariven S.A. | 1336533 | USD | $1,598 | 18-Mar-15 | 1336533 |
| Dresser Inc | Bariven S.A. | 1336458 | USD | $16,390 | 18-Mar-15 | 1336458 |
| Dresser Inc | Bariven S.A. | 1336452 | USD | $21,643 | 18-Mar-15 | 1336452 |
| Dresser Inc | Bariven S.A. | 1341240 | USD | $308,009 | 14-Apr-15 | 1341240 |
| Dresser Inc | Bariven S.A. | 1340277 | USD | $17,149 | 8-Apr-15 | 1340277 |
| Dresser Inc | Bariven S.A. | 1346446 | USD | $105,592 | 24-Apr-15 | 1346446 |
| Dresser Inc | Bariven S.A. | 1343650 | USD | $67,984 | 28-Apr-15 | 1343650 |
| Dresser Inc | Bariven S.A. | 1346057 | USD | $1,357 | 12-May-15 | 1346057 |



Annex I-4



| | | | | | | |
|---|---|---|---|---|---|---|
| Dresser Inc | Bariven S.A. | 1345607 | USD | $5,644 | 8-May-15 | 1345607 |
| Dresser Inc | Bariven S.A. | 1345606 | USD | $27,767 | 8-May-15 | 1345606 |
| Dresser Inc | Bariven S.A. | 1345605 | USD | $123,974 | 8-May-15 | 1345805 |
| Dresser Inc | Bariven S.A. | 1343098 | USD | $146,162 | 13-May-15 | 1343098 |
| Dresser Inc | Bariven S.A. | 1349117 | USD | $4,196 | 28-May-15 | 1349117 |
| Dresser Inc | Bariven S.A. | 1348878 | USD | $3,134 | 27-May-15 | 1348878 |
| Dresser Inc | Bariven S.A. | 1348879 | USD | $14,994 | 27-May-15 | 1348879 |
| Dresser Inc | Bariven S.A. | 1348075 | USD | $73,627 | 21-May-15 | 1348075 |
| Dresser Inc | Bariven S.A. | 1349820 | USD | $3,819 | 1-Jun-15 | 1349820 |
| Dresser Inc | Bariven S.A. | 1320966 | USD | $581 | 12-Aug-14 | 1320966 |
| Dresser Inc | Bariven S.A. | 1252314 | USD | $26,041 | 30-Sep-13 | 1252314 |
| Dresser Inc | Bariven S.A. | 1353278 | USD | $8,920 | 19-Jun-15 | 1353278 |
| Dresser Inc | Bariven S.A. | 1357532 | USD | $50,136 | 20-Jul-15 | 1357532 |
| Dresser Inc | Bariven S.A. | 1357283 | USD | $2,801 | 17-Jul-15 | 1357283 |
| Dresser Inc | Bariven S.A. | 1357278 | USD | $1,076 | 17-Jul-15 | 1357278 |
| Dresser Inc | Bariven S.A. | 1368700 | USD | $94,970 | 30-Sep-15 | 1368700 |
| Dresser Inc | Bariven S.A. | 1368879 | USD | $33,727 | 30-Sep-15 | 1368879 |
| Dresser Inc | Bariven S.A. | 1368701 | USD | $39,671 | 30-Sep-15 | 1368701 |
| Dresser Inc | Bariven S.A. | 1357533 | USD | $53,423 | 20-Jul-15 | 1357533 |
| Dresser Inc | Bariven S.A. | 1380520 | USD | $3,528 | 21-Dec-15 | 1380520 |
| Dresser Inc | Bariven S.A. | 1380023 | USD | $1,304 | 17-Dec-15 | 1380023 |
| Dresser Inc | Bariven S.A. | 1380024 | USD | $16,292 | 17-Dec-15 | 1380024 |
| Dresser Inc | Bariven S.A. | 1264126 | USD | $8,395 | 19-Dec-13 | 1264126 |
| Dresser Inc | Bariven S.A. | 1271365 | USD | $97,893 | 13-Feb-14 | 1271365 |
| Dresser Inc | Bariven S.A. | 1307775 | USD | $7,130 | 19-Sep-14 | 1307775 |
| Dresser Inc | Bariven S.A. | 1307449 | USD | $13,214 | 18-Sep-14 | 1307449 |
| Dresser Inc | Bariven S.A. | 1307479 | USD | $34,722 | 18-Sep-14 | 1307479 |
| Dresser Inc | Bariven S.A. | 1307494 | USD | $41,705 | 18-Sep-14 | 1307494 |
| Dresser Inc | Bariven S.A. | 1307495 | USD | $2,514 | 18-Sep-14 | 1307495 |
| Dresser Inc | Bariven S.A. | 1307497 | USD | $22,166 | 18-Sep-14 | 1307497 |
| Dresser Inc | Bariven S.A. | 1307776 | USD | $13,684 | 19-Sep-14 | 1307776 |
| Dresser Inc | Bariven S.A. | 1313970 | USD | $56,982 | 24-Oct-14 | 1313970 |
| Dresser Inc | Bariven S.A. | 1311192 | USD | $9,151 | 9-Oct-14 | 1311192 |
| Dresser Inc | Bariven S.A. | 1313969 | USD | $36,490 | 24-Oct-14 | 1313969 |
| Dresser Inc | Bariven S.A. | 1313640 | USD | $14,171 | 7-Nov-14 | 1313640 |
| Dresser Inc | Bariven S.A. | 1314697 | USD | $28,166 | 29-Oct-14 | 1314697 |
| Dresser Inc | Bariven S.A. | 1319443 | USD | $7,000 | 24-Nov-14 | 1319443 |
| Dresser Inc | Bariven S.A. | 1338132 | USD | $36,436 | 17-Mar-15 | 1338132 |
| Dresser Inc | Bariven S.A. | 1336446 | USD | $8,102 | 18-Mar-15 | 1336446 |
| Dresser Inc | Bariven S.A. | 1336454 | USD | $18,087 | 18-Mar-15 | 1336454 |
| Dresser Inc | Bariven S.A. | 1336455 | USD | $10,869 | 18-Mar-15 | 1336455 |
| Dresser Inc | Bariven S.A. | 1336456 | USD | $14,376 | 18-Mar-15 | 1336456 |
| Dresser Inc | Bariven S.A. | 1336459 | USD | $14,272 | 18-Mar-15 | 1336459 |



Annex I-5



| Dresser Inc | Bariven S.A. | 1336532 | USD | $147,311 | 19-Mar-15 | 1336532 |
|---|---|---|---|---|---|---|
| Dresser Inc | Bariven S.A. | 1336531 | USD | $192,915 | 19-Mar-15 | 1336531 |
| Dresser Inc | Bariven S.A. | 1336530 | USD | $960,069 | 19-Mar-15 | 1336530 |
| Dresser Inc | Bariven S.A. | 1336447 | USD | $18,262 | 18-Mar-15 | 1336447 |
| Dresser Inc | Bariven S.A. | 1336448 | USD | $47,195 | 18-Mar-15 | 1336448 |
| Dresser Inc | Bariven S.A. | 1336822 | USD | $27,165 | 20-Mar-15 | 1336822 |
| Dresser Inc | Bariven S.A. | 1336824 | USD | $32,435 | 20-Mar-15 | 1336824 |
| Dresser Inc | Bariven S.A. | 1339767 | USD | $9,287 | 6-Apr-15 | 1339767 |
| Dresser Inc | Bariven S.A. | 1341233 | USD | $7,217 | 14-Apr-15 | 1341233 |
| Dresser Inc | Bariven S.A. | 1339479 | USD | $73,655 | 2-Apr-15 | 1339479 |
| Dresser Inc | Bariven S.A. | 1339905 | USD | $170,271 | 7-Apr-15 | 1339905 |
| Dresser Inc | Bariven S.A. | 1342662 | USD | $3,658 | 22-Apr-15 | 1342662 |
| Dresser Inc | Bariven S.A. | 1344405 | USD | $1,945 | 30-Apr-15 | 1344405 |
| Dresser Inc | Bariven S.A. | 1345114 | USD | $19,650 | 6-May-15 | 1345114 |
| Dresser Inc | Bariven S.A. | 1346061 | USD | $11 | 12-May-15 | 1346061 |
| Dresser Inc | Bariven S.A. | 1346063 | USD | $32,621 | 12-May-15 | 1346063 |
| Dresser Inc | Bariven S.A. | 1346064 | USD | $33,693 | 12-May-15 | 1346064 |
| Dresser Inc | Bariven S.A. | 1343360 | USD | $58,908 | 27-Apr-15 | 1343360 |
| Dresser Inc | Bariven S.A. | 1346060 | USD | $22,131 | 12-May-15 | 1346060 |
| Dresser Inc | Bariven S.A. | 1346059 | USD | $132,401 | 12-May-15 | 1346059 |
| Dresser Inc | Bariven S.A. | 1348396 | USD | $5,730 | 22-May-15 | 1348396 |
| Dresser Inc | Bariven S.A. | 1346735 | USD | $1,010 | 26-May-15 | 1346735 |
| Dresser Inc | Bariven S.A. | 1348277 | USD | $956 | 22-May-15 | 1348277 |
| Dresser Inc | Bariven S.A. | 1348276 | USD | $13,879 | 22-May-15 | 1348276 |
| Dresser Inc | Bariven S.A. | 1349114 | USD | $2,201 | 28-May-15 | 1349114 |
| Dresser Inc | Bariven S.A. | 1349441 | USD | $3,376 | 29-May-15 | 1349441 |
| Dresser Inc | Bariven S.A. | 1310884 | USD | $56 | 8-Oct-14 | 1310884 |
| Dresser Inc | Bariven S.A. | 1251779 | USD | $11,479 | 27-Sep-13 | 1251779 |
| Dresser Inc | Bariven S.A. | 1251780 | USD | $198,922 | 27-Sep-13 | 1251780 |
| Dresser Inc | Bariven S.A. | 1252745 | USD | $15,042 | 10-Mar-13 | 1252745 |
| Dresser Inc | Bariven S.A. | 1351208 | USD | $26,283 | 9-Jun-15 | 1351208 |
| Dresser Inc | Bariven S.A. | 1350691 | USD | $10,594 | 5-Jun-15 | 1350691 |
| Dresser Inc | Bariven S.A. | 1350697 | USD | $28,897 | 5-Jun-15 | 1350697 |
| Dresser Inc | Bariven S.A. | 1351217 | USD | $32,328 | 9-Jun-15 | 1351217 |
| Dresser Inc | Bariven S.A. | 1351216 | USD | $95,984 | 9-Jun-15 | 1351216 |
| Dresser Inc | Bariven S.A. | 1353279 | USD | $35,090 | 19-Jun-15 | 1353279 |
| Dresser Inc | Bariven S.A. | 1357680 | USD | $22,180 | 21-Jul-15 | 1357680 |
| Dresser Inc | Bariven S.A. | 1357748 | USD | $44,837 | 21-Jul-15 | 1357748 |
| Dresser Inc | Bariven S.A. | 1357535 | USD | $44,554 | 20-Jul-15 | 1357535 |
| Dresser Inc | Bariven S.A. | 1360669 | USD | $133 | 12-Aug-15 | 1360669 |
| Dresser Inc | Bariven S.A. | 1360424 | USD | $2,126,374 | 11-Aug-15 | 1360424 |
| Dresser Inc | Bariven S.A. | 1358135 | USD | $340,399 | 23-Jul-15 | 1358135 |
| Dresser Inc | Bariven S.A. | 1358886 | USD | $1,505 | 30-Sep-15 | 1358886 |



Annex I-6



| | | | | | | |
|---|---|---|---|---|---|---|
| Dresser Inc | Bariven S.A. | 1368845 | USD | $20,129 | 30-Sep-15 | 1368845 |
| Dresser Inc | Bariven S.A. | 1388631 | USD | $14,950 | 30-Sep-15 | 1368631 |
| Dresser Inc | Bariven S.A. | 1368844 | USD | $409,107 | 30-Sep-15 | 1368844 |
| Dresser Inc | Bariven S.A. | 1388702DR204 | USD | $119,229 | 30-Sep-15 | 1388702 |
| Dresser Inc | Bariven S.A. | 1368874 | USD | $82,498 | 30-Sep-15 | 1368874 |
| Dresser Inc | Bariven S.A. | 1368873 | USD | $28,937 | 30-Sep-15 | 1368873 |
| Dresser Inc | Bariven S.A. | 1369941 | USD | $1,160 | 7-Oct-15 | 1369941 |
| Dresser Inc | Bariven S.A. | 1368887 | USD | $31,845 | 30-Sep-15 | 1368887 |
| Dresser Inc | Bariven S.A. | 1380735 | USD | $102,869 | 22-Dec-15 | 1380735 |
| Dresser Inc | Bariven S.A. | 1380025 | USD | $128,500 | 17-Dec-15 | 1380025 |
| Dresser Inc | Bariven S.A. | 1380018 | USD | $5,072 | 17-Dec-15 | 1380018 |
| Dresser Inc | Bariven S.A. | 1380518 | USD | $6,527 | 21-Dec-15 | 1380518 |
| Dresser Inc | Bariven S.A. | 1380519 | USD | $26,383 | 21-Dec-15 | 1380519 |
| Dresser Inc | Bariven S.A. | 1380645 | USD | $3,890 | 21-Dec-15 | 1380645 |
| Dresser Inc | Bariven S.A. | 1380647 | USD | $21,852 | 21-Dec-15 | 1380647 |
| Dresser Inc | Bariven S.A. | 1381609 | USD | $23,564 | 29-Dec-15 | 1381609 |
| Dresser Inc | Bariven S.A. | 1380484 | USD | $10,672 | 18-Dec-15 | 1380484 |
| Dresser Inc | Bariven S.A. | 1368883 | USD | $71,812 | 30-Sep-15 | 1368883 |
| Dresser Inc | Bariven S.A. | 1321974 | USD | $77,008 | 11-Dec-14 | 1321974 |
| Dresser Inc | Bariven S.A. | 1336450 | USD | $6,130 | 18-Mar-16 | 1336450 |
| GE Energy Parts International LLC | Bariven S.A. | 9057421 | USD | $6,244,248 | 8-Apr-15 | 9057421 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4424640 | USD | $945 | 6-Oct-14 | 4424640 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4437095 | USD | $9,089 | 23-Sep-15 | 4437095 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4405369 | USD | $110,202 | 30-Jan-14 | 4405369 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4417837 | USD | $1,925 | 30-Jan-14 | 4417837 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4437936 | USD | $23,321 | 14-Oct-15 | 4437936 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4440778 | USD | $30,177 | 5-Jan-16 | 4440778 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4441942 | USD | $59,210 | 18-Feb-16 | 4441942 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4433051 | USD | $11,432 | 19-May-15 | 4433051 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4433867 | USD | $11,390 | 9-Jun-15 | 4433867 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4434921 | USD | $40,956 | 2-Jul-15 | 4434921 |
| GE Infrastructure Sensing, Inc. | Bariven S.A. | 4435241 | USD | $1,926 | 21-Jul-15 | 4435241 |
| GE Inspection Technologies, LP | Bariven S.A. | 4350095720 | USD | $83,210 | 1-Sep-15 | 4350095720 |
| GE Inspection Technologies, LP | Bariven S.A. | 4350043895 | USD | $15,087 | 13-Mar-14 | 4350043895 |
| GE Inspection Technologies, LP | Bariven S.A. | 4350092434 | USD | $84,138 | 31-Jul-15 | 4350092434 |
| GE Inspection Technologies, LP | Bariven S.A. | 4350088309 | USD | $3,286 | 24-Jun-15 | 4350088309 |
| GE Inspection Technologies, LP | Bariven S.A. | 4350107767 | USD | $189,699 | 23-Dec-15 | 4350107767 |
| GE MULTILIN INC | Bariven S.A. | 363907 | USD | $188,000 | 9-Jul-14 | 363907 |
| GE MULTILIN INC | Bariven S.A. | 371444 | USD | $400,150 | 25-Sep-14 | 371444 |
| GE MULTILIN INC | Bariven S.A. | 376622 | USD | $1,036,005 | 22-Nov-14 | 376622 |
| GE MULTILIN INC | Bariven S.A. | 395879 | USD | $48,941 | 2-Jul-15 | 395879 |
| GE MULTILIN INC | Bariven S.A. | 399084 | USD | $5,940 | 19-Aug-15 | 399084 |
| GE MULTILIN INC | Bariven S.A. | 395586 | USD | $25,845 | 27-Jun-15 | 395586 |



| | | | | | | |
|---|---|---|---|---|---|---|
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915383668 | USD | $23,930 | 26-Nov-14 | 915383668 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915382738 | USD | $57,097 | 23-Nov-14 | 915382738 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915383434 | USD | $1,339 | 26-Nov-14 | 915383434 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915503981 | USD | $2,157 | 21-Mar-15 | 915503981 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915502710 | USD | $19,436 | 31-Mar-15 | 915502710 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915502712 | USD | $4,739 | 31-Mar-15 | 915502712 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915503804 | USD | $2,844 | 31-Mar-15 | 915503804 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915413850 | USD | $5,809 | 2-Mar-16 | 915413850 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915413848 | USD | $4,562 | 2-Mar-16 | 915413848 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915413851 | USD | $2,904 | 2-Mar-16 | 915413851 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915413842 | USD | $4,334 | 2-Mar-16 | 915413842 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915443518 | USD | $8,292 | 2-Mar-16 | 915443518 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915413846 | USD | $1,458 | 2-Mar-16 | 915413846 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915397075 | USD | $18,750 | 2-Mar-16 | 915397075 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915504047 | USD | $15,795 | 31-Mar-15 | 915504047 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915416689 | USD | $208,846 | 19-Feb-16 | 915416689 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90776680 | USD | $171,397 | 5-Apr-16 | 90776680 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90633081 | USD | $7,749 | 17-Jun-16 | 90633081 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915416691 | USD | $40,386 | 2-Mar-16 | 915416691 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915502707 | USD | $36,363 | 2-Mar-16 | 915502707 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90646290 | USD | $99,338 | 1-Oct-15 | 90646290 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90632578 | USD | $40,108 | 2-Mar-16 | 90632578 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90645711 | USD | $52,983 | 1-Oct-15 | 90645711 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 91616175 | USD | $86,468 | 30-Jul-14 | 91616175 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 910063742 | USD | $33,725 | 13-Aug-14 | 910063742C |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915411555 | USD | $32,730 | 29-Dec-14 | 915411555 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915409592 | USD | $1,174,235 | 23-Dec-14 | 915409582 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915409579 | USD | $1,174,235 | 23-Dec-14 | 915409579 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915411558 | USD | $1,174,235 | 29-Dec-14 | 915411558 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915500405 | USD | $2,271,276 | 31-Mar-15 | 915500405 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90615209 | USD | $2,904 | 19-May-15 | 90615209 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90641108 | USD | $99,976 | 25-Jun-15 | 90641108 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915469919 | USD | $2,400,000 | 26-Feb-15 | 915469919 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915466403 | USD | $1,200,000 | 24-Feb-15 | 915466403 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915102598 | USD | $385,392 | 30-Nov-14 | 915102598 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915349189 | USD | $3,223 | 25-Oct-14 | 915349189 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915500996 | USD | $908,503 | 31-Mar-15 | 915500996 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644645 | USD | $5,411,681 | 30-Jun-15 | 90644645 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915504084 | USD | $255,121 | 31-Mar-15 | 915504084 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915085304 | USD | $746,118 | 1-Oct-15 | 915085304 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915119754 | USD | $4,698 | 1-Oct-15 | 915119754 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915119798 | USD | $26,687 | 1-Oct-15 | 915119798 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 910107576 | USD | $314,047 | 1-Oct-15 | 910107576 |

Annex I-8



| | | | | | | |
|---|---|---|---|---|---|---|
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915119523 | USD | $69,012 | 1-Oct-15 | 915119523 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915232663 | USD | $12,856 | 1-Oct-15 | 915232663 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915415151 | USD | $77,504 | 1-Oct-15 | 915415151 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915156152 | USD | $309,374 | 1-Oct-15 | 915156152 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915119516 | USD | $4,335 | 1-Oct-15 | 915119516 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915119755 | USD | $3,883 | 1-Oct-15 | 915119755 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90632580 | USD | $489,590 | 1-Oct-16 | 90632580 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644648 | USD | $133,550 | 1-Oct-15 | 90644648 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915155454 | USD | $198,400 | 1-Oct-15 | 915155454 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915119515 | USD | $43,106 | 1-Oct-15 | 915119515 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915119513 | USD | $96,330 | 1-Oct-15 | 915119513 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738393 | USD | $525,847 | 28-Dec-15 | 90738393 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738910 | USD | $135,593 | 29-Dec-15 | 90738910 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738178 | USD | $14,521 | 28-Dec-15 | 90738178 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738175 | USD | $26,823 | 28-Dec-15 | 90738175 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90736039 | USD | $319,026 | 21-Dec-15 | 90736039 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739480 | USD | $81,190 | 30-Dec-15 | 90739480 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739557 | USD | $602,066 | 30-Dec-15 | 90739557 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90648264 | USD | $63,389 | 1-Oct-15 | 90648264 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915174996 | USD | $27,448 | 1-Oct-15 | 915174996 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915210409 | USD | $69,546 | 1-Oct-15 | 915210409 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90643985 | USD | $315,174 | 1-Oct-15 | 90643985 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739488 | USD | $97,874 | 30-Dec-15 | 90739488 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739489 | USD | $125,768 | 30-Dec-15 | 90739489 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90641109 | USD | $173,311 | 25-Jun-15 | 90641109 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90707343 | USD | $702 | 27-Oct-15 | 90707343 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644956 | USD | $89,627 | 30-Jun-15 | 90644956 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90707345 | USD | $7,322 | 27-Oct-15 | 90707345 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915504088 | USD | $381,975 | 19-Feb-16 | 915504088 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90736882 | USD | $402,436 | 19-Feb-16 | 90736882 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739487 | USD | $1,526,882 | 19-Feb-15 | 90739487 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738394 | USD | $225,605 | 19-Feb-16 | 90738394 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739486 | USD | $39,055 | 19-Feb-16 | 90739486 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738482 | USD | $73,141 | 19-Feb-16 | 90739482 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738395 | USD | $22,047 | 12-Feb-16 | 90738395 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738176 | USD | $46,515 | 19-Feb-16 | 90738176 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738179 | USD | $12,095 | 19-Feb-16 | 90738179 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738911 | USD | $202,368 | 19-Feb-16 | 90738911 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739484 | USD | $255,329 | 19-Feb-16 | 90739484 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915503844 | USD | $169,404 | 19-Feb-16 | 915503844 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90756487 | USD | $36,577 | 11-Feb-16 | 90756487 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738555 | USD | $6,963 | 30-Dec-15 | 90739555 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90641110 | USD | $114,799 | 25-Feb-16 | 90641110 |

Annex I-9



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644740 | USD | $293,271 | 25-Feb-16 | 90644740 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739478 | USD | $254,384 | 25-Feb-16 | 90739478 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915419950 | USD | $264,490 | 3-Mar-16 | 915419950 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90627994 | USD | $106,565 | 3-Mar-16 | 90627994 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90758746 | USD | $315,554 | 18-Feb-16 | 90758746 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90758747 | USD | $145,082 | 18-Feb-16 | 90758747 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738177 | USD | $68,543 | 2-Mar-16 | 90738177 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915419079 | USD | $417,519 | 2-Mar-16 | 915419079 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915502720 | USD | $107,959 | 2-Mar-16 | 915502720 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739726 | USD | $172,474 | 2-Mar-16 | 90739726 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644647 | USD | $79,225 | 2-Mar-16 | 90644647 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915418987 | USD | $148,290 | 2-Mar-16 | 915418987 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90650892 | USD | $42,645 | 19-Feb-16 | 90650892 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739554 | USD | $70,920 | 25-Feb-16 | 90739554 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739481 | USD | $2,957 | 25-Feb-16 | 90739481 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90645710 | USD | $38,694 | 19-Feb-16 | 90645710 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644651 | USD | $276,608 | 19-Feb-16 | 90644651 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739483 | USD | $102,601 | 25-Feb-16 | 90739483 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644649 | USD | $113,676 | 19-Feb-16 | 90644649 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644955 | USD | $255,291 | 25-Feb-16 | 90644955 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90645793 | USD | $39,965 | 25-Feb-16 | 90645793 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90645442 | USD | $37,551 | 25-Feb-16 | 90645442 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90706728 | USD | $28 | 19-Feb-16 | 90706728 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90627953 | USD | $107,456 | 19-Feb-16 | 90627953 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915503644 | USD | $20 | 19-Feb-16 | 915503644 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915503979 | USD | $8,292 | 19-Feb-16 | 915503979 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915503958 | USD | $21,997 | 19-Feb-16 | 915503958 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739485 | USD | $140,200 | 19-Feb-16 | 90739485 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644954 | USD | $507,514 | 19-Feb-16 | 90644954 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915492006 | USD | $30,068 | 19-Feb-16 | 915492006 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644742 | USD | $92,675 | 19-Feb-16 | 90644742 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90615210 | USD | $4,495 | 19-Feb-16 | 90615210 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90707344 | USD | $24,521 | 19-Feb-16 | 90707344 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644653 | USD | $405,017 | 19-Feb-16 | 90644653 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915500406 | USD | $422,578 | 19-Feb-16 | 915500406 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644650 | USD | $239,956 | 19-Feb-16 | 90644650 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90643987 | USD | $163,860 | 19-Feb-16 | 90643987 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90739556 | USD | $598,943 | 2-Mar-16 | 90739556 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915503980 | USD | $16,010 | 2-Mar-16 | 915503980 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90645696 | USD | $17,556 | 2-Mar-16 | 90645696 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915502748 | USD | $9,807 | 2-Mar-16 | 915502748 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915413885 | USD | $15,069 | 2-Mar-16 | 915413885 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915102599 | USD | $86,695 | 2-Feb-16 | 915102599 |

Annex I-10



| | | | | | | |
|---|---|---|---|---|---|---|
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738558 | USD | $69,423 | 6-Apr-16 | 90738558 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 91502742 | USD | $20,403 | 2-Dec-13 | 91502742 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915414372 | USD | $115,124 | 30-Dec-14 | 915414372 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915504089 | USD | $15,537 | 31-Mar-15 | 915504089 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915502713 | USD | $419,351 | 31-Mar-15 | 915502713 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915498513 | USD | $80,177 | 30-Mar-15 | 915498513 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915119466-A | USD | $337,500 | 4-Sep-15 | 915119466-A |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915119466 | USD | $1,723,100 | 4-Sep-15 | 915119466-B |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915066239 | USD | $356,047 | 1-Oct-15 | 915066239 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915055870 | USD | $99,103 | 1-Oct-15 | 915055870 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 91537899 | USD | $49,809 | 1-Oct-15 | 91537899 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915100747 | USD | $31,227 | 1-Oct-15 | 915100747 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 910086830 | USD | $42,790 | 1-Oct-15 | 910086830 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915409424 | USD | $15,314 | 1-Oct-15 | 915409424 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915085305 | USD | $9,187 | 1-Oct-15 | 915085305R |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90646289 | USD | $15,248 | 1-Oct-15 | 90646289 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90645443 | USD | $101,471 | 1-Oct-15 | 90645443 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915260590 | USD | $44,938 | 1-Oct-15 | 915260590 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915230012 | USD | $96,422 | 1-Oct-15 | 915230012 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915414375 | USD | $130,289 | 30-Dec-14 | 915414375 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90643986 | USD | $106,939 | 29-Jun-15 | 90643986 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915415136 | USD | $171,045 | 1-Oct-15 | 915415136 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644739 | USD | $146,929 | 30-Jun-15 | 90644739 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644741 | USD | $122,902 | 19-Feb-16 | 90644741 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915503841 | USD | $1,497 | 19-Feb-16 | 915503841 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915414370 | USD | $51,300 | 25-Feb-16 | 915414370 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915418243 | USD | $12,695 | 25-Feb-16 | 915418243 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915409423 | USD | $11,837 | 25-Feb-16 | 915409423 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915414337 | USD | $1,389 | 25-Feb-16 | 915414337 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915503645 | USD | $61,475 | 25-Feb-16 | 915503645 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915414373 | USD | $4,089 | 25-Feb-16 | 915414373 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90627952 | USD | $21,242 | 25-Feb-16 | 90627952 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90646273 | USD | $4,340 | 25-Feb-16 | 90646273 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90738909 | USD | $276,767 | 25-Feb-16 | 90738909 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915418496 | USD | $14,098 | 3-Mar-16 | 915418496 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915414335 | USD | $141,666 | 1-Oct-15 | 915414335 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90646288 | USD | $26,735 | 19-Feb-16 | 90646288 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915414333 | USD | $108,269 | 2-Mar-15 | 915414333 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90643988 | USD | $184,652 | 2-Mar-16 | 90643988 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915502747 | USD | $39,030 | 19-Feb-16 | 915502747 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 915035301 | USD | $86,462 | 8-Mar-16 | 915035301 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90627954 | USD | $20,460 | 14-Mar-16 | 90627954 |
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644646 | USD | $29,279 | 14-Mar-16 | 90644646 |

Annex I-11



| | | | | | | |
|---|---|---|---|---|---|---|
| GE Oil & Gas Compression Systems, L | Bariven S.A. | 90644738 | USD | $284,955 | 14-Mar-15 | 90644738 |
| GE Oil & Gas, Inc. | Bariven S.A. | 500108836 | USD | $5,159 | 27-Dec-12 | 500108836 |
| GE Oil & Gas, Inc. | Bariven S.A. | 500108516 | USD | $64,822 | 14-Dec-12 | 500108516 |
| GE Oil & Gas, Inc. | Bariven S.A. | 500108498 | USD | $520,339 | 14-Dec-12 | 500108498 |
| GE Oil & Gas, Inc. | Bariven S.A. | 500109458 | USD | $29,686 | 18-Jan-13 | 500109458 |
| GE Oil & Gas, Inc. | Bariven S.A. | 510018433 | USD | $100 | 28-May-14 | 510018433 |
| GE Sensing &Inspection Technologies | Bariven S.A. | 4100056443 | EUR | € 495,200 | 5-May-15 | 4100056443 |
| GE SENSING EMEA | Bariven S.A. | 160078 | EUR | € 63,093 | 10-Oct-14 | 160078 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015007436 | EUR | € 27,030 | 27-Apr-15 | 2015007436 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015012362 | EUR | € 97,940 | 28-Jun-15 | 2015012362 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025161 | EUR | € 27,629 | 24-Dec-15 | 2015025161 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015012314 | EUR | € 197,580 | 27-Jun-15 | 2015012314 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015012359 | EUR | € 188,555 | 28-Jun-15 | 2015012359 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013521 | EUR | € 241,907 | 22-Jul-15 | 2015013521 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023590 | EUR | € 255,325 | 15-Dec-15 | 2015023590 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005871 | EUR | € 172,450 | 27-Mar-15 | 2015005871 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015012329 | EUR | € 197,680 | 27-Jun-15 | 2015012329 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025162 | EUR | € 7,938 | 24-Dec-15 | 2015025162 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2016018081 | EUR | € 349,773 | 28-Sep-15 | 2016018081 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005245 | EUR | € 724,463 | 24-Mar-15 | 2015005245 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005999 | EUR | € 351,471 | 23-Mar-15 | 2015005999 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005775 | EUR | € 5,750 | 27-Mar-15 | 2015005775 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004805 | EUR | € 41,376 | 20-Mar-15 | 2015004805 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015008981 | EUR | € 2,748 | 26-Mar-15 | 2015008981 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010115 | EUR | € 54,292 | 9-Jun-15 | 2015010115 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011535 | EUR | € 134,178 | 22-Jun-15 | 2015011535 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015009929 | EUR | € 709 | 8-Jun-15 | 2015009929 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023302 | EUR | € 125,942 | 10-Dec-15 | 2015023302 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023339 | EUR | € 30,665 | 10-Dec-15 | 2015023339 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023579 | EUR | € 18,457 | 15-Dec-15 | 2015023579 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023573 | EUR | € 6,269 | 12-Dec-15 | 2015023573 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 19556 | EUR | € 64,850 | 8-Oct-14 | 19556 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003376 | EUR | € 107,904 | 5-Mar-15 | 2015003376 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003604 | EUR | € 32,688 | 9-Mar-15 | 2015003604 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003394 | EUR | € 62,715 | 5-Mar-15 | 2015003394 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004627 | EUR | € 173,570 | 19-Mar-15 | 2015004627 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004530 | EUR | € 96,557 | 18-Mar-15 | 2015004530 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003323 | EUR | € 43,441 | 5-Mar-15 | 2015003323 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005613 | EUR | € 37,847 | 26-Mar-15 | 2015005613 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005612 | EUR | € 274,266 | 26-Mar-15 | 2015005612 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004871 | EUR | € 120,362 | 20-Mar-15 | 2015004871 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005061 | EUR | € 115,088 | 23-Mar-15 | 2015005061 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005610 | EUR | € 22,202 | 26-Mar-15 | 2015005610 |

Annex I-12

| | | | | | | |
|---|---|---|---|---|---|---|
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004870 | EUR | € 62,600 | 20-Mar-15 | 2015004870 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003934 | EUR | € 4,551 | 12-Mar-15 | 2015003934 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005182 | EUR | € 288,174 | 24-Mar-15 | 2015005182 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005177 | EUR | € 3,931 | 24-Mar-15 | 2015005177 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010213 | EUR | € 53,117 | 10-Jun-15 | 2015010213 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011428 | EUR | € 11,195 | 22-Jun-15 | 2015011428 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010474 | EUR | € 43,928 | 12-Jun-15 | 2015010474 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010113 | EUR | € 17,610 | 9-Jun-15 | 2015010113 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010114 | EUR | € 33,512 | 9-Jun-15 | 2015010114 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010211 | EUR | € 44,015 | 10-Jun-15 | 2015010211 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011784 | EUR | € 78,255 | 24-Jun-15 | 2015011784 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010469 | EUR | € 23,707 | 12-Jun-15 | 2015010469 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015007246 | EUR | € 8,460,000 | 23-Apr-15 | 2015007246 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011457 | EUR | € 33,836 | 22-Jun-15 | 2015011457 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015007544 | EUR | € 2,600,000 | 30-Apr-15 | 2015007544 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013276 | EUR | € 71,248 | 16-Jul-15 | 2015013276 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013296 | EUR | € 23,604 | 16-Jul-15 | 2015013296 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013544 | EUR | € 90,973 | 22-Jul-15 | 2015013544 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017528 | EUR | € 93,491 | 24-Sep-15 | 2015017528 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017428 | EUR | € 32,936 | 23-Sep-15 | 2015017428 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016570 | EUR | € 17,659 | 16-Sep-15 | 2015016570 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015014760 | EUR | € 736,001 | 25-Aug-15 | 2015014760 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015018200 | EUR | € 1,050,014 | 29-Sep-15 | 2015018200 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015018169 | EUR | € 1,787,528 | 29-Sep-15 | 2015018169 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017812 | EUR | € 2,889 | 26-Sep-15 | 2015017812 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015070819 | EUR | € 2,671,761 | 7-Oct-15 | 2015070819 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013550 | EUR | € 36,081 | 22-Jul-15 | 2015013550 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016246 | EUR | € 376,032 | 11-Sep-15 | 2015016246 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010111 | EUR | € 156,570 | 9-Jun-15 | 2015010111 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016859 | EUR | € 489,969 | 18-Sep-15 | 2015016859 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015015822 | EUR | € 181,820 | 8-Sep-15 | 2015015822 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013634 | EUR | € 39,978 | 24-Jul-15 | 2015013634 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011262 | EUR | € 108,794 | 19-Jun-15 | 2015011262 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011665 | EUR | € 60,781 | 23-Jun-15 | 2015011665 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016316 | EUR | € 10,455 | 14-Sep-15 | 2015016316 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017733 | EUR | € 961,336 | 25-Sep-15 | 2015017733 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017734 | EUR | € 207,315 | 25-Sep-15 | 2015017734 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017602 | EUR | € 1,724,984 | 24-Sep-15 | 2015017602 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017570 | EUR | € 3,323,403 | 24-Sep-15 | 2015017570 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013263 | EUR | € 108,899 | 16-Jul-15 | 2015013263 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015081084 | EUR | € 437,704 | 28-Nov-15 | 2015081084 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015081083 | EUR | € 81,613 | 28-Nov-15 | 2015081083 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015081082 | EUR | € 281,766 | 28-Nov-15 | 2015081082 |

Annex I-13

| | | | | | | |
|---|---|---|---|---|---|---|
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024204 | EUR | € 17,200 | 17-Dec-15 | 2015024204 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023938 | EUR | € 66,095 | 15-Dec-15 | 2015023938 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023937 | EUR | € 110,224 | 15-Dec-15 | 2015023937 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023578 | EUR | € 13,970 | 15-Dec-15 | 2015023578 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023574 | EUR | € 41,894 | 15-Dec-15 | 2015023574 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023589 | EUR | € 10,391 | 15-Dec-15 | 2015023589 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023585 | EUR | € 115,000 | 15-Dec-15 | 2015023585 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023511 | EUR | € 151,497 | 11-Dec-15 | 2015023511 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024267 | EUR | € 117,313 | 7-Jan-16 | 2015024267 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024106 | EUR | € 89,906 | 16-Dec-15 | 2015024106 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024399 | EUR | € 40,431 | 18-Dec-15 | 2015024399 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025081 | EUR | € 72,234 | 7-Jan-16 | 2015025081 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015022813 | EUR | € 543,075 | 4-Dec-15 | 2015022813 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024670 | EUR | € 59,609 | 21-Dec-15 | 2015024670 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024850 | EUR | € 239,230 | 22-Dec-15 | 2015024850 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025698 | EUR | € 65,712 | 30-Dec-15 | 2015025698 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023541 | EUR | € 36,081 | 12-Dec-15 | 2015023541 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015022876 | EUR | € 150,774 | 4-Dec-15 | 2015022876 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024087 | EUR | € 801,931 | 16-Dec-15 | 2015024087 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015022816 | EUR | € 281,398 | 4-Dec-15 | 2015022816 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017537 | EUR | € 172,107 | 24-Sep-15 | 2015017537 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017185 | EUR | € 3,838 | 22-Sep-15 | 2015017185 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015015849 | EUR | € 28,064 | 8-Sep-15 | 2015015849 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015014971 | EUR | € 256 | 28-Aug-15 | 2015014971 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015014954 | EUR | € 2,098 | 28-Aug-15 | 2015014954 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015014849 | EUR | € 33,824 | 26-Aug-15 | 2015014849 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015020143 | EUR | € 44,465 | 4-Nov-15 | 2015020143 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023929 | EUR | € 146,611 | 15-Dec-15 | 2015023929 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024257 | EUR | € 6,395 | 17-Dec-15 | 2015024257 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024279 | EUR | € 256,622 | 17-Dec-15 | 2015024279 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024631 | EUR | € 17,203 | 21-Dec-15 | 2015024631 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024397 | EUR | € 178,810 | 18-Dec-15 | 2015024397 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024638 | EUR | € 18,402 | 21-Dec-15 | 2015024638 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023194 | EUR | € 328,526 | 10-Dec-15 | 2015023194 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025121 | EUR | € 558,318 | 24-Dec-15 | 2015025121 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024173 | EUR | € 4,703 | 17-Dec-15 | 2015024173 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015020070 | EUR | € 71,467 | 4-Nov-15 | 2015020070 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015021192 | EUR | € 88,738 | 16-Nov-15 | 2015021192 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003404 | EUR | € 58,540 | 5-Jun-15 | 2015003404 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015012620 | EUR | € 84,960 | 30-Jun-15 | 2015012620 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015018136 | EUR | € 194,110 | 29-Sep-15 | 2015018136 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015070585 | EUR | € 2,275,525 | 30-Jun-16 | 2015070585 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015006251 | EUR | € 2,505,788 | 31-Mar-15 | 2015006251 |

Annex I-14



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015070586 | EUR | € 338,620 | 30-Jun-15 | 2015070586 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015014831 | EUR | € 180,930 | 26-Aug-15 | 2015014831 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2016070193 | EUR | € 723,720 | 30-Mar-16 | 2016070193 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015018358 | EUR | € 723,720 | 30-Sep-15 | 2015018358 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 23546 | EUR | € 171,345 | 11-Dec-14 | 23546 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 24852 | EUR | € 33,610 | 22-Dec-14 | 24852 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 24853 | EUR | € 130,112 | 22-Dec-14 | 24853 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015000001 | EUR | € 1,090,000 | 7-Jan-15 | 2015000001 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 18995 | EUR | € 86,057 | 27-Sep-14 | 18995 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 18993 | EUR | € 140,272 | 27-Sep-14 | 18993 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003141 | EUR | € 178,918 | 5-Mar-15 | 2015003141 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003442 | EUR | € 55,174 | 6-Mar-15 | 2015003442 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004615 | EUR | € 1,306,972 | 19-Mar-15 | 2015004615 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003592 | EUR | € 264,042 | 9-Mar-15 | 2015003592 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004096 | EUR | € 321,368 | 13-Mar-15 | 2015004096 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004067 | EUR | € 91,752 | 13-Mar-15 | 2015004067 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004068 | EUR | € 2,959 | 13-Mar-15 | 2015004068 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004256 | EUR | € 107,644 | 16-Mar-15 | 2015004256 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015004826 | EUR | € 316,528 | 19-Mar-15 | 2015004826 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015003182 | EUR | € 189,149 | 3-Mar-15 | 2015003182 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005594 | EUR | € 519,190 | 26-Mar-15 | 2015005594 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005332 | EUR | € 460,790 | 25-Mar-15 | 2015005332 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015006249 | EUR | € 1,461,276 | 31-Mar-15 | 2015006249 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005119 | EUR | € 71,831 | 24-Mar-15 | 2015005119 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005624 | EUR | € 111,404 | 26-Mar-15 | 2015005624 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015005651 | EUR | € 1,009,745 | 26-Mar-15 | 2015005651 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011034 | EUR | € 179,402 | 18-Jun-15 | 2015011034 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010473 | EUR | € 1,024 | 12-Jun-15 | 2015010473 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011062 | EUR | € 26,602 | 18-Jun-15 | 2015011062 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010736 | EUR | € 174,050 | 18-Jun-15 | 2015010736 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010702 | EUR | € 2,511 | 15-Jun-15 | 2015010702 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010735 | EUR | € 203,172 | 16-Jun-15 | 2015010735 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010471 | EUR | € 406,411 | 12-Jun-15 | 2015010471 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010209 | EUR | € 930,999 | 10-Jun-15 | 2015010209 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011234 | EUR | € 160,111 | 19-Jun-15 | 2015011234 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011197 | EUR | € 162,076 | 19-Jun-15 | 2015011197 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011419 | EUR | € 284,043 | 22-Jun-15 | 2015011419 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011427 | EUR | € 46,010 | 22-Jun-15 | 2015011427 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011321 | EUR | € 170,873 | 20-Jun-15 | 2015011321 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011785 | EUR | € 730,883 | 24-Jun-15 | 2015011785 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015012394 | EUR | € 1,045,483 | 29-Jun-15 | 2015012394 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011933 | EUR | € 416,404 | 25-Jun-15 | 2015011933 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011167 | EUR | € 300,525 | 18-Jun-15 | 2015011167 |

Annex I-15



| | | | | | | |
|---|---|---|---|---|---|---|
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010747 | EUR | € 80,497 | 16-Jun-15 | 2015010747 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010737 | EUR | € 590,724 | 16-Jun-15 | 2015010737 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010639 | EUR | € 87,566 | 15-Jun-15 | 2015010639 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010638 | EUR | € 39,051 | 15-Jun-15 | 2015010638 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010462 | EUR | € 26,285 | 12-Jun-15 | 2015010462 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015000283 | EUR | € 250,980 | 15-Jan-15 | 2015000283 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013287 | EUR | € 107,218 | 16-Jul-15 | 2015013287 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013535 | EUR | € 41,508 | 24-Jul-15 | 2015013535 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016314 | EUR | € 25,819 | 14-Sep-15 | 2015016314 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016216 | EUR | € 175,675 | 11-Sep-15 | 2015016216 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015015835 | EUR | € 154,864 | 8-Sep-15 | 2015015835 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015010494 | EUR | € 30,375 | 12-Jun-15 | 2015010494 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013286 | EUR | € 43,167 | 16-Jul-15 | 2015013286 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013329 | EUR | € 64,175 | 17-Jul-15 | 2015013329 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017421 | EUR | € 16,783 | 23-Sep-15 | 2015017421 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017177 | EUR | € 214,579 | 22-Sep-15 | 2015017177 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016188 | EUR | € 629,030 | 11-Sep-15 | 2015016188 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013942 | EUR | € 12,124 | 3-Aug-15 | 2015013942 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015015806 | EUR | € 38,178 | 8-Sep-15 | 2015015806 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015015807 | EUR | € 98,150 | 8-Sep-15 | 2015015807 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016675 | EUR | € 323,018 | 17-Sep-15 | 2015016675 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016756 | EUR | € 159,755 | 17-Sep-15 | 2015016756 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015017507 | EUR | € 974,184 | 24-Sep-15 | 2015017507 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015014973 | EUR | € 33,024 | 28-Aug-15 | 2015014973 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013679 | EUR | € 101,388 | 27-Jul-15 | 2015013679 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013477 | EUR | € 27,307 | 21-Jul-15 | 2015013477 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013264 | EUR | € 284,810 | 16-Jul-15 | 2015013264 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015013825 | EUR | € 235,410 | 30-Jul-15 | 2015013825 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016550 | EUR | € 71,130 | 15-Sep-15 | 2015016550 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015020023 | EUR | € 15,618 | 3-Nov-15 | 2015020023 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025570 | EUR | € 697,273 | 30-Dec-15 | 2015025570 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025122 | EUR | € 404,146 | 24-Dec-15 | 2015025122 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023927 | EUR | € 95,353 | 15-Dec-15 | 2015023927 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023334 | EUR | € 373,883 | 10-Dec-15 | 2015023334 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025626 | EUR | € 232,862 | 30-Dec-15 | 2015025626 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025627 | EUR | € 139,948 | 30-Dec-15 | 2015025627 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024656 | EUR | € 120,388 | 21-Dec-15 | 2015024656 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024655 | EUR | € 57,657 | 21-Dec-15 | 2015024655 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024105 | EUR | € 328,429 | 16-Dec-15 | 2015024105 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015016459 | EUR | € 306,679 | 15-Sep-15 | 2015016459 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023560 | EUR | € 55,084 | 12-Dec-15 | 2015023560 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023553 | EUR | € 55,031 | 12-Dec-15 | 2015023553 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023542 | EUR | € 46,218 | 12-Dec-15 | 2015023542 |

Annex I-16



| | | | | | | |
|---|---|---|---|---|---|---|
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023138 | EUR | € 208,430 | 10-Dec-15 | 2015023138 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015023059 | EUR | € 170,582 | 9-Dec-15 | 2015023059 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015022893 | EUR | € 63,743 | 4-Dec-15 | 2015022893 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015022892 | EUR | € 8,263 | 4-Dec-15 | 2015022892 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024669 | EUR | € 16,459 | 21-Dec-15 | 2015024669 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015022865 | EUR | € 18,585 | 4-Dec-15 | 2015022865 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024203 | EUR | € 207,706 | 17-Dec-15 | 2015024203 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024193 | EUR | € 28,219 | 17-Dec-15 | 2015024193 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024258 | EUR | € 66,764 | 17-Dec-15 | 2015024258 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024263 | EUR | € 85,730 | 17-Dec-15 | 2015024263 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015022806 | EUR | € 329,274 | 4-Dec-15 | 2015022806 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015024654 | EUR | € 494,585 | 21-Dec-15 | 2015024654 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015011048 | EUR | € 62,100 | 18-Jun-15 | 2015011048 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2016005805 | EUR | € 177,075 | 24-Mar-16 | 2016005805 |
| NUOVO PIGNONE S.p.A. | Bariven S.A. | 2015025491 | USD | $506,258 | 7-Aug-15 | 2015025491 |
| Vetco Gray Inc. | Bariven S.A. | 10072601 | USD | $859,540 | 25-Jun-15 | 10072601 |
| Vetco Gray Inc. | Bariven S.A. | 10069150 | USD | $426,564 | 20-Dec-14 | 10069150 |
| Vatco Gray Inc. | Bariven S.A. | 10069849 | USD | $947,920 | 15-Aug-14 | 10069849 |
| Vetco Gray Inc. | Bariven S.A. | 10072639 | USD | $701,216 | 26-Jun-15 | 10072639 |
| Vetco Gray Inc. | Bariven S.A. | 10073926 | USD | $374,625 | 25-Sep-15 | 10073926 |
| Vatco Gray Inc. | Bariven S.A. | 10073383 | USD | $2,248,964 | 31-Aug-15 | 10073383 |
| Vetco Gray Inc. | Bariven S.A. | 10069850 | USD | $389,800 | 28-Jan-15 | 10069850 |
| Vetco Gray Inc. | Bariven S.A. | 10070846 | USD | $947,920 | 25-Mar-15 | 10070846 |
| Vetco Gray Inc. | Bariven S.A. | 10070830 | USD | $758,336 | 24-Mar-15 | 10070830 |
| Vetco Gray Inc. | Bariven S.A. | 10072640 | USD | $829,430 | 26-Jun-15 | 10072640 |
| Vetco Gray Inc. | Bariven S.A. | 10072641 | USD | $568,752 | 26-Jun-15 | 10072641 |
| Wellstream International Limited | Bariven S.A. | 10081 | USD | $23,685,912 | 5-Jun-15 | 10081 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 18804 | USD | $0 | 13-Jan-14 | M-18804 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 18896 | USD | $2,408 | 30-Jan-14 | M-18896 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19832 | USD | $161,230 | 6-Jan-15 | M-19832 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19834 | USD | $3,132 | 8-Jan-15 | M-19834 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19837 | USD | $186,238 | 8-Jan-15 | M-19837 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19841 | USD | $7,544 | 8-Jan-15 | M-19841 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19879 | USD | $879 | 26-Jan-15 | M-19879 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19907 | USD | $214 | 2-Feb-15 | M-19907 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19921 | USD | $65,127 | 24-Feb-15 | M-19921 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19866 | USD | $98,301 | 26-Jan-15 | M-19866 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19868 | USD | $134,910 | 26-Jan-15 | M-19868 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19925 | USD | $87,120 | 24-Feb-15 | M-19925 |
| CORPORACION ESP VENEZUELA. | PDVSA | 19874 | USD | $809 | 26-Jan-15 | M-19874 |



| C.A. | PETRÓLEO | | | | | |
|---|---|---|---|---|---|---|
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19872 | USD | $3,772 | 26-Jan-15 | M-19872 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19870 | USD | $3,772 | 26-Jan-15 | M-19870 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19923 | USD | $203,544 | 24-Feb-15 | M-19923 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19876 | USD | $7,260 | 26-Jan-15 | M-19876 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20001 | USD | $112,142 | 9-Mar-15 | M-20001 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19937 | USD | $1,035 | 24-Feb-15 | M-19937 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19939 | USD | $2 | 24-Feb-15 | M-19939 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19948 | USD | $102,896 | 24-Feb-15 | M-19948 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20006 | USD | $4,815 | 9-Mar-15 | M-20006 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20003 | USD | $41,488 | 9-Mar-15 | M-20003 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19950 | USD | $7,260 | 24-Feb-15 | M-19950 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20035 | USD | $252 | 24-Mar-15 | M-20035 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20037 | USD | $252 | 24-Mar-15 | M-20037 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20040 | USD | $85,355 | 24-Mar-15 | M-20040 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20056 | USD | $157,502 | 24-Mar-15 | M-20056 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19931 | USD | $140,154 | 24-Feb-15 | M-19931 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19935 | USD | $7,260 | 24-Feb-14 | M-19935 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19896 | USD | $7,260 | 27-Jan-15 | M-19896 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20086 | USD | $6,236 | 7-Apr-15 | M-20086 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20046 | USD | $28,489 | 24-Mar-15 | M-20046 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20044 | USD | $56,597 | 24-Mar-15 | M-20044 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20051 | USD | $88,695 | 24-Mar-15 | M-20051 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19933 | USD | $73,331 | 24-Feb-15 | M-19933 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20042 | USD | $1,100 | 24-Mar-15 | M-20042 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20059 | USD | $7,260 | 24-Mar-15 | M-20059 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20057 | USD | $273 | 24-Mar-15 | M-20057 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20053 | USD | $182 | 24-Mar-15 | M-20053 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 19929 | USD | $263 | 24-Feb-15 | M-19929 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20118 | USD | $60,983 | 24-Apr-15 | M-20118 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20116 | USD | $19,591 | 24-Apr-15 | M-20116 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20114 | USD | $87,623 | 24-Apr-15 | M-20114 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20120 | USD | $22,234 | 24-Apr-15 | M-20120 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20123 | USD | $3,830 | 24-Apr-15 | M-20123 |

Annex I-18



| | | | | | | |
|---|---|---|---|---|---|---|
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20048 | USD | $7,260 | 24-Mar-15 | M-20048 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20096 | USD | $82,516 | 23-Apr-15 | M-20096 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20107 | USD | $155,099 | 23-Apr-15 | M-20107 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20112 | USD | $23,785 | 23-Apr-15 | M-20112 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20104 | USD | $176,058 | 23-Apr-15 | M-20104 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20102 | USD | $86,042 | 23-Apr-15 | M-20102 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20100 | USD | $227,478 | 23-Apr-15 | M-20100 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20188 | USD | $223,055 | 25-May-15 | M-20188 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20150 | USD | $3,412 | 27-Apr-15 | M-20150 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20187 | USD | $9,786 | 22-May-15 | M-20187 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20192 | USD | $158,568 | 25-May-15 | M-20192 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20156 | USD | $27,563 | 27-Apr-15 | M-20156 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20152 | USD | $5,119 | 27-Apr-15 | M-20152 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20200 | USD | $53,796 | 25-May-15 | M-20200 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20238 | USD | $17,041 | 3-Jun-15 | M-20238 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20217 | USD | $306 | 25-May-15 | M-20217 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20266 | USD | $142,910 | 18-Jun-15 | M-20266 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20270 | USD | $8,786 | 18-Jun-15 | M-20270 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20272 | USD | $66,278 | 18-Jun-15 | M-20272 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20219 | USD | $22,028 | 25-May-15 | M-20219 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20327 | USD | $60,296 | 9-Jul-15 | M-20327 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20279 | USD | $86,274 | 22-Jun-15 | M-20279 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20281 | USD | $102,387 | 22-Jun-15 | M-20281 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20268 | USD | $36,825 | 18-Jun-15 | M-20268 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20317 | USD | $7,373 | 23-Jun-15 | M-20317 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20450 | USD | $1,279,940 | 8-Oct-15 | M-20450 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | 20277 | USD | $22,678 | 22-Jun-15 | M-20277 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | Fact x Imprimir 38 | USD | $1,099 | 19-Mar-16 | M-20545 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | Fact x Imprimir 54 | USD | $87,035 | 22-Mar-16 | M-20555 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | Fact x Imprimir 36 | USD | $2,198 | 19-Mar-16 | M-20526 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | Fact x Imprimir 01 | USD | $1,099 | 19-Mar-16 | M-20530 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | Fact x Imprimir 52 | USD | $129,521 | 19-Mar-16 | M-20534 |
| CORPORACION ESP VENEZUELA, C.A. | PDVSA PETRÓLEO | Fact x Imprimir 08 | USD | $2,198 | 19-Mar-16 | M-20543 |
| GE OIL & GAS LOGGING SERVICES, | PDVSA | 17463 | USD | $70,200 | 2-Feb-15 | 17453 |

Annex I-19



| | C.A | PETRÓLEO | | | | | |
|---|---|---|---|---|---|---|---|
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17461 | USD | $90,240 | 2-Feb-15 | 17461 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17463 | USD | $130,763 | 2-Feb-15 | 17463 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17459 | USD | $60,004 | 2-Feb-15 | 17459 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17457 | USD | $125,739 | 2-Feb-15 | 17457 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17465 | USD | $60,180 | 4-Feb-15 | 17465 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17478 | USD | $204,074 | 20-Feb-15 | 17478 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17476 | USD | $70,200 | 20-Feb-15 | 17476 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17470 | USD | $170,583 | 20-Feb-15 | 17470 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17472 | USD | $89,400 | 20-Feb-15 | 17472 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17474 | USD | $132,300 | 20-Feb-15 | 17474 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17501 | USD | $25,500 | 10-Mar-15 | 17501 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17499 | USD | $67,200 | 10-Mar-15 | 17499 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17503 | USD | $140,151 | 10-Mar-15 | 17503 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17511 | USD | $62,100 | 13-Mar-15 | 17511 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17497 | USD | $3,216 | 4-Mar-15 | 17497 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17495 | USD | $4,125 | 4-Mar-15 | 17495 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17493 | USD | $8,063 | 4-Mar-15 | 17493 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17491 | USD | $388,789 | 4-Mar-15 | 17491 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17489 | USD | $18,371 | 4-Mar-15 | 17489 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17487 | USD | $1,588 | 4-Mar-15 | 17487 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17485 | USD | $875 | 4-Mar-15 | 17485 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17483 | USD | $243 | 4-Mar-15 | 17483 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17481 | USD | $5,375 | 4-Mar-15 | 17481 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17505 | USD | $64,920 | 13-Mar-15 | 17505 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17507 | USD | $69,600 | 13-Mar-15 | 17507 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17509 | USD | $61,800 | 13-Mar-15 | 17509 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17516 | USD | $57,458 | 6-Apr-15 | 17516 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17514 | USD | $69,840 | 6-Apr-15 | 17514 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17518 | USD | $69,000 | 10-Apr-15 | 17518 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17520 | USD | $60,000 | 10-Apr-15 | 17520 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17522 | USD | $66,888 | 10-Apr-15 | 17522 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17524 | USD | $70,410 | 10-Apr-15 | 17524 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17526 | USD | $69,594 | 10-Apr-15 | 17526 |

| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17528 | USD | $61,200 | 10-Apr-15 | 17528 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17530 | USD | $66,240 | 10-Apr-15 | 17530 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17532 | USD | $63,300 | 10-Apr-15 | 17532 |
| GE OIL S GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17534 | USD | $61,200 | 10-Apr-15 | 17534 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17545 | USD | $61,200 | 22-Apr-15 | 17545 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17547 | USD | $65,700 | 22-Apr-15 | 17547 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17536 | USD | $25,500 | 17-Apr-15 | 17536 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17538 | USD | $78,600 | 17-Apr-15 | 17538 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17540 | USD | $64,800 | 17-Apr-15 | 17540 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17550 | USD | $63,000 | 27-Apr-15 | 17550 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17552 | USD | $61,200 | 27-Apr-15 | 17552 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17554 | USD | $68,088 | 27-Apr-15 | 17554 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17556 | USD | $81,200 | 27-Apr-15 | 17556 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17558 | USD | $10,200 | 27-Apr-15 | 17558 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17560 | USD | $81,365 | 27-Apr-15 | 17560 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17564 | USD | $70,784 | 6-May-15 | 17564 |
| GE OIL & GAS LOGGING SERVICES. C.A | PDVSA PETRÓLEO | 17562 | USD | $74,730 | 29-Apr-15 | 17562 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17566 | USD | $84,800 | 20-May-15 | 17566 |
| GE OIL & GAS LOGGING SERVICES. C.A | PDVSA PETRÓLEO | 17568 | USD | $61,200 | 20-May-15 | 17568 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17571 | USD | $102,744 | 26-May-15 | 17571 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17573 | USD | $75,456 | 26-May-15 | 17573 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17575 | USD | $67,935 | 8-Jun-15 | 17575 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17577 | USD | $54,320 | 8-Jun-15 | 17577 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17579 | USD | $89,900 | 8-Jun-15 | 17579 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17581 | USD | $61,776 | 8-Jun-15 | 17581 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17583 | USD | $89,600 | 8-Jun-15 | 17583 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17585 | USD | $81,200 | 8-Jun-15 | 17585 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17587 | USD | $89,600 | 8-Jun-15 | 17587 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17589 | USD | $70,600 | 8-Jun-15 | 17589 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17594 | USD | $61,360 | 10-Jun-15 | 17594 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17602 | USD | $10,200 | 25-Jun-15 | 17602 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17597 | USD | $11,160 | 25-Jun-15 | 17597 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17600 | USD | $11,064 | 25-Jun-15 | 17600 |
| GE OIL & GAS LOGGING SERVICES, | PDVSA | 17612 | USD | $10,200 | 15-Jul-15 | 17612 |

Annex I-21



| | | | | | | |
|---|---|---|---|---|---|---|
| C.A | PETRÓLEO | | | | | |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17610 | USD | $16,612 | 15-Jul-15 | 17610 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17608 | USD | $17,256 | 15-Jul-15 | 17608 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17606 | USD | $13,800 | 15-Jul-15 | 17606 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17604 | USD | $3,480 | 15-Jul-15 | 17604 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17614 | USD | $15,000 | 15-Jul-15 | 17614 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17616 | USD | $29,634 | 16-Jul-15 | 17616 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17618 | USD | $10,202 | 16-Jul-15 | 17618 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17620 | USD | $10,200 | 16-Jul-15 | 17620 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17622 | USD | $19,800 | 16-Jul-15 | 17622 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17624 | USD | $12,900 | 16-Jul-15 | 17624 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17641 | USD | $13,152 | 6-Aug-15 | 17641 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17643 | USD | $10,202 | 6-Aug-15 | 17643 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17627 | USD | $11,400 | 29-Jul-15 | 17627 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17629 | USD | $18,000 | 29-Jul-15 | 17629 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17631 | USD | $15,600 | 29-Jul-15 | 17631 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17645 | USD | $25,500 | 6-Aug-15 | 17645 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17637 | USD | $10,200 | 29-Jul-15 | 17637 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17633 | USD | $10,200 | 29-Jul-15 | 17633 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17635 | USD | $12,660 | 29-Jul-15 | 17635 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17651 | USD | $10,200 | 18-Aug-15 | 17651 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17649 | USD | $15,660 | 18-Aug-15 | 17649 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17647 | USD | $12,960 | 18-Aug-15 | 17647 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17662 | USD | $23,040 | 7-Sep-15 | 17662 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17664 | USD | $10,200 | 7-Sep-15 | 17664 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17666 | USD | $10,200 | 7-Sep-15 | 17666 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17668 | USD | $15,660 | 7-Sep-15 | 17668 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17670 | USD | $22,380 | 16-Sep-15 | 17670 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17672 | USD | $10,202 | 16-Sep-15 | 17672 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17674 | USD | $12,000 | 16-Sep-15 | 17674 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17676 | USD | $10,200 | 16-Sep-15 | 17676 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17678 | USD | $15,500 | 16-Sep-15 | 17678 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17680 | USD | $10,440 | 16-Sep-15 | 17680 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17682 | USD | $19,560 | 23-Sep-15 | 17682 |

Annex I-22



| | | | | | | |
|---|---|---|---|---|---|---|
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17685 | USD | $10,200 | 13-Oct-15 | 17685 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17704 | USD | $12,000 | 23-Oct-15 | 17704 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17700 | USD | $12,000 | 23-Oct-15 | 17700 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17698 | USD | $10,200 | 23-Oct-15 | 17698 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17696 | USD | $19,320 | 23-Oct-15 | 17696 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17693 | USD | $11,400 | 23-Oct-15 | 17693 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17690 | USD | $10,200 | 23-Oct-15 | 17690 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17688 | USD | $18,720 | 23-Oct-15 | 17688 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17740 | USD | $3 | 18-Nov-15 | 17740 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17742 | USD | $89,460 | 18-Nov-15 | 17742 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17744 | USD | $2,526 | 18-Nov-15 | 17744 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17746 | USD | $4,500 | 18-Nov-15 | 17746 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17748 | USD | $3 | 18-Nov-15 | 17748 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17750 | USD | $4,032 | 18-Nov-15 | 17750 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17752 | USD | $52,764 | 18-Nov-15 | 17752 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17754 | USD | $52,008 | 18-Nov-15 | 17754 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17756 | USD | $3 | 18-Nov-15 | 17756 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17758 | USD | $25,500 | 18-Nov-15 | 17758 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17760 | USD | $51,000 | 18-Nov-15 | 17760 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17762 | USD | $52,800 | 18-Nov-15 | 17762 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17766 | USD | $51,000 | 18-Nov-15 | 17766 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17768 | USD | $52,800 | 18-Nov-15 | 17768 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17770 | USD | $51,000 | 18-Nov-15 | 17770 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17772 | USD | $25,500 | 18-Nov-15 | 17772 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17774 | USD | $25,500 | 18-Nov-15 | 17774 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17776 | USD | $67,840 | 18-Nov-15 | 17776 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17778 | USD | $25,500 | 18-Nov-15 | 17778 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17780 | USD | $51,000 | 18-Nov-15 | 17780 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17782 | USD | $52,800 | 18-Nov-15 | 17782 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17784 | USD | $58,403 | 18-Nov-15 | 17784 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17786 | USD | $58,200 | 18-Nov-15 | 17786 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17788 | USD | $64,440 | 18-Nov-15 | 17788 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17790 | USD | $51,000 | 18-Nov-15 | 17790 |
| GE OIL & GAS LOGGING SERVICES, | PDVSA | 17792 | USD | $51,000 | 18-Nov-15 | 17792 |

Annex I-23



| C.A | PETRÓLEO | | | | | |
|---|---|---|---|---|---|---|
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | | | | | |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17794 | USD | $51,000 | 18-Nov-15 | 17794 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17796 | USD | $56,670 | 18-Nov-15 | 17796 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17798 | USD | $51,000 | 18-Nov-15 | 17798 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17800 | USD | $51,000 | 18-Nov-15 | 17800 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17802 | USD | $51,000 | 16-Nov-15 | 17802 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17804 | USD | $34,500 | 18-Nov-15 | 17804 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17806 | USD | $80,972 | 18-Nov-15 | 17806 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17808 | USD | $51,003 | 18-Nov-15 | 17808 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17810 | USD | $53,898 | 18-Nov-15 | 17810 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17812 | USD | $51,000 | 18-Nov-15 | 17812 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17814 | USD | $51,003 | 18-Nov-15 | 17814 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17816 | USD | $52,803 | 18-Nov-15 | 17816 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17818 | USD | $51,000 | 18-Nov-15 | 17818 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17820 | USD | $51,003 | 18-Nov-15 | 17820 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17822 | USD | $51,003 | 18-Nov-15 | 17822 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17824 | USD | $58,434 | 18-Nov-15 | 17824 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17826 | USD | $51,000 | 18-Nov-15 | 17826 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17828 | USD | $51,003 | 18-Nov-15 | 17828 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17830 | USD | $51,000 | 18-Nov-15 | 17830 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17832 | USD | $51,000 | 18-Nov-15 | 17832 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17834 | USD | $51,000 | 18-Nov-15 | 17834 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17836 | USD | $51,000 | 18-Nov-15 | 17836 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17706 | USD | $51,000 | 16-Nov-15 | 17706 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17708 | USD | $6,120 | 16-Nov-15 | 17708 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17710 | USD | $66,426 | 16-Nov-15 | 17710 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17712 | USD | $77,220 | 16-Nov-15 | 17712 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17714 | USD | $13,718 | 16-Nov-15 | 17714 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17716 | USD | $58,600 | 16-Nov-15 | 17716 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17718 | USD | $82,836 | 16-Nov-15 | 17718 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17720 | USD | $25,500 | 16-Nov-15 | 17720 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17738 | USD | $1,800 | 18-Nov-15 | 17738 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17736 | USD | $3 | 16-Nov-15 | 17736 |
| GE OIL & GAS LOGGING SERVICES. C.A | PDVSA PETRÓLEO | 17734 | USD | $3 | 16-Nov-15 | 17734 |

Annex I-24



| | | | | | | |
|---|---|---|---|---|---|---|
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17732 | USD | S3 | 16-Nov-15 | 17732 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17730 | USD | $72,300 | 16-Nov-15 | 17730 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17728 | USD | $61,203 | 16-Nov-15 | 17728 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17726 | USD | $64,182 | 16-Nov-15 | 17726 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17724 | USD | $60,000 | 18-Nov-15 | 17724 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17722 | USD | $61,320 | 18-Nov-15 | 17722 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17838 | USD | $51,000 | 18-Nov-15 | 17838 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17840 | USD | $51,003 | 18-Nov-15 | 17840 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17842 | USD | $53,700 | 18-Nov-15 | 17842 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17844 | USD | $60,324 | 18-Nov-15 | 17844 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17846 | USD | $51,006 | 18-Nov-15 | 17846 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17848 | USD | $52,893 | 18-Nov-15 | 17848 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17850 | USD | $51,000 | 18-Nov-15 | 17850 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17851 | USD | $51,000 | 18-Nov-15 | 17851 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17864 | USD | $54,600 | 2-Dec-15 | 17864 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17854 | USD | S3 | 25-Nov-15 | 17854 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17856 | USD | $1,800 | 25-Nov-15 | 17856 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17858 | USD | $60,000 | 25-Nov-15 | 17858 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17860 | USD | $70,170 | 25-Nov-15 | 17860 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17886 | USD | $66,120 | 11-Dec-15 | 17886 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17888 | USD | $97,800 | 11-Dec-15 | 17888 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17890 | USD | $61,202 | 11-Dec-15 | 17890 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17867 | USD | $61,203 | 11-Dec-15 | 17867 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17869 | USD | $61,200 | 11-Dec-15 | 17869 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17871 | USD | $70,200 | 11-Dec-15 | 17871 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17874 | USD | $25,500 | 11-Dec-15 | 17874 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17876 | USD | $67,620 | 11-Dec-15 | 17876 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17878 | USD | $67,872 | 11-Dec-15 | 17878 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17880 | USD | $60,005 | 11-Dec-15 | 17880 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17882 | USD | $63,900 | 11-Dec-15 | 17882 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17884 | USD | $60,000 | 11-Dec-15 | 17884 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17892 | USD | $63,543 | 16-Dec-15 | 17892 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17894 | USD | $69,600 | 16-Dec-15 | 17894 |
| GE OIL & GAS LOGGING SERVICES, | PDVSA | 17896 | USD | $80,002 | 18-Dec-15 | 17898 |

Annex 1-25

| | | | | | | |
|---|---|---|---|---|---|---|
| C.A | PETRÓLEO | | | | | |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17900 | USD | $25,500 | 23-Dec-15 | 17900 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17902 | USD | $60,003 | 23-Dec-15 | 17902 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17904 | USD | $60,000 | 23-Dec-15 | 17904 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17917 | USD | $75,084 | 28-Jan-16 | 17917 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17915 | USD | $60,900 | 28-Jan-16 | 17915 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17913 | USD | $64,800 | 28-Jan-16 | 17913 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17911 | USD | $60,000 | 28-Jan-16 | 17911 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17909 | USD | $64,920 | 28-Jan-16 | 17909 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17907 | USD | $61,200 | 28-Jan-16 | 17907 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17919 | USD | $60,000 | 28-Jan-16 | 17919 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17921 | USD | $60,000 | 28-Jan-16 | 17921 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17923 | USD | $74,405 | 10-Feb-16 | 17923 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17925 | USD | $61,203 | 10-Feb-16 | 17925 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17927 | USD | $72,000 | 10-Feb-16 | 17927 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17929 | USD | $60,002 | 10-Feb-16 | 17929 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17933 | USD | $69,000 | 10-Feb-16 | 17933 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17934 | USD | $86,390 | 10-Feb-16 | 17934 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17936 | USD | $64,920 | 16-Feb-16 | 17936 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17938 | USD | $61,205 | 16-Feb-16 | 17938 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17940 | USD | $78,204 | 16-Feb-16 | 17940 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17942 | USD | $61,800 | 16-Feb-16 | 17942 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17945 | USD | $65,412 | 24-Feb-16 | 17945 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17949 | USD | $64,428 | 4-Mar-16 | 17949 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17947 | USD | $78,600 | 4-Mar-16 | 17947 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17958 | USD | $73,776 | 14-Mar-16 | 17958 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17959 | USD | $62,400 | 14-Mar-16 | 17959 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17960 | USD | $25,500 | 14-Mar-16 | 17960 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17961 | USD | $59,502 | 14-Mar-16 | 17961 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17963 | USD | $63,600 | 29-Mar-16 | 17963 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17965 | USD | $60,006 | 29-Mar-16 | 17965 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17967 | USD | $60,000 | 29-Mar-16 | 17967 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17969 | USD | $65,400 | 29-Mar-16 | 17969 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17971 | USD | $65,940 | 29-Mar-16 | 17971 |

Annex I-26



| | | | | | | |
|---|---|---|---|---|---|---|
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17973 | USD | $63,600 | 29-Mar-16 | 17973 |
| GE OIL & GAS LOGGING SERVICES, C.A | PDVSA PETRÓLEO | 17975 | USD | $82,200 | 29-Mar-16 | 17975 |
| VETCO GRAY DE VENEZUELA, C.A. | PDVSA PETRÓLEO | M23613-2 | USD | $4,682 | 18-Feb-15 | M 23613-2 |
| VETCO GRAY DE VENEZUELA, C.A. | PDVSA PETRÓLEO | M23625-2 | USD | $18,728 | 25-Feb-15 | M23625-2 |
| VETCO GRAY DE VENEZUELA, C.A. | PDVSA PETRÓLEO | M23626-2 | USD | $4,682 | 25-Feb-15 | M23626-2 |
| VETCO GRAY DE VENEZUELA, C.A. | PDVSA PETRÓLEO | M23622-2 | USD | $2,341 | 23-Feb-15 | M23622-2 |
| VETCO GRAY DE VENEZUELA, C.A. | PDVSA PETRÓLEO | M23621-2 | USD | $32,774 | 23-Feb-15 | M23621-2 |
| VETCO GRAY DE VENEZUELA, C.A. | PDVSA PETRÓLEO | M23656-2 | USD | $5,269 | 23-Nov-15 | M23656-2 |
| VETCO GRAY DE VENEZUELA, C.A. | PDVSA PETRÓLEO | M23658-2 | USD | $18,160 | 23-Nov-15 | M23658-2 |
| VETCO GRAY DE VENEZUELA, C.A. | PDVSA PETRÓLEO | M23659-2 | USD | $12,922 | 23-Nov-15 | M23659-2 |
| VETCO GRAY DE VENEZUELA, C.A. | PDVSA PETRÓLEO | M23660-2 | USD | $19,727 | 23-Nov-15 | M23660-2 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 410002911 | USD | $257,500 | 14-Jul-15 | 410002911 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 410002917 | USD | $86,242 | 19-Oct-15 | 410002917 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 161 | USD | $130,317 | 20-Nov-12 | 161 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 173 | USD | $15,087 | 28-Nov-12 | 173 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 175 | USD | $12,710 | 28-Nov-12 | 175 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 177 | USD | $42,111 | 28-Nov-12 | 177 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 185 | USD | $406,368 | 30-Nov-12 | 185 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 193 | USD | $12,465 | 13-Dec-12 | 193 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 209 | USD | $4,008 | 30-Apr-13 | 209 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 217 | USD | $7,694 | 8-May-13 | 217 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 320 | USD | $1,565 | 27-Nov-13 | 320 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 383 | USD | $8,330 | 26-Mar-14 | 383 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 403 | USD | $19,227 | 10-Sep-14 | 403 |
| TURBINAS Y MECANICA, C.A. | PDVSA GAS | 404 | USD | $23,978 | 10-Sep-14 | 404 |
| | **TOTAL USD** | | 821 | **$118,009,293** | | |
| | **TOTAL EUR** | | 223 | **$67,129,635** | | |



# EXHIBIT E

## PETRÓLEOS DE VENEZUELA, S.A.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, AGREES TO OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE ONLY TO QUALIFIED INSTITUTIONAL BUYERS PURSUANT TO RULE 144A OF THE SECURITIES ACT OR TO BUYERS PURCHASING PURSUANT TO A REGISTRATION STATEMENT REGISTERED UNDER THE SECURITIES ACT. IN ADDITION, ANY SUCH TRANSFERS MUST OTHERWISE BE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OF AMERICA, THE BOLIVARIAN REPUBLIC OF VENEZUELA OR OTHER APPLICABLE JURISDICTION.

### 6.5% SENIOR GUARANTEED NOTE

Date: May 13, 2016

No. R-1

FOR VALUE RECEIVED, the undersigned, **PETRÓLEOS DE VENEZUELA, S.A.** (herein called the "**Issuer**"), a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela, hereby promises to pay to **GE CAPITAL EFS FINANCING, INC.**, or registered assigns, the principal sum of ONE HUNDRED NINETY-THREE MILLION NINE HUNDRED FIFTY-NINE THOUSAND SEVEN HUNDRED SIXTY-THREE AND 3/100TH DOLLARS ($193,959,763.03), with interest (a) on the unpaid principal balance thereof based on and computed on the basis of the actual number of days elapsed on a year of 365/366 days, at a rate per annum equal to six and one-half percent (6.5%), payable quarterly, on June 27, 2016 (the "**Initial Repayment Date**"), and on each day in March, June, September and December described on Exhibit A hereto occurring after the Initial Repayment Date on or prior to May 13, 2019 (the "**Maturity Date**" and, each such date on which payment of interest is due, including the Maturity Date, a "**Repayment Date**"), or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, and (b) on any overdue payment of principal, any overdue payment of interest, payable quarterly as aforesaid (or, at the option of the registered holder hereof, on demand), at a rate per annum of eight and one-half percent (8.5%) per annum, calculated as set forth above. The principal amount of this Note shall be due and payable on each Repayment Date or, if any such day is not a New York Business Day, on the next succeeding New York Business Day following the date such payment is due, in installments, with each installment being equal to the amounts set forth on Exhibit A hereto, with any unpaid principal and interest on this Note not previously paid being due and payable in full on the Maturity Date.

Payments of principal and interest on this Note are to be made in United States dollars to the Administrative Agent (at its offices at 800 Long Ridge Road, Stamford, CT 06927).

This Note is one of the Notes (herein called the "**Note**") issued pursuant to the Note Agreement, dated as of May 13, 2016 (as from time to time amended, the "**Note Agreement**"), among the Issuer, the Guarantor, the Administrative Agent and the Initial Noteholder named therein, and the Noteholder

party thereto from time to time, and is entitled to the benefits and is otherwise subject to the provisions thereof. Capitalized terms used herein and not defined shall have the same meanings when used herein as in the Note Agreement.

This Note is a registered Note and, as provided in the Note Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note (or, subject to the provisions of Section 2.11 of the Note Agreement, new Notes with an aggregate principal amount equal to the principal amount of this Note) will be issued to, and registered in the name of, the transferor, the transferee or the transferees, as the case may be. Prior to due presentment for registration of transfer, the Issuer may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Issuer will not be affected by any notice to the contrary.

This Note is subject to optional prepayment, in whole or from time to time in part.

If an Event of Default, as defined in the Note Agreement, occurs and is continuing, the principal of this Note, together with all accrued and unpaid interest hereon, may be declared or otherwise become due and payable in the manner, and with the effect provided in the Note Agreement.

THIS NOTE, AND THE RIGHTS AND OBLIGATIONS OF THE ISSUER AND THE NOTEHOLDER HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WHICH THE ISSUER, THE NOTEHOLDER AND THE ADMINISTRATIVE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

PETRÓLEOS DE VENEZUELA, S.A.

By_____

Name: Ana María España
Title: Vice President of Finance

2



Exhibit A

To

6.5% SENIOR GUARANTEED NOTE

| Repayment Date | Principal Amount Due | Interest Due |
|---|---|---|
| June 27, 2016 | $16,163,313.59 | $ 1,554,335.09 |
| September 27, 2016 | $16,163,313.59 | $ 2,912,939.09 |
| December 27, 2016 | $16,163,313.59 | $ 2,619,342.46 |
| March 27, 2017 | $16,163,313.59 | $ 2,331,502.63 |
| June 27, 2017 | $16,163,313.59 | $ 2,118,501.16 |
| September 27, 2017 | $16,163,313.59 | $ 1,853,688.51 |
| December 27, 2017 | $16,163,313.59 | $ 1,571,605.48 |
| March 27, 2018 | $16,163,313.59 | $ 1,295,279.24 |
| June 27, 2018 | $16,163,313.59 | $ 1,059,250.58 |
| September 27, 2018 | $16,163,313.59 | $ 794,437.93 |
| December 27, 2018 | $16,163,313.59 | $ 523,868.49 |
| March 27, 2019 | - | $ 259,055.85 |
| May 13, 2019 | $16,163,313.59 | $ 135,284.72 |



Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 203 of 312

# EXHIBIT F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

RED TREE INVESTMENTS, LLC,

              Plaintiff,

            -against-

                                          Index No. _____

PETROLEOS DE VENEZUELA S.A. and PDVSA
PETROLEO S.A.,

              Defendants.

## AFFIDAVIT OF DANIEL WALLITT

I, Daniel Wallitt, being duly sworn, hereby depose and say:

1.     I currently serve as a Managing Director for GE Capital EFS Financing Inc. ("GE Capital EFS"), and have held this position since 2015. In this capacity, I am personally familiar with the facts set forth in this Affidavit and know them to be true, except where I indicate otherwise.

2.     GE Capital EFS is a Delaware corporation, a financial services subsidiary of General Electric Corporation, and the successor to General Electric Capital Corporation ("GE Capital").

## THE OUTSTANDING 2015 NOTES

3.     GE Capital was the original holder of a note dated as of March 27, 2015, issued by Petróleos de Venezuela S.A. ("PDVSA") under a note agreement also dated March 27, 2015 (the "2015 Note Agreement"), between and among GE Capital, PDVSA, PDVSA Petróleo S.A. ("Petróleo"), and Union Capital Group, which note provided that PDVSA agreed to pay GE Capital or its assigns the original principal balance of $256,555,604.85 (the "2015 R-1 Note").

1

A copy of the 2015 Note Agreement is attached to the Quinn Emanuel attorney affidavit (the "QE Affidavit"), as Exhibit A.

4.    On that same date March 27, 2015, the 2015 R-1 Note was annulled and replaced by two separate two notes issued by PDVSA under the 2015 Note Agreement (together, the "Outstanding 2015 Notes"), one of which provided that PDVSA agreed to pay GE Capital or its assigns the original principal balance of $131,855,116.31 (the "2015 R-2 Note"), while the second provided that PDVSA agreed to pay SACE S.p.A. ("SACE") or its assigns the original principal balance of $124,700,488.54 (the "2015 R-3 Note"), both with interest at a rate of 6.5% per annum and the default rate to be paid at a rate of 8.5% per annum. Copies of the Outstanding 2015 Notes are attached to the QE Affidavit as Exhibits B and C, respectively.

5.    Under Article VI of the 2015 Note Agreement, Petróleo guaranteed PDVSA's prompt payment when due, including defined costs and fees (the "2015 Guarantee").

6.    Effective November 4, 2015, GE Capital EFS became the successor to GE Capital. As a result, effective that date GE Capital EFS became a party to 2015 Note Agreement and the legal owner of the 2015 R-2 Note, in the place and stead of GE Capital.

## MATURATION OF THE OUTSTANDING 2015 NOTES

7.    Under the Outstanding 2015 Notes, PDVSA was obligated to make quarterly payments to GE Capital EFS (as successor of GE Capital) and SACE, respectively, in accordance with the schedule included in the respective Exhibit A to such Outstanding 2015 Notes, normally of a combined principal amount of $21,379,633.74, starting on March 31, 2015. *See* QE Affidavit Exhibit B at 3; *id.* Exhibit C at 3.

8.    March 27, 2018 is defined as the maturity date for all notes issued under the 2015 Note Agreement. On that date, PDVSA was obligated to pay GE Capital EFS and SACE, together, $21,379,633.74 in total principal and $347,419.04 in total interest on the Outstanding

2

2015 Notes. PDVSA failed to make payment to either GE Capital EFS or SACE on March 27, 2018 and has not made any payment since. The 2015 Note Agreement has matured by its terms and those amounts, along with interest on those amounts, remain unpaid by PDVSA.

9.      Under the terms of the 2015 Guarantee, upon the Outstanding 2015 Notes becoming due and payable pursuant to Article VII of the 2015 Note Agreement, Petróleo was obligated to promptly pay all outstanding amounts due on the Outstanding 2015 Notes. *See* QE Affidavit Exhibit A, § 6.01. Petróleo has not made a single payment under the Outstanding 2015 Notes to GE Capital EFS (as successor of GE Capital) or SACE, as applicable.

10.     On July 26, 2018, GE Capital EFS sent notice of missed payment to PDVSA and Petróleo. A copy of that notice is enclosed herein as Exhibit A.

### ASSIGNMENTS OF THE OUTSTANDING 2015 NOTES

11.     On August 10, 2018, SACE entered into an assignment and acceptance of the 2015 R-3 Note with GE Capital EFS (the "2015 R-3 Note Assignment"). A copy of the 2015 R-3 Note Assignment is enclosed as Exhibit B. On August 28, 2018, SACE issued a notification to GE Capital EFS confirming August 10, 2018 as the effective date for the assignment made under the 2015 R-3 Note Assignment (the "2015 R-3 Note Effective Date Notice"). A copy of the 2015 R-3 Note Effective Date Notice is enclosed as Exhibit C.

12.     On September 6, 2018, GE Capital EFS, in its capacity as Administrative Agent, sent by electronic mail to PDVSA and Petróleo the 2015 R-3 Note Assignment and a formal notice of assignment to PDVSA and Petróleo. A copy of this notice is enclosed as Exhibit D.

13.     On January 25, 2019, GE Capital EFS entered into an assignment and acceptance of the Outstanding 2015 Notes (the "2015 Outstanding Notes Assignment") with Red Tree

3

Investments, LLC ("Red Tree"). A copy of the 2015 Outstanding Notes Assignment is enclosed as Exhibit E.

14.    The 2015 Outstanding Notes Assignment reflects a principal balance of $21,379,633.74, as well as unpaid interest, pursuant to the 2015 Note Agreement as of the date of the 2015 Outstanding Notes Assignment.

15.    On January 25, 2019, GE Capital EFS, in its then-capacity as Administrative Agent, sent PDVSA and Petróleo an electronic mail notice of the assignment of the Outstanding 2015 Notes. A copy of that notice is enclosed as Exhibit F.

DANIEL WALLITT

Sworn to before me this
25th day of JANUARY 2019

JANET DELILLE
Notary Public, State of New York
No. 01DE6197265
Qualified in Queens County
Commission Expires Nov. 24, 20 20

4

# EXHIBIT A



GE Capital EFS Financing, Inc.
901 Main Avenue
Norwalk, Connecticut 06851

July 26, 2018

Petróleos de Venezuela, S.A.
PDVSA Petróleo, S.A.
Avenida Libertador
Edificios Petroleos de Venezuela, Torre Este, Piso 8
La Campiña
Caracas, Venezuela

Attention: Iliana Ruzza, Emir Manrique and Ana Maria España
Facsimile: +58 212 708 1441
Email: ruzzai@pdvsa.com, manriquee j@pdvsa.com, and espanaam@pdvsa.com

Attention: Anabella Rivas and Edoardo Orsoni
Facsimile: +58 212 708 4989
Email: rivasaay@pdvsa.com and orsonie@pdvsa.com

**Re: Notice of Missed Payment under the Note Agreement dated as of March 27, 2015 among Petróleos de Venezuela, S.A., as Issuer, PDVSA Petróleo, S.A., as Guarantor, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as Initial Noteholder and as Administrative Agent, and Union Capital Group, as Lead Arranger (the "Note Agreement").**

To Whom It May Concern:

This letter is being sent by the Administrative Agent on behalf of itself and the Noteholders to notify the Issuer and the Guarantor of a missed payment under the terms of the Note Agreement. Capitalized terms used in this letter but not defined herein shall have the meaning given to them in the Note Agreement.

Pursuant to Article II of the Note Agreement, the Issuer was obligated to make a principal and interest payment to the Administrative Agent, for the account of the Noteholders, in the aggregate amount of Twenty One Million, Seven Hundred Twenty Seven Thousand, Fifty Two Dollars and Seventy Nine Cents ($21,727,052.79) on March 27, 2018, the Maturity Date under the Note Agreement (the "Missed Payment"). As of the date hereof, the Missed Payment remains unpaid.

Article VII(a) of the Note Agreement provides that it would be an Event of Default under the Note Agreement if the Issuer fails "to pay the principal of, or interest on any of the Notes when such principal becomes due and payable, including at any of the Repayment Dates, by acceleration or otherwise, and such failure continues for a period of five (5) days after written notice thereof has been given to the Issuer."

This letter constitutes written notification to the Issuer for purposes of Article VII(a) of the Note Agreement. Accordingly, notice is given that if the Issuer fails to make the above mentioned payment within five (5) days from the date hereof, an Event of Default will occur. In addition, the Issuer should understand that if an Event of Default occurs under this Note Agreement, it would also automatically trigger an Event of Default under (i) the Credit Agreement dated as of December 27, 2016 among Petróleos de Venezuela, S.A., as Borrower, PDVSA Petróleo, S.A., as Guarantor, GE Capital EFS Financing, Inc., as Agent, and the Lenders party thereto (the "Credit Agreement") and, (ii) pursuant to Section 8.05 *(Cross-Event of Default)* of the Credit Agreement, the Note Agreement dated as of May 13, 2016 among the Issuer, as issuer, the Guarantor, as guarantor, and GE Capital EFS Financing, Inc., as initial noteholder and administrative agent.

The Administrative Agent hereby reserves all rights and remedies available to it under the Note Agreement, each other Finance Document, as well as under applicable law, as a result of the Missed Payment that the Issuer has failed to make in accordance with the terms of the Note Agreement. Such remedies include, without limitation, the right to collect default interest at the rate with respect to the missed payments and any other amounts not paid when due as provided in Section 2.04 of the Note Agreement.

No failure or delay on the part of the Administrative Agent or any Noteholder in exercising any of their rights or remedies under the Note Agreement and each other Finance Document, as well as under applicable law, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.

This letter shall be governed by and construed in accordance with the laws of the State of New York.

Thank you.

GE CAPITAL EFS FINANCING, INC.

By: _____

Name:   Daniel Wallitt
Title:   Authorized Signatory

# EXHIBIT B

## ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between **SACE S.p.A.** (the "Assignor") and **GE Capital EFS Financing, Inc.** (as successor to General Electric Capital Corporation) (the "Assignee"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Note Agreement identified below (the "Note Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

Subject to receipt by the Assignor of the Transfer Price, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Finance Documents, as of the Effective Date set forth below, all of the interest in and to the Assignor's rights and obligations under the Note Agreement, the other Transaction Documents and any other agreements, documents or instruments delivered pursuant thereto or for the benefit of the Noteholders relating thereto, which represents the amount identified below of all of the Assignor's outstanding rights and obligations under the Note identified below (collectively, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| (a) | Assignor: | SACE, S.p.A. |
| (b) | Assignee: | GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation) |
| (c) | Issuer: | Petróleos de Venezuela, S.A. |
| (d) | Administrative Agent: | GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as administrative agent under the Note Agreement |
| (e) | Note Agreement: | The Note Agreement, dated as of March 27, 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as Administrative Agent. |
| (f) | Assigned Interest: | Unpaid principal balance of $10,391,707.36, together with accrued and unpaid interest, on Note No. R-3 dated March 27, 2015 in the original principal amount of $124,700,488.54 |
| (g) | Transfer Price: | ████████████ |
| (h) | Account for Payments: | GE Capital EFS Financing, Inc.<br>Bank Name: Deutsche Bank Trust Company<br>Account number: 50292590<br>Account name: GEC EFSF, Inc Loan COE-EFS<br>ABA – 021-001-033 |

**Effective Date:  August 10, 2018 or such other date on which the Transfer Price has been received by the Assignor in its bank account; within five (5) business days of the receipt of the Transfer Price the Assignor agrees to provide a written certification to the Assignee confirming receipt of the Transfer Price and the date of such receipt).**

Termination:  If (i) the Assignee fails to initiate the wire transfer(s) for payment of the Transfer Price within three (3) business days after execution of this Agreement, or (ii) the Assignor does not receive the Transfer Price by September 28, 2018, then Assignor may in its sole discretion elect to terminate this Assignment upon written notice to Assignee.  If subsequent to any such termination Assignor receives payment intended to pay all or any portion of the Transfer Price, Assignor shall promptly return any such payment to Assignee.  This provision shall survive any expiration or termination of this Assignment.

The terms set forth in this Assignment are hereby agreed to:


**ASSIGNOR**
SACE S.p.A.


By: _____
Name:
Title:


**ASSIGNEE**
GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation)

By: _____
Name: Daniel Wallitt
Title: Authorized Signatory

The terms set forth in this Assignment are hereby agreed to:

**ASSIGNOR**
SACE S.p.A.

By: _____
Name: Michele De Capitani
Title:   Chief Financial Officer

**ASSIGNEE**
GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation)

By: _____
Name:
Title:

NOTE AGREEMENT, DATED AS OF MARCH 27, 2015, BY AND AMONG PETRÓLEOS DE VENEZUELA, S.A., AS ISSUER, PDVSA PETRÓLEO, S.A., AS GUARANTOR, THE NOTEHOLDERS THAT ARE A PARTY THERETO FROM TIME TO TIME AND GE CAPITAL EFS FINANCING, INC. (AS SUCCESSOR TO GENERAL ELECTRIC CAPITAL CORPORATION), AS ADMINISTRATIVE AGENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ACCEPTANCE

1.    **Representations and Warranties**

1.1   **Assignor**

The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Note Agreement or any other agreement, instrument or document delivered pursuant thereto or for the benefit of the Noteholders relating thereto, other than this Assignment (collectively, the "Finance Documents"), (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Finance Documents, or any collateral thereunder, (iii) the financial condition of the Issuer, the Guarantor, any of the Subsidiaries or any of their respective Affiliates in respect of any Finance Document, or (iv) the performance or observance by the Issuer, the Guarantor, any of the Subsidiaries or any of their respective Affiliates of any of their respective obligations under any Finance Document.

1.2   **Assignee**

The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Noteholder under the Note Agreement, (ii) it is not an Eligible Institution and is not an Ineligible Transferee, (iii) from and after the Effective Date, it shall be bound by the provisions of the Note Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Noteholder thereunder, and (iv) it has received a copy of the Note Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.04 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Noteholder, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Finance Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Finance Documents are required to be performed by it as a Noteholder.

2.     **Payments**

From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest and other amounts) to the Assignee.

3.     **General Provisions**

This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy and electronic mail shall be equally effective to the delivery of a manually executed counterpart of this Assignment. THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

4.     **Costs and Expenses**

The Assignee agrees to pay all reasonable third-party out-of-pocket costs and expenses actually incurred by the Assignor in connection with the execution or enforcement of this Assignment. The Assignee shall reimburse the Assignor, by no later than five (5) business days from the date of receipt of the relevant written request from the Assignor (i) for any such costs and expenses and (ii) from any Indemnified Withholding Taxes (as defined below) imposed on the Assignor in connection with the execution and/or performance of this Agreement.

5.     **Tax Gross-up**

The payment of the Transfer Price shall be made by the Assignee without any tax deduction or withholding unless such tax deduction or withholding is required by law.

If the Assignee is required by applicable United States federal income tax law to deduct and withhold Indemnified Withholding Taxes, then the amount of the Transfer Price shall be increased by an additional amount so that after making all required withholdings or deductions for Indemnified Withholding Taxes from such payment, the Assignor receives the same amount it would have received had no such withholdings or deductions for such Indemnified Withholding Taxes been required. Indemnified Withholding Taxes shall mean: United States federal income taxes collected by means of withholding or otherwise charged, to the extent such taxes are imposed due to (i) applicable United Sates federal income tax law or (ii) the tax treaty between Italy and the United Sates. In addition, the Assignee shall not be required to pay additional amounts hereunder to the extent that the amount of Indemnified Withholding Taxes: (x) could have been reduced or avoided due to the Assignor's failure to provide timely such forms or other documentation that the Assignee reasonable requests (at no out-of-pocket expense to the Assignor) in a timely manner, and which form or other documentation the Assignor is able legally to provide.

5.     **As-Is Basis**

WITH RESPECT TO THE ASSIGNED INTEREST, EXCEPT FOR THE ASSIGNOR'S REPRESENTATIONS IN THIS AGREEMENT, SUCH ASSIGNED INTEREST IS

HEREBY SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO ASSIGNEE ON AN "AS IS", "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION, WARRANTY, GUARANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO SUCH ASSIGNED INTEREST, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW. THE ASSIGNOR FURTHER ACKNOWLEDGES THAT IT IS AWARE OF THE CURRENT NON-PAYMENTS UNDER THE NOTE AGREEMENT IN CONNECTION WITH THE ASSIGNED INTEREST.

[remainder of page intentionally left blank]

# EXHIBIT C



August 28, 2018

**GE Capital EFS Financing Inc. (as successor to General Electric Capital Corporation)**, in its capacity as Initial Noteholder
901 Main Avenue
Norwalk, CT 06851
United States of America

Atn:    Portfolio Manager

Sirs:

    Reference is made to that certain Note Agreement, dated as of March 27, 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Note Agreement"), by and among Petróleos de Venezuela, S.A., a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as issuer, PDVSA Petróleo, S.A. a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as guarantor, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), a Delaware corporation, as Initial noteholder (the "Initial Noteholder"), GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), a Delaware corporation, as administrative agent, and Union Capital Group, as lead arranger.

    Reference is also made to that certain Assignment and Acceptance, dated as of August 10, 2018, whereby SACE, S.p.A. has assigned to the Initial Noteholder the amount then outstanding of the Note (as defined in the Note Agreement) payable to SACE. S.p.A., subject to the terms and conditions stipulated in that Assignment and Acceptance.

    We hereby notify you that on this date, August 10, 2018, SACE, S.p.A. has received the Transfer Price (as defined in the Assignment and Acceptance). Consequently, the Effective Date (as defined in the Assignment and Acceptance) of such Assignment and Acceptance, and of the assignments and assumptions referenced therein, is August 10, 2018.

Yours truly,

SACE, S.p.A.

Michele De Capitani
Authorized Signatory

SACE SpA
Sede Legale
Piazza Poli, 37/42 | 00187 Roma
T +39 06 67361 | F +39 06 6736225

Capitale Sociale € 3.730.323.610,00
Iscrizione al Reg. Imp. Roma
C.F. e P.IVA 05804521002

Società soggetta all'attività
di direzione e coordinamento di Cassa
depositi e prestiti SpA (unico socio)

# EXHIBIT D



August 28, 2018

**Petróleos de Venezuela, S.A.**
La Campiña
Avenida Libertador
Calle El Empalme
Edificio Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela

Attn:    Iliana Ruzza, Emir Manrique, Victor Aular, Abraham Ortega, Anabella Rivas and
Edoardo Orsoni

**PDVSA Petróleo, S.A.**
La Campiña
Avenida Libertador
Calle El Empalme
Edificio Petróleos de Venezuela. Torre Este, Piso 8
Caracas, Venezuela

Attn:    Iliana Ruzza, Emir Manrique. Victor Aular, Abraham Ortega, Anabella Rivas and
Edoardo Orsoni

**GE Capital EFS Financing Inc. (as successor to General Electric Capital Corporation),**
In its capacity as Administrative Agent
901 Main Avenue
Norwalk, CT 06851
United States of America

Atn:    Portfolio Manager

Sirs:

Reference is made to that certain Note Agreement, dated as of March 27, 2015 (as
the same may be amended, restated, supplemented or otherwise modified from time to time
in accordance with its terms, the "Note Agreement"), by and among Petróleos de Venezuela,
S.A., a corporation (sociedad anónima) organized under the laws of the Bolivarian Republic
of Venezuela as issuer (the "Issuer"), PDVSA Petróleo, S.A. a corporation (sociedad
anónima) organized under the laws of the Bolivarian Republic of Venezuela as guarantor,
GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), a
Delaware corporation, as initial noteholder (the "Initial Noteholder"), GE Capital EFS
Financing, Inc. (as successor to General Electric Capital Corporation), a Delaware
corporation, as administrative agent (the "Administrative Agent"), and Union Capital Group,
as lead arranger. Capitalized terms used but not defined in this letter have the meanings
assigned to them in the Note Agreement.

SACE SpA
Sede Legale
Piazza Poli, 37/42 | 00187 Roma
T +39 06 67361 | F +39 06 6736225

Capitale Sociale € 3.730.323.610,00
Iscrizione al Reg. Imp. Roma
C.F. e P.IVA 05804521002

Società soggetta all'attività
di direzione e coordinamento di Cassa
depositi e prestiti SpA (unico socio)



sace
‹gruppo cdp›

Reference is also made to Section 9.04(b) of the Note Agreement according to which, upon the occurrence and continuance of an Event of Default, each Noteholder may assign to any Person or Persons all or a portion of its interests, rights and obligations under the Note Agreement and the other Finance Documents with notice to the Issuer and the Administrative Agent, and to Section 2.11 of the Note Agreement pursuant to which a Noteholder may transfer and exchange its Note in whole or in part.

We hereby notify you that on August 10, 2018, SACE, S.p.A. assigned to GE Capital EFS Financing, Inc. the unpaid principal balance of $10,391,707.36 together with accrued and unpaid interest in the amount of $418,975.01 , on Note No. R-3 dated March 27, 2015 in the original principal amount of $124,700,488.54 (the "Note"), and all of SACE, S.p.A.'s interests, rights and obligations under the Note Agreement equivalent to the Note assigned to GE Capital EFS Financing, Inc.

Attached hereto is a fully executed Assignment and Acceptance, dated as of August 10, 2018, between the undersigned as assignor and GE Capital EFS Financing, Inc. as assignee evidencing such assignment.

Yours truly,

SACE, S.p.A.

Michele De Capitan
Authorized Signatory

SACE SpA
Sede Legale
Piazza Poli, 37/42 | 00187 Roma
T +39 06 67361 | F +39 06 6736225

Capitale Sociale € 3.730.323.610,00
Iscrizione al Reg. Imp. Roma
C.F. e P.IVA 05804521002

Società soggetta all'attività
di direzione e coordinamento di Cassa
depositi e prestiti SpA (unico socio)

# EXHIBIT E

## ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (this "Assignment") is dated as of January 25, 2019 and is entered into by and between **GE Capital EFS Financing, Inc.** (as successor to General Electric Capital Corporation) (the "Assignor") and **Red Tree Investments, LLC** (the "Assignee"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Note Agreement identified below (the "Note Agreement"), receipt of a copy of which is hereby acknowledged by Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

On the Effective Date (as defined below), Assignor hereby irrevocably sells and assigns to Assignee, and Assignee hereby irrevocably purchases and assumes from Assignor, subject to and in accordance with the Standard Terms and Conditions and the Finance Documents, all of Assignor's rights, title, and interest in, to and under the Notes (as defined below) and, to the extent related thereto, all of the following: (i) the Note Agreement and the other Transaction Documents, and any other agreements, documents, guarantees and instruments delivered pursuant thereto or for the benefit of the Noteholders; and (ii) all principal, interest, claims, payments, proceeds, distributions of any kind arising from the foregoing ("Distributions") (clauses (i) and (ii) collectively, the "Assigned Interest").

Prior to the Effective Date and as conditions precedent to the transaction contemplated by this Assignment: (i) Assignor and Assignee shall each execute and deliver into escrow counterpart copies of this Assignment, (ii) Assignor shall execute and deliver into escrow Assignor's resignation as Administrative Agent under the Note Agreement (the "Agent's Resignation"); (iii) Assignee shall execute and deliver into escrow Assignee's acceptance of the Agent's Resignation and the appointment and acceptance of Assignee as the successor Administrative Agent under the Note Agreement; (iv) Assignor shall deliver into escrow the original Note R-2 referenced below as part of the Notes, together with a note power (endorsed in blank) and together with a medallion signature guarantee affixed thereto and (v) Assignor shall execute and deliver into escrow written notice of the assignment of the Notes by Assignor to Assignee and confirmation of the Effective Date for this Assignment (with the Effective Date set forth therein and herein upon receipt of the Purchase Price) (the "Transfer Notice"). Upon satisfaction of the execution and delivery of each of the foregoing documents (collectively and together with this Assignment, the "Assignment Documents") by the parties hereto (as the case may be), Assignee shall, within one (1) business day, pay Assignor the Purchase Price (defined below) in immediately available funds to Assignor's account designated below (as the same may be subsequently amended or updated by Assignor).

The sale and assignment of the Assigned Interest contemplated hereby shall become effective on the "Effective Date", which shall be the date on which Assignor shall have received the Purchase Price, in which event the Assignment Documents may be delivered from escrow to Assignee with copies thereof delivered to Assignor.

On the Effective Date, Assignor agrees to deliver to the Issuer, or Issuer's representatives, as the case may be, and the Administrative Agent the Transfer Notice (with a copy of such written notice sent to Assignee).

Assignor's Account:

GE Capital EFS Financing, Inc.
Deutsche Bank Trust Company America
60 Wall Street, 28th, New York, NY 10005
ABA# 021-001-033

Account No: 50278772
Account Name: GECC EFS/T&I Depository Account

| | | |
|---|---|---|
| (a) | Assignor: | GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation) |
| (b) | Assignee: | Red Tree Investments, LLC |
| (c) | Issuer: | Petróleos de Venezuela, S.A. |
| (d) | Existing    Administrative Agent: | GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation) |
| (e) | Note Agreement: | The Note Agreement, dated as of March 27, 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as Administrative Agent. |
| (f) | Notes: | Aggregate outstanding principal amount of $10,987,926.35, together with accrued and unpaid interest, on Note R-2 dated March 27, 2015, in the original outstanding principal amount of $131,855,116.31. |
| | | Aggregate outstanding principal amount of $10,391,707.36, together with accrued and unpaid interest, on Note R-3 dated March 27, 2015, in the original outstanding principal amount of $124,700,488.54. |
| (g) | Purchase Price: | Such amount set forth in the purchase price letter by and between the Assignor and the Assignee. |
| (h) | Assignee's    Account    for Payments: | ABA No.: 021000018 Beneficiary Account No: 8901212318 Beneficiary Account Name: Wells Fargo Securities, LLC FFC Account No.: 2MA01252 FFC Account Name:  Red Tree Investments, LLC |
| (i) | Effective Date: | January 25, 2019 |

[*signature page follows*]

The terms set forth in this Assignment are hereby agreed to:

**ASSIGNOR:**
GE CAPITAL EFS FINANCING, INC.

By: _____
Name: Daniel Wallitt
Title: Authorized Signatory

**ASSIGNEE:**
RED TREE INVESTMENTS, LLC

By: _____
Name: Lauren Murray
Title:  Authorized Signatory

Assignee's Notice Information:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR:
GE CAPITAL EFS FINANCING, INC.

By: _____
Name:
Title:

ASSIGNEE:
RED TREE INVESTMENTS, LLC

By: _____
Name: Lauren Murray
Title: Authorized Signatory

Assignee's Notice Information:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

ANNEX 1

NOTE AGREEMENT, DATED AS OF MARCH 27, 2015, BY AND AMONG PETRÓLEOS DE VENEZUELA, S.A., AS ISSUER, PDVSA PETRÓLEO, S.A., AS GUARANTOR, THE NOTEHOLDERS THAT ARE A PARTY THERETO FROM TIME TO TIME AND GE CAPITAL EFS FINANCING, INC. (AS SUCCESSOR TO GENERAL ELECTRIC CAPITAL CORPORATION), AS ADMINISTRATIVE AGENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ACCEPTANCE

## 1. Representations and Warranties of Assignor

Assignor represents and warrants to Assignee as of the date hereof and as of the Effective Date that:

1.1 (i) it, acting on behalf of itself and its Affiliates, is the sole legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance, pledge, security interest, setoff or other adverse claim, and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and assumes no responsibility with respect to (w) any statements, warranties or representations made in or in connection with the Finance Documents except for any statements, warranties, representations expressly made by Assignor in any Finance Document or this Assignment, (x) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Finance Documents, or any collateral thereunder, (y) the financial condition of the Issuer, the Guarantor, any of the Subsidiaries or any of their respective Affiliates in respect of any Finance Document or (z) the performance or observance by the Issuer, the Guarantor, any of the Subsidiaries or any of their respective Affiliates of any of their respective obligations under any Finance Document.

1.3 The aggregate outstanding principal amount of the R-2 Note is $10,987,926.35 and the original outstanding principal amount of the R-2 Note is $131,855,116.31. There is no funding obligation of any kind in respect of the R-2 Note. The aggregate outstanding principal amount of the R-3 Note is $10,391,707.36 and the original outstanding principal amount of the R-3 Note is $124,700,488.54. There is no funding obligation of any kind in respect of the R-3 Note.

1.4 Assignor (i) has not, on or after March 31, 2018, received any Distributions from the Issuer or the Guarantor, or any of their respective Affiliates, in connection with the Assigned Interest, (ii) has not entered into any agreement with the Issuer or an Affiliate of the Issuer to make loans to or otherwise extend credit to or for the benefit of the Issuer or an Affiliate of the Issuer or (iii) does not have any unpaid or outstanding liability, obligation or expense in connection with the Assigned Interest, in each case under clauses (i), (ii) and (iii), which will result in any setoff, offset or reduction in payments or distributions (including the timing of payments or distributions) made to the Assignee in connection with the Assigned Interest.

1.5 Assignor has delivered to Assignee true and correct copies of all of the Transaction Documents and each of the additional documents set forth on Schedule 1 hereto. Except for the documents listed on Schedule 1, to the best of Assignor's knowledge, there are no other documents with the Issuer or the Guarantor, or any of their respective Affiliates, to which Assignor is a party that materially or adversely affect the Assigned Interest.

2.    **Representations and Warranties of Assignee**

Assignee represents and warrants to Assignor as of the date hereof and as of the Effective Date that:

2.1    (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Noteholder under the Note Agreement, (ii) it is an Eligible Institution and is not an Ineligible Transferee, (iii) from and after the Effective Date, it shall be bound by the provisions of the Note Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Noteholder thereunder, and (iv) it has received a copy of the Note Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.04 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision; and agrees that (i) it will, independently and without reliance on the Administrative Agent, Assignor or any other Noteholder, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Finance Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Finance Documents are required to be performed by it as a Noteholder.

3.    **Payments**

From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest and other amounts) to Assignee.

4.    **General Provisions**

This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy or electronic mail shall be equally effective to the delivery of a manually executed counterpart of this Assignment. THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

5.    **Indemnities**

5.1    Assignee shall indemnify, defend, and hold Assignor and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Assignor Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, expense or disbursement (including reasonable attorneys' fees and expenses) that any Assignor Indemnitee incurs or suffers as a result of or arising out of a breach of any of Assignee's representations, warranties, covenants or agreements in this Assignment up to a maximum amount equal to the Purchase Price.

5.2    Assignor shall indemnify, defend, and hold the Assignee and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Assignee Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage,

expense or disbursement (including reasonable attorneys' fees and expenses) that any Assignee Indemnitee incurs or suffers as a result of or arising out of a breach of any of Assignor's representations, warranties, covenants or agreements in this Assignment up to a maximum amount equal to the Purchase Price.

6.    **Costs and Expenses**

Assignee agrees (i) to pay and reimburse Assignor and any other Assignor Indemnitee for, all reasonable third-party out-of-pocket costs, expenses and fees actually incurred by Assignor or such Assignor Indemnitee (including reasonable attorney's fees and expenses) and (ii) to pay, indemnify, and hold the Assignor and any other Assignor Indemnitee harmless from and against any and all other liabilities, claims, costs, losses, judgments, damages, expenses or disbursements of any kind or nature whatsoever, with respect to or arising from or in connection with (x) Assignee's execution, enforcement or collection actions, legal remedies, or efforts under the Note Agreement, the Notes or the Assigned Interest (including in connection with any litigation, arbitration, insolvency, bankruptcy, moratorium or reorganization procedures, whether in or out-of-court, involving the Assignee (or any future successors or assigns of the Assignee) and the Issuer and/or the Guarantor) or (y) any action taken by Assignor at the prior written direction of Assignee (including, without limitation, any actions taken by Assignee in connection with the terms set forth in Section 10 hereof) (including reasonable attorney's fees and expenses). Assignee shall pay Assignor or such Assignor Indemnitee, by no later than five (5) business days from the date of receipt of the relevant written request from Assignor or the relevant Assignor Indemnitee, for any such costs, expenses and fees.

7.    **As-Is Basis**

WITH RESPECT TO THE ASSIGNED INTEREST, EXCEPT FOR ASSIGNOR'S REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS IN THIS ASSIGNMENT, SUCH ASSIGNED INTEREST IS HEREBY SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO THE ASSIGNEE ON AN "AS IS", "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION, WARRANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO SUCH ASSIGNED INTEREST, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW. ASSIGNEE FURTHER ACKNOWLEDGES THAT IT IS AWARE OF THE CURRENT NON-PAYMENTS UNDER THE NOTE AGREEMENT IN CONNECTION WITH THE ASSIGNED INTEREST.

8.    **Confidentiality**

Each of Assignor and Assignee agrees that, without prior consent of the other party, it shall not disclose the contents of this Assignment (including the Purchase Price) to any government, governmental agency, authority, court or other tribunal (collectively, "Governmental Authority") or any or any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, fund, investment account or other entity (each, including a Governmental Authority, an "Entity"), except that either party may make any such disclosure (i) if required to do so by any law, court, or regulation, (ii) to implement and enforce this Assignment, (iii) to any banking, regulatory, or examining authority, (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in such party incurring a liability to any other entity, (v) to its respective affiliates, and its and their directors, officers, members, employees and professional advisors (including legal counsel) or any other service providers as may be

necessary in the ordinary course of business, or (vi) solely with the Purchase Price redacted, to the extent necessary to effect a subsequent transfer of the Assigned Interest.

9.    **Distributions**

It is understood that any Distributions in connection with the Assigned Interest made on or after the Effective Date belong to Assignee. If at any time on or after the Effective Date, Assignor receives a Distribution, Assignor shall (i) accept and hold the Distribution for the account and sole benefit of Assignee, (ii) have no equitable or beneficial interest in the Distribution and (iii) promptly deliver the Distribution to Assignee, and in no event later than five (5) business days of Assignor's receipt thereof.

10.    **Further Assurances**

Assignor agrees to execute and deliver, or cause to be executed and delivered, any further documents or acknowledgements as Assignee may reasonably request (at Assignee's sole cost and expense) that may be commercially necessary for Assignee to establish that Assignee is the owner of the Assigned Interest or entitled to receive directly any Distributions.

*[remainder of page intentionally left blank]*

**Schedule I**

LIST OF TRANSACTION DOCUMENTS

1. Note Agreement, dated as of March 27, 2015, by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as Administrative Agent.

2. Note R-2 dated March 27, 2015, in the original outstanding principal amount of \$131,855,116.31, issued under the abovementioned Note Agreement.

3. Note R-3 dated March 27, 2015, in the original outstanding principal amount of \$124,700,488.54, issued under the abovementioned Note Agreement.

# EXHIBIT F

## Anna Deknatel

| | |
|---|---|
| **From:** | Wallitt, Daniel (GE Capital) <Daniel.Wallitt@ge.com> |
| **Sent:** | Friday, January 25, 2019 4:48 PM |
| **To:** | EMMY HERRERA; LOVERALR@PDVSA.COM |
| **Cc:** | 'CARLOS COELLO'; 'diazwd@pdvsa.com'; Friel, Gerald (GE Capital); 'graffet@pdvsa.com'; Weidner, Matthew L (GE Capital); 'medinait@pdvsa.com'; 'ROSA MOTA'; Ho, Quang (GE Capital); Martyn, Sean (BHGE); JORGE CHIRINOS; CLAUDIA PEREZ; MARITZA VALLEJO; ROSIRIS CONTRERAS; apontels@pdvsa.com; lopezfmx@pdvsa.com; carpiojm@pdvsa.com; navasmu@pdvsa.com; GUZMANRU@PDVSA.COM; ruzzai@pdvsa.com; manriqueej@pdvsa.com; aularvs@pdvsa.com; bolivarmj@pdvsa.com; espanaam@pdvsa.com; orsonie@pdvsa.com; graffet@pdvsa.com; ruzzai@pdvsa.com; PATRICIA LUGO; MARVIN PINTO; CARLOS COELLO; ANABELLA Rivas; herreraev@pdvsa.com; ferrern@pdvsa.com; ROSA MOTA; Landazabal, Carlos (GE Global); Hands, Ricardo (BHGE); Romero, Jose D (BHGE); Friel, Gerald (GE Capital); Weidner, Matthew L (GE Capital); Ho, Quang (GE Capital); aularvs@pdvsa.com; ortegaae@pdvsa.com; bolivarrs@pdvsa.com; ruzzai@pdvsa.com; manriqueej@pdvsa.com |
| **Subject:** | GENEREAL ELECTRIC - PDVSA I |
| **Attachments:** | PDVSA I- Notice of Resignation as Agent.pdf; PDVSA I- Notice of Acceptance and Appointment as Agent.pdf; PDVSA I- Notice of Assignment.pdf |

All, please find the following attached files relating to the Note dated March 27, 2015:

- Notice of Resignation as Agent
- Notice of Acceptance & Appointment as Agent
- Notice of Assignment

**Dan Wallitt**
GE Capital
901 Main Avenue
Norwalk, CT 06851
T: 203-229-8616
M: 917-696-6588
daniel.wallitt@ge.com

## ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (this "Assignment") is dated as of January 25, 2019 and is entered into by and between **GE Capital EFS Financing, Inc.** (as successor to General Electric Capital Corporation) (the "Assignor") and **Red Tree Investments, LLC** (the "Assignee"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Note Agreement identified below (the "Note Agreement"), receipt of a copy of which is hereby acknowledged by Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

On the Effective Date (as defined below), Assignor hereby irrevocably sells and assigns to Assignee, and Assignee hereby irrevocably purchases and assumes from Assignor, subject to and in accordance with the Standard Terms and Conditions and the Finance Documents, all of Assignor's rights, title, and interest in, to and under the Notes (as defined below) and, to the extent related thereto, all of the following: (i) the Note Agreement and the other Transaction Documents, and any other agreements, documents, guarantees and instruments delivered pursuant thereto or for the benefit of the Noteholders; and (ii) all principal, interest, claims, payments, proceeds, distributions of any kind arising from the foregoing ("Distributions") (clauses (i) and (ii) collectively, the "Assigned Interest").

Prior to the Effective Date and as conditions precedent to the transaction contemplated by this Assignment: (i) Assignor and Assignee shall each execute and deliver into escrow counterpart copies of this Assignment, (ii) Assignor shall execute and deliver into escrow Assignor's resignation as Administrative Agent under the Note Agreement (the "Agent's Resignation"); (iii) Assignee shall execute and deliver into escrow Assignee's acceptance of the Agent's Resignation and the appointment and acceptance of Assignee as the successor Administrative Agent under the Note Agreement; (iv) Assignor shall deliver into escrow the original Note R-2 referenced below as part of the Notes, together with a note power (endorsed in blank) and together with a medallion signature guarantee affixed thereto and (v) Assignor shall execute and deliver into escrow written notice of the assignment of the Notes by Assignor to Assignee and confirmation of the Effective Date for this Assignment (with the Effective Date set forth therein and herein upon receipt of the Purchase Price) (the "Transfer Notice"). Upon satisfaction of the execution and delivery of each of the foregoing documents (collectively and together with this Assignment, the "Assignment Documents") by the parties hereto (as the case may be), Assignee shall, within one (1) business day, pay Assignor the Purchase Price (defined below) in immediately available funds to Assignor's account designated below (as the same may be subsequently amended or updated by Assignor).

The sale and assignment of the Assigned Interest contemplated hereby shall become effective on the "Effective Date", which shall be the date on which Assignor shall have received the Purchase Price, in which event the Assignment Documents may be delivered from escrow to Assignee with copies thereof delivered to Assignor.

On the Effective Date, Assignor agrees to deliver to the Issuer, or Issuer's representatives, as the case may be, and the Administrative Agent the Transfer Notice (with a copy of such written notice sent to Assignee).

Assignor's Account:

GE Capital EFS Financing, Inc.
Deutsche Bank Trust Company America
60 Wall Street, 28th, New York, NY 10005
ABA# 021-001-033

Account No: 50278772
Account Name: GECC EFS/T&I Depository Account

| | | |
|---|---|---|
| (a) | Assignor: | GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation) |
| (b) | Assignee: | Red Tree Investments, LLC |
| (c) | Issuer: | Petróleos de Venezuela, S.A. |
| (d) | Existing Administrative Agent: | GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation) |
| (e) | Note Agreement: | The Note Agreement, dated as of March 27, 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as Administrative Agent. |
| (f) | Notes: | Aggregate outstanding principal amount of $10,987,926.35, together with accrued and unpaid interest, on Note R-2 dated March 27, 2015, in the original outstanding principal amount of $131,855,116.31. |
| | | Aggregate outstanding principal amount of $10,391,707.36, together with accrued and unpaid interest, on Note R-3 dated March 27, 2015, in the original outstanding principal amount of $124,700,488.54. |
| (g) | Purchase Price: | Such amount set forth in the purchase price letter by and between the Assignor and the Assignee. |
| (h) | Assignee's Account for Payments: | ABA No.: 021000018
Beneficiary Account No: 8901212318
Beneficiary Account Name:
Wells Fargo Securities, LLC
FFC Account No.: 2MA01252
FFC Account Name: Red Tree Investments, LLC |
| (i) | Effective Date: | January 25, 2019 |

*[signature page follows]*

Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 238 of 312

The terms set forth in this Assignment are hereby agreed to:

**ASSIGNOR:**
GE CAPITAL EFS FINANCING, INC.

By: _____

Name: Daniel Wallitt
Title: Authorized Signatory

**ASSIGNEE:**
RED TREE INVESTMENTS, LLC

By: _____

Name: Lauren Murray
Title:   Authorized Signatory

Assignee's Notice Information:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR:
GE CAPITAL EFS FINANCING, INC.

By: _____
Name:
Title:

ASSIGNEE:
RED TREE INVESTMENTS, LLC

By: _____
Name: Lauren Murray
Title:   Authorized Signatory

Assignee's Notice Information:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

ANNEX 1

NOTE AGREEMENT, DATED AS OF MARCH 27, 2015, BY AND AMONG PETRÓLEOS DE
VENEZUELA, S.A., AS ISSUER, PDVSA PETRÓLEO, S.A., AS GUARANTOR, THE
NOTEHOLDERS THAT ARE A PARTY THERETO FROM TIME TO TIME AND GE CAPITAL
EFS FINANCING, INC. (AS SUCCESSOR TO GENERAL ELECTRIC CAPITAL
CORPORATION), AS ADMINISTRATIVE AGENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ACCEPTANCE

1. **Representations and Warranties of Assignor**

Assignor represents and warrants to Assignee as of the date hereof and as of the Effective Date that:

1.1 (i) it, acting on behalf of itself and its Affiliates, is the sole legal and beneficial owner of the
Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance,
pledge, security interest, setoff or other adverse claim, and (iii) it has full power and
authority, and has taken all action necessary, to execute and deliver this Assignment and to
consummate the transactions contemplated hereby; and assumes no responsibility with
respect to (w) any statements, warranties or representations made in or in connection with
the Finance Documents except for any statements, warranties, representations expressly
made by Assignor in any Finance Document or this Assignment, (x) the execution, legality,
validity, enforceability, genuineness, sufficiency or value of the Finance Documents, or any
collateral thereunder, (y) the financial condition of the Issuer, the Guarantor, any of the
Subsidiaries or any of their respective Affiliates in respect of any Finance Document or (z)
the performance or observance by the Issuer, the Guarantor, any of the Subsidiaries or any
of their respective Affiliates of any of their respective obligations under any Finance
Document.

1.3 The aggregate outstanding principal amount of the R-2 Note is $10,987,926.35 and the
original outstanding principal amount of the R-2 Note is $131,855,116.31. There is no
funding obligation of any kind in respect of the R-2 Note. The aggregate outstanding
principal amount of the R-3 Note is $10,391,707.36 and the original outstanding principal
amount of the R-3 Note is $124,700,488.54. There is no funding obligation of any kind in
respect of the R-3 Note.

1.4 Assignor (i) has not, on or after March 31, 2018, received any Distributions from the Issuer
or the Guarantor, or any of their respective Affiliates, in connection with the Assigned
Interest, (ii) has not entered into any agreement with the Issuer or an Affiliate of the Issuer
to make loans to or otherwise extend credit to or for the benefit of the Issuer or an Affiliate
of the Issuer or (iii) does not have any unpaid or outstanding liability, obligation or expense
in connection with the Assigned Interest, in each case under clauses (i), (ii) and (iii), which
will result in any setoff, offset or reduction in payments or distributions (including the
timing of payments or distributions) made to the Assignee in connection with the Assigned
Interest.

1.5 Assignor has delivered to Assignee true and correct copies of all of the Transaction
Documents and each of the additional documents set forth on Schedule I hereto. Except for
the documents listed on Schedule I, to the best of Assignor's knowledge, there are no other
documents with the Issuer or the Guarantor, or any of their respective Affiliates, to which
Assignor is a party that materially or adversely affect the Assigned Interest.

2. **Representations and Warranties of Assignee**

Assignee represents and warrants to Assignor as of the date hereof and as of the Effective Date that:

2.1    (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Noteholder under the Note Agreement, (ii) it is an Eligible Institution and is not an Ineligible Transferee, (iii) from and after the Effective Date, it shall be bound by the provisions of the Note Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Noteholder thereunder, and (iv) it has received a copy of the Note Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.04 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision; and agrees that (i) it will, independently and without reliance on the Administrative Agent, Assignor or any other Noteholder, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Finance Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Finance Documents are required to be performed by it as a Noteholder.

3. **Payments**

From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest and other amounts) to Assignee.

4. **General Provisions**

This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy or electronic mail shall be equally effective to the delivery of a manually executed counterpart of this Assignment. THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

5. **Indemnities**

5.1    Assignee shall indemnify, defend, and hold Assignor and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Assignor Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, expense or disbursement (including reasonable attorneys' fees and expenses) that any Assignor Indemnitee incurs or suffers as a result of or arising out of a breach of any of Assignee's representations, warranties, covenants or agreements in this Assignment up to a maximum amount equal to the Purchase Price.

5.2    Assignor shall indemnify, defend, and hold the Assignee and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Assignee Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage,

expense or disbursement (including reasonable attorneys' fees and expenses) that any Assignee Indemnitee incurs or suffers as a result of or arising out of a breach of any of Assignor's representations, warranties, covenants or agreements in this Assignment up to a maximum amount equal to the Purchase Price.

6.     **Costs and Expenses**

Assignee agrees (i) to pay and reimburse Assignor and any other Assignor Indemnitee for, all reasonable third-party out-of-pocket costs, expenses and fees actually incurred by Assignor or such Assignor Indemnitee (including reasonable attorney's fees and expenses) and (ii) to pay, indemnify, and hold the Assignor and any other Assignor Indemnitee harmless from and against any and all other liabilities, claims, costs, losses, judgments, damages, expenses or disbursements of any kind or nature whatsoever, with respect to or arising from or in connection with (x) Assignee's execution, enforcement or collection actions, legal remedies, or efforts under the Note Agreement, the Notes or the Assigned Interest (including in connection with any litigation, arbitration, insolvency, bankruptcy, moratorium or reorganization procedures, whether in or out-of-court, involving the Assignee (or any future successors or assigns of the Assignee) and the Issuer and/or the Guarantor) or (y) any action taken by Assignor at the prior written direction of Assignee (including, without limitation, any actions taken by Assignee in connection with the terms set forth in Section 10 hereof) (including reasonable attorney's fees and expenses). Assignee shall pay Assignor or such Assignor Indemnitee, by no later than five (5) business days from the date of receipt of the relevant written request from Assignor or the relevant Assignor Indemnitee, for any such costs, expenses and fees.

7.     **As-Is Basis**

WITH RESPECT TO THE ASSIGNED INTEREST, EXCEPT FOR ASSIGNOR'S REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS IN THIS ASSIGNMENT, SUCH ASSIGNED INTEREST IS HEREBY SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO THE ASSIGNEE ON AN "AS IS", "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION, WARRANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO SUCH ASSIGNED INTEREST, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW. ASSIGNEE FURTHER ACKNOWLEDGES THAT IT IS AWARE OF THE CURRENT NON-PAYMENTS UNDER THE NOTE AGREEMENT IN CONNECTION WITH THE ASSIGNED INTEREST.

8.     **Confidentiality**

Each of Assignor and Assignee agrees that, without prior consent of the other party, it shall not disclose the contents of this Assignment (including the Purchase Price) to any government, governmental agency, authority, court or other tribunal (collectively, "Governmental Authority") or any or any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, fund, investment account or other entity (each, including a Governmental Authority, an "Entity"), except that either party may make any such disclosure (i) if required to do so by any law, court, or regulation, (ii) to implement and enforce this Assignment, (iii) to any banking, regulatory, or examining authority, (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in such party incurring a liability to any other entity, (v) to its respective affiliates, and its and their directors, officers, members, employees and professional advisors (including legal counsel) or any other service providers as may be

FILED: NEW YORK COUNTY CLERK 02/15/2019 04:37 PM INDEX NO. 651005/2019

NYSCEF DOC. NO. Case 1:19-cv-02519-AJN Document 3-1 Filed 03/21/19 Page 243 of 312 RECEIVED NYSCEF: 02/15/2019

necessary in the ordinary course of business, or (vi) solely with the Purchase Price redacted, to the extent necessary to effect a subsequent transfer of the Assigned Interest.

9.      **Distributions**

It is understood that any Distributions in connection with the Assigned Interest made on or after the Effective Date belong to Assignee. If at any time on or after the Effective Date, Assignor receives a Distribution, Assignor shall (i) accept and hold the Distribution for the account and sole benefit of Assignee, (ii) have no equitable or beneficial interest in the Distribution and (iii) promptly deliver the Distribution to Assignee, and in no event later than five (5) business days of Assignor's receipt thereof.

10.     **Further Assurances**

Assignor agrees to execute and deliver, or cause to be executed and delivered, any further documents or acknowledgements as Assignee may reasonably request (at Assignee's sole cost and expense) that may be commercially necessary for Assignee to establish that Assignee is the owner of the Assigned Interest or entitled to receive directly any Distributions.

*[remainder of page intentionally left blank]*

**Schedule I**

LIST OF TRANSACTION DOCUMENTS

1. Note Agreement, dated as of March 27, 2015, by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as Administrative Agent.

2. Note R-2 dated March 27, 2015, in the original outstanding principal amount of $131,855,116.31, issued under the abovementioned Note Agreement.

3. Note R-3 dated March 27, 2015, in the original outstanding principal amount of $124,700,488.54, issued under the abovementioned Note Agreement.

**GE CAPITAL EFS FINANCING INC.**
(as successor to General Electric Capital Corporation)

January 25, 2019

Messrs.

**Red Tree Investments, LLC (as Noteholder)**
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

**Petróleos de Venezuela, S.A.** (as Issuer)
La Campiña
Avenida Libertador
Calle El Empalme
Edificio Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela
Attn:   Iliana Ruzza, Emir Manrique, Victor Aular, Abraham Ortega, Anabella Rivas and Edoardo Orsoni

**Re: Notice of resignation as Administrative Agent under Note Agreement**

Dear Sirs,

Reference is made to that certain Note Agreement, dated as of March 27, 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Note Agreement"), originally by and among Petróleos de Venezuela, S.A., a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as Issuer, PDVSA Petróleo, S.A. a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as guarantor, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), a Delaware corporation, as initial noteholder, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), a Delaware corporation, as administrative agent (in such capacity, the "Administrative Agent"), and Union Capital Group, as lead arranger. Capitalized terms used but not defined in this notice have the meanings assigned to them in the Note Agreement.

We hereby formally give you notice of our resignation as Administrative Agent under such Note Agreement, in accordance with Article VIII of the Note Agreement.

This resignation is made as part of a single transaction along with the following separate actions, which are taking place and shall become effective on the date hereof: (i) immediately prior to the execution of this notice of resignation, the sale and assignment of all of the interest in and to GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation)'s rights and obligations under the Note Agreement, the other Transaction Documents and any other agreements, documents or instruments delivered pursuant thereto or for the benefit of the Noteholders relating thereto, to Red Tree Investments, LLC; and (ii) immediately after the execution of this notice of resignation, the acceptance of this resignation and the appointment of a successor Administrative Agent under the Note Agreement by the

1

KLZ 3108743.2

Required Noteholders, and the acceptance of its appointment as successor Administrative Agent under the Note Agreement, by such successor Administrative Agent.

As a result of the foregoing, our resignation as Administrative Agent under such Note Agreement is effective immediately as of the date hereof.

Yours truly,

**GE Capital EFS Financing Inc.**
**(as successor to General Electric Capital Corporation)**

Authorized Signatory

2

RED TREE INVESTMENTS, LLC

January 25, 2019

Messrs.

**Petróleos de Venezuela, S.A.** (as Issuer)
La Campiña
Avenida Libertador
Calle El Empalme
Edificio Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela
Attn:    Iliana Ruzza, Emir Manrique, Víctor Aular, Abraham Ortega, Anabella Rivas and Edoardo Orsoni

**GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation)**
(as retiring Administrative Agent)
901 Main Avenue
Norwalk, CT 06851
United States of America
Atn:    Portfolio Manager

**Re: Notice of acceptance and appointment of successor Administrative Agent under Note Agreement**

Dear Sirs,

Reference is made to that certain Note Agreement, dated as of March 27, 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Note Agreement"), originally by and among Petróleos de Venezuela, S.A., a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as issuer, PDVSA Petróleo, S.A. a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as guarantor, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), a Delaware corporation, as initial noteholder, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), a Delaware corporation, as administrative agent, and Union Capital Group, as lead arranger. Capitalized terms used but not defined in this notice have the meanings assigned to them in the Note Agreement.

We hereby confirm receipt of the notice of resignation of GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation) as Administrative Agent under such Note Agreement, in accordance with Article VIII of the Note Agreement, as per the notice of resignation dated the date hereof and delivered to us on the date hereof.

We hereby accept the resignation of GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation) as Administrative Agent under such Note Agreement and formally notify you about our acceptance thereof, effective immediately. We hereby relieve, release and discharge GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation) from all its duties and obligations as Administrative Agent set forth in the Note Agreement, effective immediately as of the date hereof.

As a result of the foregoing, we hereby appoint Red Tree Investments, LLC as successor Administrative Agent under such Note Agreement, in accordance with Article VIII of the Note Agreement, effective immediately as of the date hereof.

1

KL2 3108752.1

Based on the above, Red Tree Investments, LLC shall be the Administrative Agent under the Note Agreement for all purposes effective immediately from the date hereof, and all references to the Administrative Agent in the Note Agreement and/or the Notes shall be references to Red Tree Investments, LLC, effective immediately from the date hereof

This acceptance and appointment is made as part of a single transaction along with the following separate actions, which are taking place and shall become effective on the date hereof: (i) immediately prior to the execution of this notice of acceptance and appointment and to the execution of the mentioned notice of resignation, the sale and assignment of all of the interest in and to GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation)'s rights and obligations under the Note Agreement, the other Transaction Documents and any other agreements, documents or instruments delivered pursuant thereto or for the benefit of the Noteholders relating thereto, to Red Tree Investments, LLC, and (ii) concurrently with the execution of this notice of acceptance and appointment, the resignation of GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as Administrative Agent under the Note Agreement.

Yours truly,

RED TREE INVESTMENTS, LLC

Authorized Signatory

We hereby confirm and accept our appointment as Administrative Agent under the Note Agreement for all purposes effective immediately from the date hereof, on the terms set forth herein above.

We hereby provide our account details as Administrative Agent under the Note Agreement, for purposes of amending and updating Schedule 2.08 thereof accordingly:

ABA # 021000018
Beneficiary Account No: 8901212318
Beneficiary Account Name: WELLS FARGO SECURITIES, LLC
FFC Account No: 2MA01252
FFC Account Name: Red Tree Investments, LLC

Furthermore, we hereby provide our address and details for notices and other communications to us as Administrative Agent under the Note Agreement, for purposes of amending and updating Sections 9.01(b) and 2.08 thereof accordingly:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4688 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

2

Yours truly,

RED TREE INVESTMENTS, LLC

Authorized Signatory

K12 3105752.1

# EXHIBIT G

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

RED TREE INVESTMENTS, LLC,

               Plaintiff,

        -against-

                                 Index No. _____

PETROLEOS DE VENEZUELA S.A. and PDVSA
PETROLEO S.A.,

               Defendants.

## AFFIDAVIT OF DANIEL WALLITT

I, Daniel Wallitt, being duly sworn, hereby depose and say:

1.     I currently serve as a Managing Director for GE Capital EFS Financing Inc. ("GE Capital EFS"), and have held this position since 2015. In this capacity, I am personally familiar with the facts set forth in this Affidavit and know them to be true, except where I indicate otherwise.

2.     GE Capital EFS is a Delaware corporation, a financial services subsidiary of General Electric Corporation.

## THE 2016 NOTE

3.     GE Capital EFS is the original holder of a note dated as of May 13, 2016 (the "2016 Note") issued by PDVSA pursuant to a note agreement also dated as of May 13, 2016 (the "2016 Note Agreement"), between and among GE Capital EFS, PDVSA, and Petróleo. A copy of the 2016 Note Agreement is attached to the Quinn Emanuel attorney affidavit (the "QE Affidavit"), as Exhibit D. A copy of the 2016 Note is attached to the QE Affidavit as Exhibit E.

1

4.     Under the 2016 Note, PDVSA agreed to pay GE Capital EFS or its assigns a principal amount of $193,959,763.03 plus interest on the outstanding balance at a rate of 6.5% per annum and the default rate to be paid at a rate of 8.5% per annum.

5.     Under Article VI of the 2016 Note Agreement, Petróleo guaranteed PDVSA's prompt payment when due, including defined costs and fees (the "May 2016 Guarantee").

## DEFAULT ON THE 2016 NOTE

6.     Under the 2016 Note, PDVSA was obligated to make quarterly principal payments to GE Capital EFS in accordance with the schedule included in Exhibit A to such 2016 Note, of $16,163,313.59, with interest payments, starting on June 27, 2016. PDVSA first failed to make a quarterly payment of $16,163,313.59 in principal and $1,571,605.48 in interest on December 27, 2017. *See* QE Affidavit Exhibit E at 3. PDVSA has not made a payment since.

7.     Under the terms of the May 2016 Guarantee, upon the 2016 Note becoming due and payable pursuant to Article VII of the 2016 Note Agreement, Petróleo was obligated to promptly pay all outstanding amounts due on the 2016 Note. *See* QE Affidavit Exhibit D, § 6.01. Petróleo has not made a single payment under the 2016 Note to GE Capital EFS.

8.     Accordingly, on January 5, 2018, GE Capital EFS sent notice of missed payment to PDVSA and Petróleo. A copy of that notice is enclosed herein as Exhibit A. On March 19, 2018, GE Capital EFS sent a notice of acceleration to PDVSA and Petróleo. A copy of this acceleration letter is enclosed as Exhibit B.

## ASSIGNMENT OF THE 2016 NOTE

9.     On January 25, 2019, GE Capital EFS entered into an assignment and acceptance of the 2016 Note (the "2016 Note Assignment") with Red Tree. A copy of the 2016 Note Assignment is enclosed as Exhibit C.

10.     The 2016 Note Assignment reflects an outstanding principal balance of $96,979,881.49, as well as unpaid interest, pursuant to the 2016 Note Agreement as of the date of the 2016 Note Assignment.

11.     On January 25, 2019, GE Capital EFS, in its then-capacity as Administrative Agent, sent PDVSA and Petróleo an electronic mail notice of the assignment of the 2016 Note. A copy of that notice is enclosed as Exhibit D.

DANIEL WALLITT

Sworn to before me this
25th day of February 2019

JANET DELILLE
Notary Public, State of New York
No. 01DE6197265
Qualified in Queens County
Commission Expires Nov. 24, 20_20_

3

# EXHIBIT A



GE Capital EFS Financing, Inc.
901 Main Avenue
Norwalk, Connecticut 06851

January 5, 2018

Petróleos de Venezuela, S.A.
PDVSA Petróleo, S.A.
La Campiña
Avenida Libertador
Calle El Empalme
Edificios Petroleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela

Attention: Iliana Ruzza, Emir Manrique, Ana Maria España and Renny Bolívar
Facsimile: +58 212 708 1441
Email: ruzzai@pdvsa.com, manriqueej@pdvsa.com, espanaam@pdvsa.com and
bolivarrs@pdvsa.com

Attention: Anabella Rivas and Edoardo Orsoni
Facsimile: +58 212 708 4989
Email: rivasaay@pdvsa.com and orsonie@pdvsa.com

**Re: Notice of Missed Payment under the Note Agreement dated as of May 13, 2016 among
Petróleos de Venezuela, S.A., as Issuer, PDVSA Petróleo, S.A., as Guarantor, GE Capital EFS
Financing, Inc., as Initial Noteholder, and GE Capital EFS Financing, Inc., as Administrative
Agent (the "Note Agreement")**

To Whom It May Concern:

This letter is being sent by the Administrative Agent on behalf of itself and the Noteholders to
notify the Issuer and the Guarantor of a missed payment under the terms of the Note
Agreement. Capitalized terms used in this letter but not defined herein shall have the
meaning given to them in the Note Agreement.

Pursuant to Article II of the Note Agreement, the Issuer was obligated to make a principal and
interest payment to the Administrative Agent, for the account of Noteholders, in the aggregate
amount of Seventeen Million, Seven-Hundred Thirty-Four Thousand, Nine Hundred Nineteen
Dollars and Seven Cents ($17,734,919.07) on December 27, 2017.

Article VII(a) of the Note Agreement provides that it would be an Event of Default under the
Note Agreement if the Issuer fails "to pay the principal of, or interest on any of the Notes,
when such principal becomes due and payable, including at any of the Repayment Dates, by

acceleration or otherwise, and such failure continues for a period of five (5) days after written notice thereof has been given to the Issuer."

This letter constitutes written notification to the Issuer for purposes of Article VII(a) of the Note Agreement. Accordingly, notice is given that if the Issuer fails to make the above mentioned payment within five (5) days from the date hereof, an Event of Default will occur. In addition, the Issuer should understand that if an Event of Default occurs under this Note Agreement, it would also automatically trigger an Event of Default under (i) the Credit Agreement dated as of December 27, 2016 among Petróleos de Venezuela, S.A., as Borrower, PDVSA Petróleo, S.A., as Guarantor, GE Capital EFS Financing, Inc., as Agent, and the Lenders party thereto (the "Credit Agreement") and, (ii) pursuant to Section 8.05 (*Cross-Event of Default*) of the Credit Agreement, the Note Agreement dated as of March 27, 2015 among the Issuer, as issuer, the Guarantor, as guarantor, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as initial noteholder and administrative agent, and Union Capital Group, as lead arranger.

The Administrative Agent hereby reserves all rights and remedies available to it under the Note Agreement, each other Finance Document, as well as under applicable law, as a result of the missed payment that the Issuer has failed to make in accordance with the terms of the Note Agreement. Such remedies include, without limitation, the right to collect interest at the default rate with respect to any amounts not paid when due as provided in Section 2.04 of the Note Agreement.

No failure or delay on the part of the Administrative Agent or any Noteholder in exercising any of their rights or remedies under the Note Agreement and each other Finance Document, as well as under applicable law, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.

This letter shall be governed by and construed in accordance with the laws of the State of New York.

Thank you.

GE CAPITAL EFS FINANCING, INC.

By: _____

Name: Daniel Wallitt
Title: Authorized Signatory

# EXHIBIT B



GE Capital EFS Financing, Inc.
901 Main Avenue
Norwalk, Connecticut 06851

March 19, 2018

Petróleos de Venezuela, S.A.
La Campiña
Avenida Libertador
Calle El Empalme
Edificios Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela

Attention: Iliana Ruzza, Emir Manrique, Ana Maria España and Renny Bolívar
Facsimile: +58 212 708 1441
Email: ruzzai@pdvsa.com, manriqueej@pdvsa.com, espanaam@pdvsa.com and
bolivarrs@pdvsa.com

Attention: Anabella Rivas and Edoardo Orsoni
Facsimile: +58 212 708 4989
Email: rivasaay@pdvsa.com and orsonie@pdvsa.com

**Re: Notice of Event of Default, Acceleration and Payment Demand under the Note
Agreement dated as of May 13, 2016 among Petróleos de Venezuela, S.A., as Issuer, PDVSA
Petróleo, S.A., as Guarantor, and GE Capital EFS Financing, Inc., as Initial Noteholder and as
Administrative Agent (the "Note Agreement")**

To Whom It May Concern:

This letter is being sent by the Administrative Agent on behalf of itself and the Noteholders in
furtherance of our prior letter to you dated January 5, 2018 (the "Prior Letter"). pursuant to
which we notified you that the Issuer was obligated to make a principal and interest payment
to the Administrative Agent, for the account of Noteholders, in the aggregate amount of
Seventeen Million, Seven-Hundred Thirty-Four Thousand, Nine Hundred Nineteen Dollars and
Seven Cents ($17,734,919.07) on December 27, 2017 (the "Missed Payment"). Capitalized
terms used in this letter but not defined herein shall have the meaning given to them in the
Note Agreement.

In accordance with the Prior Letter, we notified you that, pursuant to Article VII(a) of the Note
Agreement, there would be an Event of Default under the Note Agreement if the Missed
Payment continued to remain unpaid for a period of five (5) days after written notice thereof
has been given to the Issuer. As of the date hereof, the Missed Payment remains unpaid.
Consequently, this letter constitutes written notification to the Issuer and the Guarantor that
an Event of Default has occurred and is continuing under the Note Agreement. In addition, as

a result of the Event of Default under the Note Agreement, an "Event of Default" has also occurred and is continuing under (i) the Credit Agreement dated as of December 27, 2016, among Petróleos de Venezuela, S.A., as Borrower, PDVSA Petróleo, S.A., as Guarantor, GE Capital EFS Financing, Inc., as Agent, and the Lenders party thereto (the "Credit Agreement") and, (ii) pursuant to Section 8.05 *(Cross-Event of Default)* of the Credit Agreement, the Note Agreement dated as of March 27, 2015 among the Issuer, as issuer, the Guarantor, as guarantor, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as initial noteholder and administrative agent, and Union Capital Group, as lead arranger.

Notice is given to the Issuer and the Guarantor that pursuant to Article VII of the Note Agreement, the Administrative Agent, acting at the request of the Required Noteholders, declares the Notes to be forthwith due and payable in whole, and demands that the Issuer and/or the Guarantor immediately make payment of the Notes (including without limitation the principal, accrued and default interest thereon, and any unpaid accrued fees and all other liabilities of the Issuer under the Note Agreement and any other Finance Document).

The Administrative Agent hereby reserves all rights and remedies available to it under the Note Agreement, each other Finance Document, as well as under applicable law, as a result of the Event of Default subject of this letter.

No failure or delay on the part of the Administrative Agent or any Noteholder in exercising any of their rights or remedies under the Note Agreement and each other Finance Document, as well as under applicable law, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.

This letter shall be governed by and construed in accordance with the laws of the State of New York.

Thank you.

GE CAPITAL EFS FINANCING, INC.,
as Administrative Agent

By: _____

Name:  Daniel Wallitt
Title:  Authorized Signatory

# EXHIBIT C

## ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (this "Assignment") is dated as of January 25, 2019 and is entered into by and between **GE Capital EFS Financing, Inc.** (the "Assignor") and **Red Tree Investments, LLC** (the "Assignee"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Note Agreement identified below (the "Note Agreement"), receipt of a copy of which is hereby acknowledged by Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

On the Effective Date (as defined below), Assignor hereby irrevocably sells and assigns to Assignee, and Assignee hereby irrevocably purchases and assumes from Assignor, subject to and in accordance with the Standard Terms and Conditions and the Finance Documents, all of Assignor's rights, title, and interest in, to and under the Note (as defined below) and, to the extent related thereto, all of the following: (i) the Note Agreement and the other Transaction Documents, and any other agreements, documents, guarantees and instruments delivered pursuant thereto or for the benefit of the Noteholders; and (ii) all principal, interest, claims, payments, proceeds, distributions of any kind arising from the foregoing ("Distributions") (clauses (i) and (ii) collectively, the "Assigned Interest").

Prior to the Effective Date and as conditions precedent to the transaction contemplated by this Assignment: (i) Assignor and Assignee shall each execute and deliver into escrow counterpart copies of this Assignment, (ii) Assignor shall execute and deliver into escrow Assignor's resignation as Administrative Agent under the Note Agreement (the "Agent's Resignation"); (iii) Assignee shall execute and deliver into escrow Assignee's acceptance of the Agent's Resignation and the appointment and acceptance of Assignee as the successor Administrative Agent under the Note Agreement; (iv) Assignor shall deliver into escrow the original Note together with a note power (endorsed in blank) together with a medallion signature guarantee affixed thereto and (v) Assignor shall execute and deliver into escrow written notice of the assignment of the Notes by Assignor to Assignee and confirmation of the Effective Date for this Assignment (with the Effective Date set forth therein and herein upon receipt of the Purchase Price) (the "Transfer Notice"). Upon satisfaction of the execution and delivery of each of the foregoing documents (collectively and together with this Assignment, the "Assignment Documents") by the parties hereto (as the case may be), Assignee shall, within one (1) business day, pay Assignor the Purchase Price (defined below) in immediately available funds to Assignor's account designated below (as the same may be subsequently amended or updated by Assignor).

The sale and assignment of the Assigned Interest contemplated hereby shall become effective on the "Effective Date", which shall be the date on which Assignor shall have received the Purchase Price, in which event the Assignment Documents may be delivered from escrow to Assignee with copies thereof delivered to Assignor.

On the Effective Date, Assignor agrees to deliver to the Issuer, or Issuer's representatives, as the case may be, and the Administrative Agent the Transfer Notice (with a copy of such written notice sent to Assignee).

Assignor's Account:

GE Capital EFS Financing, Inc.
Deutsche Bank Trust Company America
60 Wall Street, 28th, New York, NY 10005
ABA# 021-001-033

Account No: 50278772
Account Name: GECC EFS/T&I Depository Account

(a)    Assignor:                          GE Capital EFS Financing, Inc.

(b)    Assignee:                          Red Tree Investments, LLC

(c)    Issuer:                            Petróleos de Venezuela, S.A.

(d)    Existing      Administrative
       Agent:                             GE Capital EFS Financing, Inc.

(e)    Note Agreement:                    The Note Agreement, dated as of May 13, 2016 (as the
                                          same may be amended, restated, supplemented or otherwise
                                          modified from time to time in accordance with its terms),
                                          by and among Petróleos de Venezuela, S.A. as Issuer,
                                          PDVSA Petróleo, S.A., as Guarantor, the Noteholders that
                                          are a party thereto from time to time and GE Capital EFS
                                          Financing, Inc., as Administrative Agent.

(f)    Note:                             Aggregate outstanding principal amount of $96,979,881.49,
                                          together with accrued and unpaid interest, on Note R-1
                                          dated May 13, 2016, in the original outstanding principal
                                          amount of $193,959,763.03.

(g)    Purchase Price:                   Such amount as set forth in the purchase price letter by and
                                          between the Assignor and the Assignee.

(h)    Assignee's   Account   for
       Payments:                          ABA No.: 021000018
                                          Beneficiary Account No: 8901212318
                                          Beneficiary Account Name:
                                          Wells Fargo Securities, LLC
                                          FFC Account No.: 2MA01252
                                          FFC Account Name: Red Tree Investments, LLC

(i)    Effective Date:                   January 25, 2019

*[signature page follows]*

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR:
GE CAPITAL EFS FINANCING, INC.

By: _____
Name: Daniel Wallitt
Title: Authorized Signatory

ASSIGNEE:
RED TREE INVESTMENTS, LLC

By: _____
Name: Lauren Murray
Title: Authorized Signatory

Assignee's Notice Information:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

The terms set forth in this Assignment are hereby agreed to:


ASSIGNOR:
GE CAPITAL EFS FINANCING, INC.


By: _____
Name:
Title:


ASSIGNEE:
RED TREE INVESTMENTS, LLC

By: _____
Name: Lauren Murray
Title:  Authorized Signatory


Assignee's Notice Information:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

ANNEX 1

NOTE AGREEMENT, DATED AS OF MAY 13, 2016, BY AND AMONG PETRÓLEOS DE
VENEZUELA, S.A., AS ISSUER, PDVSA PETRÓLEO, S.A., AS GUARANTOR, THE
NOTEHOLDERS THAT ARE A PARTY THERETO FROM TIME TO TIME AND GE CAPITAL
EFS FINANCING, INC., AS ADMINISTRATIVE AGENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ACCEPTANCE

1.    **Representations and Warranties of Assignor**

Assignor represents and warrants to Assignee as of the date hereof and as of the Effective Date that:

1.1    (i) it, acting on behalf of itself and its Affiliates, is the sole legal and beneficial owner of the
       Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance,
       pledge, security interest, setoff or other adverse claim, and (iii) it has full power and
       authority, and has taken all action necessary, to execute and deliver this Assignment and to
       consummate the transactions contemplated hereby; and assumes no responsibility with
       respect to (w) any statements, warranties or representations made in or in connection with
       the Finance Documents except for any statements, warranties, representations expressly
       made by Assignor in any Finance Document or this Assignment, (x) the execution, legality,
       validity, enforceability, genuineness, sufficiency or value of the Finance Documents, or any
       collateral thereunder, (y) the financial condition of the Issuer, the Guarantor, any of the
       Subsidiaries or any of their respective Affiliates in respect of any Finance Document or (z)
       the performance or observance by the Issuer, the Guarantor, any of the Subsidiaries or any
       of their respective Affiliates of any of their respective obligations under any Finance
       Document.

1.2    Attached hereto as Exhibit A is true and correct copy of a notice (the "Acceleration Notice")
       that was delivered by Assignor to the Issuer. The Acceleration Notice has not been
       modified, amended, revoked, rescinded or withdrawn.

1.3    The aggregate outstanding principal amount of the Note is $96,979,881.49 and the original
       outstanding principal amount of the Note is $193,959,763.03. There is no funding
       obligation of any kind in respect of the Note.

1.4    Assignor (i) has not, on or after December 27, 2017, received any Distributions from the
       Issuer or the Guarantor, or any of their respective Affiliates, in connection with the
       Assigned Interest, (ii) has not entered into any agreement with the Issuer or an Affiliate of
       the Issuer to make loans to or otherwise extend credit to or for the benefit of the Issuer or an
       Affiliate of the Issuer or (iii) does not have any unpaid or outstanding liability, obligation or
       expense in connection with the Assigned Interest, in each case under clauses (i), (ii) and
       (iii), which will result in any setoff, offset or reduction in payments or distributions
       (including the timing of payments or distributions) made to the Assignee in connection with
       the Assigned Interest.

1.5    Assignor has delivered to Assignee true and correct copies of all of the Transaction
       Documents and each of the additional documents set forth on Schedule I hereto. Except for
       the documents listed on Schedule I, to the best of Assignor's knowledge, there are no other
       documents with the Issuer or the Guarantor, or any of their respective Affiliates, to which
       Assignor is a party that materially or adversely affect the Assigned Interest.

2.    **Representations and Warranties of Assignee**

Assignee represents and warrants to Assignor as of the date hereof and as of the Effective Date that:

2.1    (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Noteholder under the Note Agreement, (ii) it is an Eligible Institution and is not an Ineligible Transferee, (iii) from and after the Effective Date, it shall be bound by the provisions of the Note Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Noteholder thereunder, and (iv) it has received a copy of the Note Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.04 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision; and agrees that (i) it will, independently and without reliance on the Administrative Agent, Assignor or any other Noteholder, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Finance Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Finance Documents are required to be performed by it as a Noteholder.

3.    **Payments**

       From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest and other amounts) to Assignee.

4.    **General Provisions**

       This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy or electronic mail shall be equally effective to the delivery of a manually executed counterpart of this Assignment. THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

5.    **Indemnities**

5.1    Assignee shall indemnify, defend, and hold Assignor and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Assignor Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, expense or disbursement (including reasonable attorneys' fees and expenses) that any Assignor Indemnitee incurs or suffers as a result of or arising out of a breach of any of Assignee's representations, warranties, covenants or agreements in this Assignment up to a maximum amount equal to the Purchase Price.

5.2    Assignor shall indemnify, defend, and hold the Assignee and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Assignee Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, expense or disbursement (including reasonable attorneys' fees and expenses) that any

Assignee Indemnitee incurs or suffers as a result of or arising out of a breach of any of Assignor's representations, warranties, covenants or agreements in this Assignment up to a maximum amount equal to the Purchase Price.

6.    **Costs and Expenses**

Assignee agrees (i) to pay and reimburse Assignor and any other Assignor Indemnitee for, all reasonable third-party out-of-pocket costs, expenses and fees actually incurred by Assignor or such Assignor Indemnitee (including reasonable attorney's fees and expenses) and (ii) to pay, indemnify, and hold the Assignor and any other Assignor Indemnitee harmless from and against any and all other liabilities, claims, costs, losses, judgments, damages, expenses or disbursements of any kind or nature whatsoever, with respect to or arising from or in connection with (x) Assignee's execution, enforcement or collection actions, legal remedies, or efforts under the Note Agreement, the Note or the Assigned Interest (including in connection with any litigation, arbitration, insolvency, bankruptcy, moratorium or reorganization procedures, whether in or out-of-court, involving the Assignee (or any future successors or assigns of the Assignee) and the Issuer and/or the Guarantor) or (y) any action taken by Assignor at the prior written direction of Assignee (including, without limitation, any actions taken by Assignee in connection with the terms set forth in Section 10 hereof) (including reasonable attorney's fees and expenses). Assignee shall pay Assignor or such Assignor Indemnitee, by no later than five (5) business days from the date of receipt of the relevant written request from Assignor or the relevant Assignor Indemnitee, for any such costs, expenses and fees.

7.    **As-Is Basis**

WITH RESPECT TO THE ASSIGNED INTEREST, EXCEPT FOR ASSIGNOR'S REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS IN THIS ASSIGNMENT, SUCH ASSIGNED INTEREST IS HEREBY SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO THE ASSIGNEE ON AN "AS IS", "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION, WARRANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO SUCH ASSIGNED INTEREST, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW. ASSIGNEE FURTHER ACKNOWLEDGES THAT IT IS AWARE OF THE CURRENT NON-PAYMENTS UNDER THE NOTE AGREEMENT IN CONNECTION WITH THE ASSIGNED INTEREST.

8.    **Confidentiality**

Each of Assignor and Assignee agrees that, without prior consent of the other party, it shall not disclose the contents of this Assignment (including the Purchase Price) to any government, governmental agency, authority, court or other tribunal (collectively, "Governmental Authority") or any or any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, fund, investment account or other entity (each, including a Governmental Authority, an "Entity"), except that either party may make any such disclosure (i) if required to do so by any law, court, or regulation, (ii) to implement and enforce this Assignment, (iii) to any banking, regulatory, or examining authority, (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in such party incurring a liability to any other entity, (v) to its respective affiliates, and its and their directors, officers, members, employees and professional advisors (including legal counsel) or any other service providers as may be

necessary in the ordinary course of business, or (vi) solely with the Purchase Price redacted, to the extent necessary to effect a subsequent transfer of the Assigned Interest.

9.    **Distributions**

It is understood that any Distributions in connection with the Assigned Interest made on or after the Effective Date belong to Assignee. If at any time on or after the Effective Date, Assignor receives a Distribution, Assignor shall (i) accept and hold the Distribution for the account and sole benefit of Assignee, (ii) have no equitable or beneficial interest in the Distribution and (iii) promptly deliver the Distribution to Assignee, and in no event later than five (5) business days of Assignor's receipt thereof.

10.    **Further Assurances**

Assignor agrees to execute and deliver, or cause to be executed and delivered, any further documents or acknowledgements as Assignee may reasonably request (at Assignee's sole cost and expense) that may be commercially necessary for Assignee to establish that Assignee is the owner of the Assigned Interest or entitled to receive directly any Distributions.

*[remainder of page intentionally left blank]*

**Schedule I**

LIST OF TRANSACTION DOCUMENTS

1. Note Agreement, dated as of May 13, 2016, by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and GE Capital EFS Financing, Inc., as Administrative Agent.

2. Note R-1 dated May 13, 2016, in the original outstanding principal amount of $193,959,763.03, issued under the abovementioned Note Agreement.

Exhibit A

*Acceleration Notice*

*See Attached*



GE Capital EFS Financing, Inc.
901 Main Avenue
Norwalk, Connecticut 06851

March 19, 2018

Petróleos de Venezuela, S.A.
La Campiña
Avenida Libertador
Calle El Empalme
Edificios Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela

Attention: Iliana Ruzza, Emir Manrique, Ana Maria España and Renny Bolívar
Facsimile: +58 212 708 1441
Email: ruzzai@pdvsa.com, manriqueej@pdvsa.com, espanaam@pdvsa.com and
bolivarrs@pdvsa.com

Attention: Anabella Rivas and Edoardo Orsoni
Facsimile: +58 212 708 4989
Email: rivasaay@pdvsa.com and orsonie@pdvsa.com

**Re: Notice of Event of Default, Acceleration and Payment Demand under the Note
Agreement dated as of May 13, 2016 among Petróleos de Venezuela, S.A., as Issuer, PDVSA
Petróleo, S.A., as Guarantor, and GE Capital EFS Financing, Inc., as Initial Noteholder and as
Administrative Agent (the "Note Agreement")**

To Whom It May Concern:

This letter is being sent by the Administrative Agent on behalf of itself and the Noteholders in
furtherance of our prior letter to you dated January 5, 2018 (the "Prior Letter"), pursuant to
which we notified you that the Issuer was obligated to make a principal and interest payment
to the Administrative Agent, for the account of Noteholders, in the aggregate amount of
Seventeen Million, Seven-Hundred Thirty-Four Thousand, Nine Hundred Nineteen Dollars and
Seven Cents ($17,734,919.07) on December 27, 2017 (the "Missed Payment"). Capitalized
terms used in this letter but not defined herein shall have the meaning given to them in the
Note Agreement.

In accordance with the Prior Letter, we notified you that, pursuant to Article VII(a) of the Note
Agreement, there would be an Event of Default under the Note Agreement if the Missed
Payment continued to remain unpaid for a period of five (5) days after written notice thereof
has been given to the Issuer. As of the date hereof, the Missed Payment remains unpaid.
Consequently, this letter constitutes written notification to the Issuer and the Guarantor that
an Event of Default has occurred and is continuing under the Note Agreement. In addition, as

FILED: NEW YORK COUNTY CLERK 02/15/2019 04:37 PM
NYSCEF DOC. NO. 18    Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 272 of 312

INDEX NO. 651005/2019
RECEIVED NYSCEF: 02/15/2019

a result of the Event of Default under the Note Agreement, an "Event of Default" has also occurred and is continuing under (i) the Credit Agreement dated as of December 27, 2016, among Petróleos de Venezuela, S.A., as Borrower, PDVSA Petróleo, S.A., as Guarantor, GE Capital EFS Financing, Inc., as Agent, and the Lenders party thereto (the "Credit Agreement") and, (ii) pursuant to Section 8.05 *(Cross-Event of Default)* of the Credit Agreement, the Note Agreement dated as of March 27, 2015 among the Issuer, as issuer, the Guarantor, as guarantor, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as initial noteholder and administrative agent, and Union Capital Group, as lead arranger.

Notice is given to the Issuer and the Guarantor that pursuant to Article VII of the Note Agreement, the Administrative Agent, acting at the request of the Required Noteholders, declares the Notes to be forthwith due and payable in whole, and demands that the Issuer and/or the Guarantor immediately make payment of the Notes (including without limitation the principal, accrued and default interest thereon, and any unpaid accrued fees and all other liabilities of the Issuer under the Note Agreement and any other Finance Document).

The Administrative Agent hereby reserves all rights and remedies available to it under the Note Agreement, each other Finance Document, as well as under applicable law, as a result of the Event of Default subject of this letter.

No failure or delay on the part of the Administrative Agent or any Noteholder in exercising any of their rights or remedies under the Note Agreement and each other Finance Document, as well as under applicable law, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.

This letter shall be governed by and construed in accordance with the laws of the State of New York.

      Thank you.

                             GE CAPITAL EFS FINANCING, INC.,
                             as Administrative Agent

                             By: _____

                             Name:  Daniel Wallitt
                             Title:   Authorized Signatory

Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 273 of 312

# EXHIBIT D

**Anna Deknatel**

| | |
|---|---|
| **From:** | Wallitt, Daniel (GE Capital) <Daniel.Wallitt@ge.com> |
| **Sent:** | Friday, January 25, 2019 4:50 PM |
| **To:** | 'EMMY HERRERA'; 'LOVERALR@PDVSA.COM' |
| **Cc:** | Landazabal, Carlos (GE Global); 'CARLOS COELLO'; 'diazwd@pdvsa.com'; Friel, Gerald (GE Capital); 'graffet@pdvsa.com'; Weidner, Matthew L (GE Capital); 'medinait@pdvsa.com'; 'ROSA MOTA'; Ho, Quang (GE Capital); 'JORGE CHIRINOS'; 'CLAUDIA PEREZ'; 'MARITZA VALLEJO'; 'ROSIRIS CONTRERAS'; 'apontels@pdvsa.com'; 'lopezfmx@pdvsa.com'; 'carpiojm@pdvsa.com'; 'navasmu@pdvsa.com'; 'GUZMANRU@PDVSA.COM'; 'CARLOS COELLO'; 'diazwd@pdvsa.com'; Friel, Gerald (GE Capital); 'graffet@pdvsa.com'; Weidner, Matthew L (GE Capital); 'medinait@pdvsa.com'; 'ROSA MOTA'; Ho, Quang (GE Capital); 'JORGE CHIRINOS'; 'CLAUDIA PEREZ'; 'MARITZA VALLEJO'; 'ROSIRIS CONTRERAS'; 'apontels@pdvsa.com'; 'lopezfmx@pdvsa.com'; 'carpiojm@pdvsa.com'; 'navasmu@pdvsa.com'; 'GUZMANRU@PDVSA.COM'; ruzzai@pdvsa.com; manriqueej@pdvsa.com; aularvs@pdvsa.com; 'bolivarmj@pdvsa.com'; 'espanaam@pdvsa.com'; 'orsonie@pdvsa.com'; 'graffet@pdvsa.com'; 'ruzzai@pdvsa.com'; 'PATRICIA LUGO'; 'MARVIN PINTO'; 'CARLOS COELLO'; 'ANABELLA Rivas'; 'herreraev@pdvsa.com'; 'ferrern@pdvsa.com'; 'ROSA MOTA'; Landazabal, Carlos (GE Global); Friel, Gerald (GE Capital); Weidner, Matthew L (GE Capital); Ho, Quang (GE Capital); 'aularvs@pdvsa.com'; 'ortegaae@pdvsa.com'; 'bolivarrs@pdvsa.com'; 'ruzzai@pdvsa.com'; manriqueej@pdvsa.com |
| **Subject:** | GENEREAL ELECTRIC - PDVSA II |
| **Attachments:** | PDVSA II-Notice of Assignment.pdf; PDVSA II - Notice of Acceptnce and Apointment as Agent.pdf; PDVSA II- Notice of Resignation as Agent.pdf |

All, please find the following attached files relating to the Note dated May 13, 2016:

- Notice of Resignation as Agent
- Notice of Acceptance and Appointment as Agent
- Notice of Assignment

**Dan Wallitt**
GE Capital
901 Main Avenue
Norwalk, CT 06851
T: 203-229-8616
M: 917-696-6588
daniel.wallitt@ge.com

GE CAPITAL EFS FINANCING, INC.

January 25, 2019

**Petróleos de Venezuela, S.A.**
La Campiña
Avenida Libertador
Calle El Empalme
Edificio Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela

Attn:    Iliana Ruzza, Emir Manrique, Ana María España, Renny Bolívar, Anabella Rivas and
         Edoardo Orsoni

**PDVSA Petróleo, S.A.**
La Campiña
Avenida Libertador
Calle El Empalme
Edificio Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela

Attn:    Iliana Ruzza, Emir Manrique, Ana María España, Renny Bolívar, Anabella Rivas and
         Edoardo Orsoni

**GE Capital EFS Financing Inc.,**
In its capacity as Administrative Agent
901 Main Avenue
Norwalk, CT 06851
United States of America

Atn:     Portfolio Manager

Sirs:

Reference is made to that certain Note Agreement, dated as of May 13, 2016 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Note Agreement"), by and among Petróleos de Venezuela, S.A., a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as issuer (the "Issuer"), PDVSA Petróleo, S.A. a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as guarantor, GE Capital EFS Financing, Inc., a Delaware corporation, as initial noteholder (the "Initial Noteholder"), and GE Capital EFS Financing, Inc., a Delaware corporation, as administrative agent (the "Administrative Agent"). Capitalized terms used but not defined in this letter have the meanings assigned to them in the Note Agreement.

Reference is also made to Section 9.04(b) of the Note Agreement according to which, upon the occurrence and continuance of an Event of Default, each Noteholder may assign to any Person or Persons all or a portion of its interests, rights and obligations under the Note Agreement and the other Finance Documents with notice to the Issuer and the Administrative Agent, and to Section 2.11 of the Note Agreement pursuant to which a Noteholder may transfer and exchange its Note in whole or in part.

We hereby notify you that on January 25, 2019, GE Capital EFS Financing Inc. assigned to Red Tree Investments, LLC the unpaid principal balance of $96,979,881.49, together with accrued and unpaid interest, on Note No. R-I dated May 13, 2016 in the original principal amount of $193,959,763.03 (the "Note"), and all of GE Capital EFS Financing Inc.'s interests, rights and obligations under the Note Agreement equivalent to the Notes assigned to Red Tree Investments, LLC.

Attached hereto is a fully executed Assignment and Acceptance, dated as of January 25, 2019, between the undersigned as assignor and Red Tree Investments, LLC as assignee evidencing such assignment.

Yours truly,

GE Capital EFS Financing Inc.

Authorized Signatory

KL2 3108730.2

## ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (this "Assignment") is dated as of January 25, 2019 and is entered into by and between **GE Capital EFS Financing, Inc.** (the "Assignor") and **Red Tree Investments, LLC** (the "Assignee"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Note Agreement identified below (the "Note Agreement"), receipt of a copy of which is hereby acknowledged by Assignee. The Standard Terms and Conditions set forth in <u>Annex 1</u> attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

On the Effective Date (as defined below), Assignor hereby irrevocably sells and assigns to Assignee, and Assignee hereby irrevocably purchases and assumes from Assignor, subject to and in accordance with the Standard Terms and Conditions and the Finance Documents, all of Assignor's rights, title, and interest in, to and under the Note (as defined below) and, to the extent related thereto, all of the following: (i) the Note Agreement and the other Transaction Documents, and any other agreements, documents, guarantees and instruments delivered pursuant thereto or for the benefit of the Noteholders; and (ii) all principal, interest, claims, payments, proceeds, distributions of any kind arising from the foregoing ("Distributions") (clauses (i) and (ii) collectively, the "Assigned Interest").

Prior to the Effective Date and as conditions precedent to the transaction contemplated by this Assignment: (i) Assignor and Assignee shall each execute and deliver into escrow counterpart copies of this Assignment, (ii) Assignor shall execute and deliver into escrow Assignor's resignation as Administrative Agent under the Note Agreement (the "Agent's Resignation"); (iii) Assignee shall execute and deliver into escrow Assignee's acceptance of the Agent's Resignation and the appointment and acceptance of Assignee as the successor Administrative Agent under the Note Agreement; (iv) Assignor shall deliver into escrow the original Note together with a note power (endorsed in blank) together with a medallion signature guarantee affixed thereto and (v) Assignor shall execute and deliver into escrow written notice of the assignment of the Notes by Assignor to Assignee and confirmation of the Effective Date for this Assignment (with the Effective Date set forth therein and herein upon receipt of the Purchase Price) (the "Transfer Notice"). Upon satisfaction of the execution and delivery of each of the foregoing documents (collectively and together with this Assignment, the "Assignment Documents") by the parties hereto (as the case may be), Assignee shall, within one (1) business day, pay Assignor the Purchase Price (defined below) in immediately available funds to Assignor's account designated below (as the same may be subsequently amended or updated by Assignor).

The sale and assignment of the Assigned Interest contemplated hereby shall become effective on the "Effective Date", which shall be the date on which Assignor shall have received the Purchase Price, in which event the Assignment Documents may be delivered from escrow to Assignee with copies thereof delivered to Assignor.

On the Effective Date, Assignor agrees to deliver to the Issuer, or Issuer's representatives, as the case may be, and the Administrative Agent the Transfer Notice (with a copy of such written notice sent to Assignee).

Assignor's Account:

GE Capital EFS Financing, Inc.
Deutsche Bank Trust Company America
60 Wall Street, 28th, New York, NY 10005
ABA# 021-001-033

Account No: 50278772
Account Name: GECC EFS/T&I Depository Account

|       |                              |                                                                                                                                                                                                                                                                                                                                                   |
|-------|------------------------------|---|
| (a)   | Assignor:                    | GE Capital EFS Financing, Inc. |
| (b)   | Assignee:                    | Red Tree Investments, LLC |
| (c)   | Issuer:                      | Petróleos de Venezuela, S.A. |
| (d)   | Existing Administrative Agent: | GE Capital EFS Financing, Inc. |
| (e)   | Note Agreement:              | The Note Agreement, dated as of May 13, 2016 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and GE Capital EFS Financing, Inc., as Administrative Agent. |
| (f)   | Note:                        | Aggregate outstanding principal amount of $96,979,881.49, together with accrued and unpaid interest, on Note R-1 dated May 13, 2016, in the original outstanding principal amount of $193,959,763.03. |
| (g)   | Purchase Price:              | Such amount as set forth in the purchase price letter by and between the Assignor and the Assignee. |
| (h)   | Assignee's Account for Payments: | ABA No.: 021000018<br>Beneficiary Account No: 8901212318<br>Beneficiary Account Name:<br>Wells Fargo Securities, LLC<br>FFC Account No.: 2MA01252<br>FFC Account Name: Red Tree Investments, LLC |
| (i)   | Effective Date:              | January 25, 2019 |

*[signature page follows]*

FILED: NEW YORK COUNTY CLERK 02/15/2019 04:37 PM
NYSCEF DOC. NO. 16
Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 279 of 312

INDEX NO. 651005/2019
RECEIVED NYSCEF: 02/15/2019

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR:
GE CAPITAL EFS FINANCING, INC.

By: _____
Name: Daniel Wallill
Title: Authorized Signatory


ASSIGNEE:
RED TREE INVESTMENTS, LLC


By: _____
Name: Lauren Murray
Title:  Authorized Signatory


Assignee's Notice Information:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

The terms set forth in this Assignment are hereby agreed to:


ASSIGNOR:
GE CAPITAL EFS FINANCING, INC.


By: _____
Name:
Title:



ASSIGNEE:
RED TREE INVESTMENTS, LLC

By: _____
Name: Lauren Murray
Title:   Authorized Signatory


Assignee's Notice Information:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

ANNEX 1

NOTE AGREEMENT, DATED AS OF MAY 13, 2016, BY AND AMONG PETRÓLEOS DE
VENEZUELA, S.A., AS ISSUER, PDVSA PETRÓLEO, S.A., AS GUARANTOR, THE
NOTEHOLDERS THAT ARE A PARTY THERETO FROM TIME TO TIME AND GE CAPITAL
EFS FINANCING, INC., AS ADMINISTRATIVE AGENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ACCEPTANCE

1.    **Representations and Warranties of Assignor**

Assignor represents and warrants to Assignee as of the date hereof and as of the Effective Date that:

1.1    (i) it, acting on behalf of itself and its Affiliates, is the sole legal and beneficial owner of the
       Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance,
       pledge, security interest, setoff or other adverse claim, and (iii) it has full power and
       authority, and has taken all action necessary, to execute and deliver this Assignment and to
       consummate the transactions contemplated hereby; and assumes no responsibility with
       respect to (w) any statements, warranties or representations made in or in connection with
       the Finance Documents except for any statements, warranties, representations expressly
       made by Assignor in any Finance Document or this Assignment, (x) the execution, legality,
       validity, enforceability, genuineness, sufficiency or value of the Finance Documents, or any
       collateral thereunder, (y) the financial condition of the Issuer, the Guarantor, any of the
       Subsidiaries or any of their respective Affiliates in respect of any Finance Document or (z)
       the performance or observance by the Issuer, the Guarantor, any of the Subsidiaries or any
       of their respective Affiliates of any of their respective obligations under any Finance
       Document.

1.2    Attached hereto as Exhibit A is true and correct copy of a notice (the "Acceleration Notice")
       that was delivered by Assignor to the Issuer.  The Acceleration Notice has not been
       modified, amended, revoked, rescinded or withdrawn.

1.3    The aggregate outstanding principal amount of the Note is $96,979,881.49 and the original
       outstanding principal amount of the Note is $193,959,763.03. There is no funding
       obligation of any kind in respect of the Note.

1.4    Assignor (i) has not, on or after December 27, 2017, received any Distributions from the
       Issuer or the Guarantor, or any of their respective Affiliates, in connection with the
       Assigned Interest, (ii) has not entered into any agreement with the Issuer or an Affiliate of
       the Issuer to make loans to or otherwise extend credit to or for the benefit of the Issuer or an
       Affiliate of the Issuer or (iii) does not have any unpaid or outstanding liability, obligation or
       expense in connection with the Assigned Interest, in each case under clauses (i), (ii) and
       (iii), which will result in any setoff, offset or reduction in payments or distributions
       (including the timing of payments or distributions) made to the Assignee in connection with
       the Assigned Interest.

1.5    Assignor has delivered to Assignee true and correct copies of all of the Transaction
       Documents and each of the additional documents set forth on Schedule I hereto. Except for
       the documents listed on Schedule I, to the best of Assignor's knowledge, there are no other
       documents with the Issuer or the Guarantor, or any of their respective Affiliates, to which
       Assignor is a party that materially or adversely affect the Assigned Interest.

2.    **Representations and Warranties of Assignee**

Assignee represents and warrants to Assignor as of the date hereof and as of the Effective Date that:

2.1     (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Noteholder under the Note Agreement, (ii) it is an Eligible Institution and is not an Ineligible Transferee, (iii) from and after the Effective Date, it shall be bound by the provisions of the Note Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Noteholder thereunder, and (iv) it has received a copy of the Note Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.04 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision; and agrees that (i) it will, independently and without reliance on the Administrative Agent, Assignor or any other Noteholder, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Finance Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Finance Documents are required to be performed by it as a Noteholder.

3.     **Payments**

From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest and other amounts) to Assignee.

4.     **General Provisions**

This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy or electronic mail shall be equally effective to the delivery of a manually executed counterpart of this Assignment. THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

5.     **Indemnities**

5.1     Assignee shall indemnify, defend, and hold Assignor and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Assignor Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, expense or disbursement (including reasonable attorneys' fees and expenses) that any Assignor Indemnitee incurs or suffers as a result of or arising out of a breach of any of Assignee's representations, warranties, covenants or agreements in this Assignment up to a maximum amount equal to the Purchase Price.

5.2     Assignor shall indemnify, defend, and hold the Assignee and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Assignee Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, expense or disbursement (including reasonable attorneys' fees and expenses) that any

Assignee Indemnitee incurs or suffers as a result of or arising out of a breach of any of Assignor's representations, warranties, covenants or agreements in this Assignment up to a maximum amount equal to the Purchase Price.

6.     **Costs and Expenses**

Assignee agrees (i) to pay and reimburse Assignor and any other Assignor Indemnitee for, all reasonable third-party out-of-pocket costs, expenses and fees actually incurred by Assignor or such Assignor Indemnitee (including reasonable attorney's fees and expenses) and (ii) to pay, indemnify, and hold the Assignor and any other Assignor Indemnitee harmless from and against any and all other liabilities, claims, costs, losses, judgments, damages, expenses or disbursements of any kind or nature whatsoever, with respect to or arising from or in connection with (x) Assignee's execution, enforcement or collection actions, legal remedies, or efforts under the Note Agreement, the Note or the Assigned Interest (including in connection with any litigation, arbitration, insolvency, bankruptcy, moratorium or reorganization procedures, whether in or out-of-court, involving the Assignee (or any future successors or assigns of the Assignee) and the Issuer and/or the Guarantor) or (y) any action taken by Assignor at the prior written direction of Assignee (including, without limitation, any actions taken by Assignee in connection with the terms set forth in Section 10 hereof) (including reasonable attorney's fees and expenses). Assignee shall pay Assignor or such Assignor Indemnitee, by no later than five (5) business days from the date of receipt of the relevant written request from Assignor or the relevant Assignor Indemnitee, for any such costs, expenses and fees.

7.     **As-Is Basis**

WITH RESPECT TO THE ASSIGNED INTEREST, EXCEPT FOR ASSIGNOR'S REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS IN THIS ASSIGNMENT, SUCH ASSIGNED INTEREST IS HEREBY SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO THE ASSIGNEE ON AN "AS IS", "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION, WARRANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO SUCH ASSIGNED INTEREST, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW. ASSIGNEE FURTHER ACKNOWLEDGES THAT IT IS AWARE OF THE CURRENT NON-PAYMENTS UNDER THE NOTE AGREEMENT IN CONNECTION WITH THE ASSIGNED INTEREST.

8.     **Confidentiality**

Each of Assignor and Assignee agrees that, without prior consent of the other party, it shall not disclose the contents of this Assignment (including the Purchase Price) to any government, governmental agency, authority, court or other tribunal (collectively, "Governmental Authority") or any or any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, fund, investment account or other entity (each, including a Governmental Authority, an "Entity"), except that either party may make any such disclosure (i) if required to do so by any law, court, or regulation, (ii) to implement and enforce this Assignment, (iii) to any banking, regulatory, or examining authority, (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in such party incurring a liability to any other entity, (v) to its respective affiliates, and its and their directors, officers, members, employees and professional advisors (including legal counsel) or any other service providers as may be

necessary in the ordinary course of business, or (vi) solely with the Purchase Price redacted, to the extent necessary to effect a subsequent transfer of the Assigned Interest.

9. **Distributions**

It is understood that any Distributions in connection with the Assigned Interest made on or after the Effective Date belong to Assignee. If at any time on or after the Effective Date, Assignor receives a Distribution, Assignor shall (i) accept and hold the Distribution for the account and sole benefit of Assignee, (ii) have no equitable or beneficial interest in the Distribution and (iii) promptly deliver the Distribution to Assignee, and in no event later than five (5) business days of Assignor's receipt thereof.

10. **Further Assurances**

Assignor agrees to execute and deliver, or cause to be executed and delivered, any further documents or acknowledgements as Assignee may reasonably request (at Assignee's sole cost and expense) that may be commercially necessary for Assignee to establish that Assignee is the owner of the Assigned Interest or entitled to receive directly any Distributions.

*[remainder of page intentionally left blank]*

<u>Schedule I</u>

LIST OF TRANSACTION DOCUMENTS

1.    Note Agreement, dated as of May 13, 2016, by and among Petróleos de Venezuela, S.A. as Issuer, PDVSA Petróleo, S.A., as Guarantor, the Noteholders that are a party thereto from time to time and GE Capital EFS Financing, Inc., as Administrative Agent.

2.    Note R-1 dated May 13, 2016, in the original outstanding principal amount of $193,959,763.03, issued under the abovementioned Note Agreement.

Exhibit A

*Acceleration Notice*

*See Attached*



GE Capital EFS Financing, Inc.
901 Main Avenue
Norwalk, Connecticut 06851

March 19, 2018

Petróleos de Venezuela, S.A.
La Campiña
Avenida Libertador
Calle El Empalme
Edificios Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela

Attention: Iliana Ruzza, Emir Manrique, Ana Maria España and Renny Bolívar
Facsimile: +58 212 708 1441
Email: ruzzai@pdvsa.com, manriqueej@pdvsa.com, espanaam@pdvsa.com and
bolivarrs@pdvsa.com

Attention: Anabella Rivas and Edoardo Orsoni
Facsimile: +58 212 708 4989
Email: rivasaav@pdvsa.com and orsonie@pdvsa.com

**Re: Notice of Event of Default, Acceleration and Payment Demand under the Note
Agreement dated as of May 13, 2016 among Petróleos de Venezuela, S.A., as Issuer, PDVSA
Petróleo, S.A., as Guarantor, and GE Capital EFS Financing, Inc., as Initial Noteholder and as
Administrative Agent (the "Note Agreement")**

To Whom It May Concern:

This letter is being sent by the Administrative Agent on behalf of itself and the Noteholders in
furtherance of our prior letter to you dated January 5, 2018 (the "Prior Letter"), pursuant to
which we notified you that the Issuer was obligated to make a principal and interest payment
to the Administrative Agent, for the account of Noteholders, in the aggregate amount of
Seventeen Million, Seven-Hundred Thirty-Four Thousand, Nine Hundred Nineteen Dollars and
Seven Cents ($17,734,919.07) on December 27, 2017 (the "Missed Payment"). Capitalized
terms used in this letter but not defined herein shall have the meaning given to them in the
Note Agreement.

In accordance with the Prior Letter, we notified you that, pursuant to Article VII(a) of the Note
Agreement, there would be an Event of Default under the Note Agreement if the Missed
Payment continued to remain unpaid for a period of five (5) days after written notice thereof
has been given to the Issuer. As of the date hereof, the Missed Payment remains unpaid.
Consequently, this letter constitutes written notification to the Issuer and the Guarantor that
an Event of Default has occurred and is continuing under the Note Agreement. In addition, as

a result of the Event of Default under the Note Agreement, an "Event of Default" has also occurred and is continuing under (i) the Credit Agreement dated as of December 27, 2016, among Petróleos de Venezuela, S.A., as Borrower, PDVSA Petróleo, S.A., as Guarantor, GE Capital EFS Financing, Inc., as Agent, and the Lenders party thereto (the "Credit Agreement") and, (ii) pursuant to Section 8.05 *(Cross-Event of Default)* of the Credit Agreement, the Note Agreement dated as of March 27, 2015 among the Issuer, as issuer, the Guarantor, as guarantor, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as initial noteholder and administrative agent, and Union Capital Group, as lead arranger.

Notice is given to the Issuer and the Guarantor that pursuant to Article VII of the Note Agreement, the Administrative Agent, acting at the request of the Required Noteholders, declares the Notes to be forthwith due and payable in whole, and demands that the Issuer and/or the Guarantor immediately make payment of the Notes (including without limitation the principal, accrued and default interest thereon, and any unpaid accrued fees and all other liabilities of the Issuer under the Note Agreement and any other Finance Document).

The Administrative Agent hereby reserves all rights and remedies available to it under the Note Agreement, each other Finance Document, as well as under applicable law, as a result of the Event of Default subject of this letter.

No failure or delay on the part of the Administrative Agent or any Noteholder in exercising any of their rights or remedies under the Note Agreement and each other Finance Document, as well as under applicable law, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.

This letter shall be governed by and construed in accordance with the laws of the State of New York.

        Thank you.

                            GE CAPITAL EFS FINANCING, INC.,
                            as Administrative Agent

                        By: _____

                            Name:  Daniel Wallitt
                            Title:   Authorized Signatory

**GE CAPITAL EFS FINANCING INC.**

January 25, 2019

Messrs.

**Red Tree Investments, LLC (as Noteholder)**
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

**Petróleos de Venezuela, S.A. (as Issuer)**
La Campiña
Avenida Libertador
Calle El Empalme
Edificio Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela
Attn: Iliana Ruzza, Emir Manrique, Ana María España, Renny Bolívar, Anabella Rivas and Edoardo Orsoni

**Re: Notice of resignation as Administrative Agent under Note Agreement**

Dear Sirs,

Reference is made to that certain Note Agreement, dated as of May 13, 2016 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Note Agreement"), originally by and among Petróleos de Venezuela, S.A., a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as issuer, PDVSA Petróleo, S.A. a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as guarantor, GE Capital EFS Financing, Inc., a Delaware corporation, as initial noteholder, and GE Capital EFS Financing, Inc., a Delaware corporation, as administrative agent (in such capacity, the "Administrative Agent"). Capitalized terms used but not defined in this notice have the meanings assigned to them in the Note Agreement.

We hereby formally give you notice of our resignation as Administrative Agent under such Note Agreement, in accordance with Article VIII of the Note Agreement.

This resignation is made as part of a single transaction along with the following separate actions, which are taking place and shall become effective on the date hereof: (i) immediately prior to the execution of this notice of resignation, the sale and assignment of all of the interest in and to GE Capital EFS Financing, Inc.'s rights and obligations under the Note Agreement, the other Transaction Documents and any other agreements, documents or instruments delivered pursuant thereto or for the benefit of the Noteholders relating thereto, to Red Tree Investments, LLC; and (ii) immediately after the execution of this notice of resignation, the acceptance of this resignation and the appointment of a successor Administrative Agent under the Note Agreement by the Required Noteholders, and the acceptance of its

1

KL2 3108744.1

appointment as successor Administrative Agent under the Note Agreement, by such successor Administrative Agent.

As a result of the foregoing, our resignation as Administrative Agent under such Note Agreement is effective immediately as of the date hereof.

Yours truly,

GE Capital EFS Financing Inc.

Authorized Signatory

KL2 3106744.1

## RED TREE INVESTMENTS, LLC

January 25, 2019

Messrs.

**Petróleos de Venezuela, S.A.** (as Issuer)
La Campiña
Avenida Libertador
Calle El Empalme
Edificio Petróleos de Venezuela, Torre Este, Piso 8
Caracas, Venezuela
Attn:    Iliana Ruzza, Emir Manrique, Víctor Aular, Abraham Ortega, Anabella Rivas and Edoardo Orsoni

**GE Capital EFS Financing, Inc.** (as retiring Administrative Agent)
901 Main Avenue
Norwalk, CT 06851
United States of America
Atn:     Portfolio Manager

### Re: Notice of acceptance and appointment of successor Administrative Agent under Note Agreement

Dear Sirs,

Reference is made to that certain Note Agreement, dated as of May 13, 2016 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Note Agreement"), originally by and among Petróleos de Venezuela, S.A., a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as issuer, PDVSA Petróleo, S.A. a corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela as guarantor, GE Capital EFS Financing, Inc., a Delaware corporation, as initial noteholder, and GE Capital EFS Financing, Inc., a Delaware corporation, as administrative agent. Capitalized terms used but not defined in this notice have the meanings assigned to them in the Note Agreement.

We hereby confirm receipt of the notice of resignation of GE Capital EFS Financing, Inc. as Administrative Agent under such Note Agreement, in accordance with Article VIII of the Note Agreement, as per the notice of resignation dated the date hereof and delivered to us on the date hereof.

We hereby accept the resignation of GE Capital EFS Financing, Inc. as Administrative Agent under such Note Agreement and formally notify you about our acceptance thereof, effective immediately. We hereby relieve, release and discharge GE Capital EFS Financing, Inc. from all its duties and obligations as Administrative Agent set forth in the Note Agreement, effective immediately as of the date hereof.

As a result of the foregoing, we hereby appoint Red Tree Investments, LLC as successor Administrative Agent under such Note Agreement, in accordance with Article VIII of the Note Agreement, effective immediately as of the date hereof.

Based on the above, Red Tree Investments, LLC shall be the Administrative Agent under the Note Agreement for all purposes effective immediately from the date hereof, and all references to the Administrative Agent in the Note Agreement and/or the Notes shall be references to Red Tree Investments, LLC, effective immediately from the date hereof.

1

KL2 3108755.1

FILED: NEW YORK COUNTY CLERK 02/15/2019 04:37 PM
NYSCEF DOC. NO. Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 292 of 312

INDEX NO. 651005/2019
RECEIVED NYSCEF: 02/15/2019

This acceptance and appointment is made as part of a single transaction along with the following separate actions, which are taking place and shall become effective on the date hereof: (i) immediately prior to the execution of this notice of acceptance and appointment and to the execution of the mentioned notice of resignation, the sale and assignment of all of the interest in and to GE Capital EFS Financing, Inc.'s rights and obligations under the Note Agreement, the other Transaction Documents and any other agreements, documents or instruments delivered pursuant thereto or for the benefit of the Noteholders relating thereto, to Red Tree Investments, LLC; and (ii) concurrently with the execution of this notice of acceptance and appointment, the resignation of GE Capital EFS Financing, Inc. as Administrative Agent under the Note Agreement.

Yours truly,

Red Tree Investments, LLC

_____
Authorized Signatory

We hereby confirm and accept our appointment as Administrative Agent under the Note Agreement for all purposes effective immediately from the date hereof, on the terms set forth herein above.

We hereby provide our account details as Administrative Agent under the Note Agreement, for purposes of amending and updating Schedule 2.08 thereof accordingly:

ABA # 021000018
Beneficiary Account No: 8901212318
Beneficiary Account Name: WELLS FARGO SECURITIES, LLC
FFC Account No: 2MA01252
FFC Account Name: Red Tree Investments, LLC

Furthermore, we hereby provide our address and details for notices and other communications to us as Administrative Agent under the Note Agreement, for purposes of amending and updating Sections 9.01(b) and 2.08 thereof accordingly:

Red Tree Investments, LLC
c/o Daniel Salinas-Serrano
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
202-905-4668 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
danielsalinas@quinnemanuel.com

Yours truly,
Red Tree Investments, LLC

_____
Authorized Signatory

2

K&2 3108755 1

FILED: NEW YORK COUNTY CLERK 02/15/2019 04:37 PM
NYSCEF DOC. NO. Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 293 of 312

INDEX NO. 651005/2019

RECEIVED NYSCEF: 02/15/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

RED TREE INVESTMENTS, LLC,

                    Plaintiff,

          -against-

PETRÓLEOS DE VENEZUELA, S.A. and
PDVSA PETRÓLEO, S.A.,
                    Defendants.

---

Index No. _____

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

-and-

GANFER SHORE LEEDS &
ZAUDERER LLP
360 Lexington Avenue
New York, New York 10017
212-922-9250

*Attorneys for Red Tree Investments, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND .....................................................................................................................2

    A.    The Parties and Relevant Non-Parties ...................................................2

    B.    PDVSA And Petróleo Have Defaulted Under The Notes ......................2

    C.    Petróleo Guaranteed And Agreed To Be Jointly And Severally Liable For Amounts Due Under the Notes ..............................................................5

    D.    GE Capital EFS Validly Assigned The 2015 and 2016 Notes To Red Tree ..........6

ARGUMENT ..........................................................................................................................7

I.    RED TREE IS ENTITLED TO JUDGMENT AGAINST PDVSA ...................................8

    A.    The Notes Are Subject To CPLR § 3213...............................................8

    B.    PDVSA Has Failed To Pay In Accordance With The Notes...............10

II.    RED TREE IS ENTITLED TO JUDGMENT AGAINST PETRÓLEO FOR THE AMOUNTS DUE UNDER THE GUARANTEES .......................................................11

CONCLUSION....................................................................................................................12

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alard, L.L.C. v. Weiss*,
   1 A.D.3d 131 (1st Dep't 2003) ................................................... 9

*Bank of America v. Solow*,
   2008 WL 1821877, 862 N.Y.S.2d 812 (N.Y. Sup. Apr. 17, 2008) ......................... 10

*Boland v. Indah Kiat Financial (IV) Mauritius Ltd.*,
   291 A.D.2d 342 (1st Dep't 2002) ................................................... 7, 8

*Capital Bank, N.A. v. 4021 18 Ave LLC*,
   971 N.Y.S.2d 70 (N.Y. Sup. 2013) ................................................... 8

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*,
   25 N.Y.3d 485 (2015) ................................................... 7, 8, 11

*Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l.*,
   996 N.Y.S.2d 476 (N.Y. Sup. 2014) ................................................... 10

*Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.D.r.l.*,
   142 A.D.3d 833 (2d Dep't 2016) ................................................... 10

*Cutter Bayview Cleaners, Inc. v. Spotless Shirts, Inc.*,
   57 A.D.3d 708 (2d Dep't 2008) ................................................... 8

*DH Cattle Holdings Co. v. Kuntz*,
   165 A.D.2d 568 (3rd Dep't 1991) ................................................... 9

*E. N.Y. Sav. Bank v. Baccaray*,
   214 A.D.2d 601 (2d Dep't 1995) ................................................... 8

*Equator Int'l, Inc. v. NH St. Inv'rs, Inc.*,
   978 N.Y.S.2d 817 (N.Y. Sup. 2014) ................................................... 8

*Guzzone v. Masluf Realty Corp.*,
   990 N.Y.S.2d 437 (N.Y. Sup. 2014) ................................................... 10

*Hendricks v. Hunter*,
   2016 WL 944002 (N.Y. Sup. Mar. 6, 2017) ................................................... 8

*Hudson Valley Bank v. Banxcorp.*,
   958 N.Y.S.2d 61 (N.Y. Sup. 2010) ................................................... 11

*Lugli v. Johnston*,
   78 A.D.3d 1133 (2d Dep't 2010) ................................................... 8, 9

*Maglich v. Saxe, Bacon & Bolan P.C.*,
   97 A.D.2d 19 (1st Dep't 1983) ................................................... 7

*Oak Rock Fin., LLC v. Rodriguez*,
   148 A.D.3d 1036 (2d Dep't 2017) ................................................... 10

ii

*Sarfati v. Palazzolo*,
   142 A.D.3d 877 (1st Dep't 2016) ........................................................ 8

*United Rentals (N. Am.), Inc. v. Iron Age Tool Corp.*,
   150 A.D.3d 1304 (2d Dep't 2017) ..................................................... 11

*VNB N.Y. Corp. v. Diamond*,
   2011 WL 13220807 (N.Y. Sup. Oct. 6, 2011) ...................................... 8

*Weissman v. Sinorm Deli, Inc.*,
   88 N.Y.2d 437 (1996) ................................................................... 9, 10

## **Statutory Authorities**

N.Y. Civ. Prac. L. & R. § 3213 ............................................................. passim

## **Other Authorities**

Higgit, John R., Practice Commentary, McKinney's Cons Laws of NY,
   2017 Electronic Update ...................................................................... 10

iii

Plaintiff Red Tree Investments, LLC ("Red Tree") respectfully submits this memorandum of law in support of its Motion pursuant to CPLR § 3213 for Summary Judgment in Lieu of Complaint against Defendants Petróleos de Venezuela, S.A. ("PDVSA") and PDVSA Petróleo, S.A. ("Petróleo") (together with PDVSA, "Defendants").[1]

## PRELIMINARY STATEMENT

Red Tree brings this Motion to recover the principal amount of $118,359,515.23, plus accrued interest, outstanding and overdue under three debt instruments:

- two notes issued on March 27, 2015 (the "2015 Notes"), pursuant to a Note Agreement, dated March 27, 2015, originally entered into by General Electric Capital Corporation ("GE Capital") as lender, PDVSA as issuer, and Petróleo as guarantor (the "2015 Note Agreement"); and

- a note issued on May 13, 2016 (the "2016 Note" and together with the 2015 Notes, the "Notes"), pursuant to a Note Agreement, dated May 13, 2016, originally entered into by GE Capital EFS Financing Inc. ("GE Capital EFS") as lender, PDVSA as issuer, and Petróleo as guarantor (the "2016 Note Agreement" and together with the 2015 Note Agreement, the "Note Agreements").

On January 25, 2019, GE Capital EFS assigned the Notes to Red Tree. As a result of the assignments, Red Tree now stands in GE Capital EFS's shoes as the holder of the Notes and Administrative Agent under the Note Agreements.

The Notes are in default—PDVSA failed to repay the 2015 Notes on their maturity date of March 27, 2018, and has not made any payments on the 2016 Note since September 27, 2017 (missing the December 27, 2017 payment and all payments thereafter). In addition, Petróleo has failed to pay the amounts outstanding in breach of its obligations under the guarantees on both instruments. Because the Notes are "instruments for the payment of money only," and PDVSA and Petróleo indisputably have breached their payment obligations under those instruments, Red

---

[1] The United States Treasury Department's Office of Foreign Assets Control has imposed certain sanctions on Venezuela and Venezuelan-related entities, including the Defendants. Those sanctions, however, do not affect Red Tree's ability to file, or this Court's jurisdiction to adjudicate, this action.

1

Tree is entitled to summary judgment in the amount of $118,359,515.23 (on account of outstanding principal), plus accrued interest, pursuant to CPLR § 3213.

## BACKGROUND

### A.    The Parties and Relevant Non-Parties

Plaintiff Red Tree is a limited liability company incorporated in Delaware.  Red Tree holds the Notes and is the Administrative Agent under the Note Agreements.

Defendants PDVSA and Petróleo are corporations organized under the laws of the Bolivarian Republic of Venezuela.

PDVSA and Petróleo have submitted to jurisdiction and venue in New York by expressly consenting to New York State Court jurisdiction and waiving any and all objections to venue, as well as any defense of an inconvenient forum in New York State Court for any actions related to the Notes.  PDVSA and Petróleo also waived sovereign immunity.[2]

Non-party GE Capital is a Delaware corporation and a financial services subsidiary of General Electric.  It is the original Noteholder under the 2015 Note Agreement.[3]

Non-party GE Capital EFS is a Delaware corporation and a financial services subsidiary of General Electric.  It is the original Noteholder under the 2016 Note Agreement.[4]

### B.    PDVSA And Petróleo Have Defaulted Under The Notes

#### 1.    The 2015 Notes

Under the 2015 Note Agreement, PDVSA issued (and Petróleo guaranteed) two notes: one provided that PDVSA agreed to pay GE Capital or its assigns the original principal balance of

---

[2] *See* Affirmation of Stephen Broome, dated February 15, 2019 ("Broome Aff.") Ex. A, § 9.15(a)-(c) (2015 Note Agreement); *id.* Ex. D, § 9.15(a)-(c) (2016 Note Agreement).

[3] *See id.* Ex. F, Affidavit of Daniel Wallitt, dated and sworn to January 25, 2019 ("Wallitt 2015 Notes Aff."), ¶ 3.

[4] *See id.* Ex. G, Affidavit of Daniel Wallitt, dated and sworn to January 25, 2019 ("Wallitt 2016 Note Aff."), ¶ 3.

$131,855,116.31, and the other provided that PDVSA agreed to pay SACE or its assigns the original principal balance of $124,700,488.54.[5]  SACE assigned its note to GE Capital EFS, which assigned both notes to Red Tree.[6]  The 2015 Notes provide for an annual interest rate of 6.5%, a default interest rate of 8.5%, and each include a schedule of payments as Exhibit A.[7]  The schedule of payments provides that principal payments in a combined amount of $21,379,633.74, as well as interest payments, were due to GE Capital and SACE, respectively, starting on March 31, 2015.[8]

The 2015 Note Agreement set March 27, 2018 as the maturity date for all notes issued under that agreement.[9]  On that date, PDVSA was obligated to pay to GE Capital EFS (GE Capital's successor)[10] and SACE $21,379,633.74 in principal and $347,419.03 in interest. PDVSA, however, failed to make the required payment on the maturity date.[11]  Indeed, since its default on March 27, 2018, PDVSA has made no payments on the 2015 Notes.[12]  In addition, despite Petróleo's obligation as guarantor to immediately pay all outstanding amounts due on the 2015 Notes, it failed to make any payments to GE Capital EFS.[13]  On July 26, 2018, GE Capital EFS sent notice of missed payment to PDVSA and Petróleo.  Neither PDVSA nor Petróleo has tendered any payments to GE Capital or Red Tree for the amounts outstanding under the 2015 Notes.[14]

---

[5] Wallitt 2015 Notes Aff., ¶ 4.

[6] *Id.* Ex. B (assignment); *id.* Ex. C (assignment effective date notice); *id.* Ex. D (notice of assignment); *id.*, ¶¶ 11–12.

[7] *Id.*, ¶ 4.

[8] Broome Aff. Ex. B at 3; *id.* Ex. C at 3.

[9] *Id.* Ex. A at 6.

[10] *See* Wallitt 2015 Notes Aff., ¶ 6.

[11] *Id.*, ¶ 8.

[12] *See id.*

[13] *See id.*, ¶ 9.

[14] *Id.* Ex. A (notice of non payment); *id.*, ¶¶ 8–10.

As of January 25, 2019, the date of assignment, the total outstanding principal due and owing on the 2015 Notes is $21,379,633.74.[15] This balance reflects the outstanding principal, but does not include interest, including at the default rate, which continues to accrue.[16]

### 2.    The 2016 Note

Pursuant to the 2016 Note Agreement, PDVSA issued (and Petróleo guaranteed) the 2016 Note in the principal amount of $193,959,763.03.[17] The 2016 Note provides for an annual interest rate of 6.5%, a default interest of 8.5%, and includes a schedule of payments as Exhibit A.[18] The schedule of payments provides that principal payments of $16,163,313.59, as well as interest payments, were due quarterly starting on June 27, 2016.[19]

Upon an Event of Default, the principal and accrued interest may be declared due and payable.[20] Pursuant to the 2016 Note Agreement, which is incorporated into the 2016 Note by reference, an Event of Default occurs when there is a "failure to pay the principal of, or interest" when "such principal becomes due and payable," and such failure "continues for a period of five (5) days after written notice thereof has been given" to PDVSA.[21]

PDVSA was required to make a payment to GE Capital EFS on the 2016 Note on December 27, 2017, but did not.[22] PDVSA has not made any payment on the 2016 Note since September 27,

---

[15] *Id.*, ¶ 14.

[16] *Id.*

[17] Wallitt 2016 Note Aff., ¶¶ 3–5.

[18] *Id.*, ¶ 4.

[19] Broome Aff. Ex. E at 3; Wallitt 2016 Note Aff., ¶ 6.

[20] Broome Aff. Ex. E at 2.

[21] *Id.* Ex. D at 31 (Article VII: Events of Default).

[22] Wallitt 2016 Note Aff., ¶ 6.

2017, after it missed payment on December 27, 2017.[23]  In addition, despite Petróleo's obligation as guarantor to immediately make all outstanding payments on the 2016 Note as they came due, Petróleo failed to make the payments due.[24]

On January 5, 2018, GE Capital EFS sent notice of non-payment to PDVSA and Petróleo.[25] On March 19, 2018, GE Capital EFS sent a notice of acceleration to PDVSA and Petróleo.[26] Neither PDVSA nor Petróleo has tendered any payments to GE Capital or Red Tree for the amounts outstanding under the 2016 Note.[27]

As of January 25, 2019, the date of assignment, the outstanding principal due and owing to Red Tree on the 2016 Note is $96,979,881.49.[28]  This balance reflects the outstanding principal, and does not include interest, including at the default rate, which continues to accrue.[29]

### C.    Petróleo Guaranteed And Agreed To Be Jointly And Severally Liable For Amounts Due Under the Notes

Pursuant to the 2015 and 2016 Note Agreements, Petróleo guaranteed PDVSA's obligations under any notes and loans issued pursuant to the agreements.[30]  In its capacity as "Guarantor" Petróleo "agree[d] that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees . . . prompt payment [of principal and interest] when due, whether at stated maturity, upon acceleration or otherwise, and

---

[23] *See id.*

[24] *See id.*, ¶ 7.

[25] *See id.* Ex. A (Notice of non payment); *id.*, ¶ 8.

[26] *See id.* Ex. B (Acceleration letter); *id.*, ¶ 8.

[27] Wallitt 2016 Note Aff, ¶¶ 6–8.

[28] *Id.*, ¶ 10.

[29] *Id.*

[30] *See* Broome Aff. Ex. A, at Article VI (2015 Note Agreement) (the "2015 Guarantee"); *id.* Ex. D, at Article VI (2016 Note Agreement) (the "2016 Guarantee").

at all times thereafter."[31]  Petróleo's obligations as Guarantor are "unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason."[32]

Petróleo also guaranteed "all costs and expenses including all court costs and attorneys' and paralegals' fees . . . and expenses paid or incurred by the . . . Noteholders in endeavoring to collect all or any part of the Obligations" under each agreement.[33]  And Petróleo "waive[d] any defense based on or arising out of any defense of the Issuer or the Guarantor. . . other than the indefeasible payment in full."[34]  Petróleo has not made any payments on account of the Notes.[35]

### D.    GE Capital EFS Validly Assigned The 2015 and 2016 Notes To Red Tree

The 2015 and 2016 Note Agreements both allow for the assignment of interests under the agreements.  Assignment requires notice to PDVSA, but does not require PDVSA's consent.[36]

On January 25, 2019, GE Capital EFS, as successor to GE Capital, assigned the 2015 Notes to Red Tree.  The assignment and acceptance reflects a principal balance of $21,379,633.71 (plus all accrued interest).[37]  On January 25, 2019, GE Capital EFS assigned the 2016 Note to Red Tree.

---

[31] *Id.* Ex. A § 6.01 (2015 Guarantee); *id.* Ex. D § 6.01 (2016 Guarantee).

[32] *Id.* Ex. A § 6.03 (2015 Guarantee); *id.* Ex. D § 6.03 (2016 Guarantee).

[33] *Id.* Ex. A § 6.01 (2015 Guarantee); *id.* Ex. D § 6.01 (2016 Guarantee).  The "Obligations" include as relevant here "all obligations of every nature" including "principal, interest, fees, expenses, indemnification or otherwise." *Id.* Ex. A at 8 (2015 Note Agreement Section defining "Obligations"); *id.* Ex. D at 8 (2016 Note Agreement Section defining "Obligations").

[34] *Id.* Ex. A § 6.04 (2015 Guarantee); *id.* Ex. D § 6.04 (2016 Guarantee).

[35] Wallitt 2015 Notes Aff., ¶ 9; Wallitt 2016 Note Aff., ¶ 7.

[36] Broome Aff. Ex. A, § 9.04 (2015 Note Agreement on Successors and Assigns); *id.* Ex. D § 9.04 (2016 Note Agreement on Successors and Assigns).

[37] *See* Wallitt 2015 Notes Aff. Ex. E; *id.*, ¶ 13.  SACE had previously assigned one of the 2015 Notes to GE Capital. *See id.* Ex. B; *id.*, ¶¶ 11–12.

The assignment and acceptance reflects a principal balance of $96,979,881.49 (plus all accrued interest).[38]

GE Capital EFS properly notified PDVSA and Petróleo of both assignments. Specifically, in accordance with Sections 9.04 of the Note Agreements, on January 25, 2019, GE Capital EFS, in its capacity as Administrative Agent, served notice of the assignments to Red Tree of the 2015 and 2016 Notes on PDVSA and Petróleo.[39]

## ARGUMENT

Under CPLR § 3213, a plaintiff may move for summary judgment in lieu of a complaint if the action is "based upon an instrument for the payment of money only." CPLR § 3213. The purpose of CPLR § 3213 is "to provide quick relief on documentary claims so presumptively meritorious that a formal complaint is superfluous." *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 491–92 (2015) ("*Rabobank*") (citation omitted); *Maglich v. Saxe, Bacon & Bolan P.C.*, 97 A.D.2d 19, 21 (1st Dep't 1983) (CPLR § 3213 "affords a speedy and efficient remedy to secure a judgment in certain cases where service of formal pleadings would be unnecessary for the expeditious resolution of the dispute between the parties.").

A plaintiff makes a *prima facie* case by establishing two elements: (1) "proof of the [instrument]" (i.e., that the obligation is valid and is based on an instrument for the payment of money only) and (2) proof of the "failure to make the payments called for by its terms." *Boland*

---

[38] *See* Wallitt 2016 Note Aff. Ex. C; *id.*, ¶ 9.

[39] *See* Wallitt 2015 Notes Aff.. Ex. F; *id.*, ¶ 15; Wallitt 2016 Note Aff. Ex. D; *id.*, ¶ 11. In connection with the assignment, GE Capital EFS resigned as Administrative Agent and Red Tree was appointed as successor Administrative Agent under the Note Agreements. *See* Wallitt 2015 Notes Aff. Ex. F (Notice of resignation as Administrative Agent under Note Agreement and Notice of acceptance and appointment of successor of Administrative Agent under Note Agreement); Wallitt 2016 Note Aff. Ex. D. (Notice of resignation as Administrative Agent under Note Agreement and Notice of acceptance and appointment of successor of Administrative Agent under Note Agreement).

*v. Indah Kiat Financial (IV) Mauritius Ltd.*, 291 A.D.2d 342, 343 (1st Dep't 2002). Once the plaintiff has made its *prima facie* case of entitlement to judgment as a matter of law, "the burden shifts to the defendant to establish, by admissible evidence, the existence of a triable issue with respect to a bona fide defense." *Rabobank*, 25 N.Y.3d at 492 (citing *Cutter Bayview Cleaners, Inc. v. Spotless Shirts, Inc.*, 57 A.D.3d 708, 710 (2d Dep't 2008)).

Each of the *prima facie* elements is satisfied here: the Notes are instruments for the payment of money only and PDVSA has not made the required payments.[40]

## I. RED TREE IS ENTITLED TO JUDGMENT AGAINST PDVSA

### A. The Notes Are Subject To CPLR § 3213

The Notes are "instrument[s] for the payment of money only" pursuant to CPLR § 3213. The relevant inquiry is whether the instrument being enforced "contains an unconditional promise by the borrower to pay the lender over a stated period of time." *Lugli v. Johnston*, 78 A.D.3d 1133, 1134 (2d Dep't 2010); *Hendricks v. Hunter*, 2016 WL 944002, at *2 (N.Y. Sup. Mar. 6, 2017) (same); *VNB N.Y. Corp. v. Diamond*, 2011 WL 13220807, at *4 (N.Y. Sup. Oct. 6, 2011) (same). The Notes easily satisfy this criterion.

Each of the Notes is signed by a representative of PDVSA, provides the amount of principal issued pursuant to the Note, contains an explicit "promise[]" to repay "the principal sum . . . with

---

[40] The Notes were originally issued to GE Capital, GE Capital EFS, and SACE. As discussed above, the Notes were validly assigned to Red Tree on January 25, 2019, after one of the 2015 Notes was assigned from SACE to GE Capital EFS. Motions under CPLR § 3213 are regularly granted to holders of notes by assignment. *See Sarfati v. Palazzolo*, 142 A.D.3d 877, 877 (1st Dep't 2016) (finding plaintiff entitled to summary judgment where the "assignment agreement included an unambiguous and valid assignment of plaintiff's rights under the stock purchase agreement that demonstrates the intent of the parties to assign plaintiff's rights"); *E. N.Y. Sav. Bank v. Baccaray*, 214 A.D.2d 601, 602 (2d Dep't 1995) (holding that the "defendants failed to establish the existence of any triable issues of fact or meritorious defenses in opposition" to a motion under Section 3213 brought by a holder of a note and loan security agreement by assignment); *Equator Int'l, Inc. v. NH St. Inv'rs, Inc.*, 978 N.Y.S.2d 817, 820 (N.Y. Sup. 2014) (granting summary judgment motion in lieu of complaint to assignee of original lender); *Capital Bank, N.A. v. 4021 18 Ave LLC*, 971 N.Y.S.2d 70 (N.Y. Sup. 2013) (same).

interest" on specific quarterly repayment dates and in amounts explicitly set forth in Exhibit A to each note.  The Note Agreements further provide that if an Event of Default "occurs and is continuing, the principal and accrued interests under the Note may be declared or otherwise become due and payable."[41]  New York courts routinely hold that such notes are precisely the kind of instruments that are subject to CPLR § 3213.  *See, e.g., Lugli*, 78 A.D.3d at 1134; *see also Weissman*, 88 N.Y.2d at 444 ("The prototypical example of an instrument within the ambit of the statute is of course a negotiable instrument for the payment of money—an unconditional promise to pay a sum certain, signed by the maker and due on demand or at a definite time."); *Alard, L.L.C. v. Weiss*, 1 A.D.3d 131, 131 (1st Dep't 2003) ("Plaintiff was properly granted summary judgment in lieu of complaint in this action on a promissory note."); *DH Cattle Holdings Co. v. Kuntz*, 165 A.D.2d 568, 570 (3rd Dep't 1991) (A promissory note is "clearly an instrument for the payment of money only within the meaning of CPLR § 3213[.]").

That the Notes cross-reference their respective Note Agreements does not disqualify them from enforcement via CPLR § 3213.  Standard cross-references among related transaction documents do not constitute "outside proof," but, rather, are the permissible "de minimis deviation[s] from the face of the document," permissible under CPLR § 3213.  *Weissman*, 88 N.Y.2 at 444.  The recent Practice Commentaries for the statute describe this principle:

> What is permitted under the de minimis deviation principle is a reference, in the instrument itself, to a ***specific parol source*** that, in turn, ***supplies an unambiguous and immutable fact necessary to establish the existence of a debt, the defendant's obligation to pay the debt, or the amount of the debt***.  In a way, the parol source is part of the instrument, ***the source having been expressly incorporated by reference into the instrument***.

---

[41] *See* Broome Aff. Ex. B at 1; *id.* C at 1; *id.* Ex. E at 1.

Higgit, John R., Practice Commentary, McKinney's Cons Laws of NY, 2017 Electronic Update, CPLR § 3213 (emphases added). Here, the Notes expressly incorporate by reference the respective Note Agreements (specific parol sources) which unambiguously define Events of Default (including, unsurprisingly, non-payment of principal and interest when due).[42]

### B.   PDVSA Has Failed To Pay In Accordance With The Notes

As explained in the supporting affidavits, PDVSA has defaulted on the Notes and failed to pay the balance due under each.[43]   Indeed, PDVSA has not tendered payments pursuant to the 2015 Notes since the maturity date for those notes, March 27, 2018, and pursuant to the 2016 Note since December 27, 2017, either to GE or Red Tree.[44]   As of the date of assignment, the amounts due and owing to Red Tree on the 2015 Notes is $21,379,633.74, plus unpaid interest, which continues to accrue,[45] and the amount due and owing on the 2016 Note is $96,979,881.49, plus unpaid interest, which continues to accrue.[46]

---

[42] An opinion by Justice Fried, *Bank of America v. Solow*, 2008 WL 1821877, 862 N.Y.S.2d 812 (N.Y. Sup. Apr. 17, 2008), affirmed by the First Department, 59 A.D.3d 304 (1st Dep't 2009), is instructive. The *Solow* defendant claimed that an instrument (there a guaranty) was not subject to CPLR § 3213 because it referenced other agreements and contained more than a promise for payment of money. 2008 WL 1821877, at *3. That argument was rejected because "application of CPLR 3213 is not affected by the circumstance that the instrument in question was part of a larger transaction . . . as long as the instrument requires the defendant to make certain payments and nothing else." *Id.* (internal quotation and citation omitted). The court noted that, as here, references "to other documents provide the necessary background to enforcing the [instrument] by establishing the amount owed, the interest rate, and the nature of the primary obligation." *Id.* at *4.

[43] Affidavits are regularly offered as "simple proof of nonpayment" in the demonstration of a plaintiff's case under Section 3213. *Oak Rock Fin., LLC v. Rodriguez*, 148 A.D.3d 1036, 1039 (2d Dep't 2017) (citing *Weissman v. Sinorm Deli, Inc.*, 88 N.Y.2d 437, 444 (1996)); *see Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l.*, 996 N.Y.S.2d 476, 493 (N.Y. Sup. 2014), *aff'd as modified sub nom. Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.D.r.l.*, 142 A.D.3d 833 (2d Dep't 2016) (granting a 3213 motion based on an affidavit as "simple proof of nonpayment to calculate the amount due"); *Guzzone v. Masluf Realty Corp.*, 990 N.Y.S.2d 437 (N.Y. Sup. 2014) (finding *prima facie* case on a 3213 motion established by an affidavit "asserting that defendants have failed to pay a sum certain required by the terms of the subject Note").

[44] *See* Wallitt 2015 Notes Aff., ¶ 8; Broome Aff. Ex. A at 9 (definition of Maturity Date under the 2015 Note Agreement); Wallitt 2016 Note Aff., ¶ 6; *id.* Ex. A (notice of non-payment to PDVSA under the 2016 Note).

[45] Wallitt 2015 Notes Aff., ¶ 15. The balance reflects the outstanding principal; interest is also due at the Default Rate starting March 27, 2018. *Id.*

[46] Wallitt 2016 Note Aff, ¶ 10.

Case 1:19-cv-02519-AJN   Document 3-1   Filed 03/21/19   Page 307 of 312

Accordingly, Red Tree is entitled to judgment in the amount of $118,359,515.23 (on account of outstanding principal), plus accrued interest.

## II. RED TREE IS ENTITLED TO JUDGMENT AGAINST PETRÓLEO FOR THE AMOUNTS DUE UNDER THE GUARANTEES

Under New York law, an unconditional guaranty is an "instrument for the payment of money only" within the meaning of CPLR § 3213. *See Rabobank*, 25 N.Y.3d at 492. *Hudson Valley Bank v. Banxcorp.*, 958 N.Y.S.2d 61 (N.Y. Sup. 2010) ("An unconditional guaranty is an instrument for the payment of money only, whether or not it recites a sum certain."). To enforce a guarantee pursuant to CPLR § 3213, the plaintiff "must prove the existence of the guarantee, the underlying debt and the guarantor's failure to perform under the guaranty." *Id.*; *see also United Rentals (N. Am.), Inc. v. Iron Age Tool Corp.*, 150 A.D.3d 1304, 1306 (2d Dep't 2017) ("[P]laintiff established its prima facie entitlement to judgment as a matter of law . . . by proving the existence of the unconditional guarantee" as well as the "underlying debt" and "failure to perform under the guarantee."). Each of these elements is satisfied here.

*First*, Petróleo provided unconditional guarantees of PDVSA's payment obligations under the Notes.[47] Each of Petróleo's Guarantees is expressly "unconditional and absolute" and further provides that it is "not subject to any reduction, limitation, impairment or termination for any reason."[48] *Second*, the Notes (and their respective Note Agreements), which GE Capital EFS validly assigned to Red Tree, demonstrate the existence of the underlying debt. *Third*, as set forth in the Wallitt affidavits, Petróleo has failed to make any payment under the Guarantees.[49]

---

[47] *See* Broome Aff. Ex. A at VI (2015 Guarantee); *id.* Ex. D at VI (2016 Guarantee).

[48] *Id.*

[49] *See* Wallitt 2015 Notes Aff., ¶ 9; Wallitt 2016 Note Aff., ¶ 7.

*Finally*, each of the Guarantees provides that Petróleo is "jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees . . . prompt payment when due."[50]  Accordingly, Red Tree is entitled to judgment against Petróleo for the full amount due under the 2015 Notes and the 2016 Note.

## CONCLUSION

For the reasons set forth above, Red Tree respectfully requests that the Court enter an Order granting the Motion for Summary Judgment in Lieu of Complaint against the Defendants, on a joint and several basis, in the amount of $118,359,515.23 (on account of outstanding principal), plus accrued interest, and establishing that Red Tree is entitled to an award of fees and costs, including reasonable attorneys' fees, and setting a briefing schedule regarding fees and costs.

*[Remainder of Page Left Blank Intentionally]*

---

[50] *See* Broome Aff. Ex. A § 6.01 (2015 Guarantee); *id.* Ex. D § 6.01 (2016 Guarantee).

DATED:    New York, New York
          February 15, 2019

                                    QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP


                                    By: /s/ Stephen A. Broome


                                    _____
                                    Stephen A. Broome
                                    Susheel Kirpalani
                                    Victor Noskov
                                    Anna Deknatel
                                    51 Madison Avenue, 22nd Floor
                                    New York, New York  10010-1601
                                    (212) 849-7000

                                    Daniel Salinas-Serrano (*pro hac vice*
                                    forthcoming)
                                    1300 I Street, N.W.
                                    Suite 900
                                    Washington, D.C. 20005
                                    Tel: 202-538-8132

                                    -and-

                                    /s/ Mark C. Zauderer

                                    GANFER SHORE LEEDS & ZAUDERER
                                    LLP
                                    Mark C. Zauderer, Esq.
                                    360 Lexington Avenue
                                    New York, New York 10017
                                    212-922-9250

                                    *Attorneys for Red Tree Investments, LLC*

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840 (7/2012)

| | | For Court Clerk Use Only: |
|---|---|---|
| **Supreme** | **COURT, COUNTY OF** **New York** | IAS Entry Date |
| **Index No:** _____ | **Date Index Issued:** _____ | |
| | | Judge Assigned |

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

RJI Date

RED TREE INVESTMENTS, LLC

**Plaintiff(s)/Petitioner(s)**

-against-

PETROLEOS DE VENEZUELA, S.A. and PDVSA PETROLEO, S.A.

**Defendant(s)/Respondent(s)**

## NATURE OF ACTION OR PROCEEDING:   Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ○ Contested

  **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum.** For Uncontested Matrimonial actions, use RJI form UD-13.

**TORTS**
- ○ Asbestos
- ○ Breast Implant
- ○ Environmental: _____
  (specify)
- ○ Medical, Dental, or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability: _____
  (specify)
- ○ Other Negligence: _____
  (specify)
- ○ Other Professional Malpractice: _____
  (specify)
- ○ Other Tort: _____
  (specify)

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution   [see **NOTE** under Commercial]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other: _____
  (specify)

**COMMERCIAL**
- ○ Business Entity (including corporations, partnerships, LLCs, etc.)
- ◉ Contract
- ○ Insurance (where insurer is a party, except arbitration)
- ○ UCC (including sales, negotiable instruments)
- ○ Other Commercial: _____
  (specify)

  **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the **COMMERCIAL DIV RJI Addendum.**

**REAL PROPERTY:**   How many properties does the application include? _____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify):   ○ Residential   ○ Commercial
  Property Address: _____
  Street Address     City     State     Zip
  **NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum.**
- ○ Tax Certiorari – Section: _____ Block: _____ Lot: _____
- ○ Tax Foreclosure
- ○ Other Real Property: _____
  (specify)

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration)   [see **NOTE** under Commercial]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene: _____
  (specify)
- ○ Other Special Proceeding: _____
  (specify)

## STATUS OF ACTION OR PROCEEDING:   Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ◉ | ○ | If yes, date filed: 02/15/2019 |
| Has a summons and complaint or summons w/notice been served? | ○ | ○ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ○ | If yes, judgment date: _____ |

1 of 2

## NATURE OF JUDICIAL INTERVENTION: Check ONE box only AND enter additional information where indicated.

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice   Date Issue Joined: _____
- ● Notice of Motion   Relief Sought: Judgment - Summary in Lieu of Complaint   Return Date: 03/21/2019
- ○ Notice of Petition   Relief Sought: _____   Return Date: _____
- ○ Order to Show Cause   Relief Sought: _____   Return Date: _____
- ○ Other Ex Parte Application   Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other (specify): _____

### RELATED CASES: List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases. If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|------------|----------------|-------|---------------------|------------------------------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

### PARTIES: For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in space provided. If additional space is required, complete and attach the RJI Addendum.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|--------|------|------|------|------|
| ☐ | RED TREE INVESTMENTS, LLC — Last Name; First Name; Primary Role: Plaintiff; Secondary Role (if any): | Broome (Last Name) Stephen (First Name); QUINN EMANUEL URQUHART & SULLIVAN, LLP (Firm Name); 51 Madison Avenue, 22nd Floor (Street Address) New York (City) New York (State) 10010-1601 (Zip); +1 (212) 849-7000 (Phone) Fax; stephenbroome@quinnemanuel.com (e-mail) | ○ YES  ○ NO | |
| ☐ | PETROLEOS DE VENEZUELA, S.A. — Last Name; First Name; Primary Role: Defendant; Secondary Role (if any): | Last Name First Name; Firm Name; Street Address City State Zip; Phone Fax e-mail | ○ YES  ○ NO | |
| ☐ | PDVSA PETROLEO, S.A. — Last Name; First Name; Primary Role: Defendant; Secondary Role (if any): | Last Name First Name; Firm Name; Street Address City State Zip; Phone Fax e-mail | ○ YES  ○ NO | |
| ☐ | Last Name; First Name; Primary Role:; Secondary Role (if any): | Last Name First Name; Firm Name; Street Address City State Zip; Phone Fax e-mail | ○ YES  ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.**

Dated: 02/15/2019 _____

/S/ STEPHEN A. BROOME
SIGNATURE

4463394
ATTORNEY REGISTRATION NUMBER

Stephen A. Broome
PRINT OR TYPE NAME

Print Form

SUPREME COURT OF THE STATE OF NEW YORK

UCS-840C
3/2011

COUNTY OF <u>New York</u> _____ x

Index No. _____

RED TREE INVESTMENTS, LLC

RJI No. (If any) _____

Plaintiff(s)/Petitioner(s)

-against-

PETROLEOS DE VENEZUELA, S.A. and PDVSA PETROLEO, S.A.

Defendant(s)/Respondent(s) x

## COMMERCIAL DIVISION
Request for Judicial Intervention Addendum

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

[X] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

[ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

[ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

[ ] Shareholder derivative actions — without consideration of the monetary threshold

[ ] Commercial class actions — without consideration of the monetary threshold

[ ] Business transactions involving or arising out of dealings with commercial banks and other financial institutions

[ ] Internal affairs of business organizations

[ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

[ ] Environmental insurance coverage

[ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

[ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

[ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ 125,511,713.20 _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: <u>02/15/2019</u> _____

/S/ STEPHEN A. BROOME
**SIGNATURE**

Stephen A. Broome
**PRINT OR TYPE NAME**